1        **UNITED STATES DISTRICT COURT**

2        **MIDDLE DISTRICT OF LOUISIANA**

3

4   **UNITED STATES OF AMERICA**          **: CRIMINAL ACTION**

5   **VERSUS**                            **: NO. 18-87**

6   **RANDY J. LAMARTINIERE**             **: HON. JOHN W. DEGRAVELLES**

7                                         **: DECEMBER 7, 2021**

8   ================================================================
    *BENCH TRIAL BEFORE THE*
9   *HONORABLE JOHN W. DEGRAVELLES*
    ================================================================
10       **A P P E A R A N C E S**

11

12  FOR RANDY J. LAMARTINIERE:

13     MR. BEAU BRINDLEY
       LAW OFFICES OF BEAU B. BRINDLEY
14     53 W. JACKSON BOULEVARD
       SUITE 1410
15     CHICAGO, ILLINOIS  60604-4176

16  FOR THE DEFENDANT:

17     MR. PAUL L. PUGLIESE
       U.S. ATTORNEY'S OFFICE, MIDDLE DISTRICT OF LOUISIANA
18     777 FLORIDA STREET, SUITE 208
       BATON ROUGE, LOUISIANA 70801
19

20

21            REPORTED BY: GINA DELATTE-RICHARD,CCR

22  _____

23                 UNITED STATES COURTHOUSE
                     777 FLORIDA STREET
24              BATON ROUGE, LOUISIANA 70801
                      (225) 389-3564
25

I  N  D  E  X

*GOVERNMENT'S WITNESSES:*

*CHARLES HENSON*

      DIRECT EXAMINATION BY PAUL PUGLIESE.............. 8

      CROSS-EXAMINATION BY BEAU BRINDLEY............... 27

      REDIRECT EXAMINATION BY PAUL PUGLIESE............ 38

*QUESTIONS BY THE COURT*...................................... 41

*JEREMY DOIRON*

      DIRECT EXAMINATION BY PAUL PUGLIESE.............. 44

      CROSS-EXAMINATION BY BEAU BRINDLEY.............. 55

      REDIRECT EXAMINATION BY PAUL PUGLIESE............ 67

*CAITLYN FITZGERALD*

      DIRECT EXAMINATION BY PAUL PUGLIESE.............. 73

*DR. GENE KENNEDY*

      DIRECT EXAMINATION BY PAUL PUGLIESE.............. 84

      CROSS-EXAMINATION BY BEAU BRINDLEY...............175

      REDIRECT EXAMINATION BY ALAN STEVENS............226

DECEMBER 7, 2021

(CALL TO ORDER THE COURT)

**THE COURT:**  YOU MAY BE SEATED.  MR. BRINDLEY?

**MR. BRINDLEY:**  YES, JUDGE.

**THE COURT:**  WE DID THIS 8:30 START TIME FOR YOUR BENEFIT.

**MR. BRINDLEY:**  YES, JUDGE.

**THE COURT:**  AND WE'RE HERE AT 8:47 AND YOU'RE JUST WALKING IN THE DOOR.  YOU WANT TO EXPLAIN TO ME THE REASON FOR THIS?

**MR. BRINDLEY:**  YES, JUDGE, ABSOLUTELY.  WE'RE STAYING AT THE WATERMARK HOTEL.  WE WENT TO GET THE CAR ABOUT HALF -- PLENTY OF TIME, HALF AN HOUR EARLY.  IT TOOK THEM BASICALLY A HALF AN HOUR JUST TO GET THE VEHICLE.

**THE COURT:**  YOU'RE TALKING ABOUT THE WATERMARK HOTEL DOWNTOWN?

**MR. BRINDLEY:**  WE COULD HAVE WALKED.

**THE COURT:**  THAT'S EXACTLY WHAT I'M SAYING.  YOU COULD HAVE GOT HERE ON FOOT.

**MR. BRINDLEY:**  YEAH.  WE SAID THAT AS WE WERE STANDING, WE COULD WALK AS WE WERE WAITING FOR THEM TO BRING US THIS CAR TO GET OUT OF THE HOTEL.  THAT'S WHY, JUDGE.  WE WAITED FOR A HALF AN HOUR TO GET INTO THE CAR AND GET HERE AND I APOLOGIZE.

**THE COURT:**  ALL RIGHT.  LET'S GO.  CALL YOUR NEXT

1   WITNESS.

2            **MR. STEVENS:**  JUDGE, COULD I RAISE TWO HOUSEKEEPING

3   ISSUES FIRST?

4            **THE COURT:**  I'M SORRY, MR. STEVENS?

5            **MR. STEVENS:**  I NEED TO TALK SLOWER.  I'M SORRY.

6   COULD I RAISE TWO QUICK HOUSEKEEPING ISSUES?

7            **THE COURT:**  YES, OF COURSE.

8            **MR. STEVENS:**  FIRST, YESTERDAY WITH MR. CRAWFORD AND

9   MR. DIXON I INTRODUCED A NUMBER OF VIDEOS AND TRANSCRIPTS IN

10  THEIR ENTIRETY.  I THOUGHT IT WOULD MAKE SENSE TO ALSO

11  INTRODUCE THOSE CLIPS SEPARATELY AS EXHIBITS.  I THOUGHT IT

12  MIGHT MAKE IT A LOT EASIER IN THE RECORD DOWN THE ROAD OR EVEN

13  FOR THE COURT TODAY TO GO BACK.  I CAN READ THE CLIP NUMBERS

14  AGAIN INTO THE RECORD IF YOU'D LIKE OR I'VE PREPARED A LIST OF

15  WHAT THOSE CLIPS WERE.  I'M HAPPY TO JUST PROVIDE THEM TO YOUR

16  STAFF BUT --

17           **THE COURT:**  SO THESE ARE CLIPS THAT HAVE ALREADY

18  BEEN INTRODUCED?

19           **MR. STEVENS:**  WHAT I INTRODUCED WERE THE FULL

20  RECORDINGS AND THEN WITHIN EACH RECORDING, I PLAYED --

21           **THE COURT:**  I SEE.  AND THAT WAS THE A, 1, 2, B, 1,

22  2 AND SO ON?

23           **MR. STEVENS:**  YEAH.  AND I THOUGHT IT WOULD MAKE A

24  LOT OF SENSE TO HAVE THOSE CLIPS AS SEPARATE STANDALONE

25  EXHIBITS.

1          **THE COURT:**  SURE.  I THINK THAT MAKES PERFECT SENSE.

2    AND I WOULD SAY GO AHEAD AND LET'S DO THAT NOW.

3          **MR. STEVENS:**  OKAY.  WOULD YOU LIKE ME TO READ THE

4    NUMBERS OR JUST PROVIDE A LIST TO YOUR STAFF?

5          **THE COURT:**  SO THAT THE DEFENSE CAN KEEP UP WITH IT,

6    JUST GO AHEAD AND READ IT INTO THE RECORD.

7          **MR. STEVENS:**  OKAY.

8          **THE COURT:**  AND PROVIDE US A COPY.

9          AND AS I'M LOOKING AT THIS, MR. STEVENS, THIS IS

10   FINE.  WHY DON'T WE ENTER THIS INTO THE RECORD AS A U.S.

11   EXHIBIT SO THAT WE CAN REFER TO IT IF WE NEED TO, BUT IT'S

12   SIMPLY A SUMMARY OF ALL OF THE VARIOUS CLIPS AND YOU CAN

13   INTRODUCE THESE AS EXHIBITS BY REFERRING TO THIS DOCUMENT.

14         **MR. STEVENS:**  OKAY.  THANK YOU, JUDGE.  AND THE

15   DOCUMENT ON THE SCREEN NOW IS THE CLIPS FOR MR. DIXON AND

16   THERE'S A SEPARATE LIST THAT I'VE PROVIDED THAT IDENTIFIES THE

17   CLIPS THAT WE USED WITH MR. CRAWFORD.  AND I GUESS I SHOULD

18   CHECK THE EXHIBIT NUMBERS WE SHOULD USE FOR THOSE.  I THINK

19   WE'LL USE 82 AND 83 IF THAT'S --

20         **THE COURT:**  THAT'S U.S. WHAT?

21         **MR. STEVENS:**  U.S. 82 WILL BE THE LIST OF DIXON

22   CLIPS AND U.S. 83 WILL BE THE LIST OF CRAWFORD CLIPS.

23         **THE COURT:**  ALL RIGHT.

24         **MR. STEVENS:**  I THINK THAT WILL BE A LOT EASIER DOWN

25   THE ROAD SO THAT FOLKS WHO WANT TO SEE THESE CLIPS WON'T HAVE

1   TO SIT THROUGH THE ENTIRE RECORDINGS.

2           **THE COURT:**  MAKES SENSE.

3           **MR. STEVENS:**  THE SECOND QUESTION, JUDGE, I DON'T

4   HAVE ANY ANSWER IN MIND.  WE HAD STARTED PREPARING PROPOSED

5   FACTUAL FINDINGS, AND OUR PLAN HAD BEEN TO SUPPLY THEM TO THE

6   COURT TOWARDS THE END OF THE TRIAL, HAVEN'T FINISHED THEM YET,

7   AND I KIND OF THEN STARTED TO WONDER IS THAT EVEN HELPFUL TO

8   THE COURT?  IS THAT SOMETHING THAT THE COURT WOULD EVEN WANT

9   US TO SUBMIT?  AND I THOUGHT I WOULD JUST ASK YOU, FRANKLY, IF

10  YOU WOULD LIKE US TO SUBMIT FACTUAL FINDINGS OR IF YOU'D

11  RATHER WE JUST MAKE OUR CLOSING ARGUMENT AND SIT DOWN AND HAVE

12  THAT BE THE LAST YOU HEAR FROM US.

13          **THE COURT:**  MY LAW CLERK AND I WERE TALKING ABOUT

14  THAT THIS MORNING.  LET'S DO THIS, WHY DON'T WE MEET AGAIN AND

15  TALK ABOUT THIS AT THE END OF THE TRIAL.

16          THERE'S PROS AND CONS.  WHAT I'D LIKE TO DO -- I

17  DON'T WANT TO SIT ON THIS CASE.  I WOULD LIKE TO DECIDE THIS

18  CASE AND DECIDE IT AS QUICKLY AS POSSIBLE.  RIGHT NOW MY

19  THOUGHT IS WE COULD USE SOME POST TRIAL BRIEFS.  I DON'T WANT

20  TO WAIT FOR THE TRANSCRIPT.

21          YOU CAN REFER TO THE EXHIBITS THAT HAVE ALREADY BEEN

22  INTRODUCED AND IF THERE ARE PARTICULAR PARTS OF AN EXHIBIT --

23  FOR INSTANCE, I KNOW THAT MR. BRINDLEY SPENT A LOT OF TIME

24  YESTERDAY WITH THE WITNESS TALKING ABOUT SPECIFIC PARTS OF THE

25  TRANSCRIPT.  WE'LL HAVE ALL OF THAT AVAILABLE TO US.  SO, YOU

1    KNOW, YOU CAN REFER TO WHATEVER EXHIBITS HAVE BEEN INTRODUCED

2    THAT YOU WANT THE COURT TO PAY PARTICULAR ATTENTION TO.

3              I DON'T SEE A NEED FOR, YOU KNOW, THE TRADITIONAL

4    FINDINGS OF FACT AND CONCLUSIONS OF LAW.  THAT'S HOW I FEEL

5    NOW.  IF I CHANGE MY MIND BEFORE THE END OF THE DAY I'LL LET

6    YOU KNOW WHEN WE FINISH THE TRIAL.

7              BUT MY THOUGHT IS TO GIVE YOU A REASONABLE PERIOD OF

8    TIME BUT A SHORT PERIOD OF TIME TO PREPARE POST TRIAL BRIEFS

9    WITH PERHAPS A LIMITED PAGE NUMBER SO WE CAN JUST -- YOU KNOW,

10   I'VE BEEN LISTENING VERY CAREFULLY, TAKING NOTES, AS HAS MY

11   LAW CLERK.  SO WE DON'T WANT TO SIT ON THIS.  WE WANT TO

12   DECIDE IT AS QUICKLY AS WE CAN REASONABLY AND THAT'S WHAT WE

13   INTEND TO DO.

14             BUT LET ME REVISIT THIS, MR. STEVENS.  THANK YOU FOR

15   BRINGING IT UP.  WE WERE TALKING ABOUT IT.  I HAVEN'T MADE UP

16   MY MIND, BUT WE WILL MAKE UP OUR MIND TODAY.

17             **MR. STEVENS:**  UNDERSTOOD.  THANK, YOU JUDGE.

18             **MR. PUGLIESE:**  YOUR HONOR, AT THIS TIME THE UNITED

19   STATES CALLS CHARLES HENSON TO THE STAND.

20             **THE COURT:**  MR. HENSON, COME ON UP.  HERE'S THE

21   WITNESS STAND AND MRS. CAUSEY WILL SWEAR YOU IN BEFORE YOU

22   TAKE THE WITNESS STAND.

23             *(WHEREUPON, CHARLES HENSON, HAVING BEEN DULY SWORN,*

24   *TESTIFIED AS FOLLOWS.)*

25   **DIRECT EXAMINATION**

1    **BY MR. PUGLIESE:**

2        **Q**    GOOD MORNING, MR. HENSON.  HOW YOU DOING?

3        **A**    ALL RIGHT.  I COULD BE BETTER.  I'VE GOT A HERNIA

4    THAT'S HURTING AND I'VE GOT A LITTLE SORE THROAT SO...

5        **Q**    ARE YOU ABLE TO HEAR ME TODAY?

6        **A**    YEAH, I CAN HEAR.  YOU COULD SPEAK UP A LITTLE BIT.

7        **Q**    CERTAINLY.  CAN YOU UNDERSTAND ME?

8        **A**    YEAH, I CAN UNDERSTAND YOU.

9        **Q**    THANK YOU.  WOULD YOU PLEASE STATE YOUR FIRST AND

10   LAST NAME FOR THE COURT REPORTER?

11       **A**    CHARLES EDWARD HENSON, SR.

12       **Q**    AND CHARLES, STANDARD SPELLING, C-H-A-R-L-E-S?

13       **A**    YES, SIR.

14       **Q**    EDWARD, AGAIN, E-D-W-A-R-D?

15       **A**    YES, SIR.

16       **Q**    SPELL YOUR LAST NAME, PLEASE.

17       **A**    SIR?

18       **Q**    SPELL YOUR LAST NAME, PLEASE.

19       **A**    H-E-N-S-O-N.

20       **Q**    AND YOU STATED THAT YOU ARE A SENIOR?

21       **A**    YES, SIR.

22       **Q**    MR. HENSON, AT SOME POINT IN TIME DID YOU SEE A DR.

23   RANDY LAMARTINERE FOR VARIOUS AILMENTS?

24       **A**    YES, SIR.

25       **Q**    DO YOU REMEMBER WHEN YOU STARTED SEEING HIM?

1    **A**    IN WHAT YEAR?

2    **Q**    YES, SIR.

3    **A**    2015, I'M PRETTY SURE.  I MIGHT BE OFF, BUT I THINK

4   IT WAS 2015.

5    **Q**    AND WHERE DID YOU LIVE AT THE TIME YOU SAW HIM?

6    **A**    SIR?

7    **Q**    WHERE DID YOU LIVE AT THE TIME YOU SAW HIM?

8    **A**    I LIVED IN BAYOU SORREL, 33280 GRACIE LANE.

9    **Q**    IS THAT WHERE YOU LIVE NOW?

10    **A**    NO.

11    **Q**    YOU STILL LIVE IN BAYOU SORREL?

12    **A**    YES.

13    **Q**    WITHOUT TRAFFIC, HOW LONG A RIDE IS IT TO BATON

14   ROUGE?

15    **A**    THIRTY MINUTES, 45 MINUTES.  THIRTY TO 45 MINUTES.

16    **Q**    THANK YOU.  I'M GOING TO SHOW YOU SEVERAL

17   PRESCRIPTIONS, NOT ALL OF THEM, AND I'M JUST GOING TO ASK IF

18   YOU RECOGNIZE THEM, OKAY?

19    **A**    YES, SIR.

20    **Q**    SO I'M GOING TO GIVE YOU THE EXHIBIT IDENTIFICATION

21   NUMBER, AND FOR EACH JUST ASK IF YOU RECOGNIZE THEM, OKAY?

22    **A**    IT'S GOING TO COME ON THIS SCREEN HERE?

23    **Q**    YES, SIR.

24    **A**    ALL RIGHT.

25    **Q**    SO AT THE HEADER WHERE MY FINGER IS, DO YOU SEE

1  RANDY J. LAMARTINERE, MD?

2      **A**   YES, SIR.

3      **Q**   IF THERE'S A PRESCRIPTION THAT DOESN'T HAVE THAT

4  GOING FORWARD, I WON'T REPEAT THIS AGAIN.  IS THIS

5  PRESCRIPTION FOR YOU, CHARLES HENSON?

6      **A**   YEAH, THAT'S MY NAME.

7      **Q**   THAT'S YOUR NAME?

8      **A**   YEAH, THAT'S MY NAME.

9      **Q**   AND A PRESCRIPTION FOR ADDERALL ON MARCH 31ST, 2015?

10     **A**   HE DID PRESCRIBE ME ADDERALL, BUT I DON'T KNOW WHAT

11  DATE -- IT WASN'T WHEN I FIRST STARTED, HE DIDN'T, SO...

12     **Q**   LET ME ASK YOU --

13     **A**   HE DID PRESCRIBE ME ADDERALL, YEAH.

14     **Q**   WOULD THAT BE ROUGHLY THE TIME YOU STARTED SEEING

15  DR. LAMARTINERE, SOME TIME IN MARCH OF 2015?

16     **A**   YEAH.

17     **Q**   DID YOU EVER SEE HIM AT OCHSNER?

18     **A**   NO.  NO.

19     **Q**   DID YOUR VISITS BEGIN WHEN HE HAD A PRIVATE PRACTICE

20  AND HIS OWN OFFICE?

21     **A**   YES, SIR.

22     **Q**   LET ME SHOW YOU NOW WHAT'S BEEN MARKED -- AND THAT

23  WAS EXHIBIT 8-A.  LET ME SHOW YOU NOW WHAT'S BEEN MARKED AS

24  EXHIBIT 8-B.  DO YOU SEE THAT YELLOW STICKER?

25     **A**   YES, SIR.

1    **Q**    AND, AGAIN, IS THIS YOUR NAME, CHARLES HENSON?

2    **A**    YEAH, THAT'S MY NAME.

3    **Q**    ABOVE MY PINKY, MARCH 31ST, 2015, THE DATE OF THE

4  PRESCRIPTION?

5    **A**    YEAH.

6    **Q**    AND AN OXYCODONE PRESCRIPTION?

7    **A**    YEAH.  YEAH.  NOW, THAT MUST HAVE BEEN THE FIRST DAY

8  I WENT TO HIM.

9    **Q**    AND THEN I'M GOING TO SHOW YOU EXHIBIT 9-A --

10   **A**    EXCUSE ME.

11   **Q**    CERTAINLY.  IF YOU NEED WATER LET US KNOW.

12   **A**    I PROBABLY DO.  I'VE GOT A COLD.  THANK YOU, MA'AM.

13  ALL RIGHT.  YOU CAN GO.

14   **Q**    YOU SEE MY FINGER WHERE IT SAYS "U.S. EXHIBIT 9-A"?

15   **A**    YES, SIR.

16   **Q**    AND, AGAIN, LET'S JUST LOOK, IS THIS YOUR NAME,

17  CHARLES HENSON?

18   **A**    YES, SIR.

19   **Q**    DATED NOVEMBER 16TH, 2015?

20   **A**    YES, SIR.

21   **Q**    AND FOR ADDERALL?

22   **A**    YES, SIR.

23   **Q**    AND, AGAIN, NOVEMBER 16TH, 2015, CHARLES HENSON,

24  ADDERALL, EXHIBIT 9-B?

25   **A**    YEAH.

1    **Q**    AND --

2    **A**    IT IS DIFFERENT MONTHS, HUH?

3    **Q**    YES, SIR.  WE DO JUMP AND I'LL EXPLAIN THAT.  WE

4    HAVE U.S. EXHIBIT 9-C, NOVEMBER 16TH, 2015, IN YOUR NAME FOR

5    ADDERALL; DOES THAT SOUND CORRECT?

6    **A**    YES, SIR.

7    **Q**    AND WITHOUT GOING THROUGH THEM, THERE ARE EXHIBITS

8    D, E AND F, H, G AND I.  THOSE ARE PRESCRIPTIONS FOR THE SAME

9    MEDICATIONS, BUT THEY'RE JUST POSTDATED, OKAY?  SO -- I ASSUME

10   SO YOU DIDN'T HAVE TO GO BACK TO THE OFFICE?

11   **A**    NO.  I HAD TO GO TO HIM EVERY TIME.

12   **Q**    THEN I WILL NEED TO SHOW THESE TO YOU.  SO LET'S GO

13   BACK ON 9-C; DO YOU SEE THAT?

14   **A**    YEAH.

15   **Q**    AND THAT'S NOVEMBER 16TH, 2015?

16   **A**    OH, NO, NO, NO.  I DID HAVE THREE MONTHS, RIGHT.

17   YEAH.

18   **Q**    ON THAT DATE --

19   **A**    YEAH, I SURE DID.  NOT AT THE BEGINNING, BUT

20   EVENTUALLY I DID.

21   **Q**    AND THAT NOVEMBER 16TH, 2015 PRESCRIPTION, IF THOSE

22   ARE THE PRESCRIPTIONS THAT WE'VE BEEN ABLE TO FIND, WOULD THAT

23   HAVE BEEN THE LAST DATE THAT YOU SAW DR. LAMARTINERE?

24   **A**    I'M NOT SURE WHAT'S THE LAST DATE.  I'M NOT SURE

25   WHAT WAS THE LAST DATE.

```
 1              MR. PUGLIESE:  YOUR HONOR --
 2              THE WITNESS:  I KNOW AROUND, YOU KNOW, BUT THAT'S
 3   BEEN FIVE YEARS AGO.
 4   BY MR. PUGLIESE:
 5      Q    UNDERSTOOD.
 6      A    I DON'T KNOW EXACTLY THE LAST DATE.
 7      Q    THANK YOU, SIR.
 8              MR. PUGLIESE:  YOUR HONOR, AT THIS TIME THE UNITED
 9   STATES MOVES UNITED STATES EXHIBITS 8-A THROUGH 9-I INCLUSIVE
10   INTO EVIDENCE.
11              THE COURT:  ALL RIGHT.  ANY OBJECTIONS?
12              MR. BRINDLEY:  NONE, YOUR HONOR.
13              THE COURT:  THEY WILL BE ADMITTED INTO EVIDENCE.
14   BY MR. PUGLIESE:
15      Q    I'M JUST GOING TO SHOW YOU A FEW MORE PRESCRIPTIONS,
16   SIR.
17      A    YES, SIR.
18      Q    AGAIN, I'LL POINT TO YOUR NAME, CHARLES HENSON?
19      A    YES, SIR.
20      Q    ON APRIL 28TH, 2015, AN ADDERALL PRESCRIPTION THAT'S
21   MARKED AS UNITED STATES EXHIBIT 31-A.  DOES THAT LOOK LIKE A
22   PRESCRIPTION WRITTEN TO YOU?
23      A    YEAH.  YEAH, HE DID WRITE ADDERALL.  HE DID -- I WAS
24   PRESCRIBED ADDERALL.
25      Q    DID HE PRESCRIBE THE ADDERALL THROUGHOUT YOUR --
```

1      **A**    NO.

2      **Q**    -- COURSE OF TREATMENT?

3      **A**    NOT IN THE BEGINNING.  I HAD TO GO A FEW MONTHS

4  BEFORE.  AND I HAD -- I WAS GOING TO ANOTHER DOCTOR AND HE WAS

5  WRITING ADDERALL.

6      **Q**    LET ME JUST SHOW YOU WHAT'S EXHIBIT 8-A AGAIN, ON

7  MARCH 31ST, 2015, AN ADDERALL PRESCRIPTION.  DO YOU REMEMBER

8  GETTING THAT PRESCRIPTION DURING WHAT YOU BELIEVE WAS YOUR

9  FIRST VISIT?

10      **A**    I DON'T -- I DIDN'T GET ADDERALL THE FIRST

11  PRESCRIPTION, I DON'T BELIEVE.  LET ME SEE THE DATE AGAIN.

12      **Q**    YES, SIR.

13      **A**    IF I COULD SEE WHAT ELSE HE WROTE ME I COULD

14  PROBABLY PUT IT TOGETHER.

15      **Q**    SO THAT'S EXHIBIT 8-A AND EXHIBIT 8-B THAT I'M

16  POINTING TO ON THE SAME DATE, MARCH 31ST, 2015, WAS FOR

17  OXYCODONE.

18      **A**    WELL, WHEN I FIRST STARTED HE WROTE 15-MILLIGRAMS;

19  OXYCODONE.

20      **Q**    YOU REMEMBER THE OXYCODONE PRESCRIPTION?

21      **A**    AND THEN HE MOVED ME UP TO 30'S.

22      **Q**    THANK YOU.  OKAY.  SO I'M GOING TO SHOW YOU BRIEFLY

23  UNITED STATES EXHIBIT 31-A --

24      **A**    SO HE MIGHT HAVE WROTE ADDERALL FROM THE BEGINNING.

25      **Q**    THANK YOU, SIR.  DO YOU SEE U.S. EXHIBIT 31-A?

1     **A**    YEAH.

2     **Q**    AND WAS THAT A PRESCRIPTION FROM APRIL 28TH, 2015?

3     **A**    YEAH, IT SAYS IT.

4     **Q**    AND FOR ADDERALL?

5     **A**    YEAH.

6     **Q**    AND APRIL 28TH, AGAIN, 2015, EXHIBIT 31-B, MADE OUT

7     TO YOU, CHARLES HENSON, OXYCODONE, 30-MILLIGRAMS; DOES THAT

8     SOUND CORRECT?

9     **A**    YEAH, I KNOW -- I DON'T KNOW WHAT DATE IT WAS, BUT I

10    KNOW I DID GO FROM 15'S TO THE 30'S.

11    **Q**    WE'RE GOING TO JUMP TO UNITED STATES EXHIBIT 36-G

12    DATED AUGUST 24TH, 2015 FOR OPANA XR, 20-MILLIGRAM.

13    **A**    OPANA.

14    **Q**    OPANA.  THANK YOU.

15    **A**    YEAH, OPANA.

16    **Q**    DO YOU REMEMBER GETTING OPANA?

17    **A**    I WAS GETTING OPANA BEFORE I EVEN WENT TO HIM, AND

18    THEN I GOT KICKED OUT THE DOCTOR, AND HE -- HE DIDN'T START ME

19    OFF ON OPANA, BUT HE EVENTUALLY -- HE PUT IT ON -- MUST HAVE

20    PUT ME ON IT EVENTUALLY.

21    **Q**    THANK YOU.

22    **A**    BUT IT WASN'T LONG, LIKE A MONTH MAYBE, AND THEN

23    HE -- HE GOT SHUT DOWN OR WHATEVER.

24    **Q**    SO THIS WAS AUGUST --

25    **A**    I DON'T KNOW.  I DON'T KNOW HOW MANY TIMES I WENT TO

1    HIM AND GOT THE OPANA.  I DIDN'T GO LONG TO HIM, AS MUCH AS

2    SOME PEOPLE WENT, FOR A LONG TIME TO HIM.

3        Q    BUT BASED ON THE PRESCRIPTIONS, DOES MARCH OF 2015

4    THROUGH NOVEMBER OF 2015 SOUND ACCURATE FOR VISITS?

5        A    YEAH, IT WAS '15 -- IT WAS 2015, BUT I HAD A LOT

6    GOING ON THEN SO...

7        Q    THANK YOU.  SO ON AUGUST 24TH, CHARLES HENSON, THIS

8    IS EXHIBIT 36-G, IS THIS A PRESCRIPTION FOR OPANA THAT WAS

9    ISSUED TO YOU?

10       A    YEAH, IT SAYS THAT.

11       Q    AND WE DO NOT HAVE MANY MORE --

12       A    I RATHER OPANA.  THAT'S WHAT I WANTED, OPANA.  IT

13   WORKED FOR ME BETTER.

14       Q    IT WORKED FOR YOU --

15       A    AND I WAS GETTING OPANA BEFORE I COME TO HIM FROM

16   TWO OR THREE DOCTORS, BUT THEN I ENDED FAILING A DRUG TEST,

17   DRUG TEST, DRUG TEST AND THEN I WENT TO -- HE STARTED ME OFF

18   ON A LOW DOSAGE AND HE BUILT ME BACK UP.

19       Q    THANK YOU.  SO 36-H ALL THIS IS, IS AUGUST 24TH,

20   SAME PRESCRIPTION, OPANA, IN YOUR NAME, BUT THE START DATE IS

21   A MONTH LATER; DO YOU SEE THAT?

22       A    YEAH.  I MEAN -- YEAH.

23       Q    THANK YOU.  AND DO YOU REMEMBER DR. LAMARTINERE

24   PRESCRIBING YOU OPANA AND GIVING YOU SOME, WHAT THESE WOULD BE

25   CALLED, POST-DATED SCRIPTS?  SO AS YOU CAN SEE IN 36-G, IT'S

1  AUGUST 24TH, 2015, OPANA; THEN WE GO TO WHAT I JUST SHOWED

2  YOU, 36-H, AUGUST 24TH, 2015, OPANA, START ON 09/24/15, AND

3  THEN LET ME SHOW YOU ONE MORE EXHIBIT, 36-I, AUGUST 24TH,

4  2015, YOUR NAME, OPANA AGAIN, WITH A START DATE OF

5  OCTOBER 24TH, 2015; DOES THAT SOUND ACCURATE?

6      **A**    THESE DATES IS KIND OF THROWING ME OFF BUT, YEAH,

7  THAT SOUNDS LIKE -- LIKE I SAY, WHEN I WENT TO HIM FOR A GOOD

8  WHILE I COULD PAY AND I'D GET THREE MONTHS' ADVANCE, THREE

9  MONTHS' PRESCRIPTION.

10     **Q**    DID YOU JUST INDICATE THAT TO GET THE THREE MONTHS

11 IN ADVANCE YOU WOULD PAY DR. LAMARTINERE?

12     **A**    YOU HAD TO PAY YOUR VISIT.  EVERY TIME I WENT THERE

13 I PAID A VISIT.

14     **Q**    AND WHEN YOU PAID DR. LAMARTINERE WERE YOU USING

15 INSURANCE?

16     **A**    NO.  I HAD MEDICAID, BUT THEY -- NOBODY WOULD TAKE

17 IT.  NO PAIN MANAGEMENT EVER TOOK MEDICAID.

18     **Q**    AND HOW MUCH DID YOU PAY FOR EACH VISIT; DO YOU

19 REMEMBER ROUGHLY?

20     **A**    NO, THAT DONE SLIPPED MY MIND.  I THINK 120, 140.

21     **Q**    THANK YOU, SIR.

22        **MR. PUGLIESE:**  YOUR HONOR, AT THIS POINT[,]THE

23 UNITED STATES MOVES, INCONCLUSIVELY, TO ADMIT EXHIBITS 31-A

24 THROUGH 36-I.

25        **THE COURT:**  ALL RIGHT.  ANY OBJECTIONS?

1    **MR. BRINDLEY:**  NO OBJECTION.

2    **THE COURT:**  IT WILL BE RECEIVED INTO EVIDENCE.

3    BY MR. PUGLIESE:

4        **Q**    NOW, LET'S LOOK ON THAT MARCH 31ST, 2015 VISIT.

5    BASED ON THE PRESCRIPTIONS, YOU RECEIVED PRESCRIPTIONS FOR

6    ADDERALL AND OXYCODONE.  WHEN YOU FIRST VISITED

7    DR. LAMARTINERE, DO YOU REMEMBER IF YOU BROUGHT ANY RECORDS --

8        **A**    YES, SIR.

9        **Q**    WHAT DID YOU BRING?

10        **A**    I BROUGHT MY MRI.  I BROUGHT A PRINTOUT -- A WHOLE

11    YEAR PRINTOUT OF PRESCRIPTION MEDICINE I WAS ON FROM THE

12    PHARMACY, AND ANY OTHER DOCTOR RECORDS I HAD.  BUT MAINLY THE

13    MRI SHOWED ALL MY INJURIES.  AND -- AND I HAD TO BRING A

14    PRINTOUT, AND THEN SOMETHING FROM THE OTHER DOCTOR I THINK HE

15    REFERRED -- LIKE WHERE HE REFERRED ME TO -- TO --

16        **Q**    WHEN DID THAT REFERRAL OCCUR?

17        **A**    THE OTHER DOCTOR RETIRED.  ONE OF THE DOCTORS I WAS

18    GOING TO, HE RETIRED.

19        **Q**    WAS THAT BEFORE YOU STARTED SEEING DR. LAMARTINERE?

20        **A**    NO.  NO -- YEAH. YEAH.  SAY THAT AGAIN.

21        **Q**    SO THE DOCTOR THAT RETIRED, DID HE RETIRE BEFORE

22    DR. LAMARTINERE, YOUR VISITS WITH DR. LAMARTINERE?

23        **A**    YEAH.  YEAH, I WAS ONLY GOING TO ONE DOCTOR.

24        **Q**    PRIOR TO SEEING DR. LAMARTINERE, HAD YOU BEEN

25    RECEIVING PRESCRIPTIONS FROM ADDERALL -- FOR ADDERALL?

1      **A**     SINCE WHEN?

2      **Q**     PRIOR TO YOUR FIRST VISIT WITH DR. LAMARTINERE.

3      **A**     FROM ANYBODY ELSE?

4      **Q**     CORRECT, SIR.

5      **A**     WHILE I WAS GOING TO HIM?

6      **Q**     PRIOR TO.  BEFORE --

7      **A**     OH, YEAH, YEAH, YEAH, YEAH, YEAH.  I'VE BEEN ON

ADDERALL FOR PRETTY MUCH ALL MY LIFE.

9      **Q**     DO YOU REMEMBER WHAT RECORDS YOU BROUGHT TO

10     DR. LAMARTINERE RELATING TO ADDERALL?

11     **A**     IT'S JUST THE PRINTOUT FROM THE PHARMACY.

12     **Q**     TO SHOW THE PRESCRIPTIONS --

13     **A**     YEAH, YEAH.

14     **Q**     -- YOU HAD RECEIVED?

15     **A**     YEAH.

16     **Q**     THANK YOU.  PRIOR TO SEEING DR. LAMARTINERE WERE YOU

17     SEEING A FEMALE DOCTOR AT OCHSNER?

18     **A**     YES, I WAS.

19     **Q**     WHY DID YOU STOP SEEING HER?

20     **A**     SHE JUST UP AND SAID THEY WASN'T -- I WAS THE ONLY

21     PATIENT SHE HAD THAT SHE WROTE NARCOTICS TO -- THAT KIND OF

22     MEDICINE TO, SO SHE WAS -- AND SHE JUST CUT ME OFF.  THEY SAID

23     OCHSNER WAS GOING THROUGH A PHASE OR SOMETHING.

24     **Q**     SO THAT WAS PRIOR TO YOUR FIRST VISIT WITH

25     DR. LAMARTINERE?

1   **A**   YES, SIR.

2   **Q**   AND AT THAT POINT YOU WERE IN PAIN --

3   **A**   OH, YEAH.

4   **Q**   -- IS THAT CORRECT?

5   **A**   YEAH.

6   **Q**   AND YOU NEEDED PAIN MEDICATIONS?

7   **A**   YES, SIR.

8   **Q**   WOULD YOU SAY -- WERE YOU ADDICTED TO THE PAIN

9   MEDICATIONS YOU WERE ON?

10   **A**   IF YOU DO IT, YEAH, YOU COULD GET ADDICTED DOING IT

11   THREE DAYS AND YOU'RE ADDICTED IF YOU DO IT THREE DAYS.

12   **Q**   SO JUST WITH THREE DAYS OF TAKING THE MEDICATION

13   LIKE OXYCODONE, YOU INDICATED THAT YOU BECAME ADDICTED?

14   **A**   YEAH.

15   **Q**   HOW DID YOU FIND OUT ABOUT DR. LAMARTINERE AS --

16   **A**   I HAD A BROTHER GOING TO HIM AT THE TIME.  I HAD A

17   COUPLE OTHER FRIENDS.

18   **Q**   SO DID SOME FRIENDS REFER YOU TO HIM?

19   **A**   YES.

20   **Q**   IS IT SAFE TO SAY THAT DR. LAMARTINERE DID PRESCRIBE

21   YOU, DURING THAT FIRST VISIT, OXYCODONE ON MARCH 31ST IN

22   15-MILLIGRAMS?

23   **A**   YES, SIR.

24   **Q**   AND IS THAT A LOW DOSE FOR YOU?

25   **A**   YEAH, THAT'S A REAL LOW DOSE.  THAT'S ALMOST LIKE

1   NOT EVEN TAKING NOTHING.  BACK THEN MY IMMUNE SYSTEM WAS WAY,

2   WAY, WAY UP THERE.

3        Q    MR. HENSON, I'M GOING TO SHOW YOU ANOTHER EXHIBIT.

4   IT'S A HANDWRITTEN PRESCRIPTION.  YOU SEE U.S. EXHIBIT 32-B?

5        A    YEAH.

6        Q    I'M SORRY.

7        A    YEAH, I SEE IT AT THE BOTTOM.

8        Q    DOES THAT APPEAR TO BE YOUR NAME, CHARLES HENSON?

9        A    THAT AIN'T MY HANDWRITING.

10       Q    YEAH, I UNDERSTAND THAT.  IS THAT YOUR NAME?

11       A    YEAH, THAT'S MY NAME.  I GUESS IT LOOKS LIKE A "Y."

12       Q    WHEN YOU RECEIVED PRESCRIPTIONS HANDWRITTEN FROM

13  DR. LAMARTINERE, WHO WROTE OUT THE PRESCRIPTIONS?

14       A    OH, HE DID.  HE ALWAYS DID.

15       Q    AND DOES IT APPEAR THAT THE DATE IS MAY 25TH, 2015?

16       A    YES, SIR.

17       Q    DOES IT APPEAR THAT THIS IS A PRESCRIPTION FOR

18  OXYCODONE, 30-MILLIGRAMS?

19       A    YEAH.

20       Q    SO YOUR RECOLLECTION IS THAT AFTER THAT FIRST VISIT

21  IN MARCH, YOU WENT FROM RECEIVING 15-MILLIGRAM OXYCODONES TO

22  30-MILLIGRAM OXYCODONES?

23       A    AFTER ABOUT THE THIRD VISIT.

24       Q    THANK YOU.  AND AT THE TIME, IN TERMS OF THE

25  OXYCODONE OR THE OPANA, THE OPIOID PAIN MEDICATIONS, WAS THAT

1  TO TREAT SHOULDER PAIN, COMPRESSED DISKS AND NECK TROUBLE FROM

2  A CAR ACCIDENT?

3      **A**    YEAH, AND WORKING ALL MY LIFE AND STRENUOUS WORK,

4  CONSTRUCTION WORK AND STUFF.

5      **Q**    OTHER THAN THE INITIAL MRI, I BELIEVE YOU SAID WHEN

6  YOU FIRST SAW HIM THERE WAS AN MRI YOU BROUGHT ALONG WITH

7  OTHER DOCUMENTS.  WERE THERE ANY OTHER MRI'S PERFORMED?

8      **A**    I HAD -- IN MY LIFETIME I HAD ABOUT THREE MRI'S

9  DONE.

10     **Q**    HOW MANY WITH DR. LAMARTINERE?

11     **A**    I CAN'T REMEMBER IF HE SENT ME TO GO DO ANOTHER ONE

12  OR NOT.  I THINK HE DID.  I THINK I HAD TO GO DO -- HE MADE ME

13  GO DO ANOTHER ONE.  I'M NOT SURE.

14     **Q**    WHEN YOU VISITED WITH DR. LAMARTINERE, DID HE

15  PERFORM PHYSICAL EXAMINATIONS OF YOU?

16     **A**    YES, SIR.

17     **Q**    AND DID YOU EVER SEE HIM DOCUMENT THOSE

18  EXAMINATIONS?  IN TERMS OF WAS HE ON A COMPUTER OR WAS HE

19  WRITING NOTES?

20     **A**    NO, NO, NO.  HE'D DRUG SCREEN YOU AND HE MADE YOU DO

21  SOME EXERCISE AND STUFF.

22     **Q**    SO YOU WERE DRUG SCREENED?

23     **A**    YEAH.

24     **Q**    WHILE SEEING DR. LAMARTINERE, DID YOU EVER DRUG

25  SCREEN POSITIVE FOR NARCOTICS?

```
1       A    FOR THE ONES I WAS ON.

2       Q    OKAY.  SO HOW ABOUT FOR MORPHINE?

3       A    FOR MORPHINE?

4       Q    DO YOU RECALL?

5       A    NO.  I DON'T BELIEVE, NO.  I DON'T BELIEVE I NEVER

6  HAD MORPHINE.

7       Q    HOW ABOUT HYDROMORPHONE OR --

8       A    I DON'T THINK I FAILED IT.  HE NEVER MENTIONED IF I

9  DID.

10      Q    SO IN OTHER WORDS, YOU TOOK DRUG SCREENS, BUT YOU

11 DON'T REMEMBER FAILING ANY?

12      A    NO, HE'D MENTIONED IT IF I FAILED IT.  HE'D KICKED

13 ME OUT.  THEY KICK YOU OUT IF YOU FAIL A DRUG SCREEN.

14 SOMETIMES THEY MIGHT GIVE YOU A WARNING IF IT'S A LOW DOSE.

15      Q    IN FILLING -- IS IT SAFE TO SAY YOU DID FILL YOUR

16 PRESCRIPTIONS FROM DR. LAMARTINERE AT PHARMACIES?

17      A    YEAH.  YEAH.

18      Q    AND DID YOU EXPERIENCE -- WERE THERE ANY

19 DIFFICULTIES IN GETTING PRESCRIPTIONS FROM DR. LAMARTINERE

20 FILLED?

21      A    NO.  I GO TO BARKER'S.  I'VE BEEN DEALING WITH

22 BARKER'S ALL MY LIFE.

23      Q    DID YOU JUST INDICATE YOU WENT TO BARKER'S PHARMACY?

24      A    BARKER'S AND TO THE -- THE LAST TIME I WENT TO HIM I

25 WENT TO ONE ACROSS THE STREET BECAUSE I HAD A FRIEND WITH ME
```

1   AND HE WANTED TO GO TO HIS PHARMACY, SO WHILE I WAS THERE THEY

2   DID -- I GOT THEM TO DO MINE TOO.  EVERY ONE, I'M PRETTY SURE,

3   WAS BARKER'S EXCEPT THE LAST ONE.

4        Q    AFTER BEING SEEN -- AFTER YOUR LAST VISIT WITH

5   DR. LAMARTINERE -- DO YOU KNOW HE WAS ARRESTED IN JANUARY OF

6   2016?

7        A    YEAH.  WHERE I'M AT, A SMALL TOWN, YEAH, IT FLIES

8   AROUND -- NEWS FLIES AROUND.  YEAH.

9        Q    SO YOU KNEW ABOUT IT.  IN OTHER WORDS, YOU'RE FROM A

10  SMALL TOWN, I THINK YOU SAID --

11       A    YEAH.

12       Q    -- AND WORD GOT AROUND?

13       A    I DON'T KNOW EXACTLY WHAT DATE I HEARD IT ON OR

14  NOTHING, BUT I KNEW HE GOT SHUT DOWN.

15       Q    THE LAST TIME YOU SAW HIM WAS IN NOVEMBER 2015 AND

16  HE GAVE YOU THREE MONTHS' WORTH, OR AT LEAST FROM THE

17  PRESCRIPTIONS WE LOOKED AT, DID YOU RECEIVE A PRESCRIPTION FOR

18  THAT MONTH AND TWO POST-DATED PRESCRIPTIONS?

19       A    I COULDN'T TELL YOU HERE THE DATE.

20       Q    LET ME JUST SHOW YOU PRESCRIPTIONS -- THESE

21  PRESCRIPTIONS, SIR.  THESE ARE PRESCRIPTIONS -- THE FIRST ONE

22  IS MARKED 9-G.

23       A    YES.  YEAH.  YEAH.

24       Q    THIS WAS A PRESCRIPTION WRITTEN ON NOVEMBER 16TH,

25  2015.

1    **A**    YEAH, THAT SOUNDS ABOUT -- THE LAST TIME I WENT TO

2    HIM.

3    **Q**    AND THAT WAS FOR OPANA?

4    **A**    YEAH, OPANA.

5    **Q**    AND THEN LET'S GO TO 9-H, IT'S THE SAME DATE,

6    NOVEMBER 16.  SAME MEDICATION.  YOU SEE A START DATE ON

7    DECEMBER 16TH?

8    **A**    WAS IT THE SAME MILLIGRAM?

9    **Q**    IT APPEARS TO SAY OPANA XR, 20-MILLIGRAM, 12-HOUR XR

10   TAB.

11   **A**    ON THE SAME DATE?

12   **Q**    ON NOVEMBER 16TH.  IF YOU'D GIVE ME ONE SECOND,

13   PLEASE.

14   **A**    YEAH.

15   **Q**    EXHIBIT 9-H, SAME DATE, IS IT SAFE TO SAY THAT'S THE

16   SAME PRESCRIPTION I JUST READ; OPANA?

17   **A**    YEAH.

18   **Q**    I'M SORRY -- THE START DATE, DO YOU SEE THAT,

19   DECEMBER 16TH, 2015?

20   **A**    YEAH.  YEAH.

21   **Q**    AND THEN I'LL GO TO 9-I.  THE PRESCRIPTION DATE IS

22   AGAIN -- HERE'S THE 9-I.  THE PRESCRIPTION DATE IS

23   NOVEMBER 16TH, 2015.  NOW, THE START DATE FOR THIS ONE IS A

24   MONTH LATER, CORRECT, JANUARY 16TH, 2016?

25   **A**    YEAH.

```
1        Q    AND IT'S FOR THE SAME MEDICATION?

2        A    YEAH.

3        Q    AT ANY POINT AFTER YOUR NOVEMBER VISIT, WHEN YOU GOT

4   THESE PRESCRIPTIONS, DID DR. LAMARTINERE CONTACT YOU AND REFER

5   YOU TO ANOTHER PAIN -- ANOTHER PHYSICIAN?

6        A    I NEVER BEEN TO ONE SINCE.

7        Q    DID YOU CONTINUE TO TAKE OPIOIDS?

8        A    I BOUGHT THEM OFF THE STREET FOR A WHILE AND THEN

9   I WENT TO THE METHADONE CLINIC.

10        Q    DID YOU GO TO THE METHADONE CLINIC IN 2016?

11        A    YEAH.

12        Q    AND DID THAT HELP YOU?

13        A    YES, IT DID.  IT SURE DID.  AND IT'S STILL HELPING.

14        Q    HAVE YOU BEEN ABLE SINCE THE METHADONE CLINIC TO

15   STAY OFF OF OPIOIDS --

16        A    IT'S A LOT BETTER.  IT'S WAY BETTER TO ME.  IT GOT

17   ME OFF OF THE DEVIL.  OFF MY BACK.

18        Q    WHAT ARE YOU TAKING FOR YOUR PAIN NOW?

19        A    THAT'S WHAT I TAKE -- THAT'S WHAT I TAKE, METHADONE.

20        Q    SO YOU'RE STILL TAKING METHADONE?

21        A    YEAH, I GO TO THE METHADONE CLINIC.  BUT THEY

22   MONITOR YOU AND EVERYTHING, AND YOU'VE GOT TO DO COUNSELING

23   AND ALL OF THAT, SO IT'S A LOT -- IT HELPED OUT.

24        Q    WHEN YOU SAY THEY MONITOR YOU, HOW DO THEY MONITOR

25   YOU?
```

1      **A**    YOU'VE GOT TO GO EVERY DAY.  YOU CAN'T -- YOU'VE GOT

2  TO DO GROUP MEETINGS.  YOU'VE GOT TO DO THERAPY MEETINGS.

3      **Q**    ARE THERE DRUG SCREENS?

4      **A**    OH, ONCE A MONTH AND I AIN'T FAILED ONE YET, THANK

5  THE GOOD LORD, SINCE 2016.

6      **Q**    SINCE DR. LAMARTINERE'S ARREST IN JANUARY OF 2016,

7  HAS HE CONTACTED YOU?

8      **A**    NO.  NO.  I DON'T ANSWER THE PHONE -- I DON'T LIKE

9  PHONES.

10      **Q**    UNDERSTOOD.  THANK YOU, SIR.

11      **MR. PUGLIESE:**  UNITED STATES HAS NO FURTHER

12  QUESTIONS AT THIS TIME, YOUR HONOR.

13      **THE COURT:**  YOU MAY START YOUR CROSS-EXAMINATION,

14  MR. BRINDLEY.

15      **THE WITNESS:**  OH, STAY UP HERE?

16      **THE COURT:**  WE'VE GOT SOME OTHER QUESTIONS FROM THE

17  OTHER LAWYER.

18      **THE WITNESS:**  OH, OKAY.

19  **CROSS-EXAMINATION**

20  **BY MR. BRINDLEY:**

21      **Q**    MR. HENSON, PRIOR TO -- IN OTHER WORDS, BEFORE YOU

22  WENT TO SEE DR. LAMARTINERE, YOU HAD SEEN OTHER DOCTORS FOR

23  THE TREATMENT OF YOUR PAIN IN THE PAST, RIGHT?

24      **A**    MAN, I WENT EVERYWHERE.  I WENT TO TEXAS.  I WENT

25  EVERYWHERE.

 1      **Q**     SO YOU HAD BEEN TO MULTIPLE DOCTORS IN MULTIPLE

 2   STATES SEEKING TREATMENT FOR YOUR PAIN BEFORE DR. LAMARTINERE,

 3   RIGHT?

 4      **A**     YES, SIR.  WAY BEFORE LAMARTINERE -- YEAH, WAY

 5   BEFORE HIM.

 6      **Q**     AND SO THEN IT'S FAIR TO SAY THAT MULTIPLE DOCTORS

 7   HAD REVIEWED YOUR CONDITION WITH YOU AND DETERMINED THAT THEY

 8   WOULD WRITE PAIN MEDICATION PRESCRIPTIONS FOR YOU BEFORE HE

 9   DID, RIGHT?

10      **A**     YEAH.

11      **Q**     AND DOCTORS BEFORE DR. LAMARTINERE THAT YOU HAD BEEN

12   TO WERE WILLING TO WRITE MUCH HIGHER DOSAGES FOR YOU THAN HE

13   WAS WHEN YOU FIRST SAW HIM, RIGHT?

14      **A**     YEAH.  YEAH.

15      **Q**     NOW, WHEN YOU STARTED SEEING DR. LAMARTINERE AT THE

16   BEGINNING, YOU HAD TO PROVIDE HIM WITH YOUR MRI, RIGHT?

17      **A**     YES, SIR.

18      **Q**     SO YOU HAD TO HAVE PROOF OF YOUR REAL INJURY, RIGHT?

19      **A**     YES, SIR.

20      **Q**     YOU HAD TO BE ABLE TO DEMONSTRATE TO HIM THAT YOUR

21   PAIN WAS LEGITIMATE AND TRUE, RIGHT?

22      **A**     YES, SIR.

23      **Q**     AND THAT WAS BEFORE HE WOULD TREAT YOU AT ALL FOR

24   PAIN, CORRECT?

25      **A**     YES, SIR.

1     **Q**    AND YOU SAID YOU THOUGHT THAT HE MAY HAVE EVEN

2  DIRECTED YOU TO GET ANOTHER MRI TO FOLLOW-UP, A SECOND ONE?

3     **A**    YEAH.  YEAH.

4     **Q**    SO WHEN YOU WENT TO DR. LAMARTINERE, YOU HAD TO

5  PROVIDE YOUR PROOF OF INJURY, RIGHT?

6     **A**    YEAH.  NOW, LIKE I SAY, YOU HAVE -- A PRINTOUT OF

7  THE LAST YEAR OF THE PHARMACY.

8     **Q**    YOU ALSO HAD TO PROVIDE HIM WITH A PRINTOUT SHOWING

9  WHAT YOU HAD BEEN GETTING FOR THE LAST YEAR, RIGHT?

10     **A**    YES, SIR.

11     **Q**    AND THEN WHEN YOU WENT THERE ON THAT FIRST MEETING,

12  HE WENT OVER WITH YOU THE MEDICATIONS YOU HAD BEEN TAKING

13  BEFORE, CORRECT?

14     **A**    YES.

15     **Q**    HE ALSO CONDUCTED A PHYSICAL EXAMINATION OF THE

16  INJURED AREA, CORRECT?

17     **A**    YEAH.  YES, SIR.

18     **Q**    HE TALKED WITH YOU ABOUT VARIOUS EXERCISES THAT YOU

19  COULD DO TO TRY TO HELP WITH THE PAIN, RIGHT?

20     **A**    YEAH.  YEAH.

21     **Q**    SO HE DISCUSSED WITH YOU WAYS TO HELP WITH THE PAIN

22  THAT WERE NOT JUST OPIOID MEDICATIONS, RIGHT?

23     **A**    RIGHT.  RIGHT.

24     **Q**    SO THAT WAS WHAT THE EXERCISES WERE FOR, RIGHT?

25     **A**    RIGHT.  RIGHT.

1    **Q**    OKAY.  WHEN YOU WOULD -- WHEN HE STARTED PRESCRIBING

2    TO YOU, AT FIRST HE REVIEWED YOUR PRIOR MEDICATIONS WITH YOU

3    AND SAID THAT HE WAS GOING TO START YOU ON A LOWER DOSAGE TO

4    SEE HOW YOU WOULD DO, RIGHT?

5    **A**    YES, SIR.

6    **Q**    SO YOU COULDN'T JUST GO INTO DR. LAMARTINERE AND

7    SAY, *HEY, I WANT OXY 30'S* AND HE'D JUST GIVE THEM TO YOU?

8    **A**    NO.

9    **Q**    THAT'S NOT HOW IT WORKED, WAS IT?

10   **A**    NO.  NO.  AND HE EXPLAINED THAT ON THE PHONE BEFORE

11   I EVEN WENT.

12   **Q**    SO YOU WERE TOLD ON THE PHONE THAT YOU WOULD HAVE TO

13   HAVE A FULL ANALYSIS BY THE DOCTOR BEFORE HE COULD DECIDE WHAT

14   MEDICINE WAS BEST, RIGHT?

15   **A**    YEAH.  BECAUSE HE ASKED ME WHAT DOCTOR I WAS GOING

16   TO AND WHAT I WAS GETTING AND I TOLD HIM AND HE SAID, *I WON'T*

17   *BE ABLE TO START YOU OFF ON THAT.  I'D HAVE TO START YOU OFF*

18   *ON A LOWER DOSE AND THEN WORK YOUR WAY UP.*

19   **Q**    DURING THAT FIRST MEETING, IN ADDITION TO EXAMINING

20   THE INJURED AREA, HE ALSO TALKED WITH YOU ABOUT THE NATURE OF

21   YOUR PAIN, RIGHT?

22   **A**    UH-HUH.

23   **Q**    DID YOU SAY YES?  I'M SORRY.

24   **A**    YEAH.  YES, SIR.

25   **Q**    HE ASKED YOU A BUNCH OF DETAILED QUESTIONS ABOUT

1   WHAT KIND OF PAIN YOU WERE IN, RIGHT?

2        **A**    YEAH.  I THOUGHT I'D NEVER GET OUT OF THERE.

3        **Q**    OKAY.  HE ASKED YOU DETAILED QUESTIONS ABOUT HOW THE

4   PAIN IMPACTED YOUR ABILITY TO DO THINGS IN YOUR DAILY LIFE,

5   RIGHT?

6        **A**    YEAH.  YEAH, AND IT DOES.

7        **Q**    AND YOU'VE DESCRIBED YOUR PAIN FOR HIM IN AS MUCH

8   DETAIL AS YOU COULD, RIGHT?

9        **A**    YES, SIR.

10       **Q**    AND IN RESPONSE TO YOUR DESCRIPTIONS OF YOUR PAIN,

11   HE WOULD ASK YOU FOLLOW-UP QUESTIONS, RIGHT?

12       **A**    WHAT, EVERY TIME I WENT TO HIM?

13       **Q**    JUST THE FIRST TIME.  WE'RE STILL ON THE FIRST TIME.

14       **A**    OH, YEAH.  YEAH.  YEAH.  HE --

15       **Q**    AND WHEN -- BASED ON WHAT YOU TOLD HIM AND YOUR

16   DISCUSSION WITH HIM THAT FIRST TIME, IT WAS OBVIOUS TO YOU

17   THAT DR. LAMARTINERE SEEMED VERY INTERESTED IN TRYING TO FIND

18   THE RIGHT TREATMENT FOR YOU, RIGHT?

19       **A**    YEAH.  YES, SIR.

20       **Q**    AND WHEN YOU WENT THERE YOU WERE IN VERY REAL PAIN

21   AND YOU WANTED HELP FOR THAT, RIGHT?

22       **A**    I WAS IN PAIN, YEAH.  YES, SIR.

23       **Q**    AND SO WHEN YOU TOLD HIM YOU WERE IN PAIN THAT WAS

24   NOT SOME STORY, THAT WAS THE TRUTH, WASN'T IT?

25       **A**    THAT WAS THE TRUTH, YEAH.  AND IT'S STILL THE TRUTH.

1    **Q**    AND HE RESPONDED BY TRYING TO GIVE YOU A LOW DOSAGE

2    MEDICATION AND SEE HOW WELL THAT DEALT WITH YOUR PAIN, RIGHT?

3    **A**    YES, SIR.

4    **Q**    AND SO THEN YOU WENT BACK FOR FOLLOW-UP VISITS,

5    RIGHT?

6    **A**    YES, SIR.

7    **Q**    AND IN THE FOLLOW-UP VISITS, HE WOULD TALK TO YOU

8    ABOUT HOW YOU WERE DOING WITH THE MEDICATION, RIGHT?

9    **A**    YES, SIR.

10   **Q**    HE WOULD TALK TO YOU ABOUT HOW THE PAIN WAS UNDER

11   CONTROL, RIGHT?

12   **A**    YES, SIR.

13   **Q**    HE WOULD TALK WITH YOU ABOUT HOW YOUR DAILY LIFE WAS

14   AFFECTED, THE THINGS THAT YOU COULD AND COULDN'T DO BECAUSE OF

15   THE PAIN, RIGHT?

16   **A**    RIGHT.    RIGHT.

17   **Q**    AND THEN BASED ON THESE DISCUSSIONS, HE WOULD ADJUST

18   THE MEDICATION ONE WAY OR THE OTHER, RIGHT?

19   **A**    YEAH.

20   **Q**    IT WAS THROUGH DISCUSSIONS LIKE THAT THAT YOU ENDED

21   UP TAKING OPANA AS OPPOSED TO JUST THE OXYCODONE, RIGHT?

22   **A**    YES, SIR.

23   **Q**    YOU'VE BEEN ON THAT BEFORE, OPANA, RIGHT?

24   **A**    YEAH, I WAS ON IT BEFORE.    THAT'S WHAT I WAS ON

25   BEFORE I WENT TO HIM.

```
1         Q    BUT HE DIDN'T START WITH THAT --

2         A    NO.

3         Q    -- HE ONLY ADDED THAT LATER WHEN YOU TOLD HIM THAT

4    THE PAIN WAS NOT YET UNDER CONTROL, RIGHT?

5         A    EXACTLY.  YES, SIR.

6         Q    SO IT SEEMED TO YOU WHEN YOU WERE DISCUSSING THESE

7    THINGS WITH HIM, THAT HE WAS TRYING TO FIND THE RIGHT DOSAGE

8    TO GET YOUR PAIN UNDER CONTROL WITHOUT GIVING YOU TOO MUCH

9    MEDS, RIGHT?

10        A    RIGHT.  BECAUSE I TOLD HIM THAT -- I KNEW WHAT

11   HELPED, BUT HE SAID HE WAS GOING TO GET THERE.  HE'S THE

12   DOCTOR.  LET HIM DO --

13        Q    SO YOU TOLD HIM WHAT YOU THOUGHT YOU NEEDED, RIGHT?

14        A    YEAH.

15        Q    AND HE TOLD YOU THAT HE WAS THE DOCTOR AND HE WOULD

16   BE MAKING THE DECISIONS ABOUT WHAT WAS APPROPRIATE --

17        A    YEAH.

18        Q    -- AND YOU'D GO FROM THERE, RIGHT?

19        A    YES, SIR.

20        Q    NOW, YOU ALSO WERE TREATED FOR -- WITH ADDERALL FOR

21   ATTENTION DEFICIT DISORDER?

22        A    YES.  YES, SIR.

23        Q    YOU SAID YOU'VE BEEN ON THAT --

24        A    ALL --

25        Q    -- BASICALLY ALL OF YOUR LIFE --
```

1    THE COURT:  HANG ON ONE SECOND.  MR. HENSON, YOU

2  NEED TO LET BRINDLEY FINISH HIS QUESTION BEFORE YOU ANSWER

3  BECAUSE YOU'RE TALKING OVER ONE --

4    THE WITNESS:  I'M SORRY.

5    THE COURT:  YOU'RE DOING IT WITH ME NOW, OKAY.  SO

6  THAT OUR COURT REPORTER CAN GET ALL OF THIS DOWN CLEARLY.  SO

7  WAIT FOR HIM TO FINISH BEFORE YOU BEGIN YOUR ANSWER.

8    THE WITNESS:  I'M SORRY.

9    THE COURT:  ALL RIGHT.  GO AHEAD.

10  BY MR. BRINDLEY:

11    Q    SO YOU HAD BEEN TREATED WITH ADDERALL LONG BEFORE

12  SEEING DR. LAMARTINERE, RIGHT?

13    A    YEAH.

14    Q    AND THAT'S BECAUSE YOU HAD BEEN DEALING WITH

15  ATTENTION DEFICIT DISORDER BASICALLY YOUR WHOLE LIFE, RIGHT?

16    A    YES.

17    Q    SO WHEN YOU WENT TO SEE DR. LAMARTINERE, HE TALKED

18  WITH YOU ABOUT THE ATTENTION DEFICIT DISORDER AND HOW IT HAD

19  BEEN TREATED THROUGHOUT YOUR LIFE, RIGHT?

20    A    YES.

21    Q    AND THEN BASED ON YOUR DESCRIPTION TO HIM OF THAT

22  TREATMENT THAT YOU HAD, HE PRESCRIBED ADDERALL TO YOU JUST

23  LIKE MANY OTHER PROVIDERS HAD IN THE PAST, RIGHT?

24    A    YES, SIR.

25    Q    NOW, YOU HAD TO PAY FOR YOUR VISITS, RIGHT?

1        **A**    YES, SIR.

2        **Q**    HOW THAT WORKED WAS, YOU PAID AND THEN DURING THE

3    MONTH ANY MEDICAL PROBLEM YOU HAD, WHETHER IT WAS RELATED TO

4    PAIN OR ANYTHING ELSE, YOU COULD GO TO DR. LAMARTINERE, RIGHT?

5        **A**    I DON'T -- I DON'T UNDERSTAND.  SAY IT AGAIN.  CAN

6    YOU REPEAT THE QUESTION?

7        **Q**    WHEN YOU PAID, YOU PAID FOR YOUR VISIT FOR A MONTH,

8    RIGHT?

9        **A**    TO WHO, THE DOCTOR?

10       **Q**    YES.

11       **A**    YEAH.  YEAH.  YEAH.  YEAH.

12       **Q**    DID YOU SEE HIM ONLY FOR PAIN OR DID YOU GO TO HIM

13    AS WELL FOR OTHER --

14       **A**    JUST PAIN.

15       **Q**    SO YOU ONLY WENT THERE FOR PAIN, OKAY.

16       **A**    YES, SIR.

17       **Q**    NOW, YOU SAID THE PROSECUTOR ASKED YOU A QUESTION --

18       **A**    EXCUSE ME.

19       **Q**    -- ABOUT WHETHER YOU HAD INSURANCE AND YOU SAID YOU

20    HAD MEDICARE, RIGHT?

21       **A**    YES, SIR.

22       **Q**    BUT YOU HAD BEEN TO MULTIPLE PAIN MANAGEMENT DOCTORS

23    AND NOBODY TOOK MEDICARE, RIGHT?

24       **A**    YES, SIR.

25       **Q**    DO YOU EVEN KNOW IF MEDICARE WOULD COVER PAIN

1  MANAGEMENT?

2      **A**    ONE TIME THEY DID FOR ONE YEAR WHEN I WENT TO

3  OCHSNER CLINIC WITH THE WOMAN DOCTOR.  I CAN'T REMEMBER HER

4  NAME.  BUT ONE YEAR THEY PAID FOR IT, THAT WAS IT.

5      **Q**    AND THEN THEY CUT IT OFF?

6      **A**    YEAH.  BUT THEY ALWAYS PAID FOR THE MEDICINE.

7      **Q**    OKAY.  WHENEVER YOU WENT TO SEE DR. LAMARTINERE, IN

8  EVERY VISIT HE WAS ALWAYS ASKING YOU HOW YOUR PAIN WAS AND

9  ASKING YOU TO GIVE HIM A DETAILED ACCOUNT OF HOW YOU WERE

10  DOING, RIGHT?

11      **A**    YES, SIR.

12      **Q**    AND HE ALWAYS SEEMED VERY INTERESTED IN HOW YOU WERE

13  DOING, DIDN'T HE?

14      **A**    YES, SIR.

15      **Q**    HE ALWAYS SEEMED TO BE ATTEMPTING TO MAKE SURE YOU

16  WERE DOING WELL WITH YOUR PAIN AND IN YOUR LIFE, RIGHT?

17      **A**    YES, SIR.

18      **Q**    NOW, WHAT HE PRESCRIBED FOR YOU HELPED YOU WITH YOUR

19  PAIN, RIGHT?

20      **A**    100 PERCENT.

21      **Q**    AND SO WHAT HE PRESCRIBED FOR YOU HELPED YOU TO

22  FUNCTION BETTER IN YOUR LIFE THAN YOU HAD BEFORE, RIGHT?

23      **A**    YES, SIR.

24      **Q**    AND HE WAS REALLY THE ONLY DOCTOR WHO SEEMED LIKE HE

25  WAS REALLY TRYING TO HELP WITH THE PAIN IN A DETAILED WAY LIKE

1    THIS, WASN'T HE?

2         **A**    HE WASN'T THE ONLY ONE, BUT HE WAS ONE.

3         **Q**    SO IN OTHER WORDS, YOU HAD OTHER DOCTORS WHO TRIED

4    TO HELP BEFORE, RIGHT?

5         **A**    YEAH.  YES, SIR.

6         **Q**    AND DR. LAMARTINERE SEEMED LIKE HE WAS DOING THE

7    SAME THING IN TRYING TO HELP YOU FUNCTION BETTER AND HAVE YOUR

8    PAIN UNDER CONTROL, RIGHT?

9         **A**    YES, SIR.

10        **Q**    AND AT ALL TIMES WHEN YOU WERE SEEING HIM, HE SEEMED

11   TO BE A CARING PHYSICIAN WHO WAS INTERESTED IN YOUR

12   WELL-BEING, DIDN'T HE?

13        **A**    YES, SIR.

14        **Q**    AND YOU KNOW THAT BASED ON MULTIPLE INTERACTIONS

15   WITH HIM WHEN HE QUESTIONED YOU ABOUT HOW YOU WERE DOING AND

16   HOW THINGS WERE GOING ON THE MEDICATION, RIGHT?

17        **A**    YES, SIR.

18        **Q**    NOW, AFTER DR. LAMARTINERE WAS NO LONGER AVAILABLE

19   BECAUSE OF THE CHARGES IN THIS CASE, YOU SAID THAT YOU HAD

20   STARTED TRYING TO GET PAIN MEDICATION ON THE STREET, RIGHT?

21        **A**    YES, FOR A LITTLE BIT.

22        **Q**    AND THEN ULTIMATELY YOU WENT TO A METHADONE CLINIC,

23   RIGHT?

24        **A**    YEAH.  YEAH, I DID.

25        **Q**    AND YOU STARTED GETTING METHADONE TO HELP CONTROL

1   THE PAIN, RIGHT?

2        **A**    YES, SIR.

3        **Q**    AND YOU CONTINUE TO DO THAT TO THIS DAY, RIGHT?

4        **A**    YES, SIR.

5        **Q**    THERE WAS NO TIME DURING THE MONTHS WHEN YOU SAW

6   DR. LAMARTINERE WHERE YOU EVER FELT LIKE HE WASN'T PAYING

7   ATTENTION TO YOU OR HE WAS IGNORING YOUR PROBLEMS, YOU NEVER

8   FELT LIKE THAT, DID YOU?

9        **A**    NO, NOT THE TIME I WENT TO HIM.

10       **Q**    YOU FELT LIKE HE WAS ALWAYS TRYING TO BE AS HELPFUL

11   AS POSSIBLE, RIGHT?

12       **A**    YEAH.  YEAH, HE WAS.

13       **Q**    AND WHAT HE DID HELPED A LOT, DIDN'T IT?

14       **A**    YES, SIR.

15           **MR. BRINDLEY:**  NO FURTHER QUESTIONS, JUDGE.

16           **THE COURT:**  ALL RIGHT.  REDIRECT.

17           **MR. PUGLIESE:**  YES, YOUR HONOR.  BRIEFLY.

18   **REDIRECT EXAMINATION**

19   **BY MR. PUGLIESE:**

20       **Q**    MR. HENSON, BASED ON THE RECORDS BEFORE THE COURT

21   THAT HAVE BEEN ADMITTED, THERE HAVE BEEN A TOTAL OF 30

22   PRESCRIPTIONS THAT WERE WRITTEN TO YOU BY DR. LAMARTINERE

23   BETWEEN MARCH AND NOVEMBER OF 2015, AND YOU INDICATED ON

24   CROSS-EXAMINATION FROM MR. BRINDLEY, HIS QUESTIONS, THAT

25   DR. KENNEDY WAS A DOCTOR THAT CARED ABOUT YOU AND HE MONITORED

1  THE DRUGS GIVEN TO YOU; IS THAT CORRECT?

2      A    YES, SIR.

3      Q    AT ANY TIME DO YOU RECALL HIM, AFTER THE INITIAL

4  VISIT WHERE YOU INDICATED HE GAVE YOU A SMALL PRESCRIPTION,

5  THAT WAS ON MARCH 13TH, OXYCODONE, 15-MILLIGRAMS BY 120, YOUR

6  NEXT VISIT WAS APRIL 28TH, OXYCODONE, 30-MILLIGRAMS FOR 90.

7  IS IT SAFE TO SAY THAT, AS YOU RECALL, IS THAT THEN THE LOWEST

8  AMOUNT OF OXYCODONE THAT DR. LAMARTINERE PRESCRIBED WHILE YOU

9  WERE SEEING HIM?

10     A    YEAH.  I'M PRETTY SURE.  HE MIGHT HAVE WENT TO 120,

11 BUT THEN HE WENT -- HE WENT TO OPANA EVENTUALLY.  BUT I

12 CAN'T -- I THINK HE WENT TO 120 ON THE 30'S.  I'M NOT SURE

13 NOW.

14     Q    OKAY.  UNDERSTOOD.  LET ME JUST ASK YOU, DURING THE

15 JULY 7TH VISIT, EXHIBITS 34-A THROUGH 34-C, YOU RECEIVED THE

16 STANDARD ADDERALL PRESCRIPTION OF 20-MILLIGRAMS BY 60.  YOUR

17 OXYCODONE AT THAT POINT WAS 30-MILLIGRAMS, 90 TABLETS AND THEN

18 OPANA WAS ADDED TO THE OXYCODONE PRESCRIPTION.

19          SO IS IT SAFE TO SAY -- IS OPANA A NARCOTIC FOR

20 PAIN?

21     A    YES, SIR.

22     Q    SO HE INCREASED YOUR OVERALL PRESCRIPTION FOR PAIN

23 MEDS FROM JUST OXYCODONE TO INCLUDE OPANA; IS THAT CORRECT?

24     A    YEAH --

25     Q    IN OTHER WORDS --

1      **A**     ONE OF THEM IS A BREAK-THROUGH AND ONE IS LONG-TERM.

2      **Q**     THANK YOU.  AND THEN IN AUGUST YOU RECEIVED THREE

3   OXYCODONE PRESCRIPTIONS, 30-MILLIGRAMS, 90 TABLETS, ONE FOR

4   THE DAY OF THE VISIT AND THEN POST-DATED, SAME WITH OPANA,

5   20-MILLIGRAMS, 40 UNITS AND ADDERALL, AGAIN, 20/60.  IN

6   NOVEMBER THE OXYCODONE PRESCRIPTION WENT UP TO 120 PILLS AT A

7   30-MILLIGRAM STRENGTH, CORRECT?

8      **A**     THAT'S WHEN MY BROTHER GOT KILLED AND MY MIND WAS

9   THROWED OFF IN THEM MONTHS.

10      **Q**     SO --

11      **A**     I HAD MY SON WENT TO THE MARINES AND I HAD TWO

12   BROTHERS GET KILLED IN THE SAME YEAR.  SO I WAS KIND OF -- THE

13   DATES, I DON'T KNOW, I WAS IN A FOG BACK THEN.

14      **Q**     I'M SORRY TO ASK YOU THIS, WERE THOSE LOSSES AROUND

15   THE TIME OF YOUR NOVEMBER 2015 VISIT?

16      **A**     YES.  MY BROTHER, HE DIED OCTOBER 12TH AND -- HIM

17   AND MY SISTER-IN-LAW AND MY HALF BROTHER DIED A COUPLE MONTHS

18   BEFORE THAT AND MY SON HE GRADUATED AND HE WENT TO THE

19   MARINES, SO MY MIND WAS ALL SCREWED UP.  BECAUSE ME AND MY SON

20   WAS CLOSE, YOU KNOW.

21      **Q**     SO AFTER THE MARCH 31ST PRESCRIPTION FOR

22   15-MILLIGRAMS OF OXYCODONE, DO YOU RECALL ANY TIME WHERE THE

23   DOCTOR PRESCRIBED ANYTHING LOWER THAN A STRENGTH OF

24   30-MILLIGRAMS?

25      **A**     NO.

1    **Q**    AND DURING THE RECORDS THAT WERE OBTAINED FROM

2  DR. LAMARTINERE'S PRACTICE, WOULD IT SURPRISE YOU THAT NO

3  X-RAYS WERE FOUND FOR YOU?

4    **A**    WHAT -- I NEVER TOOK X-RAYS.

5    **Q**    NO MRI'S?

6    **A**    OH, I GOT AN MRI, YEAH.

7    **Q**    FROM DR. LAMARTINERE?

8    **A**    I DON'T KNOW IF IT COME FROM HIM, BUT I GOT SOME

9  THAT I BROUGHT TO HIM.

10    **Q**    FOR THE FIRST VISIT?

11    **A**    FOR THE FIRST VISIT.  IT MIGHT HAVE BEEN A DIFFERENT

12  DOCTOR.  I'M NOT SURE.  BUT I KNOW ANOTHER DOCTOR MADE ME GO

13  GET ANOTHER ONE.  SO I ENDED UP WITH ABOUT THREE ALTOGETHER.

14  I TOOK ABOUT THREE DURING A TEN-YEAR PERIOD.  SO -- AND THEN

15  WHO SENT ME AND WHEN, I DON'T REALLY REMEMBER.

16    **Q**    LET ME ASK YOU, AFTER SEEING DR. LAMARTINERE WHEN

17  YOU STARTED GOING TO THE METHADONE CLINIC, DID YOU GET ANYMORE

18  MRI'S?

19    **A**    NO.

20    **Q**    NO FURTHER QUESTIONS.

21       **MR. PUGLIESE:**  THANK YOU, YOUR HONOR.

22  **QUESTIONS BY THE COURT**

23       **THE COURT:**  MR. HENSON, I JUST HAVE A COUPLE OF

24  QUESTIONS.

25       WHEN YOU STARTED SEEING -- BEFORE YOU STARTED SEEING

1    DR. LAMARTINERE WERE YOU ADDICTED TO ANY MEDICINES?

2              **THE WITNESS:**  YEAH, I WAS ADDICTED.

3              **THE COURT:**  WHAT WERE YOU ADDICTED TO BEFORE YOU

4    STARTED SEEING DR. LAMARTINERE?

5              **THE WITNESS:**  I WOULD HAVE BEEN ADDICTED FOR ABOUT

6    FIVE TO TEN YEARS.  I STARTED OFF ON LORTABS AND THEN I

7    STARTED OFF ON OXYCONTIN AND THEM BOOM, BOOM, BOOM, BOOM, IT

8    SNOWBALLED; WHATEVER YOU COULD GET YOUR HANDS ON.

9              **THE COURT:**  SO WHEN YOU STARTED -- AT THE TIME YOU

10    STARTED TO SEE DR. LAMARTINERE, WHAT DRUGS WERE YOU ADDICTED

11    TO?

12              **THE WITNESS:**  WELL, ANY OPIOIDS.

13              **THE COURT:**  OKAY.  AND YOU REMAINED -- REMAINED

14    ADDICTED DURING THE TIME THAT YOU SAW DR. LAMARTINERE; IS THAT

15    CORRECT?

16              **THE WITNESS:**  SIR?

17              **THE COURT:**  DID YOU REMAIN ADDICTED TO THOSE

18    MEDICINES WHILE YOU SAW DR. LAMARTINERE?

19              **THE WITNESS:**  YEAH.  IF YOU'RE TAKING THEM YOU'RE

20    ADDICTED TO THEM.  YOU CAN'T -- IF YOU COME OFF, THEY KILL

21    YOU.  THEY BAD.

22              **THE COURT:**  OKAY.

23              **THE WITNESS:**  ANY OF THAT MEDICINE IS BAD, BAD.

24    THAT'S WHY I'M GLAD I'M WHERE I'M AT.

25              **THE COURT:**  WHAT MEDICINES HAVE YOU TAKEN IN THE

1  LAST 24 HOURS?

2          **THE WITNESS:**  I TAKE XANAX, ADDERALL AND METHADONE.

3          **THE COURT:**  ANYTHING ELSE?

4          **THE WITNESS:**  NO.

5          **THE COURT:**  OKAY.  ALL RIGHT.

6          ANYBODY WANT TO FOLLOW UP ON MY QUESTIONS?

7          **MR. PUGLIESE:**  NO.  THANK YOU, YOUR HONOR.

8          **MR. BRINDLEY:**  NO, YOUR HONOR.

9          **THE COURT:**  ALL RIGHT.  THANK YOU, MR. HENSON.  YOU

10  MAY STAND DOWN.

11          **THE WITNESS:**  I COULD LEAVE?

12          **THE COURT:**  IS HE FREE TO LEAVE AND NOT COME BACK?

13          **MR. PUGLIESE:**  FREE TO LEAVE, YES.  THANK YOU.

14          **THE COURT:**  AND, MR. BRINDLEY, HE'S FREE TO LEAVE

15  AND NOT COME BACK?

16          **MR. BRINDLEY:**  YES, YOUR HONOR.

17          **THE COURT:**  ALL RIGHT.  YOU MAY LEAVE AND YOU DON'T

18  NEED TO WORRY ABOUT COMING BACK.

19          **MR. PUGLIESE:**  YOUR HONOR, OUR NEXT WITNESS IS

20  JEREMY DOIRON.  HE'S BEING BROUGHT IN BY THE MARSHALS, AND AT

21  THIS POINT, I WOULD ASK FOR A BRIEF REST CALL RECESS.

22          **THE COURT:**  YES.  LET'S TAKE 15 MINUTES RIGHT NOW.

23                          **(RECESS)**

24          **THE COURT:**  YOU MAY BE SEATED.  AND YOU MAY CALL

25  YOUR NEXT WITNESS.

 1          **MR. PUGLIESE:**  YOUR HONOR, THE UNITED STATES CALLS
 2  JEREMY DOIRON TO TESTIFY.
 3          **THE COURT:**  IS HE HERE IN THE COURTROOM?
 4          **MR. PUGLIESE:**  YES, YOUR HONOR.  HE'LL BE BROUGHT
 5  IN.
 6          **THE COURT:**  MR. DOIRON, CAN YOU HEAR ME?  COME ON
 7  OVER HERE AND MRS. CAUSEY WILL SWEAR YOU IN AND YOU CAN TAKE
 8  THE WITNESS STAND.
 9          *(WHEREUPON, JEREMY DOIRON, HAVING BEEN DULY SWORN,*
10  *TESTIFIED AS FOLLOWS.)*
11          **THE COURT:**  YOU MAY BEGIN.
12  **DIRECT EXAMINATION**
13  **BY MR. PUGLIESE:**
14      **Q**    SIR, WOULD YOU PLEASE STATE YOUR FULL NAME?
15      **A**    JEREMY JACOB DOIRON.
16      **Q**    SIR, WOULD YOU SPELL YOUR FIRST NAME, PLEASE?
17      **A**    J-E-R-E-M-Y.
18      **Q**    AND STANDARD SPELLING FOR THE MIDDLE NAME,
19  J-A-C-O-B?
20      **A**    YES, SIR.
21      **Q**    SPELL YOUR LAST NAME, PLEASE.
22      **A**    D-O-I-R-O-N.
23      **Q**    MR. DOIRON, BEFORE WE BEGIN, DID I MEET WITH YOU
24  WITH A DEA TASK FORCE OFFICER, JEREMY -- I'M SORRY, JEFFERY
25  ZETTLEMOYER IN MARCH OF 2021?

1      A    YES, SIR.

2      Q    AT THE TIME WERE YOU INCARCERATED?

3      A    YES, SIR.

4      Q    AND AT THE TIME DID I MAKE CERTAIN PROMISES TO YOU

5  ABOUT SHOULD YOU TESTIFY IN THE TRIAL OF DR. LAMARTINERE?

6      A    NO.

7      Q    DID I TELL YOU AT ANY POINT, EITHER THROUGH YOU OR

8  PERHAPS A SIGNIFICANT OTHER, THAT I WOULD ADVISE YOUR ATTORNEY

9  IF YOU TESTIFIED TRUTHFULLY?

10     A    I BELIEVE SO.

11     Q    AND HOW ABOUT THE ASSISTANT DISTRICT ATTORNEY ON A

12 CASE THAT WAS PENDING?

13     A    YEAH.

14     Q    MR. DOIRON, I WANT TO GET THROUGH THIS UPFRONT.

15 IT'S JUST ABOUT SOME CONVICTIONS THAT CAN BE CONSIDERED BY THE

16 COURT IN EVALUATING YOUR TESTIMONY.

17          I SHOW THAT YOU HAVE A 2015 FELONY CONVICTION

18 INVOLVING CONTRABAND TO A PENAL INSTITUTION; DO YOU RECALL

19 THAT?

20     A    YES, SIR.

21     Q    AND I SHOW ANOTHER 2021 CONVICTION, DISTRIBUTION,

22 POSSESSION OF A SCHEDULE I CONTROLLED SUBSTANCE AND POSSESSION

23 WITH INTENT TO DISTRIBUTE A SCHEDULE II CONTROLLED SUBSTANCE;

24 DO YOU RECALL THAT?

25     A    YES, SIR.

1    **Q**    AND DID YOU ALSO HAVE ANY FELONY CONVICTION RELATING

2    TO PRESCRIPTIONS THAT YOU RECEIVED FROM THIS DEFENDANT?

3    **A**    I DON'T BELIEVE IT WAS -- PRETTY MUCH WAS THE

4    MEDICINE -- WITH HIS MEDICINE, BUT I MEAN I HAD A CHARGE.

5    **Q**    WAS IT A CHARGE THAT INVOLVED DISTRIBUTION OF

6    METHADONE TO SOMEONE?

7    **A**    YES, SIR.

8    **Q**    THANK YOU.  MR. DOIRON, DID YOU IN FACT -- WERE YOU

9    TREATED BY DR. LAMARTINERE?

10    **A**    YES, SIR.

11    **Q**    AND ROUGHLY WHEN WERE YOU TREATED BY

12    DR. LAMARTINERE?

13    **A**    I WANT TO SAY 2013 OR '14 TO SOME POINT IN TIME AND

14    THEN IN '15.

15    **Q**    IN 2013 AND 2014, WHERE DID YOU SEE DR. LAMARTINERE?

16    **A**    AT THE OCHSNER.

17    **Q**    AND WHAT DID YOU SEE HIM FOR?

18    **A**    FOR PAIN.

19    **Q**    AND DURING THAT TIME DID HE PRESCRIBE PAIN

20    MEDICATIONS?

21    **A**    YES.

22    **Q**    AT SOME POINT IN TIME DID HE ADVISE YOU THAT HE WAS

23    LEAVING OCHSNER?

24    **A**    HE DIDN'T TELL ME.  I MEAN, IT WAS JUST GOSSIP

25    THROUGH THE PATIENTS.  HE DIDN'T NEVER SAID IT.

1    **Q**    SO PATIENTS THAT YOU KNOW WERE LETTING YOU KNOW THAT

2    HE WAS LEAVING OCHSNER?

3    **A**    YES, SIR.

4    **Q**    DURING THAT TIME WHEN YOU WERE SEEING HIM AT

5    OCHSNER, WHERE DID YOU LIVE?

6    **A**    IN PLAQUEMINE.

7    **Q**    AND THAT'S THE CITY?

8    **A**    CITY OF PLAQUEMINE, LOUISIANA.

9    **Q**    THANK YOU.  HOW ABOUT -- IS IT SAFE TO SAY YOU ALSO

10   SAW HIM WHEN HE WAS A PRIVATE PRACTITIONER, HAD HIS OWN

11   PRACTICE?

12   **A**    YES, SIR.

13   **Q**    WAS THAT ALSO -- WERE YOU ALSO LIVING IN PLAQUEMINE

14   AT THE TIME?

15   **A**    YES, SIR.

16   **Q**    I'M JUST GOING TO SHOW YOU SEVERAL PRESCRIPTIONS,

17   MR. DOIRON.  I WOULD ASK YOU TO LOOK AT THAT SCREEN.  LET ME

18   KNOW IF YOU SEE MY FINGER ABOVE A YELLOW STICKER?

19   **A**    YES, SIR.

20   **Q**    YOU SEE EXHIBIT 28-A?

21   **A**    UH-HUH.

22   **Q**    DATED AUGUST 17TH, 2015?  PLEASE, FOR THE COURT

23   REPORTER, JUST IF YOU WOULD SAY YES?

24   **A**    YES, SIR.

25   **Q**    THANK YOU.  IS THAT YOUR NAME JEREMY DOIRON?

1      **A**    YES, SIR.

2      **Q**    WAS THAT A PRESCRIPTION FOR METHADONE,

3   10-MILLIGRAMS?

4      **A**    YES, SIR.

5      **Q**    LET ME GO TO 28-B.  AGAIN, ON AUGUST 17TH, 2015, IS

6   THAT YOUR NAME JEREMY DOIRON?

7      **A**    YES, SIR.

8      **Q**    WAS THAT A PRESCRIPTION FOR OXYCODONE,

9   30-MILLIGRAMS?

10      **A**    YES, SIR.

11      **Q**    AND ANOTHER ON AUGUST 17TH.  DO YOU SEE 28-C?

12      **A**    YES, SIR.

13      **Q**    DATED AUGUST 17TH, 2015?

14      **A**    YES, SIR.

15      **Q**    AND IT'S IN YOUR NAME?

16      **A**    YES, SIR.

17      **Q**    FOR OXYCODONE 30'S?

18      **A**    YES, SIR.

19      **Q**    AND THE START DATE WAS SEPTEMBER 15TH, 2015?

20      **A**    YES, SIR.

21      **Q**    I'M GOING TO SHOW YOU EXHIBIT 28-D, ALSO

22   AUGUST 17TH, 2015.  AND YOUR NAME JEREMY DOIRON?

23      **A**    YES, SIR.

24      **Q**    AND THIS WAS OXYCODONE, 30-MILLIGRAM TABLETS?

25      **A**    YES, SIR.

1    **Q**    AND THE START DATE WAS OCTOBER 15, 2015?

2    **A**    YES, SIR.

3    **Q**    AND THAT'S EXHIBIT 28-D?

4    **A**    (NODDING AFFIRMATIVELY.)

5    **Q**    SIR?

6    **A**    YES, SIR.

7    **Q**    THANK YOU, SIR.  AND NOW I'M GOING TO SHOW YOU

8    EXHIBIT 29-A, DATED AUGUST 25TH, 2015.  AGAIN, IS THAT IN YOUR

9    NAME, JEREMY DOIRON?

10   **A**    YES, SIR.

11   **Q**    AGAIN, METHADONE, 10-MILLIGRAM TABLETS?

12   **A**    YES, SIR.

13   **Q**    THIS INDICATES, "REPLACEMENT SUPPLY INVOLVED IN

14   MVA --

15   **A**    MOTOR VEHICLE ACCIDENT.

16   **Q**    -- AND MEDS WERE DESTROYED WHEN VEHICLE CAUGHT

17   FIRE."  WAS THAT SOMETHING THAT YOU TOLD DR. LAMARTINERE?

18   **A**    NO, THEY HAD A POLICE REPORT.

19   **Q**    SO DID YOU IN FACT -- WERE YOU IN A MOTOR VEHICLE

20   ACCIDENT WITH A VEHICLE CATCHING FIRE?

21   **A**    YES, SIR.

22   **Q**    WERE YOU ARRESTED BECAUSE OF THAT?

23   **A**    I WAS.

24   **Q**    LET'S GO TO 29-B, AUGUST 25TH.  JEREMY DOIRON, AM I

25   CORRECT?

1      **A**     YES, SIR.

2      **Q**     OXYCODONE, 30-MILLIGRAM TABLETS?

3      **A**     YES, SIR.

4      **Q**     AGAIN, THIS WAS A PRESCRIPTION -- THE FIRST

5  PRESCRIPTION WAS AUGUST 17TH.  IT WAS EIGHT DAYS LATER ON

6  AUGUST 25TH?

7      **A**     WHEN I GOT IN THE WRECK.

8      **Q**     AND THIS WAS, AGAIN, YOU ADVISED THE DOCTOR THAT

9  YOUR MEDICATIONS BURNED IN AN ACCIDENT?

10     **A**     YES, SIR.

11     **Q**     IS IT SAFE TO SAY SINCE YOU RECEIVED THIS ON

12  AUGUST 25TH AND YOU WERE ARRESTED SOME TIME AFTER THE FIRST

13  VISIT AND THEN RELEASED BEFORE THIS VISIT?

14     **A**     RIGHT.

15     **Q**     AND THEN WE GO TO AUGUST 31ST.  AGAIN, THIS IS

16  EXHIBIT 30-A.  IS THAT YOUR NAME, JEREMY DOIRON?

17     **A**     YES, SIR.

18     **Q**     AUGUST 31ST, 2015?

19     **A**     YES, SIR.

20     **Q**     AND METHADONE, 10-MILLIGRAMS?

21     **A**     YES, SIR.

22     **Q**     AND THE SAME DATE, EXHIBIT 30-B; IS THAT YOUR NAME,

23  JEREMY DOIRON?

24     **A**     YES, SIR.

25     **Q**     METHADONE, 10-MILLIGRAM TABLETS?

1    A    YES, SIR.

2    Q    WHAT'S -- WHAT'S THE AMOUNT OF THAT PRESCRIPTION?

3    A    420.  MY PAIN HAD INCREASED.

4    Q    SO YOU TOLD DR. LAMARTINERE THAT YOUR PAIN HAD

5  INCREASED?

6    A    YES, SIR.

7    Q    AND THE START DATES, I'M SORRY, FOR THOSE TWO

8  PRESCRIPTIONS WERE SEPTEMBER 15TH, 2015, THAT'S 30-A --

9    A    UH-HUH.

10    Q    -- METHADONE, AND AGAIN FOR 30-B THE PRESCRIPTION ON

11  AUGUST 31ST FOR METHADONE, THE START DATE -- IT'S KIND OF

12  BLOCKED OFF -- BUT OCTOBER 15TH, 2015?

13    A    YES, SIR.

14    Q    THANK YOU, SIR.

15         MR. PUGLIESE:  YOUR HONOR, AT THIS POINT, THE UNITED

16  STATES MOVES INTO EVIDENCE INCLUSIVE EXHIBITS 28-A THROUGH

17  30-B.

18         THE COURT:  ANY OBJECTIONS?

19         MR. BRINDLEY:  NO OBJECTIONS.

20         THE COURT:  THEY WILL BE RECEIVED INTO EVIDENCE.

21  BY MR. PUGLIESE:

22    Q    MR. DOIRON, WHEN YOU STARTED SEEING DR. LAMARTINERE

23  AT OCHSNER, DID HE TAKE X-RAYS; DO YOU RECALL?

24    A    I DON'T RECALL.

25    Q    DID HE DO ANYTHING LIKE MRI'S OR CAT SCANS?

1    **A**    I ALREADY HAD MRI'S AND CAT SCANS.

2    **Q**    YOU ALREADY HAD THEM?

3    **A**    YEAH.

4    **Q**    SO YOU GAVE THEM TO HIM?

5    **A**    YES, SIR.

6    **Q**    WHEN YOU BELIEVE YOU STARTED VISITING HIM; IN 2013?

7    **A**    I THINK.

8    **Q**    DO YOU REMEMBER HIM AT ANY POINT ASKING OR

9    PRESCRIBING ADDITIONAL MRI'S?

10   **A**    I DON'T BELIEVE.

11   **Q**    NOW, PRIOR TO SEEING DR. LAMARTINERE AT OCHSNER, DID

12   YOU SEE A DR. ELLIS?

13   **A**    YES, SIR.

14   **Q**    WAS HE PRESCRIBING PAIN MEDICATION?

15   **A**    YES, SIR.

16   **Q**    AND THEN WHEN YOU SAW DR. LAMARTINERE AT OCHSNER, HE

17   WAS PRESCRIBING PAIN MEDICATION?

18   **A**    YEAH.  YES, SIR.

19   **Q**    AND AFTER HE LEFT OCHSNER AND STARTED HIS OWN

20   PRACTICE, WHEN YOU SAW HIM IN AUGUST 2015, HE GAVE YOU

21   PRESCRIPTIONS FOR METHADONE AND OXYCODONE?

22   **A**    YES, SIR.

23   **Q**    DID YOU PROVIDE HIM ANY MRI'S BEFORE THAT --

24   **A**    YEAH.

25   **Q**    -- BEFORE THOSE PRESCRIPTIONS?

1    **A**    YEAH, HE SHOULD HAVE AN MRI.

2    **Q**    WOULD THAT HAVE BEEN FROM THE OCHSNER MRI OR A NEW

3    MRI THAT WAS PROVIDED?

4    **A**    I THINK I HAD TOOK SOME NEW MRI'S BY THAT TIME.

5    **Q**    DID HE ORDER ANY MRI'S DURING AUGUST --

6    **A**    I DON'T RECALL.  I DON'T RECALL.

7    **Q**    THANK YOU.  DID YOU PAY DR. LAMARTINERE FOR YOUR

8    VISITS?

9    **A**    YES, SIR.

10   **Q**    AT OCHSNER DID YOU PAY FOR YOUR VISITS?

11   **A**    YEAH.

12   **Q**    HOW?

13   **A**    CASH.

14   **Q**    AND DID YOU PAY FOR YOUR VISITS WHEN HE WAS IN

15   PRIVATE PRACTICE?

16   **A**    YES, SIR.

17   **Q**    WAS IT EVERY VISIT?

18   **A**    YEAH, EVERY VISIT.

19   **Q**    DO YOU RECALL HOW MUCH?

20   **A**    I THINK IT WAS $100 OR SOMETHING.

21   **Q**    IN AN INTERVIEW LAST MARCH OF 2021, DID YOU

22   INDICATE -- HAVE AN OPPORTUNITY TO REVIEW, YOU RECALL, YOUR

23   FIRST INTERVIEW?

24   **A**    MY FIRST INTERVIEW?

25   **Q**    YES, SIR.

1     **A**    WHEN WAS THE FIRST INTERVIEW?

2     **Q**    THE FIRST INTERVIEW WAS IN AUGUST OF 2018.

3     **A**    I DON'T THINK I REVIEWED IT.

4     **Q**    IN, I'M SORRY, MARCH OF 2021, DID YOU INDICATE THAT

5   IT WAS A DR. OSTROWE WHO OFFERED YOU ALTERNATIVE THERAPIES AND

6   NOT DR. LAMARTINERE?

7     **A**    YEAH.  HE WANTED TO PUT A PAIN PUMP INSIDE MY

8   STOMACH, BUT I DIDN'T WANT THAT.

9     **Q**    DID DR. LAMARTINERE PRESCRIBE YOU ENOUGH

10  PRESCRIPTIONS TO HELP WITH YOUR PAIN?

11    **A**    YEAH.  YES, SIR.

12    **Q**    WERE THERE PILLS LEFT OVER FROM THOSE PRESCRIPTIONS

13  THAT YOU USED TO DISTRIBUTE?

14    **A**    NO.

15    **Q**    MR. DOIRON, YOU INDICATED THAT THERE WAS A

16  CONVICTION THAT YOU HAD.  DO YOU RECALL THAT RELATING TO

17  METHADONE?

18    **A**    YES, SIR.

19    **Q**    AND WAS THAT IN -- WAS THAT METHADONE, WAS THAT THE

20  DRUG DEAL IN AUGUST OF 2015?

21    **A**    YES, SIR.

22    **Q**    AND DID IT INVOLVE METHADONE?

23    **A**    YES, SIR.

24    **Q**    WERE YOU RECEIVING METHADONE FROM ANYONE ELSE AT

25  THAT TIME?

```
 1         A    NO, SIR.

 2         Q    WERE YOU BUYING METHADONE OFF THE STREET AT THAT

 3   TIME?

 4         A    NO, SIR.

 5              MR. PUGLIESE:  NO FURTHER QUESTIONS, YOUR HONOR.

 6              THE COURT:  MR. BRINDLEY WILL CROSS-EXAMINE.

 7              MR. BRINDLEY:  THANK YOU, YOUR HONOR.

 8   CROSS-EXAMINATION

 9   BY MR. BRINDLEY:

10         Q    MR. DOIRON, DR. ELLIS TREATED YOU WITH OPIOID PAIN

11   MEDICATIONS BEFORE DR. LAMARTINERE DID, RIGHT?

12         A    CORRECT.

13         Q    DR. ELLIS GAVE YOU SIMILAR PRESCRIPTIONS TO SOME OF

14   THOSE YOU WOULD ULTIMATELY RECEIVE FROM DR. LAMARTINERE,

15   CORRECT?

16         A    CORRECT.

17         Q    AND DR. ELLIS DID THAT AFTER REVIEWING YOUR

18   CONDITION AND THE PAIN THAT YOU WERE IN, RIGHT?

19         A    CORRECT.

20         Q    NOW, YOU DID SEE A DIFFERENT DOCTOR NAMED DR.

21   OSTROWE, RIGHT?

22         A    YES, SIR.

23         Q    AND DR. OSTROWE SUGGESTED A DIFFERENT KIND OF PAIN

24   THERAPY OTHER THAN THE PAIN MEDICATIONS, RIGHT?

25         A    YEAH.  HE WANTED TO DO A PUMP IN MY MUSCLE IN MY
```

1    STOMACH.

2        **Q**    SO THERE WOULD HAVE TO BE SOME SORT OF SURGICALLY

3    INSERTED DEVICE, RIGHT?

4        **A**    CORRECT.

5        **Q**    AND YOU WEREN'T COMFORTABLE WITH HAVING THAT DONE TO

6    YOU, RIGHT?

7        **A**    NO, SIR.

8        **Q**    AND ULTIMATELY YOU WENT TO SEE DR. LAMARTINERE

9    RIGHT?

10        **A**    CORRECT.

11        **Q**    WHEN YOU FIRST SAW DR. LAMARTINERE, HE WAS AT

12    OCHSNER, RIGHT?

13        **A**    CORRECT.

14        **Q**    AND THEN LATER YOU WENT AND SAW HIM AT HIS OWN

15    PRIVATE CLINIC, RIGHT?

16        **A**    CORRECT.

17        **Q**    NOW, WHEN YOU FIRST WENT TO SEE DR. LAMARTINERE, HE

18    CONDUCTED A PHYSICAL EXAMINATION, RIGHT?

19        **A**    YES, SIR.

20        **Q**    HE EXAMINED THE INJURED AREA THAT YOU HAD, RIGHT --

21        **A**    YES, SIR.

22        **Q**    -- ON YOUR BODY?

23        **A**    YES, SIR.

24        **Q**    WHERE WAS THE INJURY THAT GIVES RISE TO YOUR PAIN?

25        **A**    ON MY KNEE AND MY HIP AND MY ARM.

1    **Q**    YOUR KNEE, HIP AND --

2    **A**    -- ARM.

3    **Q**    -- AND YOUR ARM.  SO THE AREAS WHERE YOU WERE IN

4    PAIN, HE EXAMINED EACH OF THOSE WHEN YOU FIRST WENT TO SEE

5    HIM, RIGHT?

6    **A**    YES, SIR.

7    **Q**    HE REQUIRED THAT YOU PROVIDE HIM AN MRI THAT SHOWED

8    THE STATUS OF YOUR INJURIES LEADING TO YOUR PAIN, RIGHT?

9    **A**    YES, SIR.

10   **Q**    HE REQUIRED YOU TO SHOW PRIOR RECORDS OF

11   PRESCRIPTIONS YOU HAD BEEN ON, RIGHT?

12   **A**    YES, SIR.

13   **Q**    AND THEN HE REVIEWED WITH YOU THE MEDICATIONS THAT

14   YOU HAD BEEN ON IN THE PAST, RIGHT?

15   **A**    CORRECT.

16   **Q**    AND HE REVIEWED WITH YOU THE POSSIBLE OPTIONS ABOUT

17   WHAT MEDICATIONS YOU COULD RECEIVE TO TRY TO ADDRESS THE PAIN,

18   RIGHT?

19   **A**    CORRECT.

20   **Q**    NOW, WHEN DR. LAMARTINERE FIRST STARTED PRESCRIBING

21   FOR YOU, HE PRESCRIBED -- WAS THE DOSAGE THAT HE PRESCRIBED

22   LOWER THAN WHAT DR. ELLIS HAD PRESCRIBED?

23   **A**    I THINK IT WAS THE SAME.

24   **Q**    SO HE DIDN'T GO HIGHER THAN DR. ELLIS, HE DIDN'T GO

25   LOWER, HE ENDED UP STAYING ABOUT THE SAME PLACE, RIGHT?

1        **A**    RIGHT.  CORRECT.

2        **Q**    IN THAT INITIAL MEETING WITH DR. LAMARTINERE WHERE

3   YOU SAID HE DID THE PHYSICAL EXAMINATION OF YOUR INJURED

4   AREAS, HE ALSO PHOTOGRAPHED YOUR PRIOR INJURIES, CORRECT?

5        **A**    YES, SIR.

6        **Q**    AND THEN HE DISCUSSED WITH YOU IN DETAIL YOUR PAIN,

7   RIGHT?

8        **A**    YES, SIR.

9        **Q**    HE TALKED TO YOU ABOUT YOUR DAILY LIFE ACTIVITIES

10  AND HOW THE PAIN LIMITED THEM, RIGHT?

11       **A**    CORRECT.

12       **Q**    YOU WERE IN VERY REAL PAIN, WEREN'T YOU, SIR?

13       **A**    I STILL AM.

14       **Q**    AND YOUR DAILY LIFE IS -- LET'S STICK WITH BACK

15  THEN.  YOUR DAILY LIFE WAS PLAGUED BY THAT PAIN, RIGHT?

16       **A**    CORRECT.

17       **Q**    YOU WERE LIMITED ON WHAT YOU COULD DO IN TERMS OF

18  BASIC ACTIVITIES, RIGHT?

19       **A**    CORRECT.

20       **Q**    AND DR. LAMARTINERE TALKED TO YOU ABOUT ALL OF THAT,

21  RIGHT?

22       **A**    YES, SIR.

23       **Q**    AND DR. LAMARTINERE TALKED ABOUT WHAT DIFFERENT

24  MEDICATIONS COULD BE USED TO TRY TO GET YOU SOME MORE

25  FUNCTIONALITY IN LIFE AND GET THE PAIN UNDER CONTROL, RIGHT?

```
 1        A    RIGHT.

 2        Q    HE DISCUSSED THE TREATMENTS THAT HAD WORKED IN THE

 3   PAST, RIGHT?

 4        A    CORRECT.

 5        Q    AND HE DISCUSSED TREATMENTS THAT DID NOT WORK THAT

 6   WELL IN THE PAST, RIGHT?

 7        A    RIGHT.

 8        Q    IN FACT, YOU HAD A LENGTHY AND EXTENSIVE DISCUSSION

 9   ABOUT THIS PAIN AND ALL OF THE IMPACT IT HAD ON YOU, RIGHT?

10        A    CORRECT.

11        Q    AND ALL THE TREATMENTS YOU'VE HAD BEFORE, RIGHT?

12        A    RIGHT.

13        Q    AND DR. LAMARTINERE ALSO RECEIVED FAXED MEDICAL

14   RECORDS FROM PRIOR PROVIDERS I THINK; IS THAT RIGHT?

15        A    CORRECT.

16        Q    NOW, WHEN YOU WOULD GO BACK FOR FOLLOW-UP

17   EXAMINATIONS WITH DR. LAMARTINERE, HOW THOSE WOULD GO IS YOU

18   WOULD GO IN AND YOU WOULD -- HE WOULD ASK YOU QUESTIONS ABOUT

19   HOW YOU WERE DOING, RIGHT?

20        A    RIGHT.

21        Q    MEANING HE WOULD ASK YOU HOW MUCH CONTROL YOU HAD

22   OVER THE PAIN, RIGHT?

23        A    RIGHT.

24        Q    HE WOULD ASK YOU HOW MUCH MORE YOU WERE ABLE TO DO

25   IN YOUR DAILY LIFE THAN YOU HAD BEEN WITHOUT THE MEDICATION,
```

1  CORRECT?

2       **A**   CORRECT.

3       **Q**   AND BASED ON YOUR ANSWERS ABOUT HOW MUCH THE PAIN

4  WAS LIMITING YOUR LIFE, HE WOULD ADJUST MEDICATIONS, WOULDN'T

5  HE?

6       **A**   HE WOULD.

7       **Q**   DR. LAMARTINERE PRESCRIBED FOR YOU MEDICATIONS THAT

8  WERE BOTH NON -- BOTH NARCOTIC AND NON-NARCOTIC, CORRECT?

9       **A**   CORRECT.

10      **Q**   AND HE PRESCRIBED YOU LYRICA AT ONE POINT, RIGHT?

11      **A**   YES.

12      **Q**   HE'S PRESCRIBED YOU WITH NEURONTIN AT ONE POINT,

13  RIGHT?

14      **A**   YES.

15      **Q**   THESE ARE BOTH NON-NARCOTICS, RIGHT?

16      **A**   CORRECT.

17      **Q**   AND HE PRESCRIBED THOSE AS PART OF THESE DISCUSSIONS

18  YOU WERE HAVING ABOUT TRYING TO GET THE PAIN UNDER CONTROL,

19  RIGHT?

20      **A**   YES, SIR.

21      **Q**   HE MADE IT CLEAR TO YOU WHEN OFFERING THESE

22  NON-NARCOTIC OPTIONS THAT IT WAS IMPORTANT TO CONTROL THE PAIN

23  WITHOUT GIVING YOU TOO MUCH MEDICINE, RIGHT?

24      **A**   RIGHT.

25      **Q**   BECAUSE HE TALKED TO YOU ABOUT THE RISKS OF

1    ADDICTION, DIDN'T HE?

2         **A**    YES, SIR.

3         **Q**    AND HE TALKED TO YOU ABOUT HOW HE HAD TO LIMIT IT AS

4    MUCH AS POSSIBLE IN TERMS OF DOSAGE SO YOU COULD AVOID THAT

5    THE BEST YOU COULD, RIGHT?

6         **A**    YES, SIR.

7         **Q**    BUT HE ALSO EXPLAINED TO YOU THAT ANYONE THAT TAKES

8    PAIN MEDICATION BECOMES DEPENDENT ON IT, RIGHT?

9         **A**    YES, SIR.

10        **Q**    SO YOU UNDERSTOOD THAT YOU WOULD NEED TO TAKE MORE

11   OVER TIME TO MAINTAIN THE SAME LEVEL OF PAIN RELIEF, CORRECT?

12        **A**    CORRECT.

13        **Q**    AND THAT'S THE SAME THING THAT YOU HAD UNDERSTOOD

14   FROM PRIOR PAIN PROVIDERS, RIGHT?

15        **A**    CORRECT.

16        **Q**    THAT'S JUST THE UNFORTUNATE NATURE OF BEING IN

17   CHRONIC PAIN AND HAVING TO GET IT CONTROLLED, RIGHT?

18        **A**    YES, SIR.

19        **Q**    THAT'S BEEN YOUR EXPERIENCE?

20        **A**    YES, SIR.

21        **Q**    OKAY.  NOW, YOUR FOLLOW-UP MEETINGS WITH

22   DR. LAMARTINERE INVOLVED DETAILED DISCUSSIONS, AGAIN, ABOUT

23   THE PAIN AND ABOUT HOW IT WAS IMPACTING YOUR LIFE, CORRECT?

24        **A**    CORRECT.

25        **Q**    AND ANYTIME MEDICATION WAS INCREASED OR ADJUSTED

1   THAT HAPPENED BECAUSE YOU WERE EXPERIENCING MORE PAIN, RIGHT?

2       **A**    YEAH, I HAD GOT IN A MOTOR VEHICLE ACCIDENT.

3       **Q**    SO YOU GOT IN AN ACCIDENT AND THAT ACCIDENT HAD

4   CAUSED THE PAIN TO INCREASE SIGNIFICANTLY, RIGHT?

5       **A**    CORRECT.

6       **Q**    AND BECAUSE THE PAIN INCREASED, YOU ACCURATELY

7   REPORTED TO HIM THAT YOU WERE IN A LOT MORE PAIN AND NEEDED

8   MORE CONTROL, RIGHT?

9       **A**    RIGHT.

10      **Q**    BECAUSE YOU COULDN'T DO MUCH OF ANYTHING WITH THAT

11  PAIN?

12      **A**    CORRECT.

13      **Q**    SO HE ADJUSTED THE MEDICATION UPWARD, CORRECT?

14      **A**    CORRECT.

15      **Q**    BUT THERE WAS NEVER A POINT WHERE DR. LAMARTINERE

16  ALLOWED YOU TO JUST COME IN TO HIM AND SAY, HEY, WHAT I WANT

17  IS IT THIS DOSAGE OR THIS DRUG AND HE JUST GAVE IT TO YOU;

18  THAT DIDN'T WORK THAT WAY, DID IT?

19      **A**    NO, SIR.

20      **Q**    HE HAD A DETAILED DISCUSSION WITH YOU EVERY TIME

21  ABOUT THE PAIN AND WHAT WAS THE BEST THING THAT YOU GUYS COULD

22  DO TO KEEP IT UNDER CONTROL, CORRECT?

23      **A**    CORRECT.

24      **Q**    NOW, THE PROSECUTOR ASKED YOU QUESTIONS ABOUT THIS

25  INCIDENT WHERE YOU WERE IN A MOTOR VEHICLE ACCIDENT AND THE

63

1   MEDICATION -- YOU HAD INDICATED TO DR. LAMARTINERE THE

2   MEDICATION GOT DESTROYED IN THE ACCIDENT, RIGHT?

3       **A**   CORRECT.

4       **Q**   SO IN THAT INSTANCE, YOU DID GET INTO A MOTOR

5   VEHICLE ACCIDENT, RIGHT?

6       **A**   YEAH, I DID.

7       **Q**   THE VEHICLE DID CATCH ON FIRE, CORRECT?

8       **A**   YES, SIR.

9       **Q**   WHEN YOU WENT TO DR. LAMARTINERE, YOU DIDN'T JUST

10  TELL HIM ABOUT IT, YOU GAVE HIM PROOF, RIGHT?

11      **A**   YEAH.

12      **Q**   YOU HAD A POLICE REPORT DOCUMENTING THIS INCIDENT OF

13  THE CAR WRECK, RIGHT?

14      **A**   CORRECT.

15      **Q**   AND YOU GAVE HIM THAT POLICE REPORT TO DEMONSTRATE

16  THAT YOU HAD LOST YOUR MEDICATION, CORRECT?

17      **A**   CORRECT.

18      **Q**   SO THERE WAS NO SENSE IN WHICH DR. LAMARTINERE HAD

19  ANY REASON TO BELIEVE THAT FROM WHAT YOU GAVE HIM --

20          **MR. PUGLIESE:**  OBJECTION, YOUR HONOR.  IT'S

21  CONJECTURE.  IT CALLS FOR --

22          **THE COURT:**  I'M GOING TO OVERRULE THE OBJECTION.

23  **BY MR. BRINDLEY:**

24      **Q**   BASED ON THE DOCUMENTATION YOU GAVE HIM, YOU DID NOT

25  SEE ANY REASON TO BELIEVE THAT DR. LAMARTINERE WOULD DOUBT

1  YOU, DID YOU?

2      **A**    NO.

3      **Q**    YOU HAD HAD A LONG AND VERY POSITIVE RELATIONSHIP

4  WITH HIM, RIGHT?

5      **A**    CORRECT.

6      **Q**    AND YOU HAD BEEN VERY HONEST WITH HIM ABOUT YOUR

7  PAIN AND HOW THINGS WERE GOING THROUGHOUT, RIGHT?

8      **A**    ALWAYS.

9      **Q**    AND HE HAD BEEN VERY RESPONSIVE TO YOUR HONEST

10  ASSESSMENTS IN TRYING TO HELP YOU, RIGHT?

11      **A**    YES, SIR.

12      **Q**    AND WHEN YOU CAME IN AFTER THE MOTOR VEHICLE, NOT

13  ONLY DID YOU HAVE THE POLICE REPORT SHOWING THAT THIS ACCIDENT

14  OCCURRED AS YOU'VE SAID, BUT YOU ALSO WERE PHYSICALLY INJURED

15  OBVIOUSLY, RIGHT?

16      **A**    YES, SIR.

17      **Q**    WERE YOU IN A WHEELCHAIR WHEN YOU CAME IN?

18      **A**    I WAS IN A WALKER, BUT MY ARM WAS IN A SLING AND A

19  BRACE AND I BROKE MY COLLARBONE IN EIGHT SPOTS.

20      **Q**    SO YOU HAD A POLICE REPORT DOCUMENTING THE INCIDENT

21  AND YOU WERE OBVIOUSLY INJURED TO ANYONE THAT SAW YOU?

22      **A**    YES, SIR.

23      **Q**    NOW, YOU WERE ASKED ABOUT AN INSTANCE IN WHICH YOU

24  PROVIDED SOME METHADONE TO SOME OTHER PERSON, RIGHT?

25      **A**    YES, SIR.

1      **Q**    NOW, DR. LAMARTINERE, YOU DIDN'T GIVE HIM ANY REASON

2  TO BELIEVE YOU WERE DOING THAT, DID YOU?

3      **A**    HE DIDN'T KNOW.

4      **Q**    YOU DID THAT IN A WAY THAT DR. LAMARTINERE WOULDN'T

5  HAVE ANY KNOWLEDGE ABOUT IT, RIGHT?

6      **A**    CORRECT.  CORRECT.

7      **Q**    HE DIDN'T HAVE ANY PART IN IT, RIGHT?

8      **A**    NOPE.

9      **Q**    AND YOU BELIEVED THAT IF HE HAD FOUND OUT HE WOULD

10  HAVE CEASED YOUR TREATMENT OR AT LEAST CHANGED HOW MUCH YOU

11  WERE BEING MONITORED, RIGHT?

12      **A**    RIGHT.

13      **Q**    SO YOU KEPT THAT FROM HIM ON PURPOSE, RIGHT?

14      **A**    YES, SIR.

15      **Q**    YOU DIDN'T WANT HIM TO KNOW, RIGHT?

16      **A**    NO.

17      **Q**    YOU MADE SURE THAT HE NEVER FOUND OUT, RIGHT?

18      **A**    NO, HE NEVER FOUND OUT.

19      **Q**    OKAY.  YOU LED DR. LAMARTINERE TO BELIEVE THAT YOU

20  WERE ALWAYS TRYING TO TAKE YOUR MEDICATIONS PROPERLY, CORRECT?

21      **A**    CORRECT.

22      **Q**    AND, MR. DOIRON, AT ALL TIMES WHEN YOU WERE SEEING

23  DR. LAMARTINERE, HE SEEMED TO BE VERY THOUGHTFUL AND

24  RESPONSIVE TO YOUR EXPLANATIONS OF YOUR PAIN AND THE NEED TO

25  CONTROL IT, RIGHT?

1    **A**    CORRECT.

2    **Q**    AT ALL TIMES HE SEEMED TO BE TRYING TO GET YOU TO A

3    MEDICATION THAT COULD EFFECTIVELY CONTROL THE PAIN AND MAKE

4    YOUR LIFE BETTER, RIGHT?

5    **A**    RIGHT.

6    **Q**    AND HE ALWAYS EXPRESSED CONCERN -- AT EVERY MEETING

7    HE EXPRESSED CONCERN ABOUT HOW YOU WERE DOING AND HOW THE

8    MEDICATION WAS WORKING, CORRECT?

9    **A**    CORRECT.

10    **Q**    AT ALL TIMES HE SEEMED TO BE A DOCTOR WHO CARED

11    ABOUT YOUR WELL-BEING?

12    **A**    YEAH, HE TOOK CARE OF ME.

13    **Q**    YOU SAY HE TOOK CARE OF YOU?

14    **A**    YES, SIR.

15    **Q**    HE DID A GOOD JOB, DIDN'T HE?

16    **A**    HE DID A GOOD JOB.

17    **Q**    AND HELPED YOUR PAIN WHEN YOU WERE WITH HIM, RIGHT?

18    **A**    YES, SIR.

19    **Q**    AND AFTER YOU LOST HIM AS A DOCTOR, YOUR LIFE GOT A

20    LOT WORSE IN TERMS OF PAIN TAKING OVER YOUR LIFE, CORRECT?

21    **A**    YEAH, I WAS IN JAIL.

22    **Q**    YOU WERE IN JAIL, OKAY.

23    **A**    (NODDING AFFIRMATIVELY.)

24    **Q**    OBVIOUSLY, THE PAIN WAS A REAL PROBLEM IN JAIL AND

25    CONTINUES TO BE A REAL PROBLEM TODAY, CORRECT?

```
1        A    YES, SIR.

2        Q    GOING BACK TO DR. LAMARTINERE, WHEN YOU WERE SEEING

3   HIM, HE, AT ALL TIMES, SEEMED TO BE TRYING TO TAKE CARE OF YOU

4   AND DOING A GOOD JOB OF IT, RIGHT?

5        A    YES, SIR.

6             MR. BRINDLEY:  NO FURTHER QUESTIONS, JUDGE.

7             THE COURT:  ALL RIGHT.  REDIRECT.

8             MR. PUGLIESE:  YES, YOUR HONOR.

9   REDIRECT EXAMINATION

10  BY MR. PUGLIESE:

11       Q    MR. DOIRON, SO LET'S GO BACK.  DR. -- YOU'RE AWARE

12  DR. LAMARTINERE LEFT OCHSNER IN LATE 2014?

13       A    YEAH, THAT WAS -- YEAH, I'M AWARE.

14       Q    AND WE HAVE -- THE FIRST PRESCRIPTION THAT WE HAVE

15  IS IN AUGUST 7 -- ON AUGUST 17TH OF 2015.  DID YOU SEE HIM

16  BETWEEN THE TIME HE WAS -- LEFT OCHSNER BEFORE THAT FIRST

17  PRESCRIPTION?

18       A    I DIDN'T SEE HIM AGAIN UNTIL 2015.

19       Q    WOULD THAT BE THAT --

20       A    I GUESS --

21       Q    IN AUGUST?

22       A    I GUESS IT WOULD BE.  YEAH, ABOUT AUGUST.

23       Q    SO YOUR LENGTHY RELATIONSHIP WITH HIM WAS -- STARTED

24  2013 TO 2014 AT OCHSNER?

25       A    RIGHT.
```

1    **Q**    AND THEN BETWEEN AUGUST 17TH AND AUGUST 31ST OF

2    2015?

3    **A**    YES, SIR.

4    **Q**    AND THE RELATIONSHIP TERMINATED BECAUSE YOU WERE

5    ARRESTED?

6    **A**    YEAH.

7    **Q**    YOU INDICATED DR. LAMARTINERE PHOTOGRAPHED INJURIES.

8    THAT WAS ON YOUR FIRST VISIT?

9    **A**    I THINK SO.

10    **Q**    WHAT DID HE -- WHAT DID HE PHOTOGRAPH?

11    **A**    MY KNEE.  AND I'VE GOT STAPLES -- I'VE GOT CUTS ON

12    MY HIP WHERE I HAD A HIP REPLACEMENT.  I'VE GOT A CRUSHED KNEE

13    WHERE IT'S JUST MANGLED.  I'VE GOT SCARS AND CUTS ON MY ARM

14    FROM MY ARM ROD.  HE TOOK PICTURES OF THAT.  THAT'S WHAT HE

15    TOOK --

16    **Q**    HE TOOK PICTURES WITH A CAMERA?

17    **A**    I MEAN, I DON'T -- I KNOW HE TOOK PICTURES OR HE GOT

18    PROOF OF IT.  I DON'T KNOW IF HE TOOK PICTURES OR NOT.

19    **Q**    DID HE SEND YOU AFTER THAT -- DURING THAT FIRST

20    VISIT TO GO GET AN MRI OF ANY AREA OF YOUR BODY?

21    **A**    I REALLY DON'T RECALL.

22    **Q**    WOULD YOU KNOW WHY NO IMAGERY -- WOULD YOU KNOW WHY

23    IN NOVEMBER OF 2015, A LITTLE LESS THAN THREE MONTHS AFTER YOU

24    WERE SEEN BY DR. LAMARTINERE, WOULD YOU KNOW WHY THERE WERE NO

25    MRI'S CONTAINED IN YOUR RECORD?

1      **A**    THEY SHOULD -- THEY SHOULD HAVE THE BATON ROUGE

2   IMAGING CENTER.  THAT'S WHERE I TOOK THE CAT SCAN.

3      **Q**    WHEN WAS THAT?

4      **A**    THAT WAS IN '14 OR '15.

5      **Q**    DURING THOSE THREE ENCOUNTERS ON AUGUST 17TH,

6   AUGUST 25TH AND AUGUST 31ST, 2015, DID YOU TAKE ANY DRUG

7   SCREENS?

8      **A**    HE RANDOMLY PISS TEST ME.

9      **Q**    WHEN YOU SAY RANDOMLY --

10     **A**    I DON'T KNOW IF HE TOOK ONE THEN.

11     **Q**    SO IN AUGUST 2015 --

12     **A**    YEAH, I DON'T RECALL IF I TOOK ONE THEN OR NOT.

13     **Q**    AND YOUR AUGUST 25TH, 2015 PRESCRIPTIONS WHEN YOU

14  WENT BACK BECAUSE OF THE MOTOR VEHICLE ACCIDENT, YOU INDICATED

15  THAT YOU WERE ARRESTED BECAUSE OF THAT ACCIDENT?

16     **A**    YEAH, BUT THE -- THEY LET ME GO.

17     **Q**    AND YOU TOLD DR. LAMARTINERE YOU WERE, IN FACT,

18  ARRESTED OR IN POLICE CUSTODY?

19     **A**    YEAH.

20     **Q**    AND THAT YOU WERE DIAGNOSED WITH DRUG ABUSE?

21     **A**    NO.  I WAS DRIVING UNDER THE INFLUENCE.  WHO

22  DIAGNOSED ME WITH DRUG ABUSE?

23     **Q**    I'M JUST ASKING THE QUESTION.  I'M SORRY, SIR.

24          SO THAT AUGUST 25TH, 2015 VISIT, WAS THAT A DETAILED

25  VISIT?

1      **A**    DETAILED.  BECAUSE I BELIEVE THAT WAS THE ONE AFTER
2   THE WRECK.

3      **Q**    AFTER THE WRECK.  SO THERE WAS A PHYSICAL
4   EXAMINATION PERFORMED?

5      **A**    THEY HAD X-RAYS ALREADY FROM THE WRECK FROM THE
6   HOSPITAL ON MY SHOULDER.  I BROKE MY COLLARBONE IN EIGHT SPOTS
7   AND TORE MY ROTARY [SIC] CUP.

8      **Q**    WERE YOU ADDICTED TO PAIN MEDS BEFORE YOU SAW
9   DR. LAMARTINERE?

10     **A**    I WAS.

11     **Q**    AND WERE YOU ADDICTED AT THE TIME YOU WERE ARRESTED
12  AFTER THE PRESCRIPTION FOR METHADONE GIVEN ON AUGUST 31ST,
13  2015?

14     **A**    I WAS.

15     **Q**    HAVE YOU BEEN ABLE TO OVERCOME ADDICTION IN ANY WAY?

16     **A**    I MEAN, BEING WITHOUT IT, YOU OVERCOME IT.  BEING
17  WITHOUT IT -- WHEN I'M IN JAIL, I DON'T -- I GUESS YOU
18  OVERCOME IT THEN, YOU KNOW.

19     **Q**    ARE YOU BEING TREATED FOR YOUR PAIN NOW?

20     **A**    I AM.

21     **Q**    WITH WHAT KIND OF MEDICATION?

22     **A**    NEURONTIN.

23     **Q**    NEURONTIN?

24     **A**    YES, SIR.

25     **Q**    IS THAT ASSISTING WITH THE PAIN?

1     **A**     JUST BARELY.

2          **MR. PUGLIESE:**  NO FURTHER QUESTIONS, OH YES, I'M

3     SORRY, YOUR HONOR.

4     **BY MR. PUGLIESE:**

5     **Q**     MR. DOIRON, AFTER YOUR ARREST SOME TIME ON OR AFTER

6     AUGUST 31ST, 2015, DID YOU TALK TO DR. LAMARTINERE?

7     **A**     I'M SURE I SEEN HIM AT A VISIT -- AT A VISIT.

8     **Q**     AFTER THE AUGUST 31ST PRESCRIPTION, YOU DIDN'T GET

9     ANY MORE.  WAS THAT AROUND THE TIME YOU WERE ARRESTED?

10    **A**     YEAH.  I WAS ARRESTED IN OCTOBER.  I ALREADY HAD

11    PRESCRIPTIONS, I BELIEVE.

12    **Q**     AND AFTER YOUR ARREST -- DO YOU KNOW HE WAS ARRESTED

13    IN JANUARY OF 2016, THIS DEFENDANT, DR. LAMARTINERE?

14    **A**     YES, SIR.

15    **Q**     DID HE TALK TO YOU AFTER THAT ARREST?

16    **A**     NO, I WAS INCARCERATED.

17    **Q**     AND HE WAS INDICTED IN THIS CASE -- DID HE TALK TO

18    YOU AFTER HE WAS INDICTED IN THIS CASE IN ROUGHLY JUNE OF

19    2018?

20    **A**     I WAS INCARCERATED.

21    **Q**     AT ANY TIME?

22    **A**     I WAS INCARCERATED.

23    **Q**     SO BETWEEN THE DATE OF YOUR ARREST ON OR SHORTLY

24    AFTER AUGUST 2015 THROUGH TODAY, YOU HAVEN'T SPOKEN WITH

25    DR. KENNEDY -- DR. LAMARTINERE?

```
1         A    I THINK.  I THINK I SPOKE WITH HIM ONE TIME.

2         Q    DO YOU RECALL ROUGHLY WHAT YEAR THAT WOULD HAVE

3    BEEN?

4         A    I THINK '19.

5         Q    2019?

6         A    YES.

7         Q    THANK YOU.

8              MR. PUGLIESE:  NO FURTHER QUESTIONS.

9              THE COURT:  OKAY.  THANK YOU, SIR.  YOU MAY STAND

10   DOWN.

11             MR. PUGLIESE:  NO NEED FOR RECALL, YOUR HONOR.

12             THE COURT:  I'M SORRY?

13             MR. PUGLIESE:  NO NEED FOR RECALL.

14             THE COURT:  SAME FOR YOU MR. BRINDLEY?

15             MR. BRINDLEY:  WE AGREE, YOUR HONOR, YES.

16             THE COURT:  NO NEED FOR RECALL.

17             WHO'S YOUR NEXT WITNESS?

18             MR. PUGLIESE:  OUR NEXT WITNESS, YOUR HONOR, IS --

19   MAY I HAVE ONE MOMENT?

20             THE COURT:  SURE.

21             MR. PUGLIESE:  THE UNITED STATES CALLS MS. CAITLYN

22   FITZGERALD.

23             THE COURT:  ALL RIGHT.  MS. FITZGERALD, COME

24   FORWARD.

25             (WHEREUPON, CAITLYN FITZGERALD, HAVING BEEN DULY
```

1    *SWORN, TESTIFIED AS FOLLOWS.)*

2    **DIRECT EXAMINATION**

3    **BY MR. PUGLIESE:**

4        **Q**    GOOD MORNING, MS. FITZGERALD.

5        **A**    GOOD MORNING.

6        **Q**    WOULD YOU PLEASE STATE YOUR FIRST AND LAST NAME AND

7    SPELL THEM FOR THE RECORD.

8        **A**    CAITLYN FITZGERALD; CAITLYN, FITZGERALD,

9    F-I-T-Z-G-E-R-A-L-D.

10       **Q**    MS. FITZGERALD, WHERE ARE YOU EMPLOYED NOW?

11       **A**    CURRENTLY WITH THE LOUISIANA WHOLESALE DRUGS.

12       **Q**    AND LOUISIANA -- WHAT'S YOUR -- WHAT DUTIES DO YOU

13   PERFORM FOR LOUISIANA WHOLESALE DRUGS?

14       **A**    I AM A COMPLIANCE OFFICER.

15       **Q**    WHAT DOES THAT MEAN?

16       **A**    SO I MAKE SURE THAT OUR CUSTOMERS THAT WE SUPPLY

17   WITH CONTROLLED SUBSTANCES, I MAKE SURE THAT THEY KNOW ALL THE

18   STATE AND FEDERAL REGULATIONS, AS WELL AS OUR COMPANY POLICIES

19   REGARDING, YOU KNOW, RECORD KEEPING, DUE DILIGENCE, ANYTHING

20   TO DO WITH, YOU KNOW, PREVENTING THE DIVERSION OF CONTROLLED

21   SUBSTANCES.

22       **Q**    DID YOU WORK AS A DIVISION INVESTIGATOR FOR THE U.S.

23   DRUG ENFORCEMENT ADMINISTRATION?

24       **A**    YES, SIR.

25       **Q**    WHEN DID YOU DO THAT?

1   **A**    FROM AUGUST OF 2012 THROUGH JULY OF 2018.

2   **Q**    AND DO YOU RECALL WORKING ON THE CASE OF THIS

3   DEFENDANT DR. LAMARTINERE?

4   **A**    YES, SIR.

5   **Q**    IN FACT, DID YOU WORK -- AS PART OF YOUR DUTIES,

6   WERE YOU WORKING ON THIS DEFENDANT'S DEA REGISTRATION TO

7   DISPENSE CONTROLLED SUBSTANCES?

8   **A**    YES, SIR.

9   **Q**    AND DID YOU ALSO ASSIST WITH THE INVESTIGATION INTO

10  POTENTIAL CRIMINAL ACTIVITY?

11  **A**    YES, SIR.

12  **Q**    DO YOU REMEMBER AGENTS EXECUTING A SEARCH AT THE

13  DEFENDANT'S OFFICE IN BATON ROUGE ON GOODWOOD ON NOVEMBER 20TH

14  OF 2015?

15  **A**    YES, SIR.

16  **Q**    WERE YOU PRESENT?

17  **A**    YES.

18  **Q**    AND DID YOU ASK THE DEFENDANT QUESTIONS ALONG

19  WITH -- LET ME ASK YOU, DO YOU RECALL ASKING THE DEFENDANT ANY

20  QUESTIONS?

21  **A**    I DO NOT RECALL.

22  **Q**    HOW ABOUT QUESTIONING BY ANYONE ELSE ASSOCIATED WITH

23  THE DEA SUCH AS AGENTS, TASK FORCE OFFICERS OR OTHER DIVISION

24  INVESTIGATORS?

25  **A**    YES, SIR.

1      **Q**    DO YOU KNOW IF THAT -- DO YOU KNOW IF AT THE

2    BEGINNING OF THE SEARCH THE DEFENDANT WAS SERVED WITH A COPY

3    OF THE SEARCH WARRANT?

4      **A**    YES, THAT'S STANDARD.

5      **Q**    DO YOU REMEMBER IF THE DEFENDANT WAS ASKED TO

6    EXPLAIN HOW HE VERIFIES INFORMATION HE RECEIVES FROM PATIENTS?

7      **A**    I DO NOT RECALL.

8      **Q**    SO IT'S SAFE TO SAY YOU DON'T RECALL ANY QUESTIONING

9    ASSOCIATED WITH THE DEFENDANT BY ANYONE?

10     **A**    NOT FROM MEMORY, NO.

11     **Q**    OKAY.

12         **MR. PUGLIESE:**  YOUR HONOR, I'D LIKE TO ATTEMPT TO

13   REFRESH THE WITNESS' RECOLLECTION WITH U.S. EXHIBIT 101.

14         **THE COURT:**  ALL RIGHT.

15         **MR. PUGLIESE:**  AND I WILL PUT THAT -- IT'S A

16   FIVE-PAGE DOCUMENT.  I WILL PUT THIS ON THE OVERHEAD.

17   **BY MR. PUGLIESE:**

18     **Q**    MS. FITZGERALD, DO YOU SEE MY FINGER, BOTTOM RIGHT

19   ON YOUR SCREEN, THAT'S U.S. EXHIBIT 101?

20     **A**    YES, SIR.

21     **Q**    WERE YOU PROVIDED, PRIOR TO YOUR TESTIMONY TODAY,

22   WITH A DEA 6, IN OTHER WORDS, A DEA REPORT, ABOUT THE SEARCH

23   AND QUESTIONING OF DR. LAMARTINERE?

24     **A**    YES, SIR.

25     **Q**    HAVE YOU READ IT?

1     **A**    YES, SIR.

2     **Q**    HOW MANY TIMES?

3     **A**    FIVE OR SIX.

4     **Q**    WITHOUT LOOKING AT THAT DOCUMENT, ARE YOU ABLE TO

5   RECALL WHETHER QUESTIONS WERE ASKED OF DR. LAMARTINERE AND

6   WHAT RESPONSES WERE GIVEN, IF ANY?

7     **A**    YES.

8     **Q**    YOU CAN RECALL THAT?

9     **A**    I MEAN, AFTER HAVING READ IT A FEW TIMES.

10    **Q**    WITHOUT REFERRING TO IT, WITHOUT LOOKING AT THAT

11   SCREEN, ARE YOU ABLE TO TELL US WHETHER YOU ASKED QUESTIONS OF

12   DR. LAMARTINERE?

13    **A**    NOT ME PERSONALLY, NO.

14    **Q**    HOW ABOUT ANYONE ELSE?

15    **A**    I KNOW QUESTIONS WERE ASKED, BUT I DON'T KNOW BY

16   WHO.

17    **Q**    DID YOU ALSO HAVE AN OPPORTUNITY TO REVIEW A

18   TRANSCRIPT OF YOUR GRAND JURY TESTIMONY FROM JUNE OF 2018?

19    **A**    YES, SIR.

20    **Q**    DID THAT HELP YOU RECALL ANYTHING ABOUT THE -- ANY

21   QUESTIONINGS OR STATEMENTS MADE BY DR. LAMARTINERE DURING THE

22   SEARCH?

23    **A**    NO, SIR.

24    **Q**    I'LL ASK YOU TO LOOK AT THE BOTTOM OF U.S.

25   EXHIBIT 101.  THE SIGNATURE IN BLOCK 12, DO YOU SEE THAT,

1   CAITLYN B. FITZGERALD D.I.?

2       **A**   YES, SIR.

3       **Q**   DATED DECEMBER 4TH, 2015?

4       **A**   YES, SIR.

5       **Q**   WE INDICATED THAT THE SEARCH WAS CONDUCTED, IF YOU

6   RECALL, IN NOVEMBER OF 2015?

7       **A**   YES, SIR.

8       **Q**   NOW, THAT SIGNATURE BLOCK 12 MEANS THAT YOU -- WERE

9   YOU THE DEA EMPLOYEE WHO PREPARED THAT REPORT?

10      **A**   YES.

11      **Q**   WAS THAT REPORT PREPARED AT A TIME WHEN YOU HAD

12  PERSONAL KNOWLEDGE OF THE EVENTS THAT OCCURRED DURING THE

13  SEARCH?

14      **A**   YES.

15      **Q**   DID IT -- DOES IT TRULY REPRESENT YOUR KNOWLEDGE AS

16  IT THEN EXISTED?

17      **A**   YES, SIR.

18          **MR. PUGLIESE:**  YOUR HONOR, PURSUANT TO FEDERAL RULE

19  OF EVIDENCE 8035, RECORDED RECOLLECTION, I'D ASK FOR

20  PERMISSION TO HAVE MS. FITZGERALD READ SECTIONS OF THIS INTO

21  THE RECORD.

22          **THE COURT:**  ANY OBJECTIONS?

23          **MR. BRINDLEY:**  NO OBJECTION, YOUR HONOR.

24          **THE COURT:**  ALL RIGHT.  YOU MAY PROCEED.

25          **MR. PUGLIESE:**  THANK YOU.

1  BY MR. PUGLIESE:

2      **Q**    SO, MS. FITZGERALD, IS THIS DOCUMENT CORRECT IN

3  STATING THAT ON NOVEMBER 2015, THE SEARCH WARRANT OF THE

4  DEFENDANT'S PRACTICE ON GOODWOOD TOOK PLACE?

5      **A**    YES.

6      **Q**    AND I JUST HIGHLIGHTED THE SECTIONS I'D LIKE YOU TO

7  READ, OKAY?

8      **A**    OKAY.

9      **Q**    STARTING -- IT'S PARAGRAPH 2, PAGE 1.  I'M NOW

10  POINTING TO THE MIDDLE OF PARAGRAPH -- SAME PARAGRAPH ON PAGE

11  2 THAT BEGINS WITH "DR. LAMARTINERE STATED."  WOULD YOU READ

12  THAT YELLOW HIGHLIGHTED PORTION?  CAN YOU SEE IT?

13      **A**    YES, SIR.  "DR. LAMARTINERE STATED THAT HE HAD

14  APPROXIMATELY 250 PATIENTS.  LAMARTINERE THEN STATED THAT 80

15  TO THE 90 PERCENT OF THE PATIENTS WERE TREATED AND PRESCRIBED

16  CONTROLLED SUBSTANCE, SCHEDULE II'S.  LAMARTINERE STATED THAT

17  HE IS CURRENTLY BEING TARGETED BY THE MEDICAL BOARD AND THAT

18  THE BOARD REQUESTED PATIENT FILES FOR REVIEW."

19      **Q**    I'M NOW GOING TO ASK YOU TO GO TO PARAGRAPH 4 AND

20  WOULD YOU READ THAT IN ITS ENTIRETY.

21      **A**    "GS ARNETT ASKED LAMARTINERE TO EXPLAIN HOW HE

22  VERIFIES HIS PATIENTS' TRUTHFULNESS AND/OR ILLNESS.

23  LAMARTINERE STATED THAT HE CHECKS THE LOUISIANA BOARD OF

24  PHARMACIES PRESCRIPTION MONITORING PROGRAM OR PMP AND DRUG

25  SCREENS ALL OF HIS PATIENTS.  WHEN ASKED FOR MORE INFORMATION,

1  LAMARTINERE TOLD GS ARNETT THAT HE CHECKS PATIENTS' CRIMINAL

2  HISTORY AND ARREST REPORTS."

3       "LAMARTINERE DID NOT PROVIDE DETAILS ON WHERE AND

4  HOW HE OBTAINS THIS INFORMATION.  WHEN ASKED FOR MORE

5  INFORMATION ABOUT HIS PATIENT SCREENING PROCESS, LAMARTINERE

6  STATED THAT HE DRUG SCREENS EVERY PATIENT AND HAS COMPLETED

7  THE DRUG TEST SINCE MARCH OF 2015.  AT A LATER POINT IN THE

8  INTERVIEW, LAMARTINERE STATED THAT HE DRUG TESTS APPROXIMATELY

9  95 PERCENT OF HIS PATIENTS AND HE DOES NOT DRUG TEST ON THEIR

10  FIRST VISIT."

11     **Q**   I'M NOW SHOWING YOU PAGE 3 OF 5 AND I'D ASK YOU TO

12  READ THAT PARAGRAPH, PLEASE.

13     **A**   "LAMARTINERE STATED THAT HE WAS SUSPICIOUS OF SOME

14  OF HIS PATIENTS.  HE THEN STATED THAT HE FELT AN OBLIGATION TO

15  SERVE THESE PATIENTS WHO MIGHT NOT HAVE INSURANCE OR ACCESS TO

16  GOOD DOCTORS, SO HE WOULD CONTINUE TO TREAT THEM.  LAMARTINERE

17  STATED THAT IT IS NOT HIS JOB TO INVESTIGATE PATIENTS AND

18  THAT'S THE JOB OF THE POLICE."

19     **Q**   AND, MS. FITZGERALD, ON THE SAME PAGE, PAGE 3, WOULD

20  YOU PLEASE READ PARAGRAPH 7?

21     **A**   "ACCORDING TO LAMARTINERE, HE WAS EMPLOYED BY

22  OCHSNER HEALTH CENTER UNTIL APPROXIMATELY OCTOBER OF 2014.

23  HIS EXACT START DATE IS UNKNOWN, BUT DEA RECORDS INDICATE THAT

24  LAMARTINERE CHANGED HIS DEA REGISTERED ADDRESS TO OCHSNER

25  HEALTH CENTER ON FEBRUARY 28TH, 2013.  DEA INVESTIGATORS ASKED

1   LAMARTINERE IF HE WAS FIRED FROM OCHSNER.  LAMARTINERE STATED

2   THAT HE WAS TERMINATED WITHOUT CAUSE AND LEFT VOLUNTARILY.

3   LAMARTINERE STATED THAT OCHSNER STAFF FELT THAT HE SPENT TOO

4   LONG WITH PATIENTS AND HE DID NOT HAVE PROPER PATIENT CHARTS

5   OR FILES."

6       **Q**   DR. LAMARTINERE'S STATEMENTS DURING THIS INTERVIEW,

7   IS IT SAFE TO SAY THEY WERE IMPORTANT?

8       **A**   I'M SORRY?

9       **Q**   IS IT SAFE TO SAY THAT THEY WERE IMPORTANT TO THE

10  INVESTIGATION?

11      **A**   YES, SIR.

12      **Q**   HAD DR. LAMARTINERE MADE ANY STATEMENT ABOUT BEING

13  TERMINATED IN ANY OTHER WAY, WOULD YOU HAVE CAPTURED IT?

14      **A**   CAN YOU REPEAT?

15      **Q**   IF DR. LAMARTINERE HAD STATED ANYTHING DIFFERENT

16  ABOUT HIS TERMINATION FROM OCHSNER, WOULD YOU HAVE CAPTURED IT

17  IN YOUR MEMO?

18      **A**   YES.

19      **Q**   I'M NOW TURNING TO PAGE 4 OF 5 AND I'M GOING TO ASK

20  YOU TO READ PARAGRAPH 10 IN ITS ENTIRETY.

21      **A**   "LAMARTINERE STATED THAT HE CHECKS THE PMP, PATIENT

22  MEDICAL RECORDS, FROM PREVIOUS PHYSICIANS AND CONDUCTS DRUG

23  SCREENS.  TASK FORCE OFFICER TFO BREWER OBSERVED THAT THIS WAS

24  NOT TRUE.  LAMARTINERE COULD NOT HAVE OBTAINED PMP REPORTS

25  FROM THE UC'S.  THEIR PMP --

1    **Q**    I'M SORRY.  "UC," WHAT'S THAT STAND FOR?

2    **A**    UNDERCOVERS.

3    **Q**    THANK YOU.  PLEASE CONTINUE.

4    **A**    "THEIR PMP'S DID NOT EXIST BECAUSE THEY HAD NOT

5    PREVIOUSLY FILLED ANY PRESCRIPTIONS.  LAMARTINERE NEVER

6    OBTAINED PREVIOUS MEDICAL RECORDS FROM THE UNDERCOVERS.

7    LAMARTINERE THEN SAID THAT HE OCCASIONALLY PERMITS PATIENTS TO

8    SLIP THROUGH."

9    **Q**    AND, FINALLY, MS. FITZGERALD, WOULD YOU READ THE

10   HIGHLIGHTED SENTENCE THAT BEGINS WITH LAMARTINERE STATED?

11   **A**    "LAMARTINERE STATED THAT HE DOES NOT TAKE

12   INSURANCE."

13        **MR. PUGLIESE:**  NO FURTHER QUESTIONS OF THIS WITNESS.

14   THANKS, MS. FITZGERALD.

15        **THE COURT:**  ALL RIGHT.  CROSS-EXAMINATION.

16        **MR. BRINDLEY:**  NO QUESTIONS, YOUR HONOR.

17        **THE COURT:**  ALL RIGHT.  THANK YOU, MA'AM.  YOU MAY

18   STAND DOWN.

19        IS SHE FREE TO LEAVE?

20        **MR. PUGLIESE:**  YES, YOUR HONOR.

21        **MR. BRINDLEY:**  YES, YOUR HONOR.

22        **THE COURT:**  OKAY.  THANK YOU.  YOU DON'T NEED TO

23   WORRY ABOUT COMING BACK.

24        ALL RIGHT.  WHO IS YOUR NEXT WITNESS?

25        **MR. STEVENS:**  JUDGE, AT THIS TIME WE WOULD OFFER

| 1 | INTO EVIDENCE UNITED STATES EXHIBIT 88.  IT'S A CERTIFICATION |
| 2 | FROM THE INTERNAL REVENUE SERVICE AND IT SHOWS THAT AS OF |
| 3 | MARCH 2020, THE IRS HAD NO RECORD OF ANY TAX RETURNS FILED BY |
| 4 | THE DEFENDANT FOR 2015 OR 2016, SELF-AUTHENTICATING UNDER RULE |
| 5 | 902, AND WE COMPLIED WITH RULE 80310 BY PROVIDING NOTICE TO |
| 6 | THE DEFENDANT WELL IN ADVANCE.  WE DID NOT RECEIVE ANY |
| 7 | OBJECTION TO, THE EVIDENCE BEING OFFERED TODAY WITHOUT A LIVE |
| 8 | WITNESS, SO I'D OFFER UNITED STATES EXHIBIT 88 INTO EVIDENCE |
| 9 | AT THIS TIME. |
| 10 | **THE COURT:**  ANY OBJECTION TODAY, MR. BRINDLEY? |
| 11 | **MR. BRINDLEY:**  NO OBJECTION, YOUR HONOR. |
| 12 | **THE COURT:**  88 IS ADMITTED INTO EVIDENCE. |
| 13 | **MR. STEVENS:**  THANK YOU, JUDGE. |
| 14 | OUR NEXT WITNESS, AND I BELIEVE OUR LAST WITNESS, IS |
| 15 | DR. KENNEDY.  I EXPECT HE'LL TAKE SOME TIME AND MY COLLEAGUE |
| 16 | HAS ASKED IF WE COULD TAKE A SHORT BREAK JUST TO SET UP FOR |
| 17 | THAT. |
| 18 | **THE COURT:**  SURE.  IT'S 10:45.  LET'S TAKE ANOTHER |
| 19 | 15-MINUTE BREAK AND WE'LL START AT 11:00. |
| 20 | **MR. STEVENS:**  THANK YOU, JUDGE. |
| 21 | **(RECESS)** |
| 22 | **THE COURT:**  YOU MAY BE SEATED.  YOU MAY CALL YOUR |
| 23 | NEXT WITNESS. |
| 24 | **MR. STEVENS:**  JUDGE, BEFORE MR. PUGLIESE CALLS THE |
| 25 | NEXT WITNESS, THERE'S A STIPULATION THAT WILL HELP.  IT'S BEEN |

1   MARKED 72-D AND IT READS:

2           "STIPULATION CONCERNING PATIENT MEDICAL RECORDS."

3   I'LL SKIP THE PREAMBLE.  IT SAYS, "THE PARTIES STIPULATE THAT

4   THE MEDICAL RECORDS OBTAINED DURING A SEARCH OF DEFENDANT'S

5   OFFICE COMPUTER ON NOVEMBER 20, 2015, AND MEDICAL RECORDS

6   OBTAINED FROM AMAZING CHARTS, LLC, ON JANUARY 15, 2016,

7   CONTAIN ALL OF THE DEFENDANT'S PATIENT RECORDS FOR ALL

8   PATIENTS CHARGED IN THE INDICTMENT AND ARE TRUE AND CORRECT

9   COPIES OF RECORDS KEPT IN THE REGULAR COURSE OF ACTIVITY BY

10  THE DEFENDANT AND ARE AUTHENTIC BUSINESS RECORDS FOR PURPOSES

11  OF FEDERAL RULES OF EVIDENCE 803(6) AND 901."  IT WAS SIGNED

12  ON MARCH 19, 2021.  I'VE SIGNED IT.  I BELIEVE DEFENSE COUNSEL

13  WILL CERTIFY THAT HE AND THE DEFENDANT SIGNED IT AS WELL.

14          **MR. BRINDLEY:**  THAT'S CORRECT, YOUR HONOR, I DO SO

15  CERTIFY.

16          **THE COURT:**  THANK YOU.

17          **MR. STEVENS:**  AND I OFFER 72-D INTO EVIDENCE, JUDGE.

18          **THE COURT:**  72-D WILL BE ADMITTED.

19          **MR. STEVENS:**  THANK YOU, JUDGE.

20          **MR. PUGLIESE:**  YOUR HONOR, THE UNITED STATES CALLS

21  DR. GENE KENNEDY.

22          **THE COURT:**  ALL RIGHT.  DR. KENNEDY.

23          *(WHEREUPON, DR. GENE KENNEDY, HAVING BEEN DULY*

24  *SWORN, TESTIFIED AS FOLLOWS.)*

25  **DIRECT EXAMINATION**

1   BY MR. PUGLIESE:

2       **Q**   GOOD MORNING, SIR.  WOULD YOU PLEASE STATE AND SPELL

3   YOUR FIRST AND LAST NAME?

4       **A**   GENE, G-E-N-E, KENNEDY, K-E-N-N-E-D-Y.

5       **Q**   AND YOU'RE A MEDICAL DOCTOR, SIR?

6       **A**   I AM.

7       **Q**   WHAT YEAR DID YOU GRADUATE LAW SCHOOL -- MEDICAL

8   SCHOOL?

9       **A**   I'M SORRY?

10      **Q**   WHAT YEAR DID YOU GRADUATE MEDICAL SCHOOL?

11      **A**   I GRADUATED FROM MEDICAL SCHOOL IN 1992.

12      **Q**   AND DID THE DEA RETAIN YOU TO REVIEW MEDICAL CHARTS

13  AND RECORDS RELATING TO THIS DEFENDANT DR. RANDY LAMARTINERE?

14      **A**   YES, SIR.

15      **Q**   LET'S GO BACK.  LET'S TALK ABOUT YOUR EDUCATION.

16  I'M GOING TO SHOW YOU ON THE OVER -- DR. KENNEDY, I'D ASK YOU

17  TO LOOK AT THE SCREEN.  DO YOU SEE WHAT'S BEEN MARKED AS U.S.

18  EXHIBIT 81?

19      **A**   YES, SIR.

20          **MR. PUGLIESE:**  MS. BATEMAN, WOULD YOU GO TO PAGE 2

21  OF THAT DOCUMENT AND PAGE 3.

22  BY MR. PUGLIESE:

23      **Q**   DR. KENNEDY, IS THAT YOUR -- SORRY IF I BUTCHER

24  THIS -- CURRICULUM VITAE?

25      **A**   YES, SIR.

1    **Q**    AND IS THAT UP-TO-DATE?

2    **A**    I DIDN'T SEE THE INITIAL DATE ON THE FRONT, BUT I

3    BELIEVE I SENT YOU AN UPDATED ONE, YES, SIR.

4    **Q**    IS THAT A DOCUMENT THAT YOU PREPARED?

5    **A**    IT IS.

6    **Q**    AND DOES IT CAPTURE YOUR WORK EXPERIENCE, EDUCATION

7    AND PROFESSIONAL MEMBERSHIPS?

8    **A**    MOSTLY, YES, SIR.

9         **MR. PUGLIESE:**  YOUR HONOR, I MOVE TO ADMIT

10   EXHIBIT 81 INTO EVIDENCE.

11        **MR. BRINDLEY:**  NO OBJECTION.

12        **THE COURT:**  81 WILL BE ADMITTED.

13   **BY MR. PUGLIESE:**

14   **Q**    DR. KENNEDY, HAVE YOU EVER BEEN QUALIFIED AS AN

15   EXPERT BEFORE?

16   **A**    YES, SIR.

17   **Q**    HAVE YOU EVER NOT BEEN QUALIFIED?

18   **A**    NO, SIR.

19   **Q**    HAVE YOU EVER BEEN QUALIFIED AS AN EXPERT IN THE

20   STATE OF LOUISIANA?

21   **A**    YES, SIR.

22   **Q**    LET ME ASK YOU, WHEN QUALIFIED AS AN EXPERT, DO YOU

23   HAVE TO GET QUALIFIED IF YOU'RE DOING ADMINISTRATIVE

24   PROCEEDINGS?

25   **A**    YES, SIR.

1     **Q**    WHAT ARE THOSE TYPES OF PROCEEDINGS?

2     **A**    ADMINISTRATIVE PROCEEDINGS, AS FAR AS THE DEA OR THE

3     DOJ ARE CONCERNED, ARE NON-CRIMINAL.  THE DEA, AS I

4     UNDERSTAND, HAS A CRIMINAL AND AN ADMINISTRATIVE SIDE.  THE

5     CRIMINAL INVESTIGATIONS ARE SUCH AS WE'RE DOING HERE TODAY.

6     THE ADMINISTRATIVE IS, FOR EXAMPLE, REMOVING A REGISTRANT'S

7     DEA REGISTRATION.

8     **Q**    THOSE QUALIFICATIONS AS AN EXPERT WOULD BE COVERED

9     IN YOUR CV?

10    **A**    I'M SORRY?

11    **Q**    ARE THEY COVERED IN YOUR CV?

12    **A**    MY EXPERIENCE THAT QUALIFIES ME AS AN EXPERT FOR

13    THOSE HEARINGS IS IN MY CV.

14    **Q**    THANK YOU, SIR.  DID YOU OBTAIN A BACHELOR OF

15    SCIENCE DEGREE IN ZOOLOGY AT LSU?

16    **A**    ZOOLOGY AT LSU, YES, SIR.

17    **Q**    DID YOU OBTAIN THAT DEGREE IN THE '80S?

18    **A**    YES, SIR.

19    **Q**    AND AFTER THAT, DID YOU GO TO MEDICAL SCHOOL?

20    **A**    I DID.

21    **Q**    AND DID YOU GO INTO RESIDENCY -- IS THAT PART OF

22    MEDICAL SCHOOL OR IS THAT AFTER YOUR '92 GRADUATION?

23    **A**    RESIDENCY IS AFTER MEDICAL SCHOOL.

24    **Q**    WHAT IS RESIDENCY?

25    **A**    RESIDENCY IS WHERE YOU'RE TRAINED IN A MEDICAL

1    SPECIALTY.

2        Q    DID YOU PURSUE A MEDICAL SPECIALTY AFTER YOU

3    GRADUATED FROM MEDICAL SCHOOL?

4        A    AFTER GRADUATING FROM MEDICAL SCHOOL, I DID A

5    RESIDENCY IN FAMILY PRACTICE.

6        Q    THANK YOU.  DID YOU OBTAIN A LICENSE TO PRACTICE

7    MEDICINE AFTER MEDICAL SCHOOL OR AFTER THE RESIDENCY?

8        A    USUALLY YOUR FIRST MEDICAL LICENSE OCCURS WHILE

9    YOU'RE STILL IN RESIDENCY.  GENERALLY YOU CAN'T GET A MEDICAL

10   LICENSE UNTIL YOU'RE A YEAR OUT FROM MEDICAL SCHOOL, BUT MOST

11   PEOPLE GET THEIR FIRST MEDICAL LICENSE AFTER THEIR FIRST YEAR

12   AFTER THEIR INTERNSHIP, WHILE THEY'RE IN RESIDENCY.

13           THE COURT:  DR. KENNEDY, YOU SPEAK SOFTLY.  COULD

14   YOU MOVE THE MIC UP A LITTLE BIT CLOSER TO YOUR MOUTH SO WE

15   CAN MAKE SURE WE HEAR YOU AND GET YOU ON THE RECORD?

16           THE WITNESS:  YES, SIR.

17           THE COURT:  THANK YOU.

18   BY MR. PUGLIESE:

19       Q    DID YOU GET YOUR DOCTOR OF MEDICINE DEGREE AT NEW

20   YORK MEDICAL COLLEGE IN NEW YORK?

21       A    YES, SIR.

22       Q    AFTER THE RESIDENCY, DID YOU PRACTICE MEDICINE?

23       A    I DID.

24       Q    WHERE?

25       A    I INITIALLY PRACTICED IN OHIO IN TWO DIFFERENT

1  LOCATIONS BEFORE WE RELOCATED TO GEORGIA.

2       Q    WHAT YEARS WERE YOU PRACTICING IN OHIO?

3       A    AFTER RESIDENCY WHICH, AS I RECALL, WAS 1998 WHEN

4  RESIDENCY WAS OVER, I PRACTICED IN OHIO UNTIL -- NO, EXCUSE

5  ME.  RESIDENCY WAS '95 WHEN IT WAS OVER AND I PRACTICED IN

6  OHIO UNTIL ROUGHLY 2000.

7       Q    IS THAT WHEN YOU MOVED TO GEORGIA?

8       A    YES, SIR.

9       Q    NOW, WHEN YOU PRACTICED IN OHIO, WAS YOUR SPECIALTY

10 FAMILY PRACTICE?

11      A    YES, SIR, IT WAS.

12      Q    AND UPON MOVING TO GEORGIA, DID YOU CONTINUE TO

13 ENGAGE IN FAMILY --

14      A    I DID.

15      Q    -- FAMILY PRACTICE?

16      A    I DID.

17      Q    FOR HOW LONG?

18      A    IT WAS, I BELIEVE, THREE YEARS BEFORE WE BEGAN

19 THE -- WHEN MY PRACTICE WAS OVER IN CLAXTON, GEORGIA, AS I

20 RECALL, IT WAS 2004.  I HAD BEEN DOING FAMILY PRACTICE UNTIL

21 WE MOVED TO ST. SIMONS ISLAND, GEORGIA.

22      Q    SO IN 2004, WHEN YOU MOVED TO ST. SIMONS ISLAND, DID

23 YOU PRACTICE -- STILL PRACTICE MEDICINE?

24      A    YES, SIR.

25      Q    WHAT TYPE OF MEDICINE?

1      **A**    I WAS STILL DOING FAMILY PRACTICE AT THAT POINT.

2      **Q**    SO FROM THE TIME YOU MOVED TO GEORGIA, THROUGH THAT

3   POINT, DID YOU OBTAIN ANY LICENSES --

4      **A**    YES.

5      **Q**    -- FROM GEORGIA?  WHAT TYPE OF LICENSE?

6      **A**    I HAD A LICENSE IN WEST VIRGINIA WHERE I DID

7   RESIDENCY AND A LICENSE IN OHIO WHERE I CAME FROM AND THEN

8   ESTABLISHED A LICENSE IN THE STATE OF GEORGIA ALSO.

9      **Q**    SO WHEN YOU SAY "LICENSE," THAT'S A LICENSE TO

10  PRACTICE MEDICINE?

11     **A**    YES, SIR.

12     **Q**    THANK YOU.  SO AFTER 2004, DID YOU CONTINUE

13  PRACTICING MEDICINE?

14     **A**    YES, SIR.

15     **Q**    WHAT TYPE OF MEDICINE?

16     **A**    AFTER 2004, I OPENED A PAIN MANAGEMENT CLINIC ON ST.

17  SIMONS ISLAND.

18     **Q**    FROM 2004, ARE YOU STILL PRACTICING PAIN MANAGEMENT?

19     **A**    YES, SIR, I AM.

20     **Q**    HAVE THERE BEEN ANY OTHER PRACTICES IN THE INTERIM?

21     **A**    NO, THERE HAVE NOT BEEN.

22     **Q**    WERE YOU ALSO -- DID YOU ALSO WORK FOR A HOSPICE?

23     **A**    I -- YES, SIR, I WAS THE FIRST MEDICAL DIRECTOR OF

24  THE OHIO VALLEY HOSPICE WHEN IT OPENED IN BELMONT COUNTY,

25  OHIO.

1    **Q**    WHEN WAS THAT?

2    **A**    THAT WAS NOT TOO LONG AFTER RESIDENCY.

3    **Q**    NOW IS YOUR PRACTICE A LICENSED AND REGISTERED

4    MEDICAL PAIN MANAGEMENT PRACTICE IN GEORGIA?

5    **A**    IT IS.

6    **Q**    IS THAT A REQUIREMENT IN THE STATE OF GEORGIA, TO

7    HAVE A MEDICAL PAIN MANAGEMENT PRACTICE?

8    **A**    IT IS REQUIRED TO HAVE A SPECIFIC LICENSURE FOR A

9    MEDICAL PAIN MANAGEMENT PRACTICE, YES, SIR.

10    **Q**    WHAT'S NEEDED FOR THE CLINIC TO OBTAIN A LICENSE?

11    **A**    WELL, OF COURSE THEY CHARGE A FEE, AND THERE'S ALSO

12    EXPERIENTIAL QUALIFICATIONS AND EDUCATION QUALIFICATIONS.

13    **Q**    WHAT DO YOU DO IN YOUR PAIN MANAGEMENT PRACTICE?

14    **A**    MY PAIN MANAGEMENT PRACTICE LARGELY IS MEDICAL.  THE

15    PATIENTS THAT I SEE ARE REFERRED TO ME FROM BOARD CERTIFIED

16    INTERVENTIONAL PAIN PHYSICIANS, THE TYPE THAT DO SPINAL CORD

17    STIMULATORS AND THINGS LIKE THAT.  AND THEY WILL REFER

18    PATIENTS TO ME TO MANAGE THE MEDICATIONS OF THEIR PATIENTS, AS

19    WELL AS NEUROSURGEONS AND A NUMBER OF OTHER MEDICAL

20    SPECIALTIES.

21    **Q**    SO WHEN YOU START SEEING A PATIENT, THAT'S WHEN YOUR

22    MEDICAL MANAGEMENT OF THE PATIENT BEGINS?

23    **A**    YES, SIR.

24    **Q**    IS THERE A MEDICAL MANAGEMENT THAT'S SHORT-TERM?

25    **A**    THAT WOULD DEPEND ON THE PATIENT.

1   **Q**   HAVE YOU HAD PATIENTS WHERE IT WAS SHORT-TERM?

2   **A**   CERTAINLY.

3   **Q**   AND HOW ABOUT LONG-TERM?

4   **A**   CERTAINLY.

5   **Q**   IN THIS PAIN MANAGEMENT PRACTICE, DO YOU PRESCRIBE

6   CONTROLLED SUBSTANCES?

7   **A**   YES, SIR.

8   **Q**   DO YOU PRESCRIBE SCHEDULE II OPIOIDS?

9   **A**   I DO.

10   **Q**   HOW ABOUT SCHEDULE II STIMULANTS SUCH AS AMPHETAMINE

11   SALTS?

12   **A**   I DO NOT.  THAT'S SOMETHING THAT I HAVE NOT DONE AT

13   ALL SINCE FAMILY PRACTICE.  IT RARELY IS REQUIRED IN MEDICAL

14   PAIN MANAGEMENT.

15   **Q**   DO YOU KNOW THE BRAND NAME FOR AMPHETAMINE SALTS?

16   **A**   THERE ARE A NUMBER OF DIFFERENT TYPES OF

17   AMPHETAMINES UNDER A NUMBER OF DIFFERENT BRAND NAMES.  AN

18   EXAMPLE WOULD BE ADDERALL, WHICH IS A COMBINATION OF

19   AMPHETAMINES THAT HAVE DIFFERENT DURATIONS.  DEXEDRINE IS

20   ANOTHER NAME THAT PEOPLE WILL KNOW.  RITALIN IS A TYPE OF

21   AMPHETAMINE.

22   **Q**   DO YOU HAVE A DEA REGISTRATION OR LICENSE TO

23   PRESCRIBE CONTROLLED SUBSTANCES?

24   **A**   I DO.

25   **Q**   IS THAT SUBSTANCES FROM SCHEDULE II'S THROUGH

1    SCHEDULE V?

2        **A**    IT IS.

3        **Q**    WHEN DID YOU FIRST OBTAIN THAT REGISTRATION?

4        **A**    AS I RECALL, THE WAY THAT IT WORKS IS YOU MUST HAVE

5    YOUR FIRST MEDICAL LICENSE BEFORE YOU CAN GET A DEA

6    REGISTRATION BECAUSE THE DEA REQUIRES THAT YOU HAVE A

7    REGISTERED PRACTICE ADDRESS FOR YOUR DEA REGISTRATION.

8            SO ORDINARILY YOU CAN'T GET YOUR DEA REGISTRATION

9    UNTIL AFTER YOU GET YOUR FIRST MEDICAL LICENSE, AND USUALLY

10   THAT'S A PRETTY BIG DAY FOR AN INTERN OR A RESIDENT WHEN THEY

11   GET THEIR DEA REGISTRATION, WHICH FOLLOWS NOT TOO LONG AFTER

12   GETTING THEIR FIRST LICENSE.

13       **Q**    THAT REGISTRATION, DOES THAT COME AFTER RESIDENCY?

14       **A**    NO.  THAT USUALLY COMES RIGHT AFTER YOUR INTERNSHIP;

15   THE FIRST YEAR IN RESIDENCY.

16       **Q**    SO RESIDENCY IS BROKEN UP INTO A PART CALLED

17   INTERNSHIP AND THEN IT SWITCHES TO JUST RESIDENCY?

18       **A**    INTERNSHIP IS THE FIRST YEAR.

19       **Q**    THANK YOU.  DO YOU PRESCRIBE OPIOIDS FOR PAIN ON A

20   REGULAR BASIS?

21       **A**    I DO.

22       **Q**    ASIDE FROM PRACTICING MEDICINE DO YOU ENGAGE IN

23   OTHER PROFESSIONAL ACTIVITIES?

24       **A**    YES, SIR.

25       **Q**    WHAT ELSE DO YOU DO?

1      **A**    I HAVE TAUGHT AT THE NATIONAL ADVOCACY CENTER AND

2   I'VE TAUGHT AT THE DEA ACADEMY IN TRAINING DIVERSION

3   INVESTIGATORS.  I BELIEVE THE FIRST ONE OF THOSE WAS IN 2013.

4   AND I HAVE LECTURED FOR THE DEA AND THE DOJ AT A NUMBER OF

5   VENUES AROUND THE COUNTRY; ATLANTA AND DALLAS -- WELL,

6   MULTIPLE, AS WELL AS ONLINE.

7      **Q**    WHEN WAS -- DO YOU RECALL THE LAST TIME YOU GAVE

8   SUCH A TRAINING ON DIVERSION?

9      **A**    THE LAST TIME THAT I GAVE SOME TRAINING ON DIVERSION

10   IT WAS NOT AN OFFICIAL DOJ TRAINING, BUT IT WAS JUST SEVERAL

11   WEEKS AGO FOR A NUMBER OF INDIVIDUALS THAT I KNOW.

12      **Q**    DOES THAT INCLUDE MEDICAL PRACTITIONERS?

13      **A**    THIS WAS ALL FOR ENFORCEMENT PERSONNEL, BUT I HAVE

14   LECTURED FOR MEDICAL PROFESSIONALS.

15      **Q**    DO YOU PERFORM CHART REVIEWS?

16      **A**    YES, SIR.

17      **Q**    WHAT ARE THEY?

18      **A**    A CHART REVIEW IS ESSENTIALLY A PEER-TO-PEER

19   ACTIVITY WHERE A REVIEWER IS PROVIDED WITH A MEDICAL RECORD BY

20   AN ENTITY TO ESTABLISH AN OPINION.

21      **Q**    AND IN ESTABLISHING AN OPINION, SAY YOU'RE ASKED

22   DURING AN ADMINISTRATIVE PROCEEDING LIKE, FOR EXAMPLE, BY A

23   MEDICAL BOARD, WHAT WOULD THAT OPINION BE?

24      **A**    IF WE'RE TALKING ABOUT A CHART REVIEW FOR THE STATE

25   MEDICAL BOARD THEY -- THE MEDICAL BOARDS ARE CONCERNED WITH

1   STANDARD-OF-CARE ISSUES.  SO IF THE PHYSICIAN WHO DOES THE

2   REVIEW COMES TO A FINDING, IT'S EITHER ESSENTIALLY AN

3   AGREEMENT OR DISAGREEMENT OR OPINION ABOUT THE STANDARD OF

4   CARE THAT WAS RENDERED IN THE MEDICAL CHART.

5       Q    DOES THAT INCLUDE THE DEA IF THEY'RE TALKING ABOUT A

6   DEA REGISTRATION NUMBER AND NOT CRIMINAL ACTIVITY?

7       A    THIS WOULD BE A NONCRIMINAL -- IF IT'S A MEDICAL,

8   BOARD, THAT'S A NONCRIMINAL ADMINISTRATIVE ACTIVITY.

9       Q    HAS THE -- SO THE DEA HAS ASKED YOU TO PERFORM CHART

10  REVIEWS?

11      A    BOTH ADMINISTRATIVELY AND CRIMINALLY, YES, SIR.

12      Q    AND IF IT'S CRIMINALLY, WHAT IS THE OPINION --

13      A    WELL, AS OPPOSED TO THE STANDARD OF CARE THAT IS

14  ASKED FOR BY THE MEDICAL BOARD, IF REVIEWING A CHART FOR THE

15  DEA, OR THE DEPARTMENT OF JUSTICE FOR THAT MATTER, WHAT

16  THEY'RE INTERESTED IN IS WHETHER THE PRESCRIPTIONS WERE

17  PROVIDED WITHIN THE USUAL COURSE OF PROFESSIONAL PRACTICE AND

18  FOR A LEGITIMATE MEDICAL PURPOSE.  SO THAT'S THE DIFFERENCE IN

19  CRITERIA.

20      Q    HOW MANY PRACTITIONERS HAVE YOU PERFORMED CHART

21  REVIEWS FOR RELATING TO THESE PRESCRIBING PRACTICES?

22      A    SIR, I KNOW IT'S AT LEAST 110.

23      Q    AND IN DOING THOSE CHART REVIEWS HAVE YOU EVER FOUND

24  PRACTITIONERS WHO HAVE NOT PRESCRIBED ILLEGITIMATELY?

25      A    PRACTITIONERS WHO HAVE NOT PRESCRIBED

1   ILLEGITIMATELY, YES, SIR.

2        **Q**    ROUGHLY HOW MANY?

3        **A**    AS FAR AS PHYSICIANS, ESSENTIALLY WE'RE TALKING

4   ABOUT ONES WHERE I SAID IT WAS WITHIN THE COURSE OF USUAL

5   MEDICAL PRACTICE OR FOR A LEGITIMATE MEDICAL PURPOSE, AT LAST

6   COUNT, I BELIEVE IT WAS 13 PHYSICIANS IN NINE OR ELEVEN STATES

7   OVERALL.

8        **Q**    THANK YOU.  DID YOU AGREE WITH THE DEA TO TESTIFY

9   FOR THE DEFENDANT?  I'M SORRY, TO TESTIFY -- HAVE YOU EVER

10  AGREED TO TESTIFY FOR A DEFENDANT?

11       **A**    YES, SIR.  AGAINST THE DEA?  YES, SIR.

12       **Q**    HAVE YOU EVER BEEN ASKED TO REVIEW A CHART FOR A

13  DEFENDANT?

14       **A**    YEAH.

15       **Q**    DO A CHART REVIEW FOR A DEFENDANT?

16       **A**    YES, SIR.

17       **Q**    AND IN DOING CHART REVIEWS FOR DEFENDANTS, WERE

18  THOSE OCCASIONS WHERE YOU WERE ABLE TO SAY IF IT WAS -- I'M

19  SORRY, FOR ADMINISTRATIVE PURPOSES, WHAT'S THE TERM YOU USE?

20       **A**    YOU'RE TALKING ABOUT STANDARD-OF-CARE ISSUES?

21       **Q**    STANDARD OF CARE --

22       **A**    WELL, THE INSTANCES WHERE I HAVE DONE REVIEWS FOR

23  THE DEFENSE COUNSEL IT HAS BEEN DEA RELATED, BOTH HAVE BEEN

24  CRIMINAL.

25       **Q**    AND DURING THE CHART REVIEWS FOR DEFENDANTS, I DON'T

1    KNOW IF I ASKED THIS, HAVE YOU FOUND THAT THE DEFENDANT

2    FOLLOWED THE NORMAL COURSE OF PRACTICE?

3        A    SIR, THAT WAS NOT MY CONCLUSION, THAT THEY FOLLOWED

4    THE NORMAL COURSE OF PRACTICE.

5        Q    I'M SORRY.  WHAT WAS THE CONCLUSION?

6        A    MY CONCLUSION WAS THAT I COULD NOT STATE THAT

7    PRESCRIPTIONS WERE BEING PROVIDED FOR AN ILLEGITIMATE MEDICAL

8    PURPOSE.

9        Q    DO YOU KNOW ROUGHLY HOW MANY TIMES YOU'VE BEEN

10   QUALIFIED TO TESTIFY AS AN EXPERT IN STATE OR FEDERAL COURTS?

11       A    SIR, I BELIEVE TODAY WOULD BE THE 17TH.

12       Q    AND WHEN YOU'RE TESTIFYING FOR THE DEA, DOES THE

13   GOVERNMENT PAY YOU?

14       A    THEY DO.

15       Q    IN THIS CASE, DID YOU CHARGE THE DEA ABOUT $250 TO

16   DO 18 CHART REVIEWS?

17       A    $250 TO DO 18 CHART REVIEWS?  I'D SAY THAT'S

18   IMPOSSIBLE.

19       Q    PER CHART?  IN OTHER WORDS, IF YOU DO 18 CHART

20   REVIEWS, WERE YOU PAID APPROXIMATELY $4,500?

21       A    SIR, TO TELL YOU THE TRUTH, THIS PARTICULAR CASE

22   GOES BACK AT LEAST FIVE YEARS AND THE NUMBERS HAVE CHANGED AND

23   THERE HAVE BEEN A LOT OF CASES BETWEEN NOW AND THEN AND I

24   COULDN'T GIVE YOU AN HONEST ANSWER THAT I SPECIFICALLY

25   REMEMBER.

1    **Q**    WOULD YOU BE ABLE TO SAY IT'S SEVERAL THOUSAND

2  DOLLARS?

3    **A**    AT LEAST.

4    **Q**    AND ARE YOU ALSO CHARGING THE UNITED STATES

5  GOVERNMENT FOR YOUR ASSISTANCE IN THIS PROSECUTION?

6    **A**    YES, SIR.

7    **Q**    AND DO YOU HAVE A STANDARD RATE FOR, REGARDLESS OF

8  WHETHER YOU'RE HELPING TO ASSIST IN PREPARATION OF THE

9  PROSECUTION, SITTING AND OBSERVING A TRIAL AND TESTIFYING PER

10 HOUR?

11   **A**    WHETHER IT'S TESTIMONY OR CASE REVIEW IT'S ALL $450

12 AN HOUR.

13   **Q**    SO IT'S SAFE TO SAY THAT SINCE YOU JUST TOOK THE

14 STAND, THE UNITED STATES IS GOING TO OWE YOU MONEY, BUT WE

15 DON'T KNOW HOW MUCH YET?

16   **A**    FAIR ENOUGH.  FAIRLY STATED, SIR.

17   **Q**    DO YOU ALSO CHARGE DEFENDANTS?

18   **A**    IN THE CASES THAT I HAVE DONE FOR DEFENDANTS, I DO

19 NOT CHARGE THEM.

20        **MR. PUGLIESE:**  AT THIS POINT, YOUR HONOR, THE UNITED

21 STATES MOVES TO HAVE DR. KENNEDY RECOGNIZED AS AN EXPERT

22 WITNESS IN THE PRESCRIBING OF CONTROLLED SUBSTANCES IN THE

23 FAMILY PRACTICE AND PAIN MANAGEMENT SETTINGS.

24        **THE COURT:**  ALL RIGHT.  ANY QUESTIONS ON HIS

25 QUALIFICATIONS MR. BRINDLEY?

1    **MR. BRINDLEY:**  NO, YOUR HONOR.  WE ACCEPT HIS

2    QUALIFICATIONS.

3        **THE COURT:**  ALL RIGHT.  AND THE COURT ACCEPTS HIM AS

4    TENDERED AS AN EXPERT.  YOU MAY PROCEED.

5        **MR. PUGLIESE:**  THANK YOU, YOUR HONOR.

6    **BY MR. PUGLIESE:**

7    **Q**   DR. KENNEDY, WHAT ARE THE CHARACTERISTICS OF AN

8    OPINION RELATING TO ILLEGITIMATE PRESCRIPTIONS?

9    **A**   THE CHARACTERISTICS OF ILLEGITIMATE PRESCRIPTIONS,

10   IN MY OPINION, ARE INDICATED BY THINGS THAT JUST, FRANKLY,

11   DON'T MAKE SENSE.  AND THAT WOULD BE, FOR EXAMPLE, INITIATING

12   SCHEDULED MEDICATIONS WHERE THEY'RE NOT INDICATED; INITIATING

13   SCHEDULED MEDICATIONS WHERE THERE ARE SPECIFIC REASONS THAT

14   YOU SHOULDN'T DO THAT; CONTINUING SCHEDULED MEDICATIONS WHEN

15   YOU'RE OBVIOUSLY LOOKING AT THINGS LIKE ABNORMAL DRUG SCREENS

16   OR SOMEONE WHO, OR A PROVIDER, WHO ISSUES SCHEDULED

17   MEDICATIONS WITHOUT DOING PHYSICAL EXAMS, WITHOUT TAKING A

18   HISTORY, WITHOUT OBTAINING DRUG SCREENS; IMPROPER ACCESS OF

19   PHARMACY REPORTS.

20       ALL OF THOSE THINGS, AND NOT NECESSARILY ALL OF THEM

21   TOGETHER, BUT INDIVIDUALLY OR ALL OF THEM TOGETHER CONTRIBUTE

22   TO A PICTURE AS TO WHETHER OR NOT PRESCRIBING IS BEING DONE

23   LEGITIMATELY AND WITHIN THE COURSE OF USUAL MEDICAL PRACTICE.

24   **Q**   IS RECORD KEEPING BY MEDICAL PRACTITIONERS IMPORTANT

25   IN TREATING PATIENTS?  AND LET'S JUST GO RIGHT TO IT, PATIENTS

1    WITH PAIN MANAGEMENT.

2       **A**    WELL, WE'RE TALKING ABOUT SCHEDULED MEDICATIONS HERE

3    AND CERTAINLY IN EVERY STATE, EVERY STATE THAT I HAVE DONE

4    CASE REVIEW IN, THERE ARE SPECIFIC REQUIREMENTS ABOUT

5    SCHEDULED MEDICATIONS AND SPECIFICALLY ABOUT THE DOCUMENTATION

6    THAT IS NECESSARY ACCOMPANYING THOSE SCHEDULED MEDICATIONS.

7    THOSE REGULATIONS ORDINARILY ARE MEDICAL BOARD RULES.  THEY'RE

8    NOT OPTIONS.  THEY'RE WHAT THE PHYSICIAN MUST DOCUMENT.

9       **Q**    ARE YOU FAMILIAR WITH THOSE RULES FOR THE STATE OF

10   LOUISIANA?

11      **A**    YES, SIR.

12      **Q**    DID YOU EVER HEAR THE PHRASE IN THE MEDICAL

13   COMMUNITY THAT IF IT'S NOT IN THE CHART THAT IT DIDN'T HAPPEN?

14      **A**    YES, SIR.

15      **Q**    FROM A LAY PERSPECTIVE, IS IT SAFE TO SAY WHEN

16   TREATING A PATIENT, AND ASSUMING THERE'S MORE THAN ONE VISIT,

17   IS RECORD KEEPING IMPORTANT FOR SUBSEQUENT VISITS?

18      **A**    OF COURSE, YES, SIR.

19      **Q**    AND RECORD KEEPING FOR EACH VISIT IS IMPORTANT FOR

20   FOLLOWING VISITS?

21      **A**    YES, SIR.

22      **Q**    WHAT ABOUT RECORD KEEPING IMPORTANCE?  SHOULD A

23   PATIENT -- FOR EXAMPLE, IF I'M A PATIENT, I SEE YOU AND FOR

24   SOME REASON I DON'T LIKE YOU AND I GO TO SOMEONE ELSE, IS

25   RECORD KEEPING DURING THAT APPOINTMENT WITH YOU IMPORTANT?

1      **A**    IT'S VERY IMPORTANT.

2      **Q**    WHY?

3      **A**    WELL, ACTUALLY THE DEPARTMENT OF HEALTH AND HUMAN

4   SERVICES, AND THIS WAS ONE OF THE UPPER-ECHELON EXECUTIVES

5   WITH MEDICARE, THEY RECENTLY PUBLISHED A NEW PHYSICIAN'S

6   HANDBOOK.  AND IN THE NEW PHYSICIAN'S HANDBOOK THIS EXECUTIVE

7   SAID IF IT'S NOT DOCUMENTED, IF IT ISN'T CHARTED, IT DIDN'T

8   HAPPEN.  AND THAT KIND OF MAKES IT SOMEWHAT OFFICIAL BECAUSE

9   NOW THIS IS SOMETHING THAT'S RECORDED IN THE MEDICARE HANDBOOK

10  THAT'S BEING GIVEN TO PHYSICIANS.  SO THAT JUST OUTLINES IT'S

11  CRITICALLY IMPORTANT.

12     **Q**    OTHER THAN --

13     **A**    IF IT'S NOT DOCUMENTED YOU CAN'T DEMONSTRATE THAT IT

14  HAPPENED.

15     **Q**    OTHER THAN RECENTLY BY THIS SENIOR EXECUTIVE, IF

16  IT'S NOT IN THE CHART IT DIDN'T HAPPEN, IS THAT A COMMON THEME

17  THROUGH MEDICAL PRACTITIONERS?

18     **A**    I THINK PRETTY MUCH ALL DOCTORS HAVE KNOWN THAT FOR

19  ALL TIME.

20     **Q**    DOES STANDARD OF CARE PLAY INTO YOUR REVIEW OF THE

21  PATIENT RECORDS IN THIS CASE?

22     **A**    YES, SIR.

23     **Q**    WHAT IS THE STANDARD OF CARE THEN?

24     **A**    WELL, THE STANDARD OF CARE IS WHAT -- GENERALLY IT'S

25  ESTABLISHED IN VARIOUS LOCALES BY THE STATE MEDICAL BOARD.  SO

1  WHAT THE STATE MEDICAL BOARD RULES AND GUIDELINES ARE, IN MY

2  VIEW, IS ESSENTIALLY AN ESTABLISHMENT OF STANDARD OF CARE IN

3  THAT LOCATION.

4     **Q**    AND ARE THERE -- YOU INDICATE THAT'S SET FORTH BY

5  THE STATE MEDICAL BOARDS.  ARE THERE GENERALLY ACCEPTED

6  PRINCIPLES REGARDING PRESCRIBING OF CONTROLLED SUBSTANCES

7  AMONGST ALL STATES?

8     **A**    YES, SIR.  AND I WOULD STATE THAT THROUGHOUT THE

9  UNITED STATES, WITH ALL THE VARIOUS MEDICAL BOARDS, THERE ARE

10  DIFFERENT REGULATIONS THAT ARE SPECIFIC IN THEIR INDIVIDUAL

11  LOCATION.

12         IN LOUISIANA THERE ARE REGULATIONS REGARDING

13  PATIENTS WHO ARE BEING TREATED ESSENTIALLY AT A SUBOXONE

14  CLINIC AND IT WILL SAY SPECIFICALLY:  THIS IS WHAT NEEDS TO BE

15  DONE IF THE PATIENT HAS AN ILLEGAL -- HAS AN ABNORMAL DRUG

16  SCREEN.  THOSE KIND OF REGULATIONS MAY OR MAY NOT BE ENFORCED

17  IN OTHER STATES.  BUT IN THE BROAD STROKES, IN THE IMPORTANT

18  THINGS ABOUT THE PATIENT/PHYSICIAN INTERACTION AND WHAT

19  REALLY, REALLY MATTERS, THERE'S UNIFORM AGREEMENT PRETTY MUCH

20  EVERYWHERE, IN MY OPINION.

21     **Q**    HAVE YOU HAD AN OPPORTUNITY TO REVIEW LOUISIANA

22  ADMINISTRATIVE -- LOUISIANA ADMINISTRATIVE CODE REGARDING

23  MEDICATIONS USED IN THE TREATMENT OF NON-CANCER RELATED

24  CHRONIC OR INTRACTABLE PAIN?

25     **A**    YES, SIR.

1    **Q** DOES THAT REGULATION INCLUDE PRESCRIBING -- THE

2  PRACTICE OF PRESCRIBING OPIOIDS?

3    **A** IT DOES.

4    **Q** SIR, YOU'RE FAMILIAR WITH TREATMENT AGREEMENTS?

5    **A** I AM.

6    **Q** WHAT ARE THEY?

7    **A** TREATMENT AGREEMENTS -- I PRESUME YOU'RE

8  SPECIFICALLY TALKING ABOUT SCHEDULED MEDICATION TREATMENT

9  AGREEMENTS?

10   **Q** YES, SIR.  THANK YOU.

11   **A** SCHEDULED MEDICATION TREATMENT AGREEMENTS LAY OUT

12 THE GROUND RULES BETWEEN THE PATIENT AND THE PHYSICIAN ABOUT

13 HOW THESE MEDICATIONS ARE GOING TO BE PRESCRIBED, WHAT WILL

14 HAPPEN IF THE PATIENT HAS EITHER ABNORMAL BEHAVIOR OR ABNORMAL

15 DRUG SCREENS OR THE PHYSICIAN BELIEVES THAT THE MEDICATION

16 NEEDS TO BE DECREASED OR DISCONTINUED AND UNDER WHAT

17 CIRCUMSTANCES AND WHAT THE PLAN IS.  ALL OF THOSE THINGS WOULD

18 BE ON A TREATMENT AGREEMENT.

19   **Q** IS IT SAFE TO SAY THAT DOCTORS, WHEN THEY USE THESE

20 TREATMENT AGREEMENTS, SHOULD GO OVER THE AGREEMENT?  IN OTHER

21 WORDS, THEY SHOULDN'T JUST HAND THE AGREEMENT TO A PATIENT AND

22 SAY READ IT AND SIGN; THEY SHOULD GO OVER IT WITH THE PATIENT?

23   **A** EXACTLY.  IN A MEDICAL OFFICE, FOR ALL PATIENTS WHEN

24 THEY GO IN, IT'S VERY COMMON THAT THEY GET HANDED A BIG STACK

25 OF DOCUMENTS AND THEY SIGN THEM.  BUT THAT DOES NOT, IN MY

1  VIEW, QUALIFY AS AN INFORMED CONSENT FOR A SURGERY, JUST

2  SIGNING THOSE DOCUMENTS.

3         IT HAS TO BE A REAL CONVERSATION BETWEEN THE PATIENT

4  AND THE PHYSICIAN THAT ESTABLISHES THAT WE UNDERSTAND WHAT

5  WE'RE TALKING ABOUT.  SAME THING WITH AN OPIOID SCHEDULED

6  MEDICATION TREATMENT AGREEMENT.  IT'S SOMETHING THAT IS AN

7  AGREEMENT.  IT'S AN UNDERSTANDING.  AND JUST A SIGNED PAPER IS

8  NOT ENOUGH.  IT HAS TO BE SOMETHING THAT ACTUALLY OCCURRED.

9     **Q**    HAVE YOU EVER SINCE 2004 HAD A PATIENT REFUSE TO

10  SIGN A TREATMENT AGREEMENT?

11    **A**    SURE.

12    **Q**    HOW DO YOU TREAT THAT PATIENT?

13    **A**    I WILL NOT TREAT THAT PATIENT.

14    **Q**    WHAT DO YOU DO?

15    **A**    I WILL RETURN THEIR MONEY AND WISH THEM GOOD LUCK IN

16  THE FUTURE.  BUT IF SOMEBODY IS NOT GOING TO ENTER INTO A

17  TREATMENT AGREEMENT WITH ME WHERE WE BOTH UNDERSTAND THE

18  RULES, I CAN'T TAKE RESPONSIBILITY FOR THEIR HEALTH CARE.

19    **Q**    AS PART OF YOUR PATIENT REVIEWS IN THIS CASE FOR 18

20  INDIVIDUALS, DID THE DEA SEND YOU RECORDS RELATING TO THOSE

21  INDIVIDUALS?

22    **A**    YES, SIR.

23    **Q**    DID THOSE INCLUDE HARD COPY DOCUMENTS?

24    **A**    YES, SIR.

25    **Q**    AND A DVD -- A DISK, A COMPUTER DISK?

1      **A**    A DISK, YES, SIR.

2      **Q**    AND IS IT SAFE TO SAY LIKE, FOR EXAMPLE,

3  SPREADSHEETS TO REVIEW THE CHART, YOU WOULD PRINT THEM AND IN

4  SOME CASES, BASED ON THE NUMBER OF COLUMNS, STAPLE THEM

5  TOGETHER AND HAVE THEM RUN LEFT TO RIGHT FOR A NUMBER OF FEET?

6      **A**    YES, SIR, THERE WERE THOSE KIND OF SUPPLEMENTAL

7  DOCUMENTS.

8      **Q**    WAS YOUR OPINION ABOUT THE USUAL COURSE OF

9  PRACTICE -- DID YOU INCLUDE THAT IN THOSE REVIEWS?

10     **A**    USUALLY THAT IS MY CONCLUSION IS WHAT MY OPINION IS

11  ABOUT; IS IT WITHIN THE COURSE OF USUAL MEDICAL PRACTICE AND

12  IS IT FOR A LEGITIMATE MEDICAL PURPOSE.

13     **Q**    SO IT INCLUDES USUAL COURSE OF PROFESSIONAL PRACTICE

14  AND LEGITIMATE MEDICAL PURPOSE?

15     **A**    YES, SIR.

16     **Q**    DID YOU FIND THAT PRESCRIBING OF THE PRESCRIPTIONS

17  TO THE 18 PATIENT RECORDS THAT YOU REVIEWED BY

18  DR. LAMARTINERE, THAT ALL OF THEM WERE OUTSIDE THE USUAL SCOPE

19  OF PRACTICE?

20     **A**    NO, SIR.  I BELIEVE THERE WAS AN EXCEPTION.

21     **Q**    DO YOU REMEMBER THAT BEING A JOHN KELLY?

22     **A**    YES, SIR, THAT SOUNDS CORRECT.

23     **Q**    AND LET ME JUST ASK, DID YOU REVIEW PATIENT

24  DOCUMENTS RELATING TO FREDERICK AUGHEY, BRIAN BOUDREAUX --

25  JUST ANSWER AT THE END, PLEASE -- JEREMY DOIRON, CHARLES

1  HENSON AND ZACHARY JACKSON?

2      **A**    YES, SIR.

3      **Q**    WERE YOU HERE FOR THE TESTIMONY OF THE FIRST FOUR;

4  THAT IS AUGHEY, BOUDREAUX, DOIRON AND HENSON?

5      **A**    I WAS.

6      **Q**    HAVE YOU INTERVIEWED OR HEARD TESTIMONY FROM A

7  ZACHARY JACKSON?

8      **A**    NO.

9      **Q**    BUT DID YOU REVIEW RECORDS RELATING TO ZACHARY

10 JACKSON TO INCLUDE PRESCRIPTIONS?

11     **A**    YES.

12     **MR. PUGLIESE:**  IF I MAY, YOUR HONOR --

13 **BY MR. PUGLIESE:**

14     **Q**    LET ME DO THIS FIRST, DR. KENNEDY, THE PRESCRIPTION

15 IN THIS CASE -- PRESCRIPTIONS, INDICTED AND UNINDICTED, ARE

16 EXHIBITS 1 THROUGH 70.  DID YOU REVIEW THOSE?

17     **A**    YES.

18     **Q**    AND DID YOU ALSO REVIEW A SUMMARY SPREADSHEET WHICH

19 HAS BEEN MARKED AS EXHIBIT 71?

20     **A**    YES, I DID.

21     **Q**    AND DID THE SPREADSHEET CONTAIN THE INFORMATION --

22 THE PARTICULARS ABOUT EACH OF THE PRESCRIPTIONS?

23     **A**    YES, SIR.

24     **MR. PUGLIESE:**  YOUR HONOR, AT THIS POINT, I'M GOING

25 TO USE A SPREADSHEET -- IN FACT, AT THIS POINT, YOUR HONOR, I

1    AM GOING TO MOVE TO ADMIT -- BEFORE I DO THAT --

2    **BY MR. PUGLIESE:**

3        **Q**    WAS IT A CUMBERSOME PROCESS IN REVIEWING EACH OF THE

4    70 COUNTS, WHICH WAS ROUGHLY 123 PRESCRIPTIONS FOR THE

5    PATIENTS CHARGED IN THE INDICTMENT, AND COMPARING IT TO THE

6    SPREADSHEET?

7        **A**    SIR, RECONCILING THE INDIVIDUAL PRESCRIPTIONS, OVER

8    1OO, WITH THE SPREADSHEET WAS A NIGHTMARE, YES, SIR.

9        **Q**    WOULD IT BE MORE CONVENIENT AT THIS TIME TO USE THE

10   SPREADSHEET, THE SUMMARY SPREADSHEET, CONTAINING THE

11   PRESCRIPTIONS AS OPPOSED TO SHOWING PRESCRIPTIONS TO YOU

12   EITHER OVER VIA THE ELMO OR SOME OTHER WAY ON THE SCREEN?

13       **A**    YES, SIR, IT WOULD BE HELPFUL.

14       **Q**    SO EXHIBIT 71 THAT'S BEEN MARKED, IS THE SUMMARY

15   SPREADSHEET ACCURATE?

16       **A**    YES, TO THE BEST OF MY DETERMINATION.

17           **MR. PUGLIESE:**  YOUR HONOR, UNDER FEDERAL RULE OF

18   EVIDENCE 1006, WE'D ASK THAT WE BE ALLOWED TO USE EXHIBIT 71

19   AS OPPOSED TO POSTING INDIVIDUAL PRESCRIPTIONS?

20           **THE COURT:**  ANY OBJECTION?

21           **MR. BRINDLEY:**  NO OBJECTION.

22           **THE COURT:**  OKAY.  SO, YES, IT WILL BE ADMITTED FOR

23   THAT PURPOSE.

24           **MR. PUGLIESE:**  THANK YOU, YOUR HONOR.

25           AND, YOUR HONOR, WHAT I'M GOING TO SHOW THE

1  DEFENDANT IS THE ACTUAL EXCEL SPREADSHEET THAT'S FILTERED FOR

2  ONE SPECIFIC PATIENT, ZACHARY JACKSON.

3          **THE COURT:**  ALL RIGHT.

4  **BY MR. PUGLIESE:**

5     **Q**   SIR, I'D ASK YOU TO LOOK AT THE SPREADSHEET IN FRONT

6  OF YOU.  I'M GOING TO START AT THE TOP.  DO YOU SEE IN COLUMN

7  A -- LET'S SAY COLUMN "A" FIRST, PATIENT FIRST IS ZACHARY,

8  PATIENT LAST IS JACKSON?

9     **A**   YES, SIR, I SEE THAT.

10     **Q**   AND DO YOU SEE PRESCRIPTIONS AT THE BEGINNING FOR

11  EXHIBIT 10?

12     **A**   I DO.

13     **Q**   AND ENDING AT EXHIBIT 11?

14     **A**   YES, SIR.

15     **Q**   AND DID YOU PERFORM A CHART REVIEW FOR ZACHARY

16  JACKSON COVERING THESE TWO COUNTS?

17     **A**   YES, SIR.

18     **Q**   AND DID YOU ALSO CONSIDER EVERY PRESCRIPTION

19  STARTING AT EXHIBIT 37, WHICH IS WRITTEN APPROXIMATELY 28 DAYS

20  AFTER THE FIRST CHARGED PRESCRIPTION FOR ZACHARY JACKSON, ALL

21  THE UNCHARGED PRESCRIPTIONS THROUGH 51, WRITTEN APPROXIMATELY

22  28 DAYS BEFORE THE LAST PRESCRIPTION TO ZACHARY JACKSON?

23     **A**   ALL OF THOSE PRESCRIPTIONS IN THE MIDDLE, AS THEY

24  WOULD BEAR UPON DEVELOPING MY OPINION, YES, SIR, I WOULD

25  REVIEW THEM.

1          **MR. PUGLIESE:**  YOUR HONOR, AT THIS TIME, THE UNITED

2   STATES MOVES TO ADMIT UNITED STATES EXHIBITS 10 AND 11.

3          **THE COURT:**  ALL RIGHT.  ANY OBJECTION?

4          **MR. BRINDLEY:**  NO OBJECTION.

5          **THE COURT:**  10 AND 11 WILL BE ADMITTED.

6          **MR. PUGLIESE:**  THANK YOU, YOUR HONOR.  AND ALSO,

7   INCLUSIVELY, UNITED STATES EXHIBITS 37 THROUGH 51.

8          **THE COURT:**  OBJECTION?

9          **MR. BRINDLEY:**  NO OBJECTION.

10         **THE COURT:**  OKAY.  AND JUST TO REMIND YOU, I KNOW

11  YOU'RE BUSY TAKING NOTES, MR. BRINDLEY, BUT IT IS YOUR

12  OBLIGATION AS AN OFFICER OF THE COURT TO RISE TO ADDRESS THE

13  COURT.

14         **MR. BRINDLEY:**  YES, YOUR HONOR.  I UNDERSTAND.

15  THANK YOU.

16         **THE COURT:**  ALL RIGHT.

17  **BY MR. PUGLIESE:**

18     **Q**    DR. KENNEDY, WERE YOU ALSO PROVIDED INFORMATION

19  REGARDING PATIENTS COVERED IN COUNTS 1 THROUGH 7 -- WE ALREADY

20  KNOW JOHN KELLY, BUT SANDY ARBUCKLE, BETTY AUGHEY, JOHNNY

21  DELAPASSE, MARY GRAY, WENDY JENKINS AND BLAKE VERETT?

22     **A**    I BELIEVE FOR THOSE PATIENTS I WAS PROVIDED

23  PRESCRIPTIONS TO REVIEW.

24     **Q**    THANK YOU.  THE RECORDS THAT WERE PROVIDED TO YOU

25  INCLUDE ELECTRONIC MEDICAL RECORDS?

1      **A**     THERE WERE SOME, YES, SIR.

2      **Q**     WHAT ARE ELECTRONIC MEDICAL RECORDS?

3      **A**     AN EM -- ELECTRONIC MEDICAL RECORD, AN EMR, IS A

4    SYSTEM THAT PHYSICIANS USE FOR A NUMBER OF THINGS, PATIENT

5    DATA INPUT, ENCOUNTER INFORMATION FOR BILLING, FOR IMPORTING

6    LABS AND X-RAYS AND FOR ORDERING THINGS.  SO AN EMR IS

7    ESSENTIALLY A PRACTICE SOFTWARE.

8      **Q**     DOES THAT PRACTICE SOFTWARE ALSO ALLOW A PHYSICIAN

9    TO, DURING A VISIT, DOCUMENT THE HEIGHT AND WEIGHT OF AN

10   INDIVIDUAL?

11     **A**     CERTAINLY.

12     **Q**     BLOOD PRESSURE?

13     **A**     YES.

14     **Q**     PULSE?

15     **A**     YES.

16     **Q**     AND IS SOAP AN ACRONYM FOR SOMETHING?

17     **A**     A SOAP NOTE IS A TRADITIONAL WAY THAT A PHYSICIAN

18   ENCOUNTER IS RECORDED, BASICALLY.  SO IT' SUBJECTIVE,

19   OBJECTIVE ASSESSMENT AND PLAN IS A SOAP NOTE.

20     **Q**     DO YOU INCLUDE THOSE NOTES DURING YOUR INITIAL

21   VISITS WITH PAIN MANAGEMENT PATIENTS?

22     **A**     I'M NOT SURE I UNDERSTAND YOUR QUESTION.

23     **Q**     WHEN YOU SEE A PAIN MANAGEMENT PATIENT FOR THE FIRST

24   TIME, ARE THOSE THINGS THAT YOU JUST COVERED, USING THE

25   ACRONYM SOAP, ARE THOSE THINGS THAT YOU COVER WITH A PATIENT?

1    **A**    THOSE THINGS ARE COVERED, BUT AN INITIAL ENCOUNTER

2   IS MUCH MORE INTENSIVE.  AN INITIAL ENCOUNTER CAPTURES A LOT

3   OF INFORMATION THAT GENERALLY ISN'T SOMETHING THAT YOU WOULD

4   EXPECT TO FIND JUST IN A SOAP NOTE.

5    **Q**    AND IN LOUISIANA, THIS RECORD KEEPING FOR PAIN

6   MANAGEMENT, DOES IT INCLUDE REQUIREMENTS FOR PATIENT RECORDS

7   AND DOCUMENTING VISITS?

8    **A**    YES, IT DOES.

9    **Q**    LET ME ASK YOU, FOR THE 18 CHART REVIEWS YOU DID IN

10   THIS CASE, WHAT'S YOUR PROCESS FOR DOING THESE REVIEWS?

11    **A**    THE PROCESS FOR DOING A CHART REVIEW IS THAT YOU

12   REVIEW THE MEDICAL RECORD AND YOU REVIEW THE MEDICAL RECORD IN

13   LIGHT OF THE REGULATIONS IN THE GEOGRAPHIC AREA WHERE THE

14   PRACTICE IS OCCURRING, AS WELL AS NATIONAL STANDARDS.

15    **Q**    THANK YOU.  AND FROM THOSE CHART REVIEWS, IS IT SAFE

16   TO SAY THOSE WERE SINGLE-SPACED SEVERAL PAGES, MAYBE FROM FOUR

17   THROUGH ROUGHLY SEVEN PAGES?

18    **A**    OF MY CHART REVIEWS?

19    **Q**    YES, SIR.

20    **A**    YES, SIR, THAT SOUNDS FAIR.

21    **Q**    DID YOU PREPARE WHAT YOU CALL "PATIENT SUMMARIES"?

22    **A**    YES.

23    **Q**    WHY DO YOU PRODUCE THOSE FOR TESTIMONY?

24    **A**    WELL, FOR TESTIMONY' SAKE, THE PATIENT SUMMARIES ARE

25   ESSENTIALLY A SYNOPSIS, A DISTILLATION, OF WHAT IT IS THAT I

1    FOUND WRONG IN THE MEDICAL RECORD TO PREVENT HAVING TO GO

2    THROUGH BINDERS FULL OF EXHIBITS ON THE WITNESS STAND --

3        **Q**    THANK YOU.

4            **MR. PUGLIESE:**  WOULD YOU PLEASE PULL UP

5    EXHIBIT 100-K?

6    **BY MR. PUGLIESE:**

7        **Q**    DO YOU SEE EXHIBIT 100-K, SIR?

8        **A**    YES.

9            **MR. PUGLIESE:**  PLEASE GO TO 100-L, 100-M, 100-N,

10    100-V, 100-W AND 100-Y.  AND PLEASE GO DARK.

11    **BY MR. PUGLIESE:**

12        **Q**    ARE THOSE THE PATIENT SUMMARIES THAT YOU PREPARED

13    FOR THIS CASE?

14        **A**    YES, SIR.

15        **Q**    AND YOU PERSONALLY PREPARED THEM?

16        **A**    I DID.

17        **Q**    AND YOU BASED THEM BASED ON YOUR PATIENT CHART

18    REVIEWS?

19        **A**    THE SUMMARIES THAT YOU JUST SHOWED ARE BASED ON

20    INFORMATION DISTILLED FROM THE INDIVIDUAL CHART REVIEWS, YES,

21    SIR.

22        **Q**    AND USING THOSE TODAY, WOULD THEY BE HELPFUL IN

23    LOOKING AT SPECIFIC PATIENTS CHARGED IN THE INDICTMENT SUCH AS

24    CHARLES HENSON, ZACHARY JACKSON, MATT DIXON, WHOSE UNDERCOVER

25    NAME WAS MASON HENDRICKS, BRIAN BOUDREAUX, FREDERICK AUGHEY,

1  CRAIG CRAWFORD, WHOSE UNDERCOVER NAME WAS CRAIG NEILSON, AND

2  JEREMY DOIRON?

3      **A**    YES, SIR, IT WOULD MAKE IT QUICKER.

4      **Q**    LET ME ASK, DR. KENNEDY, JUST SO WE CAN COVER IT

5  UPFRONT, FOR THE PATIENTS THAT I JUST NAMED STARTING WITH

6  PATIENT K, CHARLES HENSON; PATIENT L, ZACHARY JACKSON; PATIENT

7  M, MATT DIXON AS MASON HENDRICKS; PATIENT N, BRIAN BOUDREAUX;

8  PATIENT V, FREDERICK AUGHEY; PATIENT W, CRAIG CRAWFORD AS

9  CRAIG NEILSON; AND PATIENT Y, JEREMY DOIRON, YOU REVIEWED

10 THOSE COUNTS AND THE PRESCRIPTIONS CHARGED FOR ALL THE COUNTS?

11     **A**    YES, SIR.

12     **Q**    AND ARE YOU ABLE TO UPFRONT GIVE AN OPINION TO THE

13 COURT AS TO WHETHER THOSE PRESCRIPTIONS WERE WRITTEN BY THE

14 DEFENDANT AS AN INDIVIDUAL PRACTITIONER ACTING IN THE USUAL

15 COURSE OF HIS PROFESSIONAL PRACTICE?

16     **A**    YES, SIR.

17     **Q**    WHAT IS THAT OPINION?

18     **A**    MY OPINION IS NOT.

19     **Q**    AND THE SAME -- DOES IT MATTER WHETHER IT BE A

20 GENERAL PRACTICE OR PAIN MANAGEMENT PRACTICE?

21     **A**    SIR, THE REQUIREMENTS -- THE ANSWER IS NO.  THE

22 REQUIREMENTS FOR WRITING NARCOTICS OR WRITING SCHEDULED

23 MEDICATIONS DO NOT VARY DEPENDING ON YOUR SPECIALTY.  WHETHER

24 YOU'RE AN INTERNIST OR WHETHER YOU'RE A BRAIN SURGEON THE SAME

25 RULES APPLY.

1    **Q**    IS THAT -- WHAT YOU JUST SAID, DOES THAT APPLY IN

2    LOUISIANA?

3    **A**    YES, SIR.

4    **Q**    AND FOR EACH OF THE PRESCRIPTIONS WE MENTIONED, DO

5    YOU HAVE AN OPINION AS TO WHETHER THEY WERE WRITTEN FOR A

6    LEGITIMATE MEDICAL PURPOSE?

7    **A**    YES, SIR.

8         **MR. PUGLIESE:**  PLEASE PULL UP EXHIBIT 100-K.

9         **THE COURT:**  I DIDN'T HEAR THE OPINION.  HE SAID HE

10    HAD AN OPINION, BUT I DIDN'T HEAR WHAT THE OPINION WAS.  I

11    THINK THAT'S AN IMPORTANT QUESTION FOR THE COURT TO CONSIDER.

12    **BY MR. PUGLIESE:**

13    **Q**    WHAT IS THAT OPINION REGARDING LEGITIMATE MEDICAL

14    PRACTICE FOR ALL THE COUNTS COVERING THE PATIENTS I

15    REFERENCED?  SO IN OTHER WORDS NOT COUNTS 1 THROUGH 7.

16    **A**    IN MY OPINION, THE PRESCRIPTIONS WERE NOT PROVIDED

17    FOR A LEGITIMATE MEDICAL PURPOSE.

18    **Q**    THANK YOU.

19         **MR. PUGLIESE:**  WOULD YOU PLEASE PULL UP

20    EXHIBIT 100-K NOW.

21    **BY MR. PUGLIESE:**

22    **Q**    IN THE INDICTMENT OF DR. LAMARTINERE, PATIENT K IS

23    CHARLES HENSON.  IS IT SAFE TO SAY ON THIS PATIENT SUMMARY

24    YOU'RE ABLE TO RECOGNIZE THAT BECAUSE YOU PUT THE FIRST TWO

25    LETTERS OF HIS INITIALS, FIRST NAME AND LAST, AT THE TOP OF

1   THE SUMMARY?

2       **A**    YES, SIR.

3       **Q**    DID YOU DO THAT FOR ALL OF THE SUMMARIES?

4       **A**    YES, SIR.

5       **Q**    ALL RIGHT.  AND LET'S JUST LOOK AT THE CHARGED

6   COUNTS.  ON MARCH 31ST, 2015.  PRESCRIPTIONS FOR ADDERALL AND

7   OXYCODONE AND BASED ON THE REVIEW OF THE RECORDS, YOU WERE

8   ABLE TO FORM YOUR OPINION THAT YOU STATED UPFRONT?

9       **A**    THAT'S CORRECT.

10      **Q**    AND PRIOR TO THE NOVEMBER 16TH, 2015 PRESCRIPTION

11  WERE YOU ABLE TO REVIEW ALL UNINDICTED COUNTS --

12  PRESCRIPTIONS, WRITTEN BETWEEN MARCH 31ST AND NOVEMBER 16TH,

13  2015?

14      **A**    YES, SIR.

15      **Q**    THE PRESCRIPTIONS, UNINDICTED AFTER MARCH 13TH AND

16  PRIOR TO NOVEMBER 16TH, DID THEY ASSIST YOU IN RENDERING AN

17  OPINION AS TO COUNT 9 THAT NOVEMBER 16TH?

18      **A**    YES, SIR.

19      **Q**    AND SAME QUESTION IN TERMS OF USUAL SCOPE OF MEDICAL

20  PRACTICE AND LEGITIMATE MEDICAL PURPOSE, YOUR OPINION IS THE

21  SAME FOR NOVEMBER 16TH, 2015; THAT IS, THE PRESCRIPTIONS FOR

22  ADDERALL, OXYCODONE AND OXYMORPHONE?

23      **A**    IT IS.

24      **Q**    LET'S JUST COVER THIS RIGHT NOW.  EXHIBIT 9, IT HAS

25  SUBSETS.  THERE'S 9-A, 9-B, 9-C FOR THE DATE OF THE SCRIPT.

| | |
|---|---|
| 1 | D, E AND F POST-DATED PRESCRIPTION FOR THE FOLLOWING MONTH AND |
| 2 | G, H AND I POST-DATED PRESCRIPTION FOR TWO MONTHS IN ADVANCE. |
| 3 | **A**   YES, SIR. |
| 4 | **Q**   YOUR OPINION ON COUNT 9 RELATES TO ALL NINE OF THOSE |
| 5 | PRESCRIPTIONS? |
| 6 | **A**   YES, SIR. |
| 7 | **Q**   OKAY.  PLEASE TELL US WHAT YOUR SUMMARY INDICATES. |
| 8 | **A**   WELL, FOR THIS PATIENT, WHICH WE'VE IDENTIFIED AS |
| 9 | PATIENT K, THIS -- WHAT ALARMED ME ABOUT THIS PARTICULAR CHART |
| 10 | IS THIS PATIENT HAD THREE DOCUMENTED ENCOUNTERS.  THIS WAS A |
| 11 | 40-YEAR OLD PATIENT.  AT 40 YEARS OLD WAS REPORTING BACK PAIN, |
| 12 | KNEE PAIN, NECK PAIN, ATTENTION DEFICIT DISORDER, ANXIETY AND |
| 13 | CHRONIC PAIN SYNDROME. |
| 14 | **Q**   WHAT'S THE SIGNIFICANCE OF THAT? |
| 15 | **A**   WELL, THAT'S A PRETTY SUBSTANTIAL -- PRETTY |
| 16 | SUBSTANTIAL PROBLEM LIST FOR ANYONE.  THIS IS A RELATIVELY |
| 17 | YOUNG PATIENT, 40-YEARS OLD, THAT'S A LOT OF THINGS FOR |
| 18 | ANYBODY TO HAVE WRONG WITH THEM. |
| 19 | **Q**   IN REVIEWING THE CHART -- I'M SORRY.  JUST SEEING |
| 20 | THAT, A PATIENT 40-YEARS OLD WITH THOSE HEALTH PROBLEMS, |
| 21 | WITHOUT REVIEWING ANYTHING ELSE, WOULD YOU BE ABLE TO RENDER |
| 22 | AN OPINION AS TO WHETHER THEY COULD HAVE ALL OF THOSE HEALTH |
| 23 | PROBLEMS? |
| 24 | **A**   I'D HAVE TO REVIEW THE MEDICAL RECORD. |
| 25 | **Q**   AND IN REVIEWING THE MEDICAL RECORD, WHAT DID YOU |

1   EXPECT TO SEE TO SUPPORT THOSE DIAGNOSES?

2      **A**   I WOULD EXPECT TO SEE SUBSTANTIAL DOCUMENTARY

3   SUPPORT.

4      **Q**   PLEASE BEGIN WITH THE LINE AFTER THAT REGARDING THE

5   INITIAL PHYSICAL EXAMINATION.

6      **A**   WELL, WHAT WAS ODD TO ME IN THE COURSE OF THIS CASE

7   REVIEW IS THAT THE PATIENT HAD ALL OF THESE PROBLEMS AND

8   ULTIMATELY WAS PRESCRIBED MULTIPLE SCHEDULED MEDICATIONS.

9   THERE WAS NO PHYSICAL EXAM DOCUMENTED IN THE CHART.  THERE WAS

10  NO DOCUMENTED INITIAL PHYSICAL EXAM AND THERE WERE NO

11  DOCUMENTED SUBSEQUENT EXAMS THAT I COULD FIND IN WHAT WAS SENT

12  TO ME PRESENT IN THIS MEDICAL RECORD.  THERE WERE NO

13  DIAGNOSTIC STUDIES.

14     **Q**   WHAT IS A DIAGNOSTIC STUDY?

15     **A**   A DIAGNOSTIC STUDY COULD BE AN MRI OR AN X-RAY OR

16  SOMETHING THAT RENDERS A DIAGNOSIS OBJECTIVELY.

17     **Q**   INCLUDING CAT SCAN?

18     **A**   YES, SIR.  AND ALSO, THERE WERE NO STATEMENTS ABOUT

19  PDMP REPORTS THAT I COULD FIND.

20     **Q**   AND PDMP REPORTS AS YOU USE THAT ACRONYM, IS THAT

21  WHAT LOUISIANA CALLS THE PRESCRIPTION MONITORING PROGRAM?

22     **A**   YES, SIR.  EXCUSE ME.  IN GEORGIA -- IN GEORGIA.  IN

23  LOUISIANA THEY CALL IT A PMP, BUT TRADITIONALLY IF YOU GO BACK

24  TO WHEN THE PROGRAM FIRST STARTED, IT WAS CALLED THE

25  PRESCRIPTION DRUG MONITORING PROGRAM.  THEY STILL CALL IT THE

1  PDMP IN GEORGIA AND THAT'S WHAT I TEND TO DEFAULT TO, BUT IT'S

2  ESSENTIALLY THE SAME THING IN EVERY STATE, ALTHOUGH THEY GO BY

3  DIFFERENT NAMES.

4  **Q**    WHEN A PHYSICIAN IS TREATING A PATIENT AND IN

5  CONSIDERING PRESCRIBING OPIOIDS WHAT'S THE REASON TO REVIEW --

6  MONITORING -- LET ME ASK YOU THIS FIRST.  SAY THE MONITORING

7  PROGRAM CAPTURES WHAT PHARMACIES ENTER TO SHOW PRESCRIPTIONS

8  THAT WERE ISSUED BY WHOM AND TO WHOM AND OTHER IMPORTANT

9  INFORMATION SUCH AS NUMBER OF PILLS AND DOSAGE.

10  **A**    THAT WOULD BE ON THE PHARMACY REPORT, YES.

11  **Q**    AND SO WHAT'S THE SIGNIFICANCE OF NO PHARMACY

12  REPORTS BEING INCLUDED IN THE RECORDS THAT YOU REVIEWED?

13  **A**    WELL, THE SIGNIFICANCE TO ME AT THE CURRENT TIME,

14  UNDER THE CURRENT MEDICAL BOARD REGULATIONS, IT'S A

15  REQUIREMENT.  BUT GOING BACK IN TIME, IT'S SOMETHING THAT

16  PHYSICIANS OUGHT TO HAVE DONE FOR A VERY LONG TIME BEFORE

17  THIS.  BECAUSE WHEN YOU HAVE SOMEBODY PRESENTING TO YOUR

18  OFFICE WITH ADD WHO ULTIMATELY MIGHT WIND UP WITH A

19  PRESCRIPTION FOR ADDERALL, IT WOULD BE GOOD TO KNOW IF THEY

20  RECEIVED AN ADDERALL PRESCRIPTION THE WEEK BEFORE FROM ANOTHER

21  PHYSICIAN.

22      IT WOULD BE GOOD TO KNOW IF THEY HAD RECEIVED

23  SCHEDULED MEDICATION PRESCRIPTIONS FROM HALF A DOZEN DIFFERENT

24  DOCTORS THAT WERE FILLED AT 11 DIFFERENT PHARMACIES, FOR

25  EXAMPLE.  THAT INFORMATION IS IMPORTANT IN MAKING A

1    DETERMINATION AS TO WHETHER OR NOT YOU'RE GOING TO PROVIDE

2    THIS PATIENT WITH SCHEDULED MEDICATIONS.

3         Q    LET'S GO TO THE FIRST VISIT, MARCH 31ST, 2015.

4    THERE WERE PRESCRIPTIONS FOR ADDERALL AND OXYCODONE.  THE FACT

5    THAT AN INITIAL PHYSICAL EXAMINATION WAS NOT PERFORMED, DOES

6    THAT HELP YOU RENDER YOUR OPINION ABOUT THE LEGITIMACY OF

7    THOSE PRESCRIPTIONS?

8         A    SIR, IN MY OPINION WITH THIS PROBLEM LIST WITH THE

9    PATIENT BEING PRESCRIBED AMPHETAMINES AND OPIOIDS WITHOUT A

10   PHYSICAL EXAM, WITHOUT A DRUG SCREEN, WITHOUT DOCUMENTED

11   DIAGNOSTIC STUDIES, WITHOUT EVER A FOLLOW-UP PHYSICAL EXAM,

12   OUTSIDE THE COURSE OF USUAL MEDICAL PRACTICE, A LEGITIMATE

13   MEDICAL PURPOSE IS NOT SUPPORTED.

14        Q    AFTER PDMP YOU HAVE SOMETHING ABOUT TOXICOLOGY

15   POSITIVE; WHAT IS THAT?

16        A    THAT MEANS DRUG SCREENING.  IN THIS PARTICULAR

17   INSTANCE, I DON'T RECALL WHETHER THAT WAS FROM A LABORATORY

18   TOXICOLOGY REPORT THAT WAS ATTACHED IN THE CHART OR IF THIS

19   WAS SOMETHING THAT WAS LIKE A URINE OFFICE DIPSTICK, BUT

20   WHATEVER THE CASE, THE PATIENT HAD A URINE DRUG SCREEN THAT

21   WAS POSITIVE FOR MORPHINE HYDROMORPHONE, WHICH IS A MORPHINE

22   METABOLITE, METHADONE AND THC.  AND WITH THOSE STUDIES THERE

23   WAS NO PHYSICIAN COMMENT.  WITH THOSE FINDINGS THERE WAS NO

24   COMMENT BY THE PHYSICIAN ABOUT THAT AND HE WAS STILL

25   PRESCRIBED SCHEDULED MEDICATIONS.  IN MY OPINION, THAT'S --

1  THAT DOES NOT SUPPORT A LEGITIMATE MEDICAL PURPOSE.

2      **Q**    AND THE LAST LINE, PATIENT ULTIMATELY PRESCRIBED 330

3  PILLS OF OXYCODONE, OXYMORPHONE, ADDERALL AND XANAX.  WHEN YOU

4  SAY "PRESCRIBED" YOU DON'T MEAN IN TOTAL, LIKE THE TOTAL FOR

5  ALL THE SCRIPTS WE'VE COVERED?

6      **A**    NO, SIR.

7      **Q**    WHAT IS THAT?

8      **A**    THIS -- IN THIS PARTICULAR INSTANCE -- AND I HAVE A

9  CAVEAT, BECAUSE THERE ARE SOME OF THEM WHERE THEY ONLY HAD

10  MAYBE A COUPLE OF ENCOUNTERS AND THAT NUMBER WILL BE THE TOTAL

11  THAT THEY RECEIVED.  BUT IN THIS INSTANCE, THAT'S HOW MANY

12  PRESCRIPTIONS -- HOW MANY UNIT DOSES THE PATIENT WAS GETTING.

13      **Q**    FOR A SPECIFIC PERIOD OF TIME?

14      **A**    FOR THAT APPOINTMENT.

15      **Q**    I BELIEVE MR. HENSON HAD SOME DIFFICULTY RECALLING

16  THAT AT HIS FIRST VISIT, HE HAD RECEIVED AN ADDERALL

17  PRESCRIPTION.  WHAT -- WAS THE DOCUMENTATION, THE MEDICAL

18  RECORD, WAS THERE SUPPORT FOR ISSUING AN ADDERALL PRESCRIPTION

19  BASED ON WHAT YOU SAW IN THE CHART?

20      **A**    NO, SIR.

21      **Q**    AND SAME FOR THE REST OF THE PRESCRIPTIONS,

22  OXYCODONE, ON MARCH 31ST AND THE THREE PRESCRIPTIONS

23  WRITTEN -- COVERED BY COUNT 9 ON NOVEMBER 16TH, 2015?

24      **A**    NO, SIR, AS THERE'S NO -- AS THERE'S NO PHYSICAL

25  EXAM.  IT'S ASSERTED.  THE PATIENT WAS TREATED WITH THESE

1    MEDICATIONS BEFORE BY ANOTHER PHYSICIAN, THAT'S FINE, BUT THAT

2    STILL DOES NOT RELIEVE THE PRESCRIBING PHYSICIAN FROM DOING

3    WHAT IS NECESSARY TO SUPPORT THIS PRESCRIPTION.

4              SO SIMPLY BECAUSE SOMEBODY COMES IN AND SAYS THAT

5    THIS HAS BEEN PRESCRIBED BEFORE, THAT IN ITSELF IS NOT

6    JUSTIFICATION FOR RE-PRESCRIBING ANYTHING.

7              **MR. PUGLIESE:**  MAY I HAVE A MOMENT, YOUR HONOR?

8              **THE COURT:**  YES.

9              **MR. PUGLIESE:**  YOUR HONOR, IF I HAVEN'T MOVED TO

10   ADMIT THE EXHIBITS 100-K, L, M, N, V, W AND Y, I OFFER THOSE

11   INTO EVIDENCE NOW.

12             **THE COURT:**  ALL RIGHT.  ANY OBJECTION?

13             **MR. BRINDLEY:**  NO OBJECTION.

14             **THE COURT:**  ALL RIGHT.  100-K, L, M, N, V, W, Y WILL

15   BE ADMITTED.

16             **MR. PUGLIESE:**  I DON'T BELIEVE -- IF I DIDN'T, YOUR

17   HONOR, THE NEXT PATIENT WE'RE GOING TO COVER IS ZACHARY

18   JACKSON.  AT THE BEGINNING, WE WENT THROUGH THE FILTERED

19   SPREADSHEET, SO OUT OF AN ABUNDANCE OF CAUTION, I BELIEVE I

20   DID OFFER INTO EVIDENCE EXHIBITS 10 AND 11 AND THE

21   PRESCRIPTIONS INCLUSIVE OF 37 THROUGH 51.

22             **THE COURT:**  I THINK YOU DID TOO.

23             **MR. PUGLIESE:**  THANK YOU.

24             **THE COURT:**  THIS IS A GOOD TIME TO TAKE A BREAK,

25   FOLKS.  WE'RE GOING TO COME BACK AT 1:15 AND YOU CAN RESUME

1    YOUR DIRECT EXAM.

2                          **(RECESS)**

3              **THE COURT:**  YOU MAY BE SEATED.  AND YOU MAY RESUME.

4              **MR. PUGLIESE:**  THANK YOU, YOUR HONOR.

5              MS. BATEMAN, WOULD YOU PULL UP EXHIBIT 100-L,

6    PLEASE.

7    **BY MR. PUGLIESE:**

8        **Q**    DR. KENNEDY, DO YOU SEE WHAT'S BEEN MARKED AS

9    EXHIBIT 100-L BEFORE YOU?

10       **A**    YES, SIR.

11       **Q**    AND THAT'S FOR PATIENT "L," ZACHARY JACKSON?

12       **A**    YES, SIR.

13       **Q**    AND AT THE TOP OF THIS SUMMARY IT COVERS COUNTS 10

14   AND 11?

15       **A**    YES, IT DOES.

16       **Q**    LET ME ASK YOU, ZACHARY JACKSON, SHE DID NOT TESTIFY

17   IN THIS PROCEEDING.  HOW, AT ALL, DOES THAT IMPACT OR AFFECT

18   YOUR OPINION ON USUAL SCOPE AND LEGITIMATE MEDICAL PURPOSE?

19       **A**    MY REVIEW IS DONE BASED ON THE MEDICAL RECORD THAT I

20   WAS GIVEN SUPPLEMENTAL DOCUMENTATION, SO IT WOULD HAVE NO

21   BEARING ON MY OPINION.

22       **Q**    IF YOU WOULD, LOOK AT COUNT 10, WHICH IS MARCH 10,

23   COUNT 11, DECEMBER 28TH.  WE HAVE A NUMBER OF PRESCRIPTIONS

24   BETWEEN THOSE TWO DATES.  IS IT SAFE TO SAY THOSE INTERMEDIATE

25   PRESCRIPTIONS ARE HELPFUL IN RENDERING AN OPINION AS TO COUNT

1    11, THE DECEMBER 28TH PRESCRIPTION?

2        A    YES, SIR.

3        Q    IF YOU WOULD GO THROUGH YOUR SUMMARY ON THIS

4    PATIENT.

5        A    THIS PATIENT HAD FOUR DOCUMENTED ENCOUNTERS.  WHAT I

6    FOUND CONCERNING ABOUT THIS, THIS PATIENT WAS 27-YEARS OLD AND

7    HAD A PROBLEM LIST THAT INCLUDED CHRONIC PAIN SYNDROME,

8    CHRONIC BACK PAIN, SCOLIOSIS, MOTOR VEHICLE ACCIDENT, ANXIETY

9    DISORDER, THIGH PAIN, MIGRAINE, ALLERGIC RHINITIS, DENTAL

10   ABSCESSES AND CONCUSSION.  AND THAT'S A FAIRLY EXTENSIVE --

11   THAT'S A FAIRLY EXTENSIVE LIST FOR ANYBODY, BUT PARTICULARLY A

12   27-YEAR OLD.

13       Q    IF YOU WERE PRESENTED WITH A PATIENT THAT ACTUALLY

14   HAD THOSE PROBLEMS WOULD IT AFFECT YOUR, LET'S SAY, INITIAL

15   VISIT?

16       A    YES, IT WOULD.

17       Q    HOW?

18       A    THE INITIAL VISIT WOULD BE QUITE EXTENSIVE AND WOULD

19   INVOLVE A LOT OF INFORMATION GATHERING FROM ALL OF THE SOURCES

20   THAT SUPPORT THESE DIAGNOSES.

21       Q    WOULD THAT INCLUDE PRIOR MEDICAL PROVIDERS?

22       A    YES, SIR.

23       Q    AND ANY IMAGERY DONE BEFORE THAT FIRST VISIT?

24       A    YES, SIR.

25       Q    PLEASE CONTINUE.

1     **A**    THIS PATIENT HAD, AS I SAID, AT 27-YEARS OLD HAD

2     THESE THINGS IN THE PROBLEM LIST AND INITIAL PHYSICAL

3     EXAMINATION WAS NOT PERFORMED.  AND THEN THROUGHOUT THE COURSE

4     OF THE REMAINING ENCOUNTERS, IT WAS NOT WHAT I CONSIDERED TO

5     BE A CREDIBLE PHYSICAL EXAM PERFORMED SUBSEQUENTLY.

6           THIS CHART CONTAINED NO PAST MEDICAL RECORDS, THERE

7     WERE NO SUPPORTING DIAGNOSTIC STUDIES PRESENT AND THERE WERE

8     NO PHYSICAL PDMP REPORTS PRESENT IN THE CHART.  DURING THE

9     COURSE OF CARE, THIS PATIENT HAD A REPORT OF STOLEN

10    MEDICATIONS AND WAS INCARCERATED.  BOTH OF THESE ARE

11    SIGNIFICANT RED FLAGS PERTAINING TO SCHEDULED MEDICATIONS. AND

12    THE PATIENT THROUGHOUT THE COURSE, ALTHOUGH PRESCRIBED

13    OXYCODONE, BUTALBITAL, WHICH IS A BARBITURATE, AND XANAX, A

14    URINE SCREEN WAS NEVER PERFORMED.

15    **Q**    IS IT IMPORTANT THAT A URINE SCREEN WAS NEVER

16    PERFORMED AFTER IF YOU GO ABOVE URINE TOXICOLOGY, A REPORT OF

17    MEDICATIONS STOLEN AND PATIENT INCARCERATED?

18    **A**    I WOULD CERTAINLY THINK SO.  IN FACT, THAT WOULD --

19    THAT WOULD EVEN RE-EMPHASIZE THE IMPORTANCE OF GETTING THAT.

20    BECAUSE IF A PATIENT REPORTS THAT THEIR MEDICATIONS ARE

21    STOLEN, IN ANY PRACTICE, AND THEY SAY THEIR MEDICATIONS WERE

22    STOLEN TWO WEEKS AGO AND THEN YOU PROCEED TO GET A URINE DRUG

23    SCREEN AND THEY'RE POSITIVE FOR THEIR MEDICATIONS OR THEY'RE

24    POSITIVE FOR SOMETHING ELSE, THAT TELLS YOU THAT YOU'VE GOT A

25    VERY ABNORMAL DRUG SCREEN HERE AND THERE'S SOME KIND OF

1   DIVERSION OR SOME KIND OF PROBLEM GOING ON.

2       **Q**   YOU WENT THROUGH THE LIST.  AT THE BOTTOM YOU

3   INDICATE "PRESCRIBED 450 PILLS OF OXYCODONE," WHICH IS AN

4   OPIOID, BUTALBITAL?

5       **A**   YES, SIR, THAT'S A BARBITURATE.

6       **Q**   AND XANAX?

7       **A**   WHICH IS BENZODIAZEPINE, YES, SIR.

8       **Q**   IS THERE ANYTHING SIGNIFICANT ABOUT THE COMBINATION

9   OF THOSE DRUGS?

10      **A**   WELL, ALL THREE OF THEM ARE CENTRAL NERVOUS SYSTEM

11  DEPRESSANTS, AND SO AS FAR AS THE OVERALL EFFECT IS CONCERNED,

12  THEY WOULD HAVE AN ADDITIVE AFFECT ON RESPIRATORY DEPRESSION.

13      **Q**   AND YOU INDICATE PATIENT ULTIMATELY PRESCRIBED 450

14  PILLS OF THOSE DRUGS.  AGAIN, WHAT DOES THAT LINE MEAN?

15      **A**   THAT WOULD DEPEND ON -- I WOULD HAVE TO TAKE A LOOK

16  AT THE SUMMARY TO TELL YOU WHETHER THAT SPECIFICALLY WAS PER

17  MONTH OR OVERALL, BUT THAT'S JUST TO INDICATE THAT THEY GOT A

18  TOTAL OF AT LEAST 450 UNIT DOSES OF OXYCODONE, BUTALBITAL AND

19  XANAX.

20      **Q**   THANK YOU.

21          **MR. PUGLIESE:**  PLEASE GO TO 100-M.

22  **BY MR. PUGLIESE:**

23      **Q**   I'M SHOWING YOU WHAT'S BEEN MARKED U.S.

24  EXHIBIT 100-M; DO YOU SEE THAT?

25      **A**   YES, SIR.

1     **Q**    IS THAT FOR PATIENT "M" WHO'S MASON HENDRICKS --

2     **A**    YES, SIR.

3     **Q**    -- AND IN REAL LIFE, HIS NAME IS ACTUALLY MATT

4  DIXON?

5     **A**    YES, SIR.

6     **Q**    AND YOU HEARD HIS TESTIMONY YESTERDAY?

7     **A**    I DID.

8     **Q**    AND WE'RE LOOKING AT COUNTS 12, 13, 14, 15, AND 16

9  AND THERE ARE SCRIPTS -- LET ME JUST CHECK -- THERE ARE

10  EXHIBITS FOR THIS PATIENT, FOR PATIENT "M," COVERING

11  POST-DATED SCRIPTS, I BELIEVE YOU SAW THEM YESTERDAY, FOR JUNE

12  OF 2015.  IF YOU WOULD PLEASE COVER YOUR SUMMARY FOR

13  PATIENT M?

14     **A**    WELL, ON COUNTS 12 THROUGH 16, THIS PATIENT WAS

15  PRESCRIBED HYDROCODONE SEVERAL TIMES, THEN ADDERALL, THEN

16  ADDERALL AND OXYCODONE.  THERE WERE FIVE DOCUMENTED ENCOUNTERS

17  IN THIS CHART.  AND THIS PATIENT WAS 30-YEARS OLD WITH A

18  REPORTED -- WHO, ON PRESENTATION, REPORTED RIGHT LEG PAIN.

19          THE PATIENT WAS DIAGNOSED WITH DISORDER OF THE LOWER

20  EXTREMITY.  THAT'S A VERY, VERY NONSPECIFIC DIAGNOSIS.  LATER

21  ON THERE MAY HAVE BEEN AN ADDITIONAL DIAGNOSIS, BUT THAT WAS

22  WHAT THE PHYSICIAN DOCUMENTED.  AND DISORDER OF THE LOWER

23  EXTREMITY COULD BE ANYTHING FROM A SPRAINED ANKLE TO INFECTED

24  TOENAIL TO ARTHRITIS OF THE HIP.  ALL OF THOSE THINGS ARE A

25  DISORDER OF THE LOWER EXTREMITY AND THAT'S A VERY NONSPECIFIC

1  DIAGNOSTIC STATEMENT.

2           INITIAL PHYSICAL EXAMINATION OF THIS PATIENT WAS

3  NORMAL.  THERE WERE NO REPORTED FINDINGS.  AND AFTER THAT, ON

4  THE SUBSEQUENT ENCOUNTERS, THERE WAS NEVER A PHYSICAL EXAM

5  THAT WAS REPEATED.  SO THERE'S NO PHYSICAL EXAMINATION

6  FINDINGS THROUGHOUT THE COURSE OF THE ENCOUNTERS THAT SUPPORT

7  ANY DIAGNOSIS.  AND LATER ON, AND DURING THE COURSE OF CARE,

8  THIS PATIENT WAS DIAGNOSED WITH ADD, AND IN MY OPINION THIS

9  DIAGNOSIS WAS CONTRIVED AND UNSUPPORTED BY MEDICAL RECORDS AND

10  SUPPLEMENTAL DOCUMENTATION.

11           THE CHART CONTAINED NO PAST MEDICAL RECORDS.  THERE

12  WERE NO SUPPORTING DIAGNOSTICS AND THE PDMP, THE LOUISIANA

13  PDMP REPORTS, WERE ABNORMAL; TOXICOLOGY SCREENING WAS NEVER

14  PERFORMED.  THE PATIENT REFUSED TO SIGN A TREATMENT AGREEMENT

15  AND THIS PATIENT WAS PRESCRIBED ADDERALL, AN AMPHETAMINE, FOR

16  AN ESTABLISHED ILLEGITIMATE PURPOSE, IN MY OPINION.  AND THIS

17  PATIENT WAS --

18           **THE COURT:**  WHO IS "M?"

19           **MR. PUGLIESE:**  I'M SORRY, YOUR HONOR.

20           **THE COURT:**  WHAT'S THE PATIENT'S NAME?  "M."

21           **MR. PUGLIESE:**  THIS IS MASON HENDRICKS, BUT THE

22  WITNESS WAS MATT DIXON, YOUR HONOR.  IF I MAY, YOUR HONOR, FOR

23  THE RECORD, THE UNINDICTED PRESCRIPTIONS FOR MATT DIXON WERE

24  52-A AND 52-B.  PLEASE CONTINUE.

25           **THE WITNESS:**  THIS PATIENT WAS ULTIMATELY PRESCRIBED

1   CONCOMITANT PERCOCET AND ADDERALL THAT, IN MY OPINION, WAS NOT

2   INDICATED.

3   **BY MR. PUGLIESE:**

4       **Q**   AND ANYTHING AFTER REVIEWING THIS THAT'S CHANGED

5   YOUR OPINION THAT THESE PRESCRIPTIONS WERE ISSUED OUTSIDE THE

6   SCOPE OF LEGITIMATE MEDICAL PRACTICE?

7       **A**   NO, SIR.

8       **Q**   AND NOT FOR A LEGITIMATE MEDICAL PURPOSE?

9       **A**   NO, SIR.

10      **Q**   I AM GOING TO USE VIDEO BECAUSE, UNLIKE SOME OF THE

11  PATIENTS, WE ACTUALLY HAVE SOMETHING TO SHOW VISITS.

12      **MR. PUGLIESE:**  SO, MS. BATEMAN, IF YOU WOULD, GO TO

13  EXHIBIT 167-B1 AND START AT THE TWO-MINUTE-AND-40-SECOND MARK.

14  IF YOU'RE SHY A FEW SECONDS THAT'S GREAT.  GOOD.  PERFECT.

15  THAT WORKS 2:33.  PLEASE HIT PLAY.

16            **(U.S. EXHIBIT 167-B1 WAS PLAYED.)**

17      **MR. PUGLIESE:**  HIT PAUSE.

18  **BY MR. PUGLIESE:**

19      **Q**   LET ME ASK YOU, DR. KENNEDY, IS THERE ANY

20  SIGNIFICANCE ABOUT A PATIENT USING THE TERM *ADDIES*?

21      **A**   YES, SIR.  THERE IS GREAT SIGNIFICANCE TO THAT AND

22  THE ENTIRETY OF THIS STATEMENT.

23      **Q**   OKAY.  LET'S FOCUS ON THE USE OF THE TERM *ADDIES*

24  FIRST.

25      **A**   YES, SIR.

128

1    **Q**    IS THAT AN INDICATION OF SOMETHING?

2    **A**    WHEN PATIENTS REFER TO MEDICATIONS BY STREET NAMES

3  TO PHYSICIANS THAT IS A RED FLAG AND SOMETHING THAT PHYSICIANS

4  SHOULD TAKE ACCOUNT OF.  IF YOU HAVE A PATIENT COME IN WHO'S

5  OSTENSIVELY A PAIN PATIENT AND HE SAYS THAT -- HE'S PRESCRIBED

6  OXY'S, OR HE'S BEEN TAKING OXY'S, AND NOW HE PRESENTS WITH A

7  FRIEND WHO'S WORKING OFFSHORE WHO TAKES ADDIES TO STAY AWAKE,

8  THESE SHOULD BE A VERY HIGH INDEX OF SUSPICION OF DRUG ABUSE

9  IN THIS PATIENT OR DIVERSION.

10   **Q**    WE'LL PLAY IT, BUT LOOK AT THE NEXT LINE 12,

11  DR. LAMARTINERE (SIC) AND I REALIZE IT'S A TRANSCRIPT, IT'S

12  WHAT WE ACTUALLY HEAR THAT MEANS SOMETHING BUT, THE STATEMENT

13  "WE DON'T -- THAT'S ACTUALLY ILLEGAL FOR THAT," IS THAT A

14  CORRECT STATEMENT?

15   **A**    DR. LAMARTINERE STATES "THAT'S ILLEGAL."  AND THAT'S

16  CORRECT, IT IS.

17   **Q**    THANK YOU.  PLEASE CONTINUE.

18       **(U.S. EXHIBIT 167-B1 WAS PLAYED.)**

19  **BY MR. PUGLIESE:**

20   **Q**    IS THAT AN ACCURATE STATEMENT BY DR. LAMARTINERE?

21   **A**    THAT IT IS A NON-INDICATED THING?

22   **Q**    CORRECT.

23   **A**    YES.  IT DEFINITELY IS.  IT'S NOT INDICATED FOR

24  KEEPING PEOPLE AWAKE.  IT'S INDICATED FOR OTHER MEDICAL

25  CONDITIONS ENTIRELY.

1    **Q**    THANK YOU.  PLEASE CONTINUE.

2              **(U.S. EXHIBIT 167-B1 WAS PLAYED.)**

3              **MR. PUGLIESE:**  PLEASE PAUSE.

4    BY MR. PUGLIESE:

5    **Q**    IS ADDERALL HIGHLY ABUSED?

6    **A**    IT IS, YES, SIR.  IT'S AN AMPHETAMINE.

7    **Q**    IS THERE ANYTHING ABOUT A WARNING THAT GOES ALONG

8    WITH ADDERALL THAT MAY BE DIFFERENT FROM OTHER SCHEDULE II

9    CONTROLLED SUBSTANCES?

10   **A**    WELL, I DON'T KNOW ESPECIALLY AS BEING DIFFERENT

11   FROM OTHER SCHEDULE II'S, BUT AS FAR AS THIS MEDICATION ITSELF

12   IS CONCERNED, ADDERALL CONTAINS THE FACTORY INSERTS, WHICH

13   GOES OUT WITH THE DRUG IN THE BOX, HAS GOT WHAT'S CALLED A

14   "BLACK BOX WARNING."

15   **Q**    WHAT IS THAT?

16   **A**    A BLACK BOX WARNING IS THE HIGHEST CAUTIONARY LEVEL

17   THAT THE FDA GIVES ON MEDICATIONS.  IT'S A BLACK BOX WARNING.

18   AND THAT BLACK BOX WARNING, I CAN'T QUOTE IT TO YOU VERBATIM,

19   BUT AMONG THE VERY FIRST WORDS ARE, *THIS MEDICATION IS HIGHLY*

20   *ADDICTIVE AND VERY ABUSABLE*, AMONG THE VERY FIRST THINGS THAT

21   IT SAYS AS A CAUTIONARY NOTE TO PRESCRIBERS ABOUT THIS AGENT.

22             **MR. PUGLIESE:**  PLEASE CONTINUE.

23             **(U.S. EXHIBIT 167-B1 WAS PLAYED.)**

24             **MR. PUGLIESE:**  PLEASE PAUSE.

25   BY MR. PUGLIESE:

1      **Q**    DR. KENNEDY, YOU SAW A TEXT YESTERDAY THAT

2  MR. STEVENS BROUGHT OUT DURING THE TESTIMONY OF MATT DIXON; DO

3  YOU RECALL THAT?

4      **A**    I SAW WHAT?  A TEXT?

5      **Q**    A TEXT MESSAGE.

6      **A**    I RECALL SEEING TEXT MESSAGES.

7      **Q**    WAS THAT A TEXT MESSAGE FROM MATT DIXON TO THE

8  DOCTOR ASKING IF HE COULD STOP BY --

9      **A**    YES, SIR.

10     **Q**    -- FRIDAY TO PICK UP THE MEDS?

11     **A**    YES, SIR, IT WAS.

12     **Q**    THIS IS AN AUGUST 17TH VISIT.  THE VIDEO OF THE

13  PRESCRIPTION BEING HANDED TO MATT DIXON WAS AUGUST 24TH IN THE

14  RECEPTION AREA.  IS THERE ANYTHING OTHER THAN THE TEXT THAT

15  YOU FOUND IN THE RECORDS OR HEARD DURING THE TESTIMONY THAT

16  WOULD WARRANT THE PRESCRIPTION FOR ADDERALL ON AUGUST 24TH?

17     **A**    NO, SIR.

18          **MR. PUGLIESE:**  PLEASE CONTINUE.  I'M SORRY

19  APRIL 24TH.  PLEASE CONTINUE.

20          **(U.S. EXHIBIT 167-B1 WAS PLAYED.)**

21          **MR. PUGLIESE:**  PLEASE STOP AND PLEASE MOVE TO THE

22  FOUR-MINUTE-AND-50-SECOND MARK OR JUST BEFORE IT.  PERFECT.

23  PLEASE HIT PLAY.

24          **(U.S. EXHIBIT 167-B1 WAS PLAYED.)**

25          **MR. PUGLIESE:**  PAUSE.

1  BY MR. PUGLIESE:

2      **Q**    THAT STATEMENT THAT DIXON MADE AT THAT POINT, I

3  BELIEVE IT'S "I TRIED ONE OF HIS.  IT WORKED GREAT."  IS THAT

4  CAUSE FOR ALARM?

5      **A**    SIR, THERE ARE A NUMBER OF STATEMENTS IN THAT

6  EXCHANGE THAT ARE CAUSE FOR ALARM.  BUT THE PATIENT SAYING

7  THAT HE TOOK SOMEBODY ELSE'S AMPHETAMINES AND IT WORKED GREAT

8  FOR A NON-INDICATED MEDICAL PURPOSE IS A MAJOR RED FLAG.  THIS

9  IS EXTREMELY ALARMING.  THIS IS A FRANK ADMISSION OF DRUG

10  ABUSE.

11      **Q**    BY THE PATIENT?

12      **A**    BY THE PATIENT.

13      **Q**    BUT THROUGHOUT THIS COURSE, DR. LAMARTINERE, IS HE

14  ACTUALLY GIVING GOOD ADVICE ABOUT PRESCRIBING -- WHAT'S NEEDED

15  TO PRESCRIBE ADDERALL?

16      **A**    IN MY OPINION, YES.

17          **MR. PUGLIESE:**  PLEASE CONTINUE.

18              **(U.S. EXHIBIT 167-B1 WAS PLAYED.)**

19          **MR. PUGLIESE:**  PLEASE STOP RIGHT THERE.

20  BY MR. PUGLIESE:

21      **Q**    "IT'S UNETHICAL TO PRESCRIBE IT FOR THAT."  DO THE

22  LOUISIANA REGULATIONS ADDRESS WHAT A DOCTOR SHOULD DO WHEN

23  FACED WITH A PATIENT WHO APPEARS TO BE ABUSING CONTROLLED

24  SUBSTANCES?

25      **A**    YES, SIR.

1    **Q**    WHAT IS THAT?

2    **A**    WELL, AT THIS POINT -- IN MY OPINION, AT THIS POINT

3    THE PATIENT IS CLEARLY ADMITTING TO ABUSING DIVERTED DRUGS,

4    WHICH HE REFERS TO AS ADDIES. PRESENTATION PREVIOUSLY HE HAD

5    PRESENTED TALKING ABOUT OXY'S AND NOW WE HAVE THIS.  AND HIM

6    TRYING TO PURSUE A PRESCRIPTION FOR AMPHETAMINES WHILE HE IS

7    ALREADY TAKING OXYCODONE BRINGS INTO EFFECT A LOUISIANA

8    MEDICAL BOARD REGULATION.  AND THAT MEDICAL BOARD REGULATION

9    STATES THAT IF YOU HAVE EVIDENCE OF DRUG ABUSE IN A PATIENT

10   WHO'S BEING TREATED FOR CHRONIC MEDICATION WITH SCHEDULED

11   MEDICATION THE PHYSICIAN SHALL AT THAT POINT WEAN AND

12   DISCONTINUE OPIOID MEDICATIONS, AND THEY'RE NOT TO BE RESUMED

13   ON OPIOID MEDICATIONS UNTIL THEY HAVE BEEN TO SEE AN

14   ADDICTION-OLOGIST AND HAVE HAD A CLEARING CONSULTATION.

15   **Q**    THANK YOU.

16   **MR. PUGLIESE:**  PLEASE CONTINUE.

17       **(U.S. EXHIBIT 167-B1 WAS PLAYED.)**

18   **MR. PUGLIESE:**  PLEASE GO TO EXHIBIT 167-B2.

19       **(U.S. EXHIBIT 167-B2 WAS PLAYED.)**

20   **MR. PUGLIESE:**  PAUSE, PLEASE.  DO ME A FAVOR, GET

21   THAT TIME BACK UP.  THAT SHOULD BE AROUND 20.

22   **BY MR. PUGLIESE:**

23   **Q**    DR. KENNEDY, WHO BRINGS UP THE ATTENTION ISSUES; WAS

24   IT THE PATIENT OR DR. LAMARTINERE?

25   **A**    SO IT WAS DR. LAMARTINERE, AND THAT'S WHY THIS

1   COURSE OF DIALOGUE IS SO IMPORTANT.  THROUGHOUT THE PATIENT

2   HAS ASKED FOR THIS AS SOMETHING TO KEEP HIM AWAKE AND NOW

3   DR. LAMARTINERE IS INQUIRING OF HIM HOW LONG HAVE YOU HAD

4   ATTENTION DEFICIT PROBLEMS; NOT DO YOU HAVE ATTENTION DEFICIT

5   PROBLEMS, BUT PRESUMING THAT THIS IS SOMETHING THAT HAS BEEN

6   GOING ON.

7        **Q**    THANK YOU.

8            **MR. PUGLIESE:**  PLEASE CONTINUE.

9            **(U.S. EXHIBIT 167-B2 WAS PLAYED.)**

10  BY MR. PUGLIESE:

11       **Q**    LET ME ASK YOU, DR. KENNEDY, YOU'VE TESTIFIED BEFORE

12  AND HEARD OBJECTIONS.  IS IT SAFE TO SAY DR. LAMARTINERE IS

13  LEADING THE PATIENT TOWARDS AN ADDERALL PRESCRIPTION?

14       **A**    YES, SIR.

15       **Q**    BUT THESE QUESTIONS AND ANSWERS ALONE, IS THAT

16  SUFFICIENT TO JUSTIFY AN ADDERALL PRESCRIPTION?

17       **A**    IN MY OPINION, NO.

18       **Q**    WAS DR. LAMARTINERE CORRECT THAT TESTING WOULD BE

19  NEEDED, PERHAPS A REFERRAL TO A NEUROPSYCHOLOGIST?

20       **A**    WELL, I DON'T BELIEVE THAT IT'S THE CASE THAT YOU

21  ABSOLUTELY HAVE TO HAVE AN EVALUATION BY A NEUROPSYCHIATRIST

22  TO GET A DIAGNOSIS OF ADD OR ADHD, BUT CERTAINLY IF YOU'RE

23  GOING TO BE STARTED ON AMPHETAMINES FOR ATTENTION DEFICIT

24  DISORDER, THIS IS A BIG DEAL AND YOU NEED TO HAVE A PROPER

25  DIAGNOSIS.  BECAUSE THIS IS SOMETHING THAT'S GOING TO STAY

```
1    WITH THEM FOR THE REST OF THEIR LIFE.  THIS IS NOT A SMALL

2    THING, AND IT REQUIRES A -- SUBSTANTIAL MORE INVESTIGATION

3    THAN THIS, IN MY OPINION.

4        Q    DOES THE INVESTIGATION GO BEYOND THE DIALOGUE

5    BETWEEN THE DOCTOR AND THE PATIENT THAT YOU'VE JUST INDICATED?

6        A    POTENTIALLY.  THERE ARE SOME -- THEY HAVE

7    QUESTIONNAIRES THAT YOU CAN FILL OUT AND A NUMBER OF DIFFERENT

8    INTERVIEW QUESTIONS.  THE PROBLEM WITH THOSE, IN MY VIEW, IS

9    THAT PEOPLE WHO ARE SEEKING AMPHETAMINES CAN BE VERY, VERY

10   WILY AND KNOW VERY WELL HOW TO ANSWER THOSE QUESTIONS TO GET

11   THEIR AMPHETAMINES.  SO AN EQUAL AMOUNT AND PERHAPS BETTER CAN

12   BE GAINED BY SIMPLY QUESTIONING THE PATIENT IN A MEANINGFUL

13   WAY.

14       Q    IS THIS QUESTIONING IN A MEANINGFUL WAY BY

15   DR. LAMARTINERE?

16       A    IN MY OPINION, NO.

17           MR. PUGLIESE:  PLEASE CONTINUE.

18               (U.S. EXHIBIT 167-B2 WAS PLAYED.)

19           MR. PUGLIESE:  PLEASE PAUSE.

20   BY MR. PUGLIESE:

21       Q    DR. LAMARTINERE JUST SAID, "TRY TO FIND OUT A WAY

22   PRIOR TO THE NEXT APPOINTMENT TO COME UP WITH A DIAGNOSIS THAT

23   WE CAN USE FOR IT, YOU KNOW, IN PRESCRIBING IT."  WOULD YOU

24   COMMENT ON THAT STATEMENT BY THE DOCTOR?

25       A    IN MY OPINION THIS IS EXTREMELY ALARMING.  BECAUSE
```

1    WHAT WE'RE TALKING ABOUT IS ESSENTIALLY ESTABLISHING A

2    DIAGNOSIS THAT WE KNOW THE PATIENT DOESN'T HAVE.  HE'S LOOKING

3    FOR THESE MEDICATIONS TO STAY AWAKE AND NOW WE'RE GOING TO

4    COME UP WITH A WAY TO DIAGNOSE HIM WITH ATTENTION DEFICIT

5    DISORDER AND THEN PUT THAT INTO HIS MEDICAL RECORD.  THIS IS

6    REALLY, REALLY, REALLY FAR OUTSIDE THE SCOPE OF USUAL MEDICAL

7    PRACTICE AND LEGITIMATE PRESCRIPTIONS NOT SUPPORTED HERE, IN

8    MY OPINION.

9         **MR. PUGLIESE:**  PLEASE GO TO -- ADVANCE, MS. BATEMAN,

10   TO THE 3:00 MINUTE 15-SECOND MARK.  THAT'S GOOD.  THANK YOU.

11              **(U.S. EXHIBIT 167-B2 WAS PLAYED.)**

12        **MR. PUGLIESE:**  PLEASE PAUSE.

13   **BY MR. PUGLIESE:**

14   **Q**   HOW WOULD DR. LAMARTINERE BE ABLE TO DOCUMENT ENOUGH

15   STUFF BY THE NEXT VISIT?

16   **A**   WELL, THE ONLY WAY THAT YOU CAN DO THAT, IN MY

17   OPINION, WITHIN THE COURSE OF USUAL MEDICAL PRACTICE, IS TO

18   OBTAIN THAT INFORMATION, SO YOU WOULD HAVE TO HAVE SUPPORTING

19   PAST MEDICAL RECORDS.  YOU WOULD HAVE TO HAVE SOME KIND OF

20   MEANINGFUL DIAGNOSTIC INTERVIEW.  PAST MEDICAL RECORDS, SOME

21   KIND OF RECORDS FROM CHILDHOOD OR SOMETHING THAT WOULD SUPPORT

22   THAT YOU'RE WILLING TO GIVE THIS PERSON A DIAGNOSIS OF

23   ATTENTION DEFICIT DISORDER OR AN APPROPRIATE EVALUATION OF HIS

24   OWN.

25   **Q**   THANK YOU.

1      **MR. PUGLIESE:**  PLEASE CONTINUE.

2          **(U.S. EXHIBIT 167-B2 WAS PLAYED.)**

3      **MR. PUGLIESE:**  PLEASE PAUSE.

4  **BY MR. PUGLIESE:**

5      **Q**    IS THAT A CORRECT STATEMENT, "IT'S NOT THAT HABIT

6  FORMING"?

7      **A**    SIR, IF YOU RECALL FROM WHEN WE BEGAN LISTENING TO

8  THIS DIALOGUE, HE SAID THAT IT IS "HIGHLY ADDICTIVE AND VERY

9  ABUSABLE," OR ALONG THOSE LINES, WERE DR. LAMARTINERE'S WORDS.

10     **Q**    AND THOSE WERE CORRECT?

11     **A**    THAT WAS CORRECT.  AND THEN NOW BEFORE THE

12 CONVERSATION IS COMPLETED, BEFORE THIS PATIENT/PHYSICIAN

13 ENCOUNTER IS COMPLETED, WE'RE SAYING WELL, YOU KNOW, IT'S NOT

14 THAT HABIT FORMING.

15     **MR. PUGLIESE:**  PLEASE CONTINUE.

16         **(U.S. EXHIBIT 167-B2 WAS PLAYED.)**

17     **MR. PUGLIESE:**  PLEASE STOP RIGHT THERE.

18 **BY MR. PUGLIESE:**

19     **Q**    "THAT AIN'T ME.  I DON'T ABUSE THEM."  IN THE PAIN

20 MANAGEMENT PRACTICE, OR JUST A PRESCRIPTION OF OPIOIDS, IS IT

21 GOOD ENOUGH TO JUST TRUST WHAT YOUR PATIENT TELLS YOU?

22     **A**    NO, SIR.  IF IT WAS, THERE WOULD BE NO NEED FOR DRUG

23 SCREENS AND PHARMACY REPORTS.

24     **Q**    AND IS IT SUFFICIENT TO TRUST A PATIENT WHO'S JUST

25 ADMITTED THEY ABUSE DRUGS?

1    **A**    WELL, IN THIS INSTANCE, IT HIGHLIGHTS THAT THE

2    PATIENT IS ABUSING DRUGS.

3    **Q**    THANK YOU.

4          **MR. PUGLIESE:**  PLEASE CONTINUE.

5              **(U.S. EXHIBIT 167-B2 WAS PLAYED.)**

6          **MR. PUGLIESE:**  PLEASE PAUSE.

7    BY MR. PUGLIESE:

8    **Q**    WAS THERE ANYTHING IN TERMS OF THE RECORDS THAT YOU

9    REVIEWED AFTER THIS APRIL 17TH VISIT BY PATIENT "M" -- MATT

10   DIXON PLAYING THE ROLE OF MASON HENDRICKS, THAT WOULD JUSTIFY

11   THE PRESCRIPTION?

12   **A**    NO, SIR.

13         **MR. PUGLIESE:**  PLEASE CONTINUE.

14             **(U.S. EXHIBIT 167-B2 WAS PLAYED.)**

15         **MR. PUGLIESE:**  PLEASE PAUSE.

16   BY MR. PUGLIESE:

17   **Q**    THAT VISIT ACTUALLY ISN'T THE ADDERALL PRESCRIPTION,

18   THAT'S APRIL 17, COUNT 13, A HYDROCODONE PRESCRIPTION.  WAS

19   THERE ANYTHING ADDED DURING THE TESTIMONY OF MATT DIXON OR THE

20   VIDEOS BEYOND YOUR CHART REVIEW THAT WOULD CHANGE YOUR OPINION

21   ABOUT THE USUAL SCOPE AND LEGITIMATE MEDICAL PURPOSE FOR COUNT

22   13, THE HYDROCODONE ISSUE DISPENSED, ON APRIL 17TH TO THIS

23   UNDERCOVER?

24   **A**    NO, SIR.

25   **Q**    AND THEN WHEN YOU INDICATED YOU SAW THE TEXT --

1    **MR. PUGLIESE:**  DO ME A FAVOR, PULL UP 168-A AND B.

2    **BY MR. PUGLIESE:**

3    **Q**    IF YOU WOULD, DR. KENNEDY, LOOK AT THE FIRST TEXT AT

4    11:43 ON THE LEFT.

5    **A**    YES, SIR.

6    **Q**    BASED ON THE CONTENT OF THAT TEXT, DOES THAT APPEAR

7    TO BE A TEXT THAT DR. LAMARTINERE SENT TO MASON HENDRICKS?

8    **A**    THIS IS -- IT APPEARS THAT THE INITIATING

9    CONVERSATION IS THE UNDERCOVER.

10    **Q**    AND THE UNDERCOVER ACTUALLY SAYS, AGAIN, HE WANTS TO

11    COME BY AND PICK UP SCRIPTS FOR ADDIES?

12    **A**    YES, SIR.

13    **Q**    IS IT JUST SAFE, IN SUMMARY, THAT THE DOCTOR SAYS

14    THAT HE'S NOT AVAILABLE ON WEDNESDAY, BUT HE'LL BE AVAILABLE

15    ON FRIDAY?

16    **A**    YES, SIR.

17    **Q**    AND YOU DID -- LET ME SHOW YOU.

18    **MR. PUGLIESE:**  IF YOU WOULD, PULL UP EXHIBIT 14,

19    MS. BATEMAN, AND HIGHLIGHT THAT BOX.  YEP.

20    **BY MR. PUGLIESE:**

21    **Q**    SO BASED ON EVERYTHING YOU KNOW AS YOU TESTIFY RIGHT

22    NOW, FROM THE CHART REVIEW, TESTIMONY, VIDEOS, WAS THERE ANY

23    LEGITIMATE MEDICAL PURPOSE FOR THIS PRESCRIPTION ON

24    APRIL 24TH, 2015 FOR ADDERALL?

25    **A**    NO --

1      **Q**   WAS IT --

2      **A**   -- IN MY OPINION.

3      **Q**   WAS IT ISSUED IN THE USUAL COURSE OF MEDICAL

4   PRACTICE?

5      **A**   IN MY OPINION, NO.

6      **Q**   THANK YOU.

7          **MR. PUGLIESE:**  YOU CAN GO BLACK WITH THE SCREEN,

8   PLEASE.  MS. BATEMAN, IF YOU WOULD, LET'S GO NEXT TO

9   EXHIBIT 100-N.

10  **BY MR. PUGLIESE:**

11     **Q**   SO, DR. KENNEDY, AT THE TOP IT'S PATIENT "N".  IT'S

12  SAFE TO SAY THAT'S BRIAN BOUDREAUX?

13     **A**   YES, SIR.

14     **Q**   AND YOU HEARD HIM TESTIFY YESTERDAY?

15     **A**   I DID.

16     **Q**   AND IS IT SAFE TO SAY THAT BETWEEN THE FIRST

17  PRESCRIPTION AND THE LAST, DECEMBER 11TH, ALL OF THE

18  PRESCRIPTIONS THAT HAVE BEEN ADMITTED TO PATIENT "N" HELP WITH

19  YOUR OPINION AS TO THE OXYCODONE PRESCRIPTION ON

20  NOVEMBER 13TH, 2015 IN COUNT 18 AND THE DECEMBER 11, 2015

21  PRESCRIPTION FOR ADDERALL AND OXYMORPHONE IN COUNT 19?

22     **A**   YES, SIR.

23     **Q**   PLEASE, IF YOU WOULD GO THROUGH YOUR SUMMARY.

24     **A**   THIS PATIENT HAD NINE DOCUMENTED ENCOUNTERS THAT

25  WERE PRESENT IN THE CHART, AND WHAT WAS ALARMING TO ME ABOUT

1  THIS IS THIS PATIENT, AGAIN, WAS 28-YEARS OLD, HAD REPORTED

2  ADD, LOW BACK PAIN, STEROID ABUSE, ANXIETY DISORDER,

3  DEGENERATIVE DISK DISEASE, ERECTILE DISFUNCTION AND AN

4  UNSPECIFIED LOW BACK INJURY AT AGE 28.  SO, AGAIN, THIS IS A

5  FAIRLY YOUNG PERSON WITH A FAIRLY EXTENSIVE PROBLEM LIST.

6      Q    LET ME ASK YOU, IF YOU HAD A PATIENT THAT CAME

7  IN WITH -- IS THIS LIST OVER THE COURSE OF TREATMENT OR FROM

8  THE -- JUST IDENTIFIED DURING THE FIRST VISIT PURPORTEDLY?

9      A    IN THIS CASE, I CAN'T ANSWER THAT QUESTION.  THESE

10  ARE TOTAL THINGS FROM THE PROBLEM LIST THROUGHOUT THE CHART.

11      Q    CONTINUE ABOUT WHAT THE CHART CONTAINED.

12      A    I WOULD SAY IF I HAD MY CASE REVIEW I COULD TELL YOU

13  SPECIFICALLY WHAT WAS REPORTED ON THE INITIAL ENCOUNTER --

14      Q    WE --

15      A    -- IF THAT'S NECESSARY.

16      MR. PUGLIESE:  PULL UP COUNT 17, PLEASE.  I'M SORRY.

17  THIS IS -- AND HIGHLIGHT.

18  BY MR. PUGLIESE:

19      Q    SO THIS EXHIBIT 17, THIS IS WHAT WAS ISSUED ON THE

20  FIRST ENCOUNTER, AT LEAST IN TERMS OF SCHEDULE II MEDICATIONS;

21  OXYCODONE, OKAY, DOCTOR?

22      A    YES, SIR.

23      MR. PUGLIESE:  OKAY.  GO BACK TO 100-N.  THANK YOU.

24  BY MR. PUGLIESE:

25      Q    PLEASE CONTINUE REGARDING PATIENT HISTORY.

1    **A**    AGAIN, WITH THAT PATIENT PROBLEM LIST, THE CHART

2    CONTAINS NO PATIENT HISTORY, NO SIGNIFICANT DOCUMENTED HISTORY

3    EITHER SUPPLIED BY THE PATIENT OR THE PHYSICIAN THAT ACCOUNTS

4    FOR THIS.  IN MY OPINION, ALL THE PHYSICAL EXAMS -- THERE WERE

5    PHYSICAL EXAMS DONE BUT THEY WERE ALL NONCONTRIBUTORY AND

6    NONCREDIBLE TOWARD SUPPORTING THIS PLETHORA OF DIAGNOSES.

7    **Q**    WHAT'S NONCONTRIBUTORY MEAN?

8    **A**    NONCONTRIBUTORY MEANS THAT IF YOU SAY THAT YOU HAVE

9    A HEADACHE, THEN MY PHYSICAL EXAM SAYS THAT YOUR RIGHT ELBOW

10   LOOKS GOOD.  SO MY PHYSICAL EXAM DOES NOT CONTRIBUTE TO THE

11   ESTABLISHMENT OF THE DIAGNOSIS.

12   **Q**    THANK YOU.  PLEASE CONTINUE.

13   **A**    THE CHART CONTAINED NO PAST MEDICAL RECORDS AND

14   THERE WAS NOT A PAST MEDICAL RECORD REQUEST.  ADDITIONALLY,

15   THERE ARE NO SUPPORTING DIAGNOSTIC STUDIES PRESENT IN THIS

16   CHART.

17   **Q**    AGAIN, THAT'S --

18   **A**    WHEN I SAY *DIAGNOSTIC STUDIES*, ORDINARILY WITH

19   CHRONIC PAIN PATIENTS WE'RE VERY FREQUENTLY TALKING ABOUT CT

20   SCANS OR MRI'S, BUT IT COULD BE AN X-RAY OR SOME OTHER KIND OF

21   STUDY THAT SUPPORTS THE CONDITION WE'RE TALKING ABOUT; THAT IS

22   OBJECTIVE, THAT'S OBTAINED FROM AN MRI SCAN OR A CT SCAN.  SO

23   WHEN I SAY THAT THERE ARE NO SUPPORTING DIAGNOSTIC STUDIES,

24   WHAT I MEAN IS THERE ARE NO REPORTS FOR ANY OF THOSE.

25   **Q**    PLEASE CONTINUE.

1          **A**     DURING THE COURSE OF TIME, THERE WERE STATE PHARMACY

2     REPORTS OBTAINED ON THIS PATIENT AND THOSE PHARMACY REPORTS,

3     IN MY OPINION, ARE ALARMING.  THIS PATIENT HAD RECEIVED

4     SCHEDULED MEDICATIONS FROM SEVEN PHYSICIANS.  SEVEN PHYSICIANS

5     HAD PRESCRIBED SCHEDULED MEDICATIONS THAT HE FILLED AT 11

6     DIFFERENT PHARMACIES.  NOW, I WOULD SAY THAT THERE'S A

7     POTENTIAL THAT THAT MAY BE OKAY, BUT THE REASON WE HAVE

8     PHARMACY REPORTS IS SO THAT THAT CAN BE INVESTIGATED BY THE

9     PRESCRIBER.  THIS IS SOMETHING THAT MUST BE TALKED ABOUT, IT

10    MUST BE DISCUSSED WITH THE PATIENT.

11         **Q**     ANYTHING IN THE RECORDS TO SHOW THAT IT WAS TALKED

12    ABOUT AND DISCUSSED --

13         **A**     WHAT DR. LAMARTINERE RECORDED WAS "LA. PMP REVIEWED

14    WITH NO ANOMALIES NOTED."

15         **Q**     LET ME ASK YOU DURING THE TESTIMONY -- NOPE, WRONG

16    PATIENT.  I'M SORRY.  PLEASE CONTINUE.

17         **A**     THE URINE TOXICOLOGY SCREENING ON THIS PATIENT WAS

18    EXTREMELY ALARMING.  THIS PATIENT HAD DRUG TESTS THAT WERE

19    REPEATEDLY INDICATING THAT HE WAS NONCOMPLIANT AND THAT HE WAS

20    ABUSING HEROIN.  THIS IS A VERY LARGE ISSUE FOR SOMEBODY BEING

21    PRESCRIBED AMPHETAMINES AND OPIOIDS.  FOR AN EXAMPLE, THIS

22    PATIENT WAS TAKING ADDERALL.  A DRUG SCREEN WAS OBTAINED AND

23    IT'S NEGATIVE FOR AMPHETAMINES.

24         **Q**     WHAT'S THE SIGNIFICANCE OF THAT?

25         **A**     WELL, THE SIGNIFICANCE IS THE SAME AS THE FACT THAT

1   THIS PATIENT WAS ALSO PRESCRIBED ALPRAZOLAM AND HE WAS

2   NEGATIVE FOR ALPRAZOLAM.  WHEN YOU HAVE A PATIENT WITH THESE

3   FINDINGS WHO IS ALSO ABUSING HEROIN, OF COURSE, YOU CAN'T

4   PROVE THIS JUST BASED ON THAT, BUT HEROIN CAN COST MONEY AND

5   PEOPLE WHO ARE ABUSERS, WHO ARE ALSO GETTING A LOT OF

6   SCHEDULED MEDICATIONS, WILL SOMETIMES SELL THEIR SCHEDULED

7   MEDICATIONS TO BUY HEROIN AND THAT ACCOUNTS FOR WHY THEIR DRUG

8   SCREEN WOULD BE NEGATIVE.  NOT TO MENTION THAT HAVING

9   DIAGNOSED SOMEBODY WITH A CONDITION THAT'S GOING TO REQUIRE

10   THEM TO TAKE A SCHEDULE II AMPHETAMINE POSSIBLY FOR THE REST

11   OF THEIR LIFE THIS MUST BE ACCOUNTED FOR --

12   **Q**   AND --

13   **A**   -- IN MY OPINION.

14   **Q**   SO THE FACT THAT THE PATIENT TAKES ADDERALL BUT A

15   TOXICOLOGY IS NEGATIVE FOR AMPHETAMINES, DOES THAT INDICATE

16   THAT THE PATIENT IS NOT FOLLOWING THE DIRECTIONS OR EVEN USING

17   THE PRESCRIPTION?

18   **A**   IT'S TEXTBOOK NONCOMPLIANCE.

19   **Q**   SAME FROM THE ALPRAZOLAM?

20   **A**   YES, SIR.

21   **Q**   AND WE HEARD THAT THIS DEFENDANT WAS POSITIVE FOR

22   HEROIN -- I'M SORRY.  PLEASE CONTINUE.

23   **A**   WELL, THE DRUG SCREEN THAT WAS OBTAINED WAS POSITIVE

24   FOR HEROIN, FENTANYL, BUPRENORPHINE, CLONAZEPAM AND MARIJUANA

25   AND THE PATIENT WAS NOT PRESCRIBED HEROIN OR FENTANYL OR

1    BUPRENORPHINE OR KLONOPIN OR MARIJUANA.

2         IN MY COMMUNICATION AMONG OTHER DOCTORS OR WITH THE

3    DEA, FOR EXAMPLE, I WOULD DESCRIBE THIS AS A WILDLY ABNORMAL

4    DRUG SCREEN PROFILE.

5         **Q**    DID YOU HEAR MR. BOUDREAUX TESTIFY YESTERDAY?

6         **A**    I DID.

7         **Q**    DID YOU HEAR HIM INDICATE THAT THE DOCTOR STILL

8    PRESCRIBED HIM MEDS, BUT HE MADE IT FOR A SHORTER PERIOD OF

9    TIME?

10        **A**    I RECALL SOMETHING OF THAT SORT.

11        **MR. PUGLIESE:**  WOULD YOU PULL UP EXHIBIT 71.  THANK

12   YOU.  GO DOWN TO PATIENT "L," ZACHARY JACKSON.  SLOWLY,

13   SLOWLY.  GO INTO AUGUST, I BELIEVE, AND THE DATE OF

14   PRESCRIPTION.  HOLD ONE MINUTE.  GO DOWN A LITTLE MORE.  I MAY

15   HAVE MISSED IT.  GO BACK.  I'M SORRY.  DOWN TO PATIENT

16   BOUDREAUX AND GO TO AUGUST.  PLEASE STOP RIGHT THERE.

17   **BY MR. PUGLIESE:**

18        **Q**    ARE YOU ABLE -- SO LINE 59-C, FOUR DOWN FROM THE

19   TOP; DO YOU SEE THAT?

20        **A**    I DO.

21        **Q**    AND THE PATIENT IS BRIAN BOUDREAUX, PRESCRIPTION

22   AUGUST 21ST, 2015, IT'S OXYMORPHONE 12-HOUR XR, 30-MILLIGRAMS,

23   14 DAYS.  IS THIS A SMALLER DOSE OF OXYMORPHONE THAN

24   PREVIOUSLY DESCRIBED -- PREVIOUSLY DISPENSED?

25        **A**    IT LOOKS LIKE THAT WAS 08/28 AND IT WAS -- THANK

1   YOU -- 30-MILLIGRAMS.  IT APPEARS TO ME IT'S IDENTICAL.  IT'S

2   STILL TWICE A DAY.  IT'S STILL TWICE A DAY.  SO WHAT I'M

3   LOOKING AT HERE APPEARS TO BE THE SAME DOSAGE AND IT'S TWICE

4   DAILY.

5       **Q**    HOW ABOUT THE DOSAGE UNITS?  IF YOU LOOK AT THE TOP

6   OF 58-C, IT WAS 38-MILLIGRAMS, 60 UNITS AND THERE YOU HAVE --

7       **A**    YES.  BUT GIVING THE PHYSICIAN THE BENEFIT OF THE

8   DOUBT, ONE OF THOSE COULD HAVE POTENTIALLY BEEN FOR A TWO-WEEK

9   PRESCRIPTION, I DON'T KNOW.  ONE OF THEM COULD BE FOR A 30-DAY

10  PRESCRIPTION, I DON'T KNOW.  WHAT I WOULD SAY IS THE DOSAGE

11  APPEARS TO BE THE SAME.

12      **Q**    OKAY.

13          **MR. PUGLIESE:**  PLEASE UN-HIGHLIGHT.  I'D LIKE YOU TO

14  HIGHLIGHT 59-B -- LET'S JUST GET THE DATE.  AUGUST 21ST, TWO

15  PRESCRIPTIONS, OKAY, FOR OXYCODONE -- OXYCODONE AND

16  OXYMORPHONE, OKAY.  THAT'S 59-B AND C, AUGUST 21ST.  GO DOWN

17  TO THE NEXT TWO PRESCRIPTIONS, WHICH WOULD BE 60-A AND 60-B.

18  NOPE.  GO BACK UP.  60-A.

19  **BY MR. PUGLIESE:**

20      **Q**    SO IS IT SAFE TO SAY THAT SEVEN DAYS AFTER THAT

21  AUGUST 21ST PRESCRIPTION, HE'S BACK UP TO OXYCODONE, 120 PILLS

22  AND OXYMORPHONE 60?

23      **A**    YES, THAT'S WHAT'S PRESCRIBED.

24      **Q**    THANK YOU.

25          **MR. PUGLIESE:**  GO BACK TO 100-N, PLEASE.  THANK YOU.

1    BY MR. PUGLIESE:

2        Q    THE NEXT LINE ON YOUR SUMMARY INDICATES PATIENT HAD

3    MULTIPLE REPORTS OF STOLEN MEDICATION.  WHAT'S THE

4    SIGNIFICANCE OF THAT?

5        A    WELL, THAT'S ANOTHER RED FLAG, AND DEPENDING ON HOW

6    YOU INTERPRET THESE OTHER THINGS, IT COULD BE A VERY RED FLAG.

7    THE REASON THAT MY DRUG SCREEN IS NEGATIVE FOR AMPHETAMINES IS

8    BECAUSE MY DRUGS WERE STOLEN.  WITHOUT HAVING A REPORT,

9    WITHOUT HAVING SOMETHING THAT SUPPORTS THAT, JUST THE

10   ASSERTION OF STOLEN MEDICATIONS ALL BY ITSELF IS A RED FLAG.

11       Q    WOULD YOU PLEASE INDICATE WHAT THE LAST LINE IS AND

12   ITS SIGNIFICANCE.

13       A    WELL, THAT THIS PATIENT ULTIMATELY WAS RECEIVING 390

14   PILLS OF OXYCODONE, OXYMORPHONE, XANAX AND AMPHETAMINES.

15           MR. PUGLIESE:  PLEASE GO TO EXHIBIT 100-V.

16   BY MR. PUGLIESE:

17       Q    IF YOU LOOK AT THE TOP PATIENT "V" IS THIS FREDERICK

18   AUGHEY?

19       A    YES, SIR.

20       Q    DO YOU RECALL MR. AUGHEY TESTIFYING YESTERDAY?

21       A    I DO.

22       Q    DO YOU RECALL IN RESPONSE TO QUESTIONS BY

23   MR. BRINDLEY HIM SAYING THAT DURING EVERY VISIT HE HAD --

24   THERE WERE DETAILED NOTES AND DETAILED DISCUSSIONS ABOUT HIS

25   HEALTH WITH DR. LAMARTINERE?

1    **A**    SIR, I DON'T REMEMBER THE PATIENT MAKING THAT

2    ASSERTION.  I RECALL THE PATIENT AGREEING TO THAT ASSERTION ON

3    QUESTIONING.

4    **Q**    SO IN OTHER WORDS, MR. BRINDLEY ASKED THE QUESTION

5    AND THE WITNESS AUGHEY AGREED?

6    **A**    YES, SIR.

7    **Q**    LET'S GET INTO YOUR RECORD -- LET ME ASK YOU, DURING

8    YOUR RECORD REVIEW, WAS THERE ANYTHING TO SUPPORT, ON ANY

9    VISIT, DOCUMENTATION OF ANY DETAILED DISCUSSION OF HEALTH,

10   PAIN, ANYTHING RELATED TO MEDICAL ISSUES WITH FREDERICK

11   AUGHEY?

12   **A**    SIR, IT'S BEEN FIVE YEARS, SO I WOULD HATE TO SAY

13   CATEGORICALLY NO, BUT I WOULD SAY CATEGORICALLY NOTHING THAT

14   RISES TO THE LEVEL OF JUSTIFYING THE MEDICATIONS THAT WERE

15   PRESCRIBED, IN MY OPINION.

16   **Q**    OKAY.  YOU SAW IN THE RECORDS FOUR DOCUMENTED

17   ENCOUNTERS STARTING ON JUNE 29TH AND ENDING ON NOVEMBER 13TH?

18   **A**    I'M SORRY, SIR, AGAIN.

19   **Q**    LOOK AT THE TOP BOX.  DO YOU SEE COUNTS 20, 21,

20   22 --

21   **A**    YES.

22   **Q**    -- 23.  GO TO THE FIRST LINE AFTER THAT.  WHAT IS

23   THAT?

24   **A**    SEPTEMBER 28TH.

25   **Q**    AM I MISSING SOMETHING?

1      **A**     OH, YOU'RE TALKING ABOUT --

2      **Q**     I'M SORRY.

3      **A**     FORGIVE ME.  I THOUGHT YOU WERE TALKING ABOUT OTHER

4    COUNTS.  FORGIVE ME, SIR.  THIS PATIENT HAD FOUR DOCUMENTED

5    ENCOUNTERS -- I SEE -- BETWEEN 06/29/15 AND 11/13/15.

6      **Q**     PLEASE CONTINUE.

7      **A**     THIS PATIENT WAS 41-YEARS OLD AND WAS DIAGNOSED WITH

8    LOW BACK PAIN.  OVER THE COURSE OF THESE ENCOUNTERS, THE CHART

9    DOES NOT CONTAIN A BACK EXAMINATION.  THE PATIENT WAS

10   DIAGNOSED WITH ANXIETY.  OVER THE COURSE OF ENCOUNTERS, THERE

11   IS NOT A DIAGNOSTIC INTERVIEW THAT SUPPORTS A DIAGNOSIS OF

12   ANXIETY.  THE CHART DOESN'T CONTAIN ANY PATIENT OR

13   PHYSICIAN-COMPLETED HISTORICAL FORMS.  PAST MEDICAL RECORDS,

14   SUPPORTING PAST MEDICAL RECORDS, WERE NOT PRESENT AND THEY

15   WEREN'T REQUESTED.

16          THROUGHOUT THE COURSE OF THESE ENCOUNTERS, VITAL

17   SIGNS WERE OBTAINED, ONCE, ON ONE ENCOUNTER, WITH NO HEIGHT

18   AND NO WEIGHT FOR THIS PATIENT.  THERE IS NO URINE TOXICOLOGY

19   REPORT PRESENT IN THE CHART.  I BELIEVE THAT IT WAS DOCUMENTED

20   IN THE MEDICAL RECORD AND, AGAIN, THIS IS GOING BACK, I

21   BELIEVE IT WAS DOCUMENTED THAT A DRUG SCREEN WAS OBTAINED, BUT

22   THERE WAS NO REPORT IN THE CHART OR STATEMENT OF WHAT MIGHT

23   HAVE BEEN ON IT.  SO THAT'S WHY THAT IS INCLUDED HERE.  AND

24   THEN IT GOES ON TO SAY WHERE IT SAYS "NO URINE TOXICOLOGY

25   REPORT" BENEATH THAT ON THE FINAL ENCOUNTER, THE PATIENT SAID,

1    "HERE FOR REPEAT DRUG SCREEN."  ADMITS TO SPIKED URINE LAST

2    OFFICE VISIT.  PATIENT ADMITS TO BEING ON PROBATION FOR

3    COCAINE DISTRIBUTION.  PATIENT DENIES ILLICIT DRUG USE.

4    DISTANT HISTORY OF METHADONE CLINIC TREATMENT."

5              AS IT PERTAINS TO URINE DRUG SCREENING, THOSE ARE

6    ALL EXTREMELY ALARMING.

7        Q    IS THERE ANYTHING TO INDICATE THAT THOSE FINDINGS

8    WERE AFTER THE PRESCRIPTION OF MEDICATIONS TO THIS PATIENT

9    FREDERICK AUGHEY?

10       A    CAN YOU REPEAT THE LAST PART?  I'M SORRY.

11       Q    THAT THESE FINDINGS -- THESE FINDINGS WERE MADE OR

12   YOU IDENTIFIED THEM AS BEING MADE AFTER HIS LAST PRESCRIPTION;

13   THAT IS, COUNT 23 AT THE TOP, DECEMBER 27, 2015 OXYCODONE.

14       A    YES, SIR.

15       Q    SO THOSE FINDINGS WERE MADE AFTER THAT LAST

16   PRESCRIPTION?

17       A    OH, I DON'T HAVE -- I DON'T HAVE THE DATE FOR THE

18   SPECIFIC DRUG SCREEN ON HERE, SO I WOULD HATE TO HAVE TO SAY.

19       Q    WOULD IT HELP YOU TO REVIEW YOUR PATIENT RECORD --

20       A    CERTAINLY IT WOULD.

21       Q    -- FOR FREDERICK AUGHEY?

22       A    YES, SIR.

23            **MR. PUGLIESE:**  MAY I APPROACH THE WITNESS, YOUR

24   HONOR?

25            **THE COURT:**  YES, YOU MAY.

1  BY MR. PUGLIESE:

2      **Q**    DR. KENNEDY, PLEASE DON'T READ ANY OF THAT ALOUD,

3  BUT IS IT SAFE TO SAY I'VE HANDED YOU AN EXPERT WORKSHEET CASE

4  NUMBER 2 FOR PATIENT NAME FREDERICK AUGHEY?

5      **A**    YES, SIR.

6      **Q**    WOULD YOU PLEASE REVIEW THAT?

7      **A**    YES, SIR.  IS THERE A SPECIFIC PLACE YOU WANT ME TO

8  GO TO?

9      **Q**    NO.  YES, IF YOU WOULDN'T MIND, LET'S JUST GO RIGHT

10  TO -- I BELIEVE YOU SAID IT'S BEEN SO LONG THAT YOU COULDN'T

11  REMEMBER -- DID YOU START WITH THE VITAL SIGNS OR NO URINE

12  TOXICOLOGY REPORT?

13      **A**    YES, SIR.  MY DOCUMENTATION SAYS THAT THIS OCCURRED

14  ON THE FINAL ENCOUNTER.

15      **Q**    SO IS IT SAFE TO SAY, THEN, THAT THE COMMENTS ABOUT

16  THE URINE TOXICOLOGY REPORT THAT CAME UP DURING THE FINAL

17  ENCOUNTER, THE DEFENDANT -- LOOK BACK TO THE SUMMARY -- YOU

18  CAN PUT THAT TO THE SIDE, SIR.  100-V, IS THAT STILL ON YOUR

19  SCREEN?

20      **A**    YES, SIR.

21      **Q**    IF YOU LOOK AT COUNT 23, DECEMBER 2015, OXYCODONE,

22  BASED ON WHAT YOU JUST IDENTIFIED IN THE FINAL ENCOUNTER, DO

23  YOU HAVE ANY ISSUES WITH THAT PRESCRIPTION FOR OXYCODONE?

24      **A**    CERTAINLY.  I HAVE ISSUES WITH ALMOST ALL OF THE

25  PRESCRIPTIONS OR ALL OF THE PRESCRIPTIONS, BUT THIS ONE IN

1   PARTICULAR, IN LIGHT OF WHAT'S IN THE DOCUMENTATION, YES, SIR.

2       **Q**    SHOULD FREDERICK AUGHEY HAVE WALKED OUT OF HIS VISIT

3   WITH DR. LAMARTINERE ON DECEMBER 27TH WITH OXYCODONE?

4       **A**    POTENTIALLY, BUT NOT WITHOUT AN EXTENSIVE

5   PATIENT/PHYSICIAN INTERACTION WHERE THE PHYSICIAN INDICATES

6   THERE'S A RATIONALE, I'M GIVING THIS TO YOU DESPITE ALL OF

7   THIS STUFF BECAUSE OF YOUR TERRIBLE CONDITION.  AND THAT BEING

8   THE CASE, THEN IT WOULD BE HARD TO FIND FAULT IN SOMEONE.  IT

9   WOULD BE HARD TO FIND FAULT WITH THE PRESCRIBER.  BUT TO

10  SIMPLY MAKE NO COMMENT AND RE-PRESCRIBE OUTSIDE THE COURSE AND

11  LEGITIMATE PURPOSE, NO, IT'S NOT SUPPORTED.

12      **Q**    PLEASE CONTINUE THEN ON EXHIBIT 100-V.  PHYSICIAN

13  REFERENCES PDMP REPORT.

14      **A**    PHYSICIAN REFERENCED THE PDMP REPORT, BUT THERE WERE

15  NO FINDINGS DOCUMENTED IN THE CHART AND THE PDMP ITSELF

16  DEMONSTRATES THAT THERE WERE OTHER PROVIDERS OF SCHEDULED

17  MEDICATIONS IN THE PREVIOUS YEAR.

18      **Q**    CONTINUE.

19      **A**    THIS CHART CONTAINS, IN MY OPINION, NOTHING

20  OBJECTIVE THAT SUPPORTS PRESCRIBING SCHEDULED MEDICATIONS.

21      **Q**    AND AT THE BOTTOM, YOU INDICATE THAT HE WAS

22  ULTIMATELY PRESCRIBED A TOTAL OF 400 PILLS?

23      **A**    400 PILLS OF COMBINED OXYCODONE, METHADONE,

24  ALPRAZOLAM, YES, SIR.

25      **Q**    THANK YOU.  LET'S GO TO EXHIBIT 100-W.

1    SIR, THIS COVERS COUNTS 24, 25, 26 AND 27, AS YOU

2    HAVE WHAT APPEARS TO BE LISTED AT THE TOP OF EXHIBIT 100-W.

3    PATIENT "W", BASED ON THE INITIALS, IS CRAIG NEILSON.  THAT

4    WAS THE UNDERCOVER, CRAIG CRAWFORD.  DID YOU HEAR HIS

5    TESTIMONY YESTERDAY?

6    **A**    YES, SIR, I DID.

7    **Q**    PLEASE TELL US YOUR FINDINGS.

8    **A**    THIS PATIENT HAD FOUR ENCOUNTERS BETWEEN 07/06/15

9    AND 09/29/15.  THIS PATIENT WAS 34-YEARS OLD AND HAD A

10   DIAGNOSIS OF NEURALGIA PARESTHETICA WHICH IS ESSENTIALLY --

11   IT'S LIKE A -- YOU CAN CALL IT A NEUROPATHIC CONDITION THAT

12   AFFECTS THE THIGH.

13   **Q**    LIKE PINS AND NEEDLES?

14   **A**    YOU'LL HAVE AN AREA WITH A DIFFERING SENSATION,

15   PAIN, NUMBNESS, TINGLING KIND OF THING ON THE THIGH.

16   **Q**    THANK YOU.  PLEASE CONTINUE.

17   **A**    AND ALSO LUMBAR RADICULOPATHY AND THAT'S FROM A

18   NERVE ROOT THAT'S BEING IMPINGED ON BY A BULGING DISK OR

19   HERNIATED DISK, FOR EXAMPLE.

20   **Q**    HOW DO YOU DIAGNOSE LUMBAR -- PLEASE SAY THAT AGAIN,

21   LUMBAR WHAT?

22   **A**    LUMBAR RADICULOPATHY.

23   **Q**    HOW DO YOU COME TO A DIAGNOSIS OF THAT?

24   **A**    WELL, A CONCRETE DIAGNOSIS, I MEAN, YOU CAN DO A

25   PHYSICAL EXAM, CERTAINLY THAT WOULD SUPPORT -- THAT WOULD

1     SUPPORT THE PATIENT HAVING CONDITIONS CAUSED BY THAT, BUT FOR

2     THIS PARTICULAR THING PRETTY MUCH THE GOLD STANDARD OF

3     DIAGNOSIS WOULD BE TO HAVE AN MRI THAT SHOWS AN ACTUAL

4     HERNIATED DISK BUTTING UP AGAINST A NERVE ROOT.

5     **Q**     BASED ON THE VIDEOS, THE TESTIMONY AND THE RECORDS

6     YOU REVIEWED, WAS THE EXAMINATION SUFFICIENT TO COME UP WITH

7     THAT DIAGNOSIS?

8     **A**     IN MY OPINION, NO.

9     **Q**     PLEASE CONTINUE.

10     **A**     AFTER THAT INITIAL EXAMINATION, WHICH, IN MY

11     OPINION, WAS NOT SUPPORTIVE DIAGNOSTIC, THERE WERE NO FURTHER

12     PHYSICAL EXAMINATIONS.  AND THERE ARE NO PATIENT OR

13     PHYSICIAN-COMPLETED MEDICAL HISTORY FORMS ESTABLISHING THE

14     PATIENT'S OVERALL MEDICAL HISTORY.  THIS PATIENT'S PAST

15     MEDICAL RECORDS WERE NOT PRESENT OR REQUESTED.  A URINE

16     TOXICOLOGY SCREENING ON THIS PATIENT WAS NEVER OBTAINED.

17     THERE WERE PDMP REPORTS; THEY WERE ABNORMAL.

18     **Q**     HOW WERE THEY ABNORMAL?

19     **A**     WELL, THAT I CAN'T TELL YOU WITHOUT REFERRING BACK

20     TO MY REVIEW, BUT JUST TO SAY THERE WERE PDMP ANOMALIES BUT

21     THEY DIDN'T RESULT IN ANY ALTERATION OF THE TREATMENT.

22     **Q**     LET ME ASK YOU THIS, THIS WAS THE UNDERCOVER CRAIG

23     CRAWFORD.  DO YOU RECALL HIM SAYING HE DIDN'T REFILL THE

24     PRESCRIPTIONS?

25     **A**     OH, EXCUSE ME.  FORGIVE ME.  YES.  THIS IS THE ONE

1  WHO HAD PDMP ABNORMALITY BEING THAT THERE WAS NOTHING ON THE

2  PDMP REPORT, YEAH.

3      Q    NEXT POINT.

4      A    AND THAT DID NOT RESULT IN ANY KIND OF CHANGE OF

5  TREATMENT AND THE PATIENT ALSO REFUSED TO SIGN A TREATMENT

6  AGREEMENT.

7      Q    AND I BELIEVE YOU SAID BEFORE THAT THAT'S A RED

8  FLAG?

9      A    YES, SIR.

10     Q    AND YOUR FINAL FINDING ON THAT REVIEW?

11     A    WELL, AGAIN, HAVING REFUSED TO SIGN A TREATMENT -- A

12  TREATMENT AGREEMENT, WITH ALL OF THESE RED FLAGS, THE PHYSICAL

13  EXAMS, LACK OF MEDICAL RECORDS, THE LACK OF SUPPORT INDICATES

14  TO ME THAT THE PRESCRIPTIONS ARE BEING PROVIDED OUTSIDE THE

15  COURSE OF THE USUAL MEDICAL PRACTICE.  THE FACT THAT THEY

16  CONTINUED TO BE PRESCRIBED WHEN THERE WERE OBVIOUS PDMP

17  ABNORMALITIES OF ALARM INDICATES TO ME THAT A LEGITIMATE

18  MEDICAL PURPOSE IS NOT BEING SUPPORTED HERE.

19     Q    NOW, THE FIRST COUNT FOR THIS UNDERCOVER WAS COUNT

20  24, JULY 6, 2015 A PRESCRIPTION FOR HYDROCODONE.  I'M GOING TO

21  SEE IF I CAN SHOW YOU -- LET'S SEE IF WE CAN PULL IT UP.

22        MR. PUGLIESE:  CAN YOU PULL UP 172-A1, MS. BATEMAN?

23  BY MR. PUGLIESE:

24     Q    ARE YOU ABLE TO SEE THAT, DR. KENNEDY?  YES, SIR.

25  IF YOU WOULD, JUST READ DOWN TO WHERE DR. LAMARTINERE SAYS --

1   I'LL TELL YOU WHEN TO STOP.  JUST READ THAT TO YOURSELF.  AND

2   THAT'S KIND OF STUPID OF ME.  SO WHERE I'M GOING TO ASK YOU TO

3   STOP IS -- "SO KIND OF WHERE DOES THE SHOOTING START?"

4       **A**    YES, SIR.

5       **Q**    WHO BRINGS UP "SHOOTING PAIN"?

6       **A**    WELL, THE PATIENT SAID, "IT JUST FEELS FUNNY."  AND

7   THEN THE NEXT QUESTION IS, "WHERE IS THE PAIN?"  AND THE

8   PATIENT SAYS, "ALL THE WAY DOWN."  AND IT SAYS, "WHAT DOES --

9   WHAT -- SO KIND OF WHERE DOES THE SHOOTING PAIN START?"

10      **Q**    AND IS IT SAFE, IF YOU GO DOWN A FEW MORE LINES,

11  CRAWFORD MAKES A REFERENCE TO "UH STARTED LIFTING HEAVY SO…"

12  AND LAMARTINERE SAYS, "SO IT FEELS FUNNY.  THE DISCOMFORT

13  BEGINS IN YOUR -- KIND OF THE THIGH OR LOWER BACK?"

14      **A**    YES, SIR.

15      **Q**    IS IT SAFE TO SAY, BASED ON YOUR READING, THE ONLY

16  MENTION OF BACK BY CRAWFORD IS IN HIS -- THE FIRST ENTRY FOR

17  CRAWFORD IN THE MIDDLE, "UH… WAY BACK WHEN I WAS LIFTING"?

18      **A**    WELL, THAT'S A DIFFERENT -- I MEAN, HE'S SAYING WAY

19  BACK WHEN I WAS LIFTING THIS HAPPENED --

20      **Q**    CORRECT.

21      **A**    NOW YOU'RE TALKING ABOUT A BACK EXAM OR A BACK

22  SYMPTOM.

23      **Q**    WHO BRINGS UP THE BACK SYMPTOM?

24      **A**    DR. LAMARTINERE.

25          **MR. PUGLIESE:**  PLEASE FLIP THE PAGE.

1  BY MR. PUGLIESE:

2     Q    IF YOU'LL LOOK AT THE THIRD ENTRY DOWN WHICH IS "L".

3          "NO.  JUST THAT IT FEELS FUNNY.

4          I MEAN, CAN YOU DESCRIBE THE FUNNY FEELING?  YOU

5  KNOW LIKE THE, SAY, LIKE IF YOUR, UH, LEGS FELL ASLEEP OR

6  SOMETHING, ARM WOULD FALL ASLEEP.  DOES IT FEEL LIKE THAT?"

7          "YEAH, IT HAS BEFORE.  OKAY.  WELL, NOT NOW."

8          I'M GOING TO JUMP DOWN A FEW LINES.  "WERE YOU

9  PRESCRIBED SOME -- SOMETHING FOR IT BEFORE?  NO.  AND I, UH --

10  ACTUALLY THAT DOESN'T LOOK HURT, IT JUST KIND OF BOTHERS YOU

11  BASICALLY?"  AND THEN THE RESPONSE TO THAT IS, "YEAH, IT

12  BOTHERS ME REAL BAD."

13          DOES THAT EXCHANGE GIVE YOU ANY INDICATION TO

14  SUPPORT A PRESCRIPTION FOR ANY PAIN -- SCHEDULE II PAIN MED?

15     A    NO, SIR.  IT MAKES VERY LITTLE SENSE TO ME.

16     Q    AND THEN GO -- YOU'LL SEE "BACKGROUND NOISE SNIFF"

17  AND IT STARTS WITH "L."  "AND UH, WHAT WERE YOU TAKING FOR IT

18  BEFORE?  UM, I GOT A COUPLE OF ROXYS." LET'S GO BACK.  THE USE

19  OF THE TERM *ROXYS* BY A PATIENT, WHAT IS THAT INDICATIVE OF TO

20  YOU?

21     A    THE USE OF THE WORD *ROXYS*, BY ITSELF, IS A RED FLAG

22  AND WITH A NONSPECIFIC PRESENTING COMPLAINT, THAT DOESN'T MAKE

23  IT ANY BETTER.

24     Q    AND DOES IT MAKE IT BETTER THAT THE UNDERCOVER SAID

25  "I GOT THEM FROM A FRIEND.  WE USED TO GO TO TEXAS.  IT'S TOO

1  FAR"?

2        **A**    NO, SIR.  IT MAKES IT WORSE.

3        **Q**    AND HOW ABOUT THE TOP OF THE NEXT PAGE.  CAN YOU

4  READ THAT LINE NEXT TO "C"?

5        **A**    "I'LL PUT IT TO YOU THAT WAY.  BUT THEY TOO DAMN

6  EXPENSIVE MAN."

7             **MR. PUGLIESE:**  GO BACK TO THE FIRST PAGE OF THAT

8  NEAR THE TOP, MS. BATEMAN.

9  **BY MR. PUGLIESE:**

10       **Q**    AND THAT'S, AS YOU CAN SEE, FOR THE JULY 6TH FIRST

11 VISIT.

12       **A**    YES, SIR.

13            **MR. PUGLIESE:**  MS. BATEMAN, WOULD YOU PLEASE GO TO

14 EXHIBIT 172-C1.

15 **BY MR. PUGLIESE:**

16       **Q**    AND I'LL JUST READ YOU THIS ALOUD, DR. KENNEDY, AND

17 ASK YOU TO COMMENT ON IT.

18            "OKAY.  EVERYTHING SEEMS TO BE FINE.  YOUR LEGS ARE

19 FINE.  YEAH, IT REALLY SOUNDS LIKE YOU -- YOU INJURED A NERVE

20 THERE.  I MEAN, ALMOST CERTAINLY YOU HAVE A DISK THAT BULGES,

21 UH, PROBABLY PRESSING ON A NERVE DOWN THERE AND THAT'S

22 PROBABLY WHAT'S CAUSING -- I MEAN, YOU PROBABLY HAVE A DISK

23 ISSUE BUT THANKFULLY IT'S NOT HURTING.  BUT OBVIOUSLY, IT'S

24 BOTHERSOME.  UM, YOUR REFLEXES ARE STILL OKAY.  THEY'RE FINE.

25 NO REAL WEAKNESS IN THE LEG."

1           IS THERE ANYTHING IN THOSE STATEMENTS MADE BY

2    DR. LAMARTINERE ON JULY 6TH THAT SUPPORT THAT HYDROCODONE

3    PRESCRIPTION THAT WAS ISSUED ON JULY 6TH?

4        **A**    IN MY OPINION, NO.

5           **MR. PUGLIESE:**  PLEASE GO TO 172-C3.

6    **BY MR. PUGLIESE:**

7        **Q**    DR. KENNEDY, WOULD YOU PLEASE -- I'LL READ IT.

8           "YOU WANT TO TRY THE TRAMADOL JUST ONE LAST TIME?

9    NAH (GIGGLES) NOT REALLY.  WHAT DO YOU MEAN NOT REALLY?  DO

10   YOU WANT TO …"

11          CRAWFORD, "NO, NO."

12          LAMARTINERE, "NO?  OKAY.  YEAH.  OKAY.  DON'T SAY I

13   DIDN'T SUGGEST THE BETTER IDEA."

14          PLEASE COMMENT ON THAT SECTION OF THIS -- THAT

15   TRANSCRIPT RIGHT THERE.

16       **A**    IT'S NOT UP TO THE PATIENT TO DETERMINE WHAT THE

17   DOCTOR IS GOING TO SIGN HIS NAME TO IN A PRESCRIPTION AND IF A

18   PHYSICIAN FEELS THAT THIS PATIENT IS BETTER OFF TAKING

19   TRAMADOL AND NAPROSYN, THEN THAT'S WHAT HE GETS.

20       **Q**    IS TRAMADOL --

21       **A**    AND THIS IS NOT A MATTER OF NEGOTIATION THAT

22   SOMEBODY WANTS TO TAKE HYDROCODONE OR OXYCODONE BECAUSE IT

23   MAKES THEM FEEL GOOD.  IF YOU'RE GOING TO DO WHAT'S BEST FOR

24   THE PATIENT, WHAT'S BEST FOR THE PATIENT IS THE EXERCISING OF

25   YOUR JUDGMENT AS A PHYSICIAN, AND SOMETIMES THAT MEANS NOT

1    GIVING PEOPLE WHAT THEY WANT.

2        **Q**    TRAMADOL, IS THAT A SCHEDULE IV CONTROLLED

3    SUBSTANCE?

4        **A**    IT IS.

5            **MR. PUGLIESE:**  PLEASE GO TO 172-C4.

6    **BY MR. PUGLIESE:**

7        **Q**    THIS IS STILL JULY 6.  "SO, UM, OKAY."

8            IS THIS A DISCUSSION ABOUT PAYMENT FOR THE VISIT?

9        **A**    IT APPEARS TO BE, YES, SIR.

10       **Q**    AND AT THE END, THE DOCTOR TELLS CRAWFORD HE'LL SEE

11   HIM IN THREE MONTHS?

12       **A**    YES, SIR.

13       **Q**    AND THAT'S ALSO ON JULY 6TH, 2015?

14       **A**    YES, SIR.

15           **MR. PUGLIESE:**  PLEASE GO TO 173-A1.

16   **BY MR. PUGLIESE:**

17       **Q**    WELL, NOW WE'RE AT AN AUGUST 4TH VISIT, WHICH IS

18   COUNT 25, OXYCODONE.  LET ME ASK YOU, DR. LAMARTINERE --

19   KENNEDY, IF YOU WOULD READ THROUGH THAT.  "LET ME JUST CHECK

20   ON THE COST OF THIS USENTA."

21       **A**    I BELIEVE THAT'S SUPPOSED TO BE NUCYNTA.

22       **Q**    THANK YOU.  LET ME ASK YOU, WHAT'S NUCYNTA?

23       **A**    IT IS A SYNTHETIC OPIOID.

24       **Q**    SCHEDULE II?

25       **A**    YES, SIR.

1    **Q**    HOW WOULD YOU SPELL IT?

2    **A**    I BELIEVE IT'S N-U-C-Y-N-T-A.

3    **Q**    THANK YOU.  PLEASE CONTINUE AND LET ME KNOW WHEN

4    YOU'RE FINISHED.

5    **A**    YES, SIR.

6    **Q**    OTHER THAN THE PRICE DIFFERENCE, WHICH SEEMS TO HAVE

7    DRIVEN A DECISION TO PRESCRIBE OXYCODONE, WHAT'S THE

8    DIFFERENCE BETWEEN NUCYNTA AND OXYCODONE, IF ANY?

9    **A**    WELL, I MEAN THE -- WHERE WE'RE HEADING FOR HERE IS

10   ESSENTIALLY A PRESCRIPTION FOR PERCOCET, WHICH IS CHEAPER THAN

11   NUCYNTA WHICH IS NEWER AND A BRAND-NAMED DRUG AND, QUITE

12   FRANKLY, THAT MAKES SENSE TO ME.

13   **Q**    IN TERMS OF -- WHEN YOU'RE COMPARING OPIOIDS,

14   WHAT'S -- WHAT'S THE DRUG THAT'S USED, LIKE THE MILLIGRAM

15   EQUIVALENCE OF SOMETHING?  IS IT MORPHINE?

16   **A**    I BELIEVE YOU'RE TALKING ABOUT MORPHINE MILLIGRAM

17   EQUIVALENCE.  AND, YES, THAT'S A SCALE THAT ALLOWS YOU TO --

18   IT ALLOWS YOU TO ANALYZE THE STRENGTH OF A GIVEN DRUG BY

19   CHANGING ITS DOSAGE TO MORPHINE.  SO, FOR EXAMPLE, HYDROCODONE

20   IS A ONE.  SO 1-MILLIGRAM OF HYDROCODONE IS THE SAME STRENGTH

21   AS 1-MILLIGRAM OF MORPHINE.

22        IF YOU'RE TALKING ABOUT OXYCODONE, 1-MILLIGRAM OF

23   OXYCODONE IS EQUIVALENT TO 1.5-MILLIGRAMS.  IF YOU LOOK AT THE

24   METABOLITES, A MEDICATION LIKE OXYMORPHONE, ITS MME IS 3.  SO

25   1-MILLIGRAM OF OXYMORPHONE IS EQUIVALENT TO 3-MILLIGRAMS OF

1  MORPHINE.  HYDROMORPHONE IS 4.  AND WITH A DRUG LIKE

2  METHADONE, IT GOES REALLY, REALLY HIGH.  METHADONE GOES 12 AND

3  BEYOND.

4       SO IF A PERSON IS TAKING A HIGH DOSAGE OF METHADONE,

5  1-MILLIGRAM OF METHADONE COULD ACTUALLY BE EQUIVALENT TO 12 OR

6  POTENTIALLY MORE MILLIGRAMS OF MORPHINE.

7    **Q**    IN TERMS OF THIS SYNTHETIC SCHEDULE II OPIOID

8  NUCYNTA, WOULD YOU HAVE ANY IDEA WHAT THAT --

9    **A**    THE MME?  NOT OFF THE TOP OF MY HEAD FOR THAT ONE,

10  SIR.

11    **Q**    THANK YOU.

12       **MR. PUGLIESE:**  PLEASE GO TO 173-A2.

13  **BY MR. PUGLIESE:**

14    **Q**    IF YOU'D START IN THE MIDDLE AND -- I'LL JUST DO IT.

15  OKAY -- DO YOU SEE WHERE IT'S, "OKAY.  IT'S THAT IMPORTANT."

16  IT'S THE FIFTH BULLET DOWN NEXT TO "L".

17    **A**    YES, SIR.

18    **Q**    "OKAY.  IT'S IMPORTANT.  I MEAN THE,

19  UNFORTUNATELY -- I MEAN, THEY'RE USING PEOPLE LIKE YOU AROUND

20  TO CATCH DOCTORS LIKE THIS.  SO, YOU KNOW, THAT'S WHY I HAVE

21  TO BE CAREFUL, NOT THAT YOU'D BE THAT PERSON.  IT'S JUST --"

22  CRAWFORD, "THAT AIN'T ME."  LAMARTINERE, "THEY DO THAT KIND OF

23  STUFF."  CRAWFORD, "OKAY."  LAMARTINERE, "ALL RIGHT.  WE'LL

24  SEE.  TAKE CARE."  CRAWFORD, "ALL RIGHT.  DON'T WORK TOO

25  HARD -- OR HARD ENOUGH -- YOU WORK HARD ENOUGH."

1        IS THERE ANYTHING, GOING THROUGH THE END OF THAT --

2   THAT APPEARS TO BE THE END OF THE VISIT ON AUGUST 4TH -- BASED

3   ON THE RECORDS AND TESTIMONY THAT WOULD SUPPORT THAT AUGUST

4   4TH PRESCRIPTION FOR OXYCODONE?

5        **A**    NO, SIR.  IN MY OPINION, NO.

6        **MR. PUGLIESE:**  WOULD YOU PLEASE GO DO 174-A1.

7   BY MR. PUGLIESE:

8        **Q**    I'LL READ.  "SO THAT'S PROBABLY THE DIFFERENCE.  AND

9   IF WE GIVE YOU THE PERCOCET 10'S --" THIS IS SEPTEMBER 1ST,

10  2015, CHARGE IN COUNT 26 IN THE INDICTMENT OXYCODONE.

11       "SO IF WE GIVE YOU THE PERCOCET 10'S AND GO UP TO

12  90, THEN IT MIGHT BE ENOUGH.  BEYOND THAT, WE'RE REALLY GOING

13  TO REALLY HAVE TO START THINKING ABOUT -- YOU NEED TO HAVE

14  STUFF LIKE MRI'S DONE."  CRAWFORD, "RIGHT."  "AT LEAST X-RAYS

15  OF YOUR BACK, UH, SPEAKING OF X-RAYS -- YOUR BACK, YOU COULD

16  POSSIBLY GO UP AND GET SOME, I MEAN, UH, WELL, LET'S JUST TRY

17  A HIGHER DOSE FIRST."

18       IS THERE ANYTHING OF CONCERN IN TERMS OF PRESCRIBING

19  A HIGHER DOSE WITHOUT AN X-RAY?

20       **A**    IN MY OPINION, THIS IS LARGELY NONSENSICAL IN THAT

21  THE PATIENT'S DIAGNOSIS SHOULD BE FIRMLY ESTABLISHED BEFORE WE

22  STARTED WITH THE OXYCODONE PRESCRIPTION, AND SO NOW WE'RE

23  SAYING I'M GIVING YOU THIS CERTAIN AMOUNT OF OXYCODONE.

24  BEFORE I CAN GIVE YOU MORE, WE NEED TO -- WE MIGHT NEED TO GET

25  SOMETHING THAT ACTUALLY GIVES US A DIAGNOSIS FOR WHAT'S WRONG

1   WITH YOU, AND THEN THAT'S FOLLOWED BY -- *WELL, WE'LL HOLD OFF*

2   *ON THAT FOR NOW.  LET'S GIVE YOU A HIGHER DOSAGE*, IS THE WAY I

3   INTERPRET THAT MYSELF AND THAT MAKES NO SENSE TO ME.

4        **Q**    SO I'M GOING TO GO INTO THE MIDDLE.  IT STARTS WITH

5   "L.  "IT MAKES THIS WORK BETTER.  IT MAKES THE PERCOCET WORK

6   BETTER."

7             I'M GOING TO GO TO THE MIDDLE OF THE THIRD LINE.

8             "UH, I FOUND THE FIRST NOTE, UH, ALSO STARTING NEXT

9   MONTH, UM, I'M GOING TO HAVE -- THE QUESTION IS ARE YOU IN THE

10  POSITION TO BE ELIGIBLE TO DO THE THREE-MONTH FOLLOW-UP?"

11  CRAWFORD, "I GOT, UH, I GET PAID SUNDAY."  LAMARTINERE,

12  "OKAY."  CRAWFORD, "I CAN BRING YOU -- I CAN PROBABLY, SAY,

13  LIKE WHEN I GET OFF MONDAY, I CAN BRING YOU SOME CASH."

14  LAMARTINERE, "OH, SO YOU CAN'T REALLY PAY FOR THE VISIT

15  TODAY?"  "NO, I DON'T HAVE IT TODAY."  LAMARTINERE, "OKAY.

16  WELL, I CAN, WELL, ACTUALLY --" CRAWFORD, "I'LL COME BY

17  MONDAY.  I GET PAID SUNDAY."  LAMARTINERE, "THAT'S FINE.  I'LL

18  JUST GO AHEAD AND BILL YOU FOR THIS VISIT, BUT I APPRECIATE

19  YOU TAKING CARE OF THAT IN THE NEAR FUTURE."

20             IS THERE ANYTHING SIGNIFICANT ABOUT ON THAT DATE,

21  SEPTEMBER 1ST, 2015, COUNT 26, OXYCODONE GIVEN TO CRAIG

22  NEILSON, THE UNDERCOVER CRAIG CRAWFORD, IS THERE -- LET ME

23  SAY, BASED ON EVERYTHING YOU'VE SEEN AND HEARD WAS THERE

24  ANYTHING TO SUPPORT THAT PRESCRIPTION AS IN THE USUAL COURSE

25  OF MEDICAL PRACTICE OR FOR A LEGITIMATE MEDICAL PURPOSE?

1   **A**   IN MY OPINION, NO.

2   **Q**   DOES THIS DISCUSSION ABOUT PAYMENT GIVE YOU ANY

3   CONCERN?

4   **A**   ACTUALLY, IN MY OPINION, THIS SHOWS DR. LAMARTINERE

5   IN A GOOD LIGHT FOR ME.

6   **Q**   WHY IS THAT?

7   **A**   WELL, BECAUSE I THINK EVERYBODY WHO'S BEEN A DOCTOR

8   WHO HAS PATIENTS WHO HAVE OWED THEM SOMETIMES A GREAT DEAL OF

9   MONEY AND IF A DOCTOR IS WILLING TO GIVE A PATIENT A BREAK ON

10   TIME OR A BREAK ON THEIR BILL, I ALWAYS APPRECIATE THAT AS

11   BEING A GOOD THING.

12   **Q**   THANK YOU.

13       **MR. PUGLIESE:**  WOULD YOU GO TO 175-A1, PLEASE.

14   **BY MR. PUGLIESE:**

15   **Q**   I'M GOING TO START WITH THE SECOND "L."

16       "I'VE NEVER SEEN THAT BEFORE.  YOU JUST HAD, UH, IT

17   WAS ON THE FRITZ FOR A LITTLE WHILE.  UM, THE PAIN MEDICATIONS

18   ARE LASTING.  DID YOU RUN OUT THIS TIME OR DID YOU HAVE ENOUGH

19   TO MAKE IT?"

20       CAN YOU READ WHAT "C" SAYS IN RESPONSE?

21   **A**   YES, SIR.

22   **Q**   PLEASE.

23   **A**   YOU WANT ME TO READ IT?

24   **Q**   YES, PLEASE, OUT LOUD.

25   **A**   "WELL, UH, I WENT AND STAYED AT A CHICK'S HOUSE,

1   AND, UH, I HAD THEM IN MY BAG AND A GUY ASKED ME TO BORROW A

2   SHIRT, AND SO I LET HIM BORROW A SHIRT, AND I GOT UP THE NEXT

3   MORNING AND MY MEDICINE WAS GONE.   I THINK I KNOW, UH, HE'S

4   SUPPOSED TO COME BACK OVER THERE.   SO I'M GONNA, UH…I'M

5   GONNA…"

6      **Q**   DR. LAMARTINERE STATES, "I GUESS YOU'RE LEARNING.  I

7   GUESS, UH."

8      **A**   YES, SIR.

9      **Q**   IF A PATIENT, WHETHER THEY'VE RUN OUT PRESCRIPTION

10   OR NOT OR COMING BACK EARLY TO GET A PRESCRIPTION, HE'S

11   TALKING ABOUT PRESCRIPTIONS BEING STOLEN --

12      **A**   YES, SIR.

13      **Q**   -- WHAT'S THE ACCEPTABLE PRACTICE BEFORE

14   DISTRIBUTING ADDITIONAL PAIN MEDICATION, SCHEDULE II OPIOIDS?

15      **A**   SIR, IN DOING A LOT OF CASE REVIEWS, I MEAN, THIS IS

16   SOMETHING THAT YOU SEE A LOT, AND MY RESPONSE TO YOUR QUESTION

17   WOULD BE IT DEPENDS ENTIRELY ON WHAT THE PHYSICIAN SAYS.

18         IF THE PHYSICIAN WRITES A NOTE, IF THE PHYSICIAN

19   SAYS SOMETHING:  THIS IS UNCHARACTERISTIC FOR THIS PATIENT AND

20   I BELIEVE THEM, SO I'M GOING TO GO AHEAD AND ISSUE THEIR

21   MEDICATIONS, THEN THAT'S FINE.

22         IF THE PATIENT -- IF THE PHYSICIAN SAYS, I'M NOT

23   SURE ABOUT THIS, BUT I DON'T WANT THEM GOING INTO WITHDRAWALS

24   SO I'M GOING TO GIVE THEM TEN PILLS TO LAST UNTIL THEIR NEXT

25   PRESCRIPTION FILL OR WHATEVER, THAT MAKES SENSE TO ME AS WELL.

1   WHAT DOESN'T MAKE SENSE IS NO RESPONSE AT ALL WITH SOMETHING

2   THAT IS OBVIOUSLY CONCERNING.

3          **MR. PUGLIESE:**  PLEASE GO BACK TO 100-W, MS. BATEMAN.

4   **BY MR. PUGLIESE:**

5      **Q**   SO BASED ON WHAT WE JUST REVIEWED, BASED ON YOUR

6   PATIENT SUMMARY, YOUR CHART REVIEW FOR THIS UNDERCOVER, WHOSE

7   REAL NAME IS CRAIG CRAWFORD, WAS THERE ANYTHING TO CHANGE YOUR

8   OPINION ABOUT THE USUAL COURSE OF PRACTICE OR LEGITIMATE

9   MEDICAL PURPOSE FOR THE PRESCRIPTIONS CHARGED IN COUNTS 24,

10  25, 26 AND 27?

11     **A**   NO, SIR.

12     **Q**   THANK YOU.

13         **MR. PUGLIESE:**  PLEASE GO TO EXHIBIT 100-Y.

14  **BY MR. PUGLIESE:**

15     **Q**   100-Y, DR. KENNEDY, WAS JEREMY DOIRON, OUR LAST

16  PATIENT WITNESS CALLED THIS MORNING.  DO YOU REMEMBER HIS

17  TESTIMONY?

18     **A**   YES, SIR, I DO.

19     **Q**   AND HE'S COVERED BY COUNTS 28, 29 AND 30.

20         LET ME ASK YOU, WHEN YOU EARLIER WERE TALKING ABOUT

21  MORPHINE EQUIVALENCE, WHAT WAS THE DRUG THAT YOU SAID HAD THE

22  HIGHEST NUMBER FOR MORPHINE EQUIVALENCE, ROUGHLY 12?

23     **A**   I DIDN'T SAY THAT IT HAD THE HIGHEST NUMBER, BUT

24  METHADONE HAS A NUMBER THAT THE MME INCREASES WITH THE DOSAGE

25  BECAUSE OF THE HALF LIFE OF THE MEDICATION.  DO YOU WANT ME TO

1  EXPLAIN THAT?

2     **Q**    LET'S JUST START -- SO HYDROCODONE YOU SAID WAS A 1?

3     **A**    HYDROCODONE IS A 1.

4     **Q**    OXYCODONE WAS 3?

5     **A**    ONE AND A HALF.

6     **Q**    ONE AND A HALF.  OXYMORPHONE?

7     **A**    THREE.

8     **Q**    AND METHADONE?

9     **A**    METHADONE IS DOSAGE DEPENDENT BECAUSE OF THE HALF

10  LIFE OF THE MEDICATION.

11    **Q**    SO WE HEARD MR. DOIRON TESTIFY THIS MORNING THAT HE

12  SAW THE DEFENDANT WHEN HE WAS AT OCHSNER, AND WE KNOW THE

13  DEFENDANT'S RELATIONSHIP WITH OCHSNER, IN THE FALL, EARLY

14  WINTER, LATE 2014, AND DOIRON THEN STATES THAT HE SEES HIM

15  AGAIN FOR HIS FIRST VISIT ON AUGUST 17TH, 2015, WHEN HE GETS A

16  PRESCRIPTION FOR OXYCODONE AND METHADONE.

17          LET'S GO THROUGH YOUR SUMMARY FIRST.  PLEASE START

18  WITH THE THREE DOCUMENTED ENCOUNTERS.

19    **A**    YES, SIR.  THE CHART THAT I REVIEWED CONTAINED THREE

20  DOCUMENTED ENCOUNTERS BETWEEN 08/17 AND 08/31 OF 2015.  THIS

21  PATIENT WAS A 30-YEAR OLD AND WHAT WAS DESCRIBED, HIS PROBLEM

22  WAS LATE EFFECTS OF MOTOR VEHICLE ACCIDENT, ANXIETY, LOW BACK

23  PAIN, CHRONIC PAIN SYNDROME AND INSOMNIA.

24    **Q**    NEXT LINE.

25    **A**    WHAT CONCERNED ME ABOUT THIS CHART, AGAIN, THIS IS A

1    YOUNG PERSON IN THEIR 30'S WITH A SIGNIFICANT PROBLEM LIST.

2    THE INITIAL PHYSICAL EXAMINATION AS DOCUMENTED IN THIS CHART

3    CONTAINS A PHYSICAL EXAMINATION FOR THE RIGHT KNEE ONLY.

4         NOW, THERE ARE OTHER THINGS THAT ARE EXAMINED, BUT

5    EVERYTHING ELSE THAT IS EXAMINED IS NORMAL.  SO THE ONLY

6    POSITIVE FINDINGS THAT WE HAVE IN THE CHART FOR THIS PATIENT

7    WITH LOW BACK PAIN, ET CETERA, ET CETERA, THE ONLY POSITIVE

8    FINDINGS WE HAVE ARE FOR THE KNEE AND THEN SUBSEQUENT EXAMS

9    WERE NEVER PERFORMED, NEVER REPEATED, EVEN DESPITE THIS

10   PATIENT BEING INVOLVED IN A MOTOR VEHICLE ACCIDENT AND

11   SUSTAINING A FRACTURE -- IF I HAVE READ THE MEDICAL RECORD

12   CORRECTLY.

13       **Q**    THE PATIENT --

14       **A**    -- IF I HAVE READ THE MEDICAL RECORD CORRECTLY.

15       **Q**    THE PATIENT INDICATED AN X-RAY TO SUPPORT THE

16   FRACTURE.  DO YOU RECALL SEEING AN X-RAY IN THE CHART?

17       **A**    NO, SIR.  BUT I HAVE TO BE CAREFUL BECAUSE WHEN I

18   SAY THERE'S NO X-RAY REPORT, IT'S POSSIBLE THAT THERE COULD

19   HAVE BEEN AN ER REPORT WHERE AN X-RAY WAS REFERENCED.

20       **Q**    THANK YOU.  PLEASE CONTINUE.

21       **A**    THE CHART DOESN'T CONTAIN ANY PATIENT OR

22   PHYSICIAN-COMPLETED MEDICAL HISTORY FORM.

23       **Q**    LET ME ASK YOU, THAT GAP IN THE VISITS OF THIS

24   DOCTOR/PATIENT RELATIONSHIP FROM THE END OF 2014 THROUGH

25   AUGUST OF 2015, IS THAT A SHORT ENOUGH PERIOD OF TIME WHERE

1   THERE SHOULD -- THERE WAS NO NEED FOR A PHYSICIAN-COMPLETED

2   MEDICAL HISTORY FORM?

3       A   I'M UNSURE HOW TO ANSWER YOUR QUESTION, SIR, EXCEPT

4   TO SAY THAT A PATIENT'S MEDICAL CHART, EVERYBODY'S MEDICAL

5   CHART SHOULD HAVE A HISTORY IN IT.

6       Q   AND THERE WAS NO HISTORY FOR ANY OF THE VISITS?

7       A   NO, SIR.

8       Q   PLEASE CONTINUE.

9       A   THIS PATIENT'S URINE TOXICOLOGY SCREENING WAS NEVER

10  OBTAINED AND THERE ARE NO REPORTS IN THE CHART.  THERE'S

11  NOTHING TO INDICATE THAT URINE DRUG SCREENING WAS EVER

12  OBTAINED.

13      Q   GO TO THE NEXT --

14      A   THERE IS AN ER, AS I RECALL, THE NOTE WAS FROM THE

15  FACILITY ITSELF, THAT THE PATIENT WAS SEEN IN THE EMERGENCY

16  ROOM AFTER A MOTOR VEHICLE ACCIDENT WITH A RESULTING DIAGNOSIS

17  OF DRUG ABUSE AND THE PATIENT WAS DISCHARGED FROM THE

18  EMERGENCY ROOM IN POLICE CUSTODY.

19      Q   LET'S GO BACK --

20      A   -- WITH THIS NOTE -- WITH THIS -- IN THE CHART

21  THERE'S NO DISCUSSION BY THE PHYSICIAN ABOUT THIS NOTE OR HOW

22  IT MIGHT BEAR ON HIS TREATMENT AND SUBSEQUENTLY THIS PATIENT'S

23  METHADONE DOSAGE WAS ESCALATED.

24      Q   WAS IT ESCALATED WITHOUT A URINE TOXICOLOGY SCREEN

25  PERFORMED?

1    **A**    THERE WERE NO TOXICOLOGY SCREENS PRESENT IN THE

2    CHART, SIR.

3    **Q**    AND YOU HAVE NO RECORD OF A PHYSICIAN DISCUSSING

4    THIS WITH MR. DOIRON?

5    **A**    NO, SIR.

6    **Q**    PLEASE GO TO YOUR LAST BULLET.

7    **A**    THE PATIENT WAS ULTIMATELY PRESCRIBED 740 OXYCODONE,

8    METHADONE -- IS THAT WHAT YOU'RE REFERRING TO, SIR?

9    **Q**    YES, SIR.

10   **A**    740 PILLS OF OXYCODONE, METHADONE, CLONAZEPAM,

11   SONATA AND LYRICA.

12   **Q**    DURING THIS, YOU INDICATE THREE DOCUMENTED

13   ENCOUNTERS, IF YOU LOOK AT THE COUNTS -- FIRST PRESCRIPTION

14   AUGUST 17TH; NEXT, AUGUST 25TH; THIRD, AUGUST 31ST.  IF WE

15   START THE CLOCK ON THE FIRST DAY, LET'S SAY, THAT'S 15-DAYS,

16   WAS THERE ANYTHING IN THE RECORD OR THE TESTIMONY THAT

17   SUPPORTS THE PRESCRIBING OF ANY OF THESE OXYCODONE AND

18   METHADONE PRESCRIPTIONS, THE FIRST TWO COUNTS, 28 AND 29?

19   **A**    THE PATIENT -- I'M QUITE WILLING TO BELIEVE THAT

20   THIS PATIENT HAD A HISTORY OF A SIGNIFICANT PAIN PROBLEM, BUT

21   AS FAR AS THIS PHYSICIAN'S CONTRIBUTORY DOCUMENTATION, WHAT IT

22   WAS THAT WAS DONE, NO, SIR, THERE'S NOTHING THAT SUPPORTS A

23   LEGITIMATE MEDICAL PURPOSE HERE, IN MY OPINION.

24   **Q**    AND THAT ALSO INCLUDES THE AUGUST 31ST PRESCRIPTION,

25   2015, FOR METHADONE?

1      **A**    SIR, THAT IS FOR EACH OF THESE PRESCRIPTIONS.

2      **Q**    DR. LAMARTINERE, (SIC) WE'RE GOING TO GO FORWARD IN

3   TIME NOW TO COUNTS 1 THROUGH 7.

4      **A**    I'M DR. KENNEDY.

5      **Q**    THANK YOU, SIR.  DR. KENNEDY, WE'RE GOING TO GO

6   AHEAD IN TIME TO JANUARY 5TH, 2016.  AS YOU SIT HERE TODAY,

7   ARE YOU AWARE OF WHETHER DR. LAMARTINERE'S STATE MEDICAL

8   LICENSE TO PRESCRIBE CONTROLLED SUBSTANCES WAS SUSPENDED?

9      **A**    SIR, IF I RECALL THE TESTIMONY FROM YESTERDAY

10  CORRECTLY, I BELIEVE THAT HIS PRESCRIBING AUTHORITY HAD BEEN

11  REMOVED AT THAT POINT.

12     **Q**    LET'S SAY -- I'LL GIVE YOU A FACT TO CONSIDER --

13  THAT IT WAS REVOKED ON DECEMBER 30TH AND HE RECEIVED NOTICE OF

14  THE REVOCATION OR SUSPENSION ON JANUARY 4TH.  LET'S GO THROUGH

15  THESE PATIENTS, PLEASE --

16          **MR. PUGLIESE:**  MAY I HAVE ONE MOMENT, YOUR HONOR?

17          THANK YOU, YOUR HONOR.

18  BY MR. PUGLIESE:

19     **Q**    SO COUNT 1 OF THE INDICTMENT COVERS PATIENT "A" OF

20  SANDY ARBUCKLE; COUNT 2, PATIENT "B," BETTY AUGHEY; COUNT 3,

21  PATIENT "D," JOHNNY DELAPASSE; PAGE -- PATIENT "E," MARY GRAY,

22  COVERED IN COUNT 4; PATIENT "F," COVERED IN COUNT 5, OXYCO --

23  I'M SORRY, WENDY JENKINS; COUNT 6, PATIENT "G," JOHN KELLY;

24  AND COUNT 7, PATIENT "I," BLAKE VERETT.

25          DR. KENNEDY, IF A PHYSICIAN IN LOUISIANA WRITES A

1  PRESCRIPTION AFTER THE LICENSE IS SUSPENDED BY THE STATE

2  LICENSING BOARD, THE LICENSE TO PRESCRIBE ANY CONTROLLED

3  SUBSTANCES, WOULD THAT -- WOULD THOSE PRESCRIPTIONS BE IN THE

4  USUAL COURSE OF PRACTICE?

5      **A**    NO, SIR.  IN FACT, IF I RECALL THE REGS IN LOUISIANA

6  CORRECTLY, THAT WOULD BE A DEFINITION OF PHYSICIAN MISCONDUCT.

7      **Q**    LET'S GO THROUGH THESE PATIENTS ONE BY ONE.

8          COUNT 1 IS OXYCODONE TO SANDY ARBUCKLE.  DID YOU SEE

9  ANYTHING TO SUPPORT A PRESCRIPTION OF OXYCODONE TO SANDY

10  ARBUCKLE ON JANUARY 5TH, 2016?

11      **A**    NO, SIR, NOT THAT I RECALL.

12      **Q**    LET'S JUST COVER ALL OF THEM ON THE JANUARY 5TH

13  PRESCRIPTIONS, COUNTS 1 THROUGH 7, CONTINUING WITH BETTY

14  AUGHEY, JOHNNY DELAPASSE, MARY GRAY, WENDY JENKINS, JOHN KELLY

15  AND BLAKE VERRET.  ANYTHING IN WHAT YOU'VE REVIEWED THAT WOULD

16  JUSTIFY OR GIVE A LEGITIMATE MEDICAL PURPOSE FOR THOSE

17  PRESCRIPTIONS?

18      **A**    SIR, AS I RECALL, THERE WAS NOTHING THAT SUPPORTED

19  THOSE PRESCRIPTIONS.

20      **Q**    YOU DID DO A PATIENT REVIEW, A CHART REVIEW, FOR

21  JOHN KELLY; IS THAT CORRECT?

22      **A**    YES, SIR.

23      **Q**    AND FOR KELLY YOU STATE, "IN MY OPINION, THE

24  TREATMENT OF THIS 55-YEAR OLD PATIENT FALLS BELOW AN

25  ACCEPTABLE STANDARD OF CARE, BUT I CANNOT STATE CATEGORICALLY

1    THAT THE TREATMENT WAS NOT MEDICALLY LEGITIMATE."

2          HOW DOES THAT SQUARE WITH COUNT 6, THE PRESCRIPTION

3    TO JOHN KELLY ON JANUARY 5TH, 2016, FOR OXYCODONE?

4      **A**    AS I RECALL, THAT PRESCRIPTION FELL OUTSIDE OF THE

5    TIME THAT I HAD REVIEWED AND THAT PRESCRIPTION, IN FACT, WAS

6    AT A TIME SUBSEQUENT TO THE PRESCRIBING AUTHORITY BEING

7    REMOVED AND THERE'S NOTHING SUPPORTING THAT PRESCRIPTION.

8    FORGIVE ME, UNLESS I HAVE MY DATES CONFUSED.  THERE'S A LOT OF

9    DATES TO REMEMBER.

10     **Q**    CAN YOU SEE WHAT I'M SHOWING YOU AS CASE NUMBER 8?

11     **A**    YES, SIR.

12     **Q**    AND IF YOU LOOK WHERE IT SAYS, "THE CHART CONTAINS,"

13   IF YOU WOULD JUST READ THAT FIRST BULLET TO YOURSELF?

14     **A**    I'M SORRY.  YES, SIR.

15     **Q**    DOES THAT REFRESH YOUR RECOLLECTION AS TO THE PERIOD

16   OF TIME THAT YOU REVIEWED FOR JOHN KELLY?

17     **A**    YES.

18     **Q**    DOES THAT PERIOD INCLUDE JANUARY 5TH, 2016?

19     **A**    NO, SIR.

20     **MR. PUGLIESE:**  NO FURTHER QUESTIONS, YOUR HONOR.

21   THANK YOU.

22     **THE COURT:**  OKAY.  IT'S A GOOD TIME FOR A BREAK AND

23   WE WILL TAKE TEN MINUTES AND SEE YOU IN TEN.

24                    **(RECESS)**

25     **THE COURT:**  YOU MAY BE SEATED.

1    **MR. PUGLIESE:**  YOUR HONOR, MR. BRINDLEY HAS BEEN

2  KIND ENOUGH TO ALLOW ME TO REQUEST EXHIBITS TO BE OFFERED.

3    **THE COURT:**  OKAY.

4    **MR. PUGLIESE:**  SO THE UNITED STATES IS OFFERING

5  EXHIBITS 1 THROUGH 7-B INCLUSIVE, 10 AND 11 AND EXHIBITS 37 TO

6  51 INTO EVIDENCE.

7    **THE COURT:**  OKAY.  ANY OBJECTION, MR. BRINDLEY?

8    **MR. BRINDLEY:**  YOUR HONOR, I DON'T HAVE ANY

9  OBJECTION BEYOND THOSE WHICH HAVE BEEN PREVIOUSLY STATED IN

10 ORAL ARGUMENTS.

11   **THE COURT:**  OKAY.  I UNDERSTAND.  SO THESE ARE THE

12 ONES THAT I SAID WOULD BE SUBJECT TO 403 ANALYSIS AT TRIAL; IS

13 THAT THE OBJECTION YOU'RE TALKING ABOUT?

14   **MR. BRINDLEY:**  JUDGE, I JUST WANT TO MAKE SURE I'M

15 NOT WAIVING ANYTHING.  SO THAT WOULD BE THE ONLY ONE THAT

16 WOULD APPLY, YES.

17   **THE COURT:**  OKAY.  SO, I'M STILL CONFUSED.  WHAT ARE

18 THESE DOCUMENTS?  IS THERE AN OBJECTION OR NOT?

19   MR. BRINDLEY, I'M CONFUSED.  ARE YOU OBJECTING TO

20 THIS EXHIBITS?

21   **MR. BRINDLEY:**  JUDGE, I THINK AS A MATTER OF

22 HOUSEKEEPING, HE WANTED TO MAKE SURE THE EXHIBITS WERE ALL IN,

23 SO I DON'T HAVE ANY OBJECTION TO THAT.  BUT I WANT TO MAKE

24 SURE I'M NOT MISSING SOMETHING AND WAIVING SOMETHING THAT I'VE

25 ALREADY PRESERVED.  THAT'S THE ONLY --

1    **THE COURT:**  I SEE.  OKAY.  I'VE GOT IT.  SO SUBJECT

2    TO ANY PREVIOUS OBJECTION MADE BY MR. BRINDLEY TO THESE

3    EXHIBITS, THESE WILL BE ADMITTED.

4    **MR. PUGLIESE:**  THANK YOU, YOUR HONOR.

5    **MR. BRINDLEY:**  MAY I PROCEED, JUDGE?

6    **THE COURT:**  YES, YOU MAY.

7    **CROSS-EXAMINATION**

8    **BY MR. BRINDLEY:**

9    **Q**   DR. KENNEDY, TO BEGIN WITH, I'D LIKE TO TALK ABOUT

10   SOME GENERAL CONCEPTS.  THERE'S A DIFFERENCE BETWEEN

11   DEPENDENCE AND ADDICTION; IS THAT TRUE?

12   **A**   YES, SIR.

13   **Q**   NOW, WHENEVER ANYBODY IS ON OPIOID PAIN MEDICATION

14   FOR A LONG PERIOD OF TIME, THAT PERSON CAN BECOME DEPENDENT ON

15   THAT MEDICATION, CORRECT?

16   **A**   THAT IS TRUE.

17   **Q**   AND OVER TIME, THEY DEVELOP A TOLERANCE THAT WOULD

18   REQUIRE A LARGER DOSE TO ACHIEVE THE SAME RESULTS; IS THAT

19   FAIR TO SAY?

20   **A**   YES, SIR.

21   **Q**   OKAY.  AND DEPENDENTS -- WELL, PEOPLE THAT ARE ON

22   OPIOIDS ARE OFTEN DEPENDENT.  THEY ARE NOT ALL ADDICTED,

23   CORRECT?

24   **A**   YES, SIR.

25   **Q**   AND THE DISTINCTION BETWEEN ADDICTION AND

1   DEPENDENCE, IT CAN BE A DIFFICULT ONE FOR LAY PERSONS TO

2   COMPREHEND, WOULD YOU AGREE WITH THAT?

3       **A**    I WOULD, YES, SIR.

4       **Q**    JUST SO WE'RE CLEAR FOR THE COURT, WOULD YOU

5   DESIGNATE THE DIFFERENCE BETWEEN DEPENDENCE AND ADDICTION?

6       **A**    DEPENDENCE IS CLEARLY WHEN THIS IS A MEDICATION THAT

7   YOU NEED.  IF YOU DON'T HAVE IT, YOU MIGHT GO INTO WITHDRAWAL.

8   YOU CAN DEVELOP A TOLERANCE FOR IT.  ADDICTION IS WHEN YOU

9   PURSUE TAKING THAT MEDICATION DESPITE HARM TO YOURSELF.

10      **Q**    SO IF IT'S A PAIN MEDICATION THAT YOU ACTUALLY NEED

11  FOR A SERIOUS PAIN PROBLEM AND YOU'LL GO INTO WITHDRAWAL IF

12  YOU DON'T HAVE IT, THAT'S DEPENDENCE, RIGHT?

13      **A**    YES, SIR.

14      **Q**    BUT IF SOMEBODY IS GOING OUT ON THE STREET AND JUST

15  BUYING OXYCODONE BECAUSE THEY WANT TO GET HIGH, THAT'S

16  ADDICTION, RIGHT?

17      **A**    THAT'S ABUSE.

18      **Q**    THAT'S ABUSE AND IT COULD BE AS A RESULT OF

19  ADDICTION, RIGHT?

20      **A**    ADDICTION IS WHEN YOU WOULD GO OUT AND ROB SOMEBODY

21  OR STEAL OR DO SOMETHING ILLEGAL OR WHATEVER TO GET THAT

22  MEDICATION, ALTHOUGH IT'S BAD FOR YOU TO HAVE IT.

23      **Q**    OKAY.  NOW, WE'VE SEEN LOTS OF PRESCRIPTIONS DURING

24  THE COURSE OF THE TRIAL WHERE DR. LAMARTINERE WOULD WRITE THE

25  PRESCRIPTION ON ONE DATE AND THEN INDICATE THAT IT'S TO BE

1    FILLED ON A FUTURE DATE, RIGHT?

2         **A**    YES, SIR.

3         **Q**    LIKE HE WOULD GIVE THREE PRESCRIPTIONS FOR

4    THREE-MONTHS' TIME TO BE FILLED ON DIFFERENT DATES, CORRECT?

5         **A**    YES, SIR.

6         **Q**    NOW, THERE'S NOTHING ILLEGAL OR IMPROPER BY DOING

7    THAT, IS THERE?

8         **A**    THERE IS NOT.

9         **Q**    OKAY.  AND IT'S NOT REQUIRED CERTAINLY THAT PAIN

10   MANAGEMENT PATIENTS HAVE TO BE SEEN EVERY 30 DAYS OR

11   SOMETHING; THAT'S NOT REQUIRED EITHER, IS IT?

12        **A**    IT'S NOT REQUIRED BY REGULATION, BUT IT WOULD BE

13   REQUIRED BY A STANDARD IF THE PATIENT REQUIRED MORE FREQUENT

14   FOLLOW-UP.

15        **Q**    SO IF THERE'S AN ISSUE WITH A PATIENT THAT YOU NEED

16   TO MONITOR, THEN YOU BETTER BE BRINGING THEM IN MORE OFTEN

17   THAN EVERY THREE MONTHS, RIGHT?

18        **A**    THAT'S FAIR TO SAY, YES, SIR.

19        **Q**    BUT IF THERE'S NOT AN ISSUE THAT YOU IDENTIFIED TO

20   MONITOR, THEN HAVING PATIENTS COME IN EVERY THREE MONTHS IS

21   NOT NECESSARILY A PROBLEM, IS IT?

22        **A**    THAT'S FAIRLY STATED.

23        **Q**    NOW, YOU TALKED EARLIER ABOUT PATIENT HISTORY FORMS,

24   RIGHT?

25        **A**    I MENTIONED THE ABSENCE OF HISTORY FORMS, YES, SIR.

1      Q    OKAY.  NOW, THERE'S NO PARTICULAR FORMAT THAT A

2  PATIENT HISTORY FORM HAS TO TAKE, CORRECT?

3      A    SIR, THERE DOESN'T EVEN HAVE TO BE ONE AS LONG AS A

4  HISTORY IS TAKEN.

5      Q    SO THERE DOESN'T EVEN HAVE TO BE AN ACTUAL FORM AS

6  LONG AS HISTORY IS TAKEN ONE WAY OR ANOTHER, CORRECT?

7      A    YES, SIR.

8      Q    THERE WERE AT LEAST ONE INCIDENT THAT WE -- ONE OF

9  THE PATIENTS YOU WERE DISCUSSING, WHERE DR. LAMARTINERE HAD

10 PRESCRIBED METHADONE ALONG WITH OXYCODONE; IS THAT RIGHT?

11     A    YES.  I DON'T REMEMBER WHICH PATIENT.

12     Q    GENERALLY SPEAKING, THAT COMBINATION, METHADONE AND

13 OXYCODONE, THAT CAN BE A LEGITIMATE COMBINATION, CORRECT?

14     A    IT CAN BE IF IT IS CAREFULLY, CAREFULLY MANAGED AND

15 DOCUMENTED.

16     Q    AND SO THE SIMPLE COMBINATION OF THE TWO MEDICATIONS

17 COULD BE A HELPFUL COMBINATION TO A PATIENT IN NEED, THAT'S

18 CERTAINLY SOMETHING THAT COULD BE TRUE, CORRECT?

19     A    IT'S NOT IMPOSSIBLE.

20     Q    AND THEY'RE NOT PROHIBITED TO BE COMBINED IN ANY

21 WAY, ARE THEY?

22     A    NO, SIR.

23     Q    OBVIOUSLY YOU'D AGREE WITH ME THAT SOME DOCTORS KEEP

24 BETTER RECORDS THAN OTHERS DO, RIGHT?

25     A    YES, SIR.

1     **Q**     SOME DOCTORS ARE EXTREMELY SLOPPY WITH

2  RECORD-KEEPING, RIGHT?

3     **A**     YES, SIR.

4     **Q**     AND SOME DOCTORS' RECORDS, WHEN THEY'RE TRYING TO

5  KEEP THEM, THEIR RECORDS ARE SIMPLY INSUFFICIENT TO ADEQUATELY

6  REFLECT WHAT HAPPENED DURING A VISIT. THAT CAN HAPPEN, RIGHT?

7     **A**     YES, IT CAN.

8     **Q**     AND A DOCTOR WHO'S TRYING TO HELP HIS PATIENTS WITH

9  THE MEDICAL PROBLEMS THEY'RE HAVING, A DOCTOR LIKE THAT COULD

10  STILL KEEP LOUSY RECORDS, RIGHT?

11     **A**     YES, SIR.

12     **Q**     SO A DOCTOR WHO'S ACTING WITH A SINCERE EFFORT TO

13  HELP HIS PATIENTS WITH THEIR PROBLEMS THAT ARE COMING TO SEE

14  HIM, HE STILL MIGHT NOT RECORD THE EVENTS ADEQUATELY ENOUGH TO

15  JUSTIFY WHAT HE'S DONE, ISN'T THAT TRUE?

16     **A**     I DON'T KNOW THAT I WOULD AGREE WITH THE WAY THAT

17  YOU'VE CHARACTERIZED THAT STATEMENT.  BECAUSE IN CARING FOR

18  PATIENTS, CARING FOR PATIENTS APPROPRIATELY REQUIRES A CERTAIN

19  AMOUNT OF DOCUMENTATION.  IF WE'RE TALKING ABOUT -- IF WE'RE

20  TALKING ABOUT HIGH DOSAGES OF OPIOIDS IN PARTICULAR, PART OF

21  CARING FOR PEOPLE IS THE RECORD-KEEPING.

22     **Q**     I APPRECIATE THAT.  MY ONLY QUESTION IS A DOCTOR

23  COULD BE ACTING WITH A SINCERE EFFORT TO WANT TO HELP THE

24  PATIENTS THAT'S COMING TO SEE HIM, WHILE AT THE SAME TIME NOT

25  KEEPING THE RIGHT RECORDS, THAT COULD HAPPEN, CORRECT?

1        **A**    NO, SIR.  IN MY VIEW, PART OF SINCERELY TRYING TO

2    TAKE CARE OF SOMEBODY IS GOING TO BE RECORDING WHAT IT IS

3    THAT'S HAPPENING WITH THEM.

4        **Q**    SO IN YOUR VIEW, YOU'D HAVE TO KEEP THE APPROPRIATE

5    RECORDS OR YOU'RE NOT MAKING A SINCERE EFFORT TO HELP PEOPLE,

6    RIGHT?

7        **A**    I THINK THAT'S PRETTY FAIRLY SAID.

8        **Q**    OKAY.  NOW, THERE WERE A NUMBER OF PATIENTS WHOSE

9    RECORDS YOU REVIEWED ABOUT WHICH YOU TESTIFIED EARLIER TODAY,

10   CORRECT?

11       **A**    I'M SORRY, DO IT AGAIN.

12       **Q**    YEAH.  YOU TALKED ABOUT A NUMBER OF PATIENTS TODAY

13   WHO WERE NOT UNDERCOVER AGENTS, RIGHT?

14       **A**    YES.

15       **Q**    SO I WANT TO FOCUS FIRST ON THE NON-UNDERCOVER

16   PATIENTS.  WITH RESPECT TO MANY OF THE NON-UNDERCOVER PATIENTS

17   THAT YOU TESTIFIED ABOUT TODAY, YOU INDICATED THAT THERE WAS

18   NO PHYSICAL EXAM, CORRECT?

19       **A**    YES, SIR.

20       **Q**    YOU HEARD FROM SEVERAL NON-UNDERCOVER PATIENTS

21   TESTIFYING IN THIS CASE, CORRECT?

22       **A**    YES, SIR.

23       **Q**    YOU HEARD IT HERE IN COURT SEATED IN THE COURTROOM,

24   RIGHT?

25       **A**    YES.

1      Q      YOU DIDN'T TALK TO ANY OF THESE FOLKS BEFORE COMING

2  HERE AND APPEARING TO LISTEN TO THE TESTIMONY, CORRECT?

3      A      NO, SIR.

4      Q      SO WHEN THE NON-UNDERCOVER PATIENTS TESTIFIED IN

5  COURT, THEY ALL INDICATED THAT A PHYSICAL EXAMINATION WAS DONE

6  ON THE INJURED AREAS, DIDN'T THEY?

7      A      I DON'T KNOW THAT THEY ALL DID, BUT I DID -- I DID

8  HEAR THEIR AGREEMENTS WITH YOU THAT THEY HAD BEEN DONE.

9      Q      SO THEN WHEN I QUESTIONED THEM, YOU REMEMBER THE

10 NON-UNDERCOVER PATIENTS SAYING -- AGREEING WITH ME THAT A

11 PHYSICAL EXAMINATION WAS DONE ON THE AREA OF INJURY OR THE

12 AREA WHERE THEY HAD PAIN, RIGHT?

13     A      YES, I HEARD THAT.

14     Q      AND YOU -- IN ONE OF THE UNDERCOVER RECORDINGS, I

15 BELIEVE IT WAS WITH THE PATIENT NEILSON, YOU OBSERVED A

16 LIMITED PHYSICAL EXAMINATION THAT WAS DONE OF THE LEG WHERE HE

17 SAID HE HAD HIS PAIN, CORRECT?

18     A      YES, SIR.

19     Q      THAT WAS WHERE DR. LAMARTINERE SAID HE WAS CHECKING

20 HIS REFLEXES AND THEY SEEMED GOOD, RIGHT?

21     A      THAT'S -- YES.

22     Q      SO BASED ON THE TESTIMONY YOU HEARD FROM THE

23 PATIENTS THAT WERE THERE, THE NON-UNDERCOVER PATIENTS THAT

24 WERE IN THE MEETINGS WITH DR. LAMARTINERE, YOU HEARD THEM SAY

25 UNDER OATH THAT PHYSICAL EXAMINATIONS OF THEIR INJURED AREAS

1   OCCURRED, CORRECT?

2       **A**    IN GENERAL, SIR, THEY WERE AGREEING WITH YOUR

3   ASSERTIONS.  IT WAS NOT SPONTANEOUS TESTIMONY, BUT YES.

4       **Q**    WELL, THEY WERE ASKED QUESTIONS AND THEY AGREED

5   THAT'S WHAT HAPPENED, CORRECT?

6       **A**    YES.

7       **Q**    OKAY.  AND THEIR DESCRIPTIONS OF THOSE PHYSICAL

8   EXAMINATIONS OR THEIR AGREEMENT WITH MY DESCRIPTIONS OF THOSE

9   PHYSICAL EXAMINATIONS, THAT WAS -- THOSE EXAMINATIONS DID NOT

10  APPEAR ACCURATELY OR ADEQUATELY NOTED IN THE CHARTS, DID THEY?

11      **A**    SIR, AS WITH -- AS WITH OTHER PARTS OF THE TREATMENT

12  AND MANAGEMENT AND EVALUATION, THEY WERE ABSENT FROM THE

13  MEDICAL RECORD.

14      **Q**    SO THERE WAS -- THERE WERE THINGS THAT THE PATIENTS

15  TESTIFIED HAPPENED, IN TERMS OF THESE PHYSICAL EXAMINATIONS,

16  THAT WERE NOT RECORDED IN THE MEDICAL CHARTS, THAT'S TRUE?

17      **A**    NOT JUST THE PHYSICAL EXAMINATIONS, BUT THE

18  ENCOUNTERS IN GENERAL, YES, SIR.

19      **Q**    WE'LL GET TO THE REST OF THEM.  I'M GOING TO GO PART

20  BY PART.  BUT FOR THE PHYSICAL EXAMINATIONS, YOU'RE AGREEING

21  WITH THAT SPECIFIC THING, CORRECT?

22      **A**    THAT THE PHYSICAL EXAMS ARE A SPECIFIC THING, YES,

23  SIR.

24      **Q**    THAT WERE NOT INCLUDED IN THE CHARTS BUT WERE

25  DESCRIBED BY THE WITNESSES TESTIFYING?

1    A    YES, SIR.

2    Q    OKAY.  NOW, ONE OF THE COMMON PROBLEMS THAT YOU

3    IDENTIFIED WITH DR. LAMARTINERE'S PRACTICES WAS THE FACT THAT

4    THERE WERE NOT DOCUMENTATION -- THERE WAS NOT DOCUMENTATION IN

5    THE MEDICAL CHARTS SUPPORTING DIAGNOSIS, CORRECT?

6    A    YES, SIR.

7    Q    AND YOU LISTENED DURING THE TESTIMONY OF THE

8    NON-UNDERCOVER PATIENTS AND HEARD THEM AGREE THAT, IN FACT,

9    THEY DID PROVIDE MRI DOCUMENTS TO DR. LAMARTINERE, RIGHT?

10    A    YES, SIR.  AND THAT'S PROBLEMATIC IN THE INSTANCE OF

11    MR. BOUDREAUX, FOR EXAMPLE, WHO TESTIFIED THAT HE PROVIDED

12    PSYCH RECORDS SUPPORTING ADD.  HE PRESENTED RADIOGRAPHIC

13    DOCUMENTATION SUPPORTING A PAIN CONDITION.  HE PRESENTED OTHER

14    DOCUMENTATION, THAT WAS WHAT HE TESTIFIED TO, BUT THERE'S NONE

15    OF THAT IN THE MEDICAL RECORD.

16    Q    SO THE PATIENTS, NOT JUST BOUDREAUX, BUT HIM BEING

17    ONE EXAMPLE, THE PATIENTS UNIFORMLY AGREED THAT WHEN THEY

18    FIRST WENT TO THE DOCTOR, THEY PROVIDED HIM WITH

19    DOCUMENTATION, WHETHER IT BE X-RAYS OR MRI'S, THERE WERE A

20    NUMBER OF THINGS THEY SAID THEY BROUGHT, CORRECT?

21    A    I DON'T KNOW ABOUT UNIFORMLY BECAUSE I DIDN'T COUNT

22    THEM, BUT THERE WAS A GENERAL CONSENSUS, YES, SIR.

23    Q    OKAY.  WHILE THERE WAS A GENERAL CONSENSUS AMONG THE

24    PATIENTS THAT THEY WERE ACTUALLY PROVIDING THOSE THINGS TO THE

25    DOCTOR FOR HIS REVIEW, IT'S ALSO TRUE THAT THOSE THINGS DIDN'T

1    MAKE IT INTO THE RECORDS FOR THE MOST PART, CORRECT?

2         **A**    THEY DID NOT MAKE IT INTO THE RECORDS I REVIEWED.

3         **Q**    SO THAT'S ANOTHER SITUATION WHERE THE THINGS THAT

4    THE PATIENTS REPORTED ACTUALLY HAPPENING WERE NOT ACCURATELY

5    REFLECTED IN THE MEDICAL CHARTS, CORRECT?

6         **A**    I'D AGREE WITH THAT, YES, SIR.

7         **Q**    NOW, YOU ALSO HEARD, AND THERE WAS A FAIR AMOUNT OF

8    CONSENSUS AND A PRETTY MUCH UNIFORM CONSENSUS AMONG THE

9    NON-UNDERCOVER PATIENTS, THAT WHEN THEY MET WITH

10   DR. LAMARTINERE, THEY ENGAGED IN LENGTHY DISCUSSIONS WITH HIM

11   ABOUT THE NATURE OF THEIR PAIN, CORRECT?

12        **A**    I DID HEAR THAT.

13        **Q**    THEY INDICATED GENERALLY AS A CONSENSUS THAT THEY

14   TALKED WITH HIM IN DETAIL ABOUT THEIR LIFE FUNCTION AND THE

15   IMPACT THE PAIN WAS HAVING, RIGHT?

16        **A**    I HEARD THAT.

17        **Q**    AND ABOUT THE WAY THAT THE MEDICINE WAS EITHER

18   IMPROVING OR NOT IMPROVING ENOUGH OF THEIR ABILITY TO

19   FUNCTION, RIGHT?

20        **A**    I HEARD THAT ALSO.

21        **Q**    OKAY.  SO YOU WOULD AGREE WITH ME AGAIN THAT IN THE

22   MEDICAL CHARTS THAT DR. LAMARTINERE PREPARED, THOSE KINDS OF

23   DETAILED DISCUSSIONS WERE NOT ADEQUATELY OR ACCURATELY

24   REFLECTED?

25        **A**    THERE WERE NO DETAILED DISCUSSIONS.

1      **Q**    IN THE CHARTS, CORRECT?

2      **A**    IN THE CHARTS.

3      **Q**    SO THERE'S ANOTHER INSTANCE HERE, WITH WHAT THE

4   PATIENTS DESCRIBE AS HAVING HAPPENED IN THE APPOINTMENTS WITH

5   THE DOCTOR IS SIMPLY INCONSISTENT WITH WHAT'S RECORDED IN THE

6   CHARTS, CORRECT?

7      **A**    I THINK I WOULD AGREE WITH THAT.

8      **Q**    NOW, IF DR. LAMARTINERE WAS ENGAGING IN THESE KINDS

9   OF DETAILED DIALOGUES AND MONITORING AND EVALUATION OF HIS

10  PATIENT'S PROGRESS WITH PAIN AND MEDICATION, IF HE WAS DOING

11  THAT AND PROPERLY REFLECTING IN THE CHART, THEN YOU MIGHT NOT

12  HAVE ANY PROBLEM WITH HIS PRACTICE; IS THAT TRUE?

13     **A**    IT'S POSSIBLE.

14     **Q**    SO IF WHAT THE PATIENTS WERE DESCRIBING WAS ACTUALLY

15  HAPPENING AND IT WAS CORRECTLY RECORDED, THEN YOU MIGHT HAVE A

16  DIFFERENT OPINION?

17     **A**    IT'S POSSIBLE.

18     **Q**    BUT HIS RECORDS, OBVIOUSLY -- I DON'T THINK IT'S

19  CONTROVERSIAL TO SAY DR. LAMARTINERE'S RECORDS WERE POOR,

20  WEREN'T THEY?

21     **A**    I WOULD AGREE WITH THAT CHARACTERIZATION.

22     **Q**    THEY REFLECTED FAR LESS THAN WHAT THE PATIENTS

23  DESCRIBED AS HAPPENING IN THEIR INTERACTIONS, CORRECT?

24     **A**    I WOULD AGREE.

25     **Q**    NOW, YOU HEARD A BASIC AGREEMENT -- AS I TRIED TO

1    ASK THEM ALL A SIMILAR QUESTION, YOU HEARD A BASIC AGREEMENT

2    AMONG THE NON-UNDERCOVER PATIENTS THAT DR. LAMARTINERE SEEMED

3    TO BE, AT ALL TIMES, TRYING TO HELP THEM WITH THEIR PAIN

4    PROBLEM, RIGHT?

5        **A**    I HEARD THAT.

6        **Q**    AND YOU HEARD THEM INDICATE THAT HIS TREATMENT THAT

7    THEY WERE GETTING FROM HIM IMPROVED THEIR FUNCTIONALITY,

8    RIGHT; IMPROVED THEIR LIFE FUNCTION?

9        **A**    I DID HEAR THAT AS WELL.

10       **Q**    AND THAT IT -- AND THAT HIS -- THE MEDICATIONS HE

11   PRESCRIBED WERE EFFECTIVE IN HELPING WITH THEIR PAIN; YOU

12   HEARD THEM SAY THAT?

13       **A**    I DID.

14       **Q**    AND YOU ARE NOT ABLE TO TESTIFY THAT THE PATIENTS

15   WERE WRONG WHEN THEY SAID THAT THEIR QUALITY OF LIFE IMPROVED

16   UNDER HIS TREATMENT, ARE YOU?

17       **A**    NO, SIR.

18       **Q**    AND MOREOVER, DR. KENNEDY, YOU CANNOT -- THE

19   PATIENTS THAT TESTIFIED HERE -- LET ME BACK UP AND REPHRASE

20   THAT QUESTION.  THE PATIENTS THAT TESTIFIED HERE,

21   NON-UNDERCOVER THAT IS, THEY ALL INDICATED THAT THEY HAD A

22   SERIOUS PROBLEM WITH PAIN, RIGHT?

23       **A**    YES --

24       **Q**    AND MANY OF THEM --

25       **A**    NO.  MY MEMORY ISN'T PERFECT, BUT AS I RECALL, YES,

1  THERE WAS A GENERAL CONSENSUS THAT THEY PRESENTED AS PAIN

2  PATIENTS.

3      **Q**    AND MANY OF THEM HAD BEEN TREATED FOR PAIN BY OTHER

4  DOCTORS BEFORE DR. LAMARTINERE, CORRECT?

5      **A**    THAT'S TRUE.

6      **Q**    MANY HAD RECEIVED SIMILAR OPIOID MEDICATION

7  PRESCRIPTIONS FROM OTHER DOCTORS BEFORE DR. LAMARTINERE,

8  CORRECT?

9      **A**    THAT'S TRUE.

10     **Q**    AND YOU'D AGREE WITH ME THAT THE PRIOR TREATMENT

11  FROM OTHER PRACTITIONERS WHO SEE A PATIENT BEFORE YOU DO IS

12  SOMETHING THAT CAN IMPACT YOUR DECISION-MAKING IN ONE WAY OR

13  ANOTHER, RIGHT?

14     **A**    PARTICULARLY AS AT LEAST ONE, BUT I BELIEVE SEVERAL

15  OF HIS PATIENTS HAD BEEN TERMINATED FROM PREVIOUS PRACTICES.

16  YES, IT COULD MAKE A DETERMINATION.

17     **Q**    OKAY.  AND THE MEDICATIONS THAT THE PEOPLE HAD BEEN

18  ON PREVIOUSLY, IF THOSE -- THAT INFORMATION COULD IMPACT A

19  DOCTOR'S DECISION-MAKING AS WELL, CORRECT?

20     **A**    YES, SIR, IF YOU HAVE THE RECORDS.

21     **Q**    NOW, YOU LOOKED AT THE -- AND ONE OF THE THINGS THAT

22  OFTEN IS A PROBLEM WITH DR. LAMARTINERE'S RECORDS IS THEY

23  DON'T REALLY DO ANY KIND OF QUALITY JOB OF REFLECTING WHAT

24  RECORDS HE WAS REVIEWING OR NOT REVIEWING IN ANY MEANINGFUL

25  WAY, RIGHT?

1        A    YES, SIR.

2        Q    OFTENTIMES, AND I'M JUST GOING TO SHOW YOU ON THE

3   SCREEN --

4              **MR. BRINDLEY:**  ONE MOMENT, JUDGE.

5   **BY MR. BRINDLEY:**

6        Q    WHEN YOU REVIEWED DR. LAMARTINERE'S CHARTS, A LOT OF

7   THEM WERE HANDWRITTEN, CORRECT?

8        A    THAT'S CORRECT.

9        Q    AND A LOT OF THIS IS SORT OF HANDWRITTEN LIKE STREAM

10  OF CONSCIOUSNESS KIND OF CHICKEN SCRATCH, IS THAT A FAIR WAY

11  OF WHAT YOU'RE LOOKING AT IN THESE?

12       A    I WOULD NEVER SAY THAT A PHYSICIAN'S RECORDS WERE A

13  STREAM OF CONSCIOUS CHICKEN SCRATCH.

14       Q    YOU WOULD NOT AGREE THAT WITH?

15       A    I WILL NOT.  I AGREE WITH IT PHILOSOPHICALLY, BUT I

16  WOULDN'T AGREE WITH THOSE TERMS.

17       Q    YOU DON'T LIKE MY TERMINOLOGY.  BUT YOU WOULD AGREE

18  WITH ME THAT HIS HANDWRITTEN NOTES WERE RELATIVELY DISJOINTED

19  AND KIND OF ALL OVER THE PLACE, RIGHT?

20       A    I WOULD AGREE WITH THAT CHARACTERIZATION.

21       Q    THEY'RE NOT ORGANIZED VERY WELL, RIGHT?  AND THEY'RE

22  HARD TO FOLLOW?

23       A    THAT'S TRUE, SIR.

24       Q    NOW, IN THOSE -- IN THOSE RECORDS, THE HANDWRITTEN

25  NOTES, HE WILL MAKE NOTES OF THINGS LIKE, MRI REPORT NOTED OR

1    LOUISIANA PMP; HE MAY WRITE THOSE THINGS, CORRECT?

2    **A**    I DO RECALL SEEING BRIEF STATEMENTS SUCH AS THOSE,

3    YES.

4    **Q**    OKAY.  BUT THERE WASN'T ENOUGH DETAIL FOR YOU TO BE

5    SURE EXACTLY WHAT HE WAS REVIEWING, CORRECT?

6    **A**    WELL, THERE WAS NO ACCOMPANYING MRI REPORT OR PDMP

7    REPORT.

8    **Q**    THE ACTUAL PDMP'S WEREN'T PRINTED OUT AND PUT IN THE

9    CHARTS, CORRECT?

10    **A**    OVER THE COURSE OF ALL THE REVIEWS I DID, THERE MAY

11    HAVE BEEN.  I MEAN -- THERE MAY HAVE BEEN PDMP REPORTS IN

12    SEVERAL OF THEM.  IN THE ONES THAT ARE THE CHARGED COUNTS, I

13    DON'T RECALL THAT BEING THE CASE.

14    **Q**    OKAY.  BUT YOU ALSO -- AND YOU ALSO KNOW FROM THE

15    UNDERCOVER RECORDINGS, YOU KNOW THAT HE WAS REVIEWING PMP OR

16    PDMD -- WHICH IS IT IN LOUISIANA; PDMP OR IS IT PMP?

17    **A**    IN LOUISIANA, IT'S PMP.

18    **Q**    OKAY.  SO HE WAS REVIEWING THE PMP FOR THOSE

19    UNDERCOVER PATIENTS, WASN'T HE?

20    **A**    ON THE OCCASIONS THAT WE HAD THE SURVEILLANCE VIDEO,

21    YES, SIR.

22    **Q**    BECAUSE DURING THE SURVEILLANCE VIDEO, YOU WERE ABLE

23    TO SEE HIM QUESTIONING THESE GUYS ABOUT WHY THEIR

24    PRESCRIPTIONS WEREN'T SHOWING UP ON THE PMP, RIGHT?

25    **A**    THAT'S CORRECT.

1   **Q**   SO TO DO THAT HE DEFINITELY HAD TO REVIEW THE PMP
2   FOR THOSE PATIENTS, CORRECT?

3   **A**   YES, SIR.

4   **Q**   ALTHOUGH HIS CHARTS DIDN'T REFLECT THAT THAT WAS
5   DONE, DID THEY?

6   **A**   FOR THOSE TWO SPECIFICALLY, I DON'T RECALL IF THE
7   PDMP ACCESS WAS RECORDED OR NOT, SO IT WOULD BE UNFAIR FOR ME
8   TO SAY YES OR NO.

9   **Q**   OKAY.  SO YOU JUST DON'T REMEMBER WITH RESPECT TO
10  THOSE TWO?

11  **A**   WHETHER THERE'S SPECIFIC DOCUMENTATION FOR THOSE
12  TWO, I DON'T RECALL.

13  **Q**   OKAY.  BUT CERTAINLY WE CAN DETERMINE, AT LEAST WITH
14  RESPECT TO THOSE TWO INDIVIDUALS, THAT EVEN IF THE CHART DID
15  NOT REFLECT THE PMP BEING REVIEWED, IT DID HAPPEN, RIGHT?

16  **A**   YES, SIR.  YES, SIR, I WOULD AGREE.

17  **Q**   AND SO THE PMP, IT HADN'T BEEN PRINTED OUT AND PUT
18  IN THOSE GUYS' CHARTS LIKE IT SHOULD BE, BUT YET THE REVIEW
19  DID HAPPEN; WE CAN AGREE ON THAT, CORRECT?

20  **A**   WELL, IT'S NOT A MATTER OF IT BEING PRINTED IN THEIR
21  CHARTS LIKE IT SHOULD BE BECAUSE THE PATIENTS' NAMES DIDN'T
22  EVEN EXIST IN THE SYSTEM, AND THAT'S WHAT BRINGS ALL THE
23  SUBSEQUENT PROBLEMS ASSOCIATED WITH THESE CHARTS.

24  **Q**   SO EVEN IF THE CHARTS DON'T REFLECT THE PMP REVIEW
25  OR THE DETAILED PROBLEMS WITH IT, WE KNOW THAT THAT REVIEW

1   TOOK PLACE AND THOSE PROBLEMS WERE DISCUSSED WITH THE

2   PATIENTS, CORRECT?

3       **A**   I AGREE.

4       **Q**   AND THE CHART SHOULD REFLECT THAT SO IT WOULD BE

5   CLEAR AND AVAILABLE TO EVERYBODY, RIGHT?

6       **A**   YES.

7       **Q**   OR AVAILABLE TO EVERYONE USING THE CHART.

8   UNFORTUNATELY, THAT'S NOT HOW IT WAS WITH DR. LAMARTINERE,

9   CORRECT?

10      **A**   WELL, AGAIN, THE SPECIFIC DOCUMENTATION PERTAINING

11  TO THE PDMP REPORTS.  I WOULDN'T WANT TO MISQUOTE.

12      **Q**   YOU WOULD AGREE WITH ME, THAT THERE WAS A LOT THAT

13  HAPPENED IN THOSE UNDERCOVER SESSIONS IN TERMS OF THE DIALOGUE

14  BETWEEN DOCTOR AND PATIENT WHICH WAS NOT AT ALL REFLECTED IN

15  THE MEDICAL CHARTS THAT YOU REVIEWED, CORRECT?

16      **A**   SIR, I WOULD GO FURTHER AND SAY IN MY COVER LETTER

17  FOR THIS CASE I SPECIFICALLY SAID THAT, THAT ONE THING THAT

18  COULD BE LEARNED FROM THESE UNDERCOVER VIDEOS IS THAT A LOT

19  CAN HAPPEN THAT ISN'T DOCUMENTED, IN FAIRNESS TO

20  DR. LAMARTINERE.  IN MY OPINION, THAT DOESN'T EXCUSE THE OTHER

21  THINGS THAT WERE GOING ON, BUT IN ALL FAIRNESS, THAT SHOULD BE

22  SAID.

23      **Q**   SO YOU DO -- I OBVIOUSLY WAS AWARE OF YOUR REPORT

24  WHEN I ASKED YOU THAT QUESTION, BUT YOU DO AGREE WITH ME THEN

25  THAT THERE'S A LOT THAT HAPPENS IN THESE SESSIONS THAT SIMPLY

1    ISN'T AVAILABLE IN THE MEDICAL CHARTS, RIGHT?

2         A    YES, SIR.

3         Q    AND, FOR EXAMPLE, WITH PATIENT NEILSON, THAT

4    INCLUDED A DETAILED DIALOGUE ABOUT THE POSSIBILITY OF

5    PRESCRIBING TRAMADOL OR ULTRAM, RIGHT; YOU REMEMBER ALL OF

6    THAT?

7         A    YES.

8         Q    AND IT INCLUDED THE PATIENT SAYING TO THE DOCTOR

9    REPEATEDLY THE TRAMADOL DIDN'T WORK -- HE TRIED IT AND IT

10   DIDN'T WORK, RIGHT?

11        A    YES, SIR.

12        Q    BUT THE RECORDING DEMONSTRATED THAT THE DOCTOR WAS

13   SUGGESTING A MUCH LESS POTENT NARCOTIC THAN THAT WHICH THE

14   PATIENT HAD COME IN ASKING FOR, WHICH WAS OXYMORPHONE, RIGHT?

15        A    YOU SAID A MUCH LESS POTENT?

16        Q    YES, SIR.

17        A    YES, SIR.

18        Q    DR. KENNEDY, BEFORE I GET TOO MUCH FURTHER DOWN THE

19   ROAD, LET ME GO BACK AND ASK YOU THIS, IS THERE ANY KIND OF

20   ACTUAL REQUIREMENT THAT THE PMP BE PRINTED OUT AND PLACED IN

21   THE CHART?

22        A    I THINK THE COMPLETE ANSWER TO THAT QUESTION IS NOW,

23   YES.

24        Q    BACK THEN?

25        A    IN 2015, 2016, I DON'T KNOW FOR CERTAIN.

1       **Q**    OKAY.  FAIR ENOUGH.  NOW, TO GO BACK TO THE CONTENT

2   OF THE UNDERCOVER INTERVIEWS THAT WERE CONDUCTED BY

3   DR. LAMARTINERE, OR THE UNDERCOVER APPOINTMENTS, I SHOULD SAY,

4   HE GAVE DETAILED WARNINGS TO THE UNDERCOVER PATIENT ABOUT THE

5   RISK OF ADDICTION, RIGHT?

6       **A**    YES.

7       **Q**    AND HE GAVE DETAILED WARNINGS TO THAT PATIENT ABOUT

8   WHY HE MIGHT BE A CANDIDATE FOR ADDICTION BASED ON SOME OF HIS

9   ANSWERS THAT HE GAVE?

10      **A**    YES, SIR.

11      **Q**    AND NONE OF THAT WAS REFLECTED IN THE CHART EITHER,

12  WAS IT?

13      **A**    NO, IT WAS NOT.

14      **Q**    AND FOR BOTH OF THE UNDERCOVER PATIENTS, HE

15  QUESTIONED THEM EXTENSIVELY ABOUT WHY THEIR PRESCRIPTIONS

16  AREN'T SHOWING UP AS BEING FILLED ON THE PMP, RIGHT?

17      **A**    THAT IS CORRECT.

18      **Q**    AND HE QUESTIONED THEM IN DETAIL ABOUT WHY THEY

19  WEREN'T GETTING THEM FILLED IN LOUISIANA, CORRECT?

20      **A**    THAT'S ALSO CORRECT.

21      **Q**    AND HE DIRECTED THEM THAT THEY NEEDED TO START

22  GETTING THEIR PRESCRIPTIONS FILLED IN LOUISIANA SO HE COULD

23  PROPERLY MONITOR THEM, RIGHT?

24      **A**    YES.

25      **Q**    AND NONE OF THAT IS IN THE MEDICAL CHARTS EITHER,

1    CORRECT?

2        **A**    I DON'T RECALL THAT SPECIFICALLY BEING IN THE

3    RECORD, SO I WOULD SAY PROBABLY NOT.

4        **Q**    SO WITH DR. LAMARTINERE AND THE EVIDENCE YOU HAVE TO

5    REVIEW FROM THESE UNDERCOVER RECORDINGS, IN CONJUNCTION WITH

6    THE INCONSISTENCIES WE'VE HEARD FROM THE PATIENT TESTIMONY AND

7    THE CHARTS, WE COULD AGREE THAT THERE WERE A LOT OF

8    SUBSTANTIVE DISCUSSIONS THAT HE WAS HAVING WITH PATIENTS THAT

9    WERE APPARENTLY NOT GETTING REPORTED IN THE CHARTS AS YOU

10   WOULD EXPECT, CORRECT?

11       **A**    SIR, I WOULD EVEN GO FURTHER THAN THAT TO SAY,

12   AGAIN, IN MY REVIEW I INDICATED THAT AT LEAST MY IMPRESSION

13   WAS THAT IT WAS CLEAR THAT DR. LAMARTINERE WAS STRUGGLING,

14   THAT HE WAS STRUGGLING WITH THESE PATIENTS, BECAUSE HE WAS

15   TRYING TO MAKE A CONFIRMATORY THING.  BUT HAVING SAID THAT, HE

16   DIDN'T FOLLOW THROUGH TO CARRY TO THE END TO GET THE ANSWER OF

17   WHY THESE PATIENTS ARE IN THE PDMP REPORT, AND SO ALTHOUGH HE

18   WAS STRUGGLING THAT DOES NOT EXCUSE THE ULTIMATE OUTCOME OF

19   THE PRESCRIPTIONS BEING WRITTEN, IN MY VIEW.

20       **Q**    I UNDERSTAND WHAT YOU'RE SAYING, DR. KENNEDY.  PUT

21   ANOTHER WAY, WHEN YOU SAY, "HE WAS STRUGGLING," HE WAS

22   ATTEMPTING TO DETERMINE WHETHER SOMETHING PROBLEMATIC WAS

23   HAPPENING OR NOT, CORRECT?

24       **A**    I WOULD SAY HE WAS STRUGGLING, BUT HE WAS NOT MAKING

25   THE APPROPRIATE ATTEMPT OR THE APPROPRIATE HARD DECISION THAT

1  HAS TO BE MADE TO ANSWER THE QUESTION THAT'S AT HAND.

2      **Q**    WHAT YOU SAY THAT -- WHAT YOU SAY ABOUT THE HARD

3  DECISION, YOU MEAN THAT THE PRESCRIPTION SHOULDN'T BE WRITTEN

4  WITHOUT A DEFINITIVE ANSWER?

5      **A**    NO.  WHAT I MEAN IS YOU TOLD ME THAT YOU GOT YOUR

6  PRESCRIPTIONS FILLED AT A MOM AND POP PLACE IN TEXAS.  WHERE?

7  WHAT'S THE NAME?  TELL ME NOW OR WE'RE DONE.

8      **Q**    IN THE RECORDINGS AT ONE POINT HE TELLS THEM THAT --

9  ONE OF THE TWO AT LEAST -- THAT HE NEEDS TO BRING HIM THE

10 RECEIPT, THE WRITTEN RECEIPT FROM THE PHARMACY TO PROVE WHERE

11 HE'S GETTING THEM, DOESN'T HE?

12     **A**    YET HE PROVIDED A PRESCRIPTION FOR SCHEDULED

13 MEDICATION ANYWAY, WITHOUT THAT.

14     **Q**    AND IT'S CERTAINLY TRUE -- GETTING TO THAT VERY

15 POINT, IT'S CERTAINLY TRUE THAT SOME DOCTORS GIVE PEOPLE MORE

16 OF A BENEFIT OF THE DOUBT THAN OTHERS DO, CORRECT?

17     **A**    I WOULD AGREE.

18     **Q**    AND SOMETIMES DOCTORS GIVE PEOPLE TOO MUCH BENEFIT

19 OF THE DOUBT; WOULD YOU AGREE WITH THAT?

20     **A**    I WOULD AGREE THAT DOCTORS GIVE PATIENTS THE BENEFIT

21 OF THE DOUBT SOMETIMES, AS IN THIS CASE, EVEN TO THE POINT

22 WHERE IT GOES BEYOND MEDICAL BOARD REGULATIONS.

23     **Q**    AND YOU WOULD AGREE WITH ME THAT IT'S POSSIBLE FOR A

24 DOCTOR TO GIVE A PATIENT THE BENEFIT OF THE DOUBT AND BE WRONG

25 IN DOING SO, AS IT TURNS OUT, CORRECT?

1    **A**    YES.

2    **Q**    AND A DOCTOR WHO IS GIVING A PATIENT THE BENEFIT OF

3    THE DOUBT, AND DOING SO INCORRECTLY, THAT DOCTOR MAY BE

4    SINCERELY TRYING TO TREAT THE PATIENT AND JUST FAILED,

5    CORRECT?

6    **A**    THAT IS POSSIBLE.

7    **Q**    AND YOU WOULD AGREE WITH ME THAT SOME DOCTORS ARE

8    MORE -- YOU'VE ALREADY ANSWERED THAT QUESTION.  I'LL WITHDRAW

9    THAT.

10    YOU'D AGREE WITH ME THAT SOME DOCTORS HAVE A HARDER

11    TIME SAYING NO TO PERSISTENT PATIENTS THAN OTHERS, CORRECT?

12    **A**    SAYING NO TO WHAT KIND --

13    **Q**    PERSISTENT.

14    **A**    PERSISTENT.

15    **Q**    PATIENTS THAT WANT A PARTICULAR THING AND ARE

16    PUSHING IT.

17    **A**    YES, SIR.

18    **Q**    THAT CAN BE HARD, CAN'T IT, DEALING WITH THAT?

19    **A**    NOT FOR ME.  BUT FOR OTHER DOCTORS, PERHAPS.

20    **Q**    FAIR ENOUGH.  AND IT APPEARED TO YOU FROM THE

21    UNDERCOVER RECORDINGS THAT DR. LAMARTINERE STRUGGLED WITH

22    THAT, RIGHT?

23    **A**    HE DID.

24    **Q**    NOW, YOU KNOW THAT SOME OF DR. LAMARTINERE'S

25    PATIENTS HAD SEEN HIM PREVIOUSLY AT -- SOME OF THE ONES YOU'VE

1   TALKED ABOUT, THEY SAW HIM PREVIOUSLY AT THIS PLACE CALLED

2   OCHSNER, CORRECT?

3        A    AS I RECALL, YES, SIR.

4        Q    AND THE RECORDS THAT YOU GOT DID NOT INCLUDE OCHSNER

5   RECORDS, DID THEY, FOR THE MOST PART?

6        A    YOU'RE GOING BACK FIVE YEARS.  AS I RECALL -- YOU'RE

7   GOING BACK TO 2016.  AS I RECALL, THE CHARTS THAT I GOT WERE A

8   COMBINATION OF HANDWRITTEN DOCUMENTATION FROM HIS CURRENT

9   OFFICE AND ALSO ELECTRONIC MEDICAL RECORDS.  I DON'T KNOW IF

10  THERE WAS ANY OVERLAP IN THAT TIME WITH OCHSNER AND IT WOULD

11  BE DISINGENUOUS FOR ME TO SAY SO.

12       Q    SO YOU CAN'T SAY WHETHER YOU ACTUALLY REVIEWED

13  OCHSNER CHARTS OR NOT?

14       A    I DO NOT RECALL SEEING ANY CHARTS THAT WERE LABELED

15  AS OCHSNER CHARTS.

16       Q    OKAY.  SO YOU DO NOT KNOW IF DR. LAMARTINERE WAS

17  IMPACTED BY ANY PREVIOUS INFORMATION CONTAINED IN THE CHARTS

18  THAT HE SAW AT OCHSNER REGARDING PATIENTS HE THEN SAW LATER AT

19  HIS OWN CLINIC?

20       A    CAN YOU ASK THAT AGAIN, SIR?

21       Q    SURE.  DR. LAMARTINERE HAD PATIENTS HE SAW AT

22  OCHSNER AND THEN SAW AGAIN AT HIS OWN PRIVATE CLINIC LATER,

23  RIGHT?

24       A    YES.

25       Q    AND IT'S POSSIBLE THAT DR. LAMARTINERE HAD SEEN

198

1  RECORDS REGARDING THOSE PATIENTS WHEN HE WAS AT OCHSNER THAT

2  IMPACTED HIS KNOWLEDGE OF THAT, CORRECT?

3      **A**    SIR, IT'S POSSIBLE, BUT THERE'S NO WAY TO KNOW.

4      **Q**    AND THE REASON THERE'S NO WAY TO KNOW IS BECAUSE THE

5  SUBSEQUENT RECORDS DON'T -- IT'S NOT ALL CONTAINED TOGETHER

6  LIKE YOU WOULD LIKE TO SEE, RIGHT?

7      **A**    THAT'S TRUE.

8      **Q**    NOW YOU'RE FAMILIAR, DR. KENNEDY, WITH THE TERM THAT

9  PEOPLE SOMETIMES USE, THE TERM *PILL MILL*, CORRECT?

10      **A**    I AM.

11      **Q**    A PILL MILL IS A PLACE ESSENTIALLY WHERE PEOPLE GO

12  SEE A MEDICAL PROVIDER AND THEY GO IN WITH THE HOPE OF GETTING

13  A PARTICULAR NARCOTIC DRUG AND THEY PAY MONEY AND THEY GET THE

14  DRUG, RIGHT?

15      **A**    NOT NECESSARILY.

16      **Q**    BUT IS THAT -- IS THAT A FAIR GENERALIZATION?

17      **A**    THAT IS ONE DESCRIPTION OF A PILL MILL.  THERE ARE

18  MANY.

19      **Q**    OKAY.  NOW, IN THE MEETINGS WITH THE UNDERCOVER

20  PATIENTS, DR. LAMARTINERE DID HAVE EXTENDED DISCUSSIONS ABOUT

21  THE RISK OF ADDICTION WITH THEM, CORRECT?

22      **A**    YES.

23      **Q**    AND WITH PATIENT NEILSON, HE DISCUSSED MULTIPLE

24  DIFFERENT OPTIONS RATHER THAN THE ROXICODONE THAT THE

25  UNDERCOVER PATIENT ASKED FOR, CORRECT?

1      **A**    THIS WAS THE TRAMADOL CHART?

2      **Q**    YES.  THIS IS THE GUY THAT WANTED THE ROXIES --

3      **A**    YES, SIR.

4      **Q**    -- AND HE WAS ASKING HIM ABOUT TRAMADOL AND NUCYNTA

5  AND ALL OF THAT, CORRECT?

6      **A**    YES.

7      **Q**    HE ALSO SUGGESTED TO THE PATIENT NEILSON, THE SAME

8  ONE WE WERE JUST TALKING ABOUT, HE SUGGESTED TO HIM SOME

9  POSSIBLE NONNARCOTIC MEDICATIONS, CORRECT?

10      **A**    THAT WAS IN THE COURSE OF THE DIALOGUE, YES.

11      **Q**    AND EVEN WHEN THE PATIENT TOLD HIM THAT TRAMADOL

12  DIDN'T WORK FOR HIM REPEATEDLY, THE DOCTOR DID NOT TURN AROUND

13  AND GIVE HIM A PRESCRIPTION FOR ROXICODONE, DID HE?

14      **A**    YES, HE DID, JUST NOT ON THAT ENCOUNTER.

15      **Q**    ON THAT OCCASION WHEN HE MET WITH HIM, HE DID NOT

16  GIVE HIM THE THING THAT HE ASKED FOR, DID HE?

17      **A**    HE GAVE HIM HYDROCODONE.

18      **Q**    CORRECT.  AND THEN HE HAD HIM TRY THE HYDROCODONE,

19  WHICH WAS A LESS POTENT MEDICATION FIRST, DIDN'T HE?

20      **A**    YES.

21      **Q**    HE DID THAT EVEN THOUGH THE PATIENT CAME IN AND SAID

22  ROXIES ARE WHAT I WANT, THAT'S WHAT WORKED FOR ME SO TO SPEAK,

23  RIGHT?

24      **A**    HE GAVE THEM TO HIM NEXT TIME.

25      **Q**    AFTER HE CAME BACK AND SAID THAT THE FIRST

1    PRESCRIPTION WAS NOT EFFECTIVE?

2         A    YES.

3         Q    MEANING THE PATIENT CAME IN AND SAID THAT THE LEG

4    WAS STILL BOTHERING HIM AND THEN -- ONLY THEN DID

5    DR. LAMARTINERE CHANGE TO A DIFFERENT DRUG, CORRECT?

6         A    WELL, THAT WAS THE COURSE OF EVENTS, YES.

7         Q    CERTAINLY YOU'D AGREE WITH ME THAT IN WHAT MIGHT BE

8    A PILL MILL-TYPE SETTING, IT'S NOT COMMON FOR THE PILL MILL

9    DOCTOR TO BE CONTINUALLY SUGGESTING NONNARCOTIC OR LESS POTENT

10   DRUGS?

11        A    I DON'T KNOW THAT I WOULD AGREE WITH YOU WITH THAT,

12   SIR.

13        Q    YOU WOULDN'T?

14        A    NOT NECESSARILY.

15        Q    I GUESS THERE'S A POSSIBILITY THAT THESE THINGS COME

16   IN ALL SHAPES AND SIZES, I SUPPOSE.  IS THAT WHAT YOU MEAN?

17        A    THAT'S MY EXPERIENCE.

18        Q    BUT IN THIS PARTICULAR INSTANCE WITH THIS PARTICULAR

19   DOCTOR, WHAT WE SAW FROM THE UNDERCOVER RECORDINGS WAS HIM

20   STRUGGLING WITH A PATIENT TO TRY TO COME TO SOME SORT OF

21   MEDICATION THAT WOULD HELP THE PATIENT WHILE NOT POSING A

22   RISK; THAT'S WHAT'S HAPPENING IN THE DIALOGUE.  HE'S TALKING

23   ABOUT NEEDING THE MEDICINE TO BE AS SAFE AS POSSIBLE.

24        A    I WOULD AGREE WITH THE SECOND CHARACTERIZATION, BUT

25   I DON'T KNOW THAT I WOULD WITH THE FIRST ABOUT NO RISKS.

1    **Q**    SO HE'S TALKING TO HIM ABOUT TRYING TO LIMIT THE

2    RISK AND MAKE THE MEDICATION AS SAFE AS POSSIBLE, RIGHT?

3    **A**    THAT'S TRUE.

4    **Q**    HE TALKS TO HIM ABOUT THE NEED TO AVOID GETTING TOO

5    MUCH MEDICINE, RIGHT?  HE TALKS ABOUT HOW IF YOU GET TOO MUCH

6    MEDICINE, THEN IT CAN BE A PROBLEM?

7    **A**    YEAH.  YES, SIR.

8    **Q**    NOW, LET'S TALK ABOUT THE ADDERALL SEGMENT OF THE

9    RECORDING.  WITH RESPECT TO THE UNDERCOVER PATIENT SEEKING THE

10   ADDERALL, THE DOCTOR EXPLAINED THAT THE ONLY REASON WAS TO

11   KEEP THE PATIENT AWAKE, THAT WASN'T THE APPROPRIATE OR

12   INDICATED USE FOR ADDERALL, CORRECT?

13   **A**    HE STATED IT WOULD BE ILLEGAL.

14   **Q**    HE SAID THAT IT WOULD BE ILLEGAL, THAT IS WHAT HE

15   SAID, CORRECT?

16   **A**    YES, SIR.

17   **Q**    NOW, IN FACT, YOU'RE FAMILIAR WITH THE TERM

18   *NON-LABEL USE OF DRUGS*, CORRECT?

19   **A**    YES, SIR.

20   **Q**    NON-LABEL USE MEANS THE USE OF A MEDICATION FOR SOME

21   PURPOSE OTHER THAN THAT WHICH IS GENERALLY INDICATED, CORRECT?

22   **A**    YES, SIR.

23   **Q**    NON-LABEL USE IS NOT ACTUALLY ILLEGAL, IS IT?

24   **A**    NON-LABEL USE IS NOT TECHNICALLY ILLEGAL, BUT THIS

25   IS NOT A RECOGNIZED NON-LABELED USE FOR AMPHETAMINES.

1    Q    SO AS A GENERAL MATTER, FIRST OF ALL, NON-LABEL USE

2  IS NOT ILLEGAL, YOU'D AGREE?

3    A    I DO.

4    Q    THEN WHAT YOU SAID WAS IF IT WAS JUST TO KEEP HIM

5  UP, THAT WOULD NOT BE -- SAY THAT AGAIN.  THIS IS NOT --

6  REPEAT WHAT YOU JUST SAID ABOUT NON-LABEL USE.

7    A    THAT'S NOT A LEGITIMATE MEDICAL PURPOSE.  THAT'S A

8  RECREATIONAL PURPOSE.

9    Q    OKAY.  SO THE REASON YOU'RE SAYING IT'S NOT A

10 LEGITIMATE NON-LABEL USE IS YOU'RE SAYING IT'S A RECREATIONAL,

11 NOT A MEDICAL REASON?

12   A    YES, SIR.

13   Q    OKAY.  AFTER HE TOLD HIM; DR. LAMARTINERE THAT IS,

14 ABOUT THE THINGS THAT YOU CAN AND CAN'T PRESCRIBE ADDERALL

15 FOR, HE ALSO TOLD HIM THAT HE WOULD NEED TO GET TESTED FOR

16 ATTENTION DEFICIT DISORDER IF HE WANTED TO USE ADDERALL,

17 CORRECT?

18   A    IN THAT ONE SEGMENT WHAT HE SAID WAS, WAS THAT THAT

19 WAS A WAY TO GET DIAGNOSED WITH ADD.

20   Q    AND PERHAPS SEE A NEUROPSYCHIATRIST, CORRECT?

21   A    YES, SIR.

22   Q    AND YOU SAID THAT WASN'T ACTUALLY NECESSARY.  AS FAR

23 AS YOU UNDERSTAND, YOU DON'T THINK YOU'VE GOT TO GO SEE A

24 NEUROPSYCHOLOGIST IN ORDER TO BE ELIGIBLE FOR AN ADDERALL

25 PRESCRIPTION OR DIAGNOSED WITH ADD, CORRECT?

1       **A**    I BELIEVE WHAT I SAID WAS I DON'T BELIEVE THAT YOU

2   HAVE TO HAVE A NEUROPSYCHOLOGIST TO MAKE A DIAGNOSIS FOR

3   ATTENTION DEFICIT DISORDER, THAT OTHER PHYSICIANS, INCLUDING

4   DR. LAMARTINERE, COULD DO THAT IF IT WAS APPROPRIATELY

5   APPROACHED.

6       **Q**    AND DR. LAMARTINERE DID ASK HIM A SERIES OF

7   QUESTIONS ABOUT WHETHER HE HAD PROBLEMS IN SCHOOL, WHETHER HE

8   HAD DIFFICULTY FOCUSING, HE DID ASK HIM THOSE SERIES OF

9   QUESTIONS, CORRECT?

10      **A**    YES, SIR.

11      **Q**    AND THEN WHEN THE WITNESS GAVE AFFIRMATIVE, ALTHOUGH

12  SOMEWHAT PROBLEMATIC RESPONSES, AGREED?

13      **A**    THEY WERE EXTREMELY PROBLEMATIC RESPONSES, SIR.

14      **Q**    NONETHELESS HE ASKED HIM THOSE QUESTIONS, THE

15  WITNESS GIVES RESPONSES, AND IN THE PROCESS OF ALL OF THAT,

16  DR. LAMARTINERE SAYS THAT HE'S GOING TO HAVE TO LOOK INTO IT

17  TO DETERMINE WHETHER HE'S GOING TO BE ABLE TO PRESCRIBE HIM

18  ADDERALL OR NOT, CORRECT?

19      **A**    SIR, THE WAY I INTERPRETED THAT WAS HE WAS GOING TO

20  HAVE TO LOOK INTO IT TO GIVE HIM THE DIAGNOSIS FOR WHICH HE

21  WOULD PRESCRIBE THE ADDERALL.

22      **Q**    OKAY.  HE WOULD HAVE TO LOOK INTO IT TO SEE IF THE

23  DIAGNOSIS WAS APPROPRIATE?

24      **A**    YES, SIR.

25      **Q**    AND HE DID NOT GIVE HIM THE ADDERALL PRESCRIPTION

1  THAT DAY FOLLOWING THE PATIENT'S RESPONSE TO THE QUESTIONS,

2  DID HE?

3     **A**   HE DID NOT GIVE HIM THE PRESCRIPTION THAT DAY, THAT

4  IS CORRECT.

5     **Q**   SO THE GUY ASKED FOR THE ADDERALL PRESCRIPTION ON

6  THAT DAY, BUT HE DID NOT LEAVE WITH IT ON THAT DAY, CORRECT?

7     **A**   YES, SIR.  I BELIEVE THAT THE WAY THAT THE SEQUENCE

8  OF EVENTS WENT WAS THAT HE SAID PERHAPS BY THE NEXT

9  APPOINTMENT, AND THEN SUBSEQUENT TO THAT, HE SAID PROBABLY NOT

10  EVEN BY THE NEXT APPOINTMENT.

11     **Q**   OKAY.  AND AFTER THE PATIENT LEFT, YOU DO NOT KNOW

12  WHETHER DR. LAMARTINERE CONSULTED ANYBODY ELSE THAT DOES MORE

13  WORK WITH ATTENTION DEFICIT DISORDER THAN HE DOES, DO YOU?

14     **A**   THERE'S NOTHING DOCUMENTED, SIR.

15     **Q**   SO WE'VE ALREADY TALKED ABOUT THE PROBLEMS WITH

16  THINGS THAT HE LEAVES OUT OF HIS RECORDS, RIGHT?

17     **A**   SO THERE'S NO WAY TO KNOW IF THERE'S NOTHING

18  DOCUMENTED.

19     **Q**   CORRECT.  SO YOU DON'T KNOW WHETHER HE DID THAT OR

20  NOT; IT'S POSSIBLE, RIGHT?

21     **A**   ALL I KNOW IS THAT IT'S NOT DOCUMENTED.

22     **Q**   CORRECT.  AND THEN SUBSEQUENT TO THAT, HE DID GIVE

23  HIM A PRESCRIPTION, CORRECT, FOR ADDERALL?

24     **A**   YES, SIR.

25     **Q**   NOW, IN TERMS OF MEDICAL HISTORY, YOU SAID THERE

1  DIDN'T NEED TO BE A FORM BUT THE MEDICAL HISTORY HAD TO BE

2  TAKEN, CORRECT?

3      **A**    YES, SIR.

4      **Q**    AND ON THE UNDERCOVER RECORDING WE DO HEAR

5  DR. LAMARTINERE ASKING BOTH OF THESE INDIVIDUALS A SERIES OF

6  QUESTIONS ABOUT ALLERGIES THAT THEY HAVE, PRIOR HEALTH

7  PROBLEMS THAT THEY HAVE, CORRECT?

8      **A**    THAT IS TRUE.

9      **Q**    AND THEN HE ASKED THEM HOW OFTEN DO YOU DRINK AND

10  HOW OFTEN DO YOU SMOKE, RIGHT?

11      **A**    YES, SIR.

12      **Q**    HE ASKED THEM ABOUT THEIR STOMACH ISSUES AND THINGS

13  LIKE THAT, CORRECT?

14      **A**    THAT IS CORRECT.

15      **Q**    OKAY.  AND THOSE KINDS OF QUESTIONS ARE THE KINDS OF

16  QUESTIONS THAT ARE ASKED IN A MEDICAL HISTORY, CORRECT?

17      **A**    I WOULD AGREE WITH THAT.

18      **Q**    THE PROBLEM IS HE ASKED THE QUESTIONS IN PRACTICE IN

19  THE ROOM BUT THEN DIDN'T RECORD IN THE CHART THAT THE

20  QUESTIONS HAD BEEN ASKED, RIGHT?

21      **A**    NO, SIR.  THE PROBLEM IS THAT HE HAS A MEDICAL

22  PRACTICE WITH DOZENS AND DOZENS AND DOZENS OF PEOPLE, AND WHEN

23  YOU HAVE THAT KIND OF INFORMATION THAT IS NOT CHARTED, YOU

24  CAN'T REMEMBER IT IN THE FUTURE.  IF SOMEBODY SAYS THEY

25  BROUGHT AN MRI REPORT -- ON MY FIRST APPOINTMENT I BROUGHT AN

1    MRI REPORT, EVERYBODY BROUGHT AN MRI REPORT.  FOUR OR FIVE

2    LATER, THERE ISN'T A PHYSICIAN ALIVE THAT CAN TELL YOU

3    SPECIFICALLY WHAT'S ON THOSE REPORTS, THAT'S THE PROBLEM.

4        **Q**    I UNDERSTAND.  SO -- I UNDERSTAND YOUR POINT.  WHAT

5    I'M SAYING IS THAT, AS A MATTER OF FACT, HE WAS ASKING THE

6    MEDICAL HISTORY QUESTIONS OF THE PATIENTS IN THE ROOM,

7    CORRECT?

8        **A**    IN THE INSTANCE THAT WE HAVE RECORDINGS OF, YES,

9    SIR, THERE ARE HISTORIES THAT WERE TAKEN.

10       **Q**    NOW, ONE OF THE THINGS THAT YOU HAD NOTED ABOUT

11   MR. AUGHEY, FREDERICK AUGHEY, WAS THAT HE HAD, IN THE PAST,

12   BEEN AT A METHADONE CLINIC.  THAT WAS NOTED.  IF YOU NEED TO

13   REVIEW SOMETHING TAKE A LOOK.

14       **A**    YES, SIR.

15       **Q**    AND SO HE HAD BEEN TO A METHADONE CLINIC IN THE

16   PAST.  NOW OF COURSE YOU DON'T KNOW -- THAT WAS NOTED IN THE

17   CHART SOMEWHERE, RIGHT?

18       **A**    AS FAR AS I RECALL.

19       **Q**    OR DID YOU GET IT FROM SOMEWHERE ELSE?

20       **A**    THAT WAS ON THE FINAL ENCOUNTER.

21       **Q**    SO IN THE FINAL ENCOUNTER WITH MR. AUGHEY, THE CHART

22   REFLECTS THAT AUGHEY SAID SOMETHING ABOUT HAVING BEEN AT A

23   METHADONE CLINIC IN THE PAST, CORRECT?

24       **A**    CORRECT.

25       **Q**    NOW, OBVIOUSLY THERE'S NO WAY FOR YOU TO KNOW AS YOU

1    SIT HERE WHETHER MR. AUGHEY WAS SEEKING TREATMENT FOR PAIN OR

2    FOR A DRUG ADDICTION WHEN HE WENT TO THE METHADONE CLINIC,

3    RIGHT?

4        **A**    METHADONE CLINICS ARE ESSENTIALLY IN EXISTENCE FOR

5    TREATING PEOPLE WITH OPIOID USE DISORDER, PEOPLE WHO ARE

6    ADDICTED.  IT MAY BE POSSIBLE THAT THEY TAKE CARE OF A PAIN

7    PATIENT.  BUT IN MY EXPERIENCE, OVERWHELMINGLY, THEY'RE TAKING

8    CARE OF PEOPLE WHO HAVE PROBLEMS WITH ADDICTION; OPIOID USE

9    DISORDER.

10       **Q**    METHADONE DOES TREAT PAIN, WE'VE ALREADY ESTABLISHED

11   THAT, CORRECT?

12       **A**    YES, SIR.

13       **Q**    AND OBVIOUSLY YOU DON'T TAKE THE POSITION, I DON'T

14   THINK THAT YOU DO, THAT PEOPLE THAT HAVE BEEN IN METHADONE

15   CLINICS AT SOME POINT IN THE PAST CANNOT HAVE REAL PAIN THAT

16   REQUIRES TREATMENT?

17       **A**    CERTAINLY NOT.

18       **Q**    AND THERE WAS SOME INDICATION FROM THE LAST VISIT

19   WITH MR. AUGHEY WHERE MR. AUGHEY HAD INDICATED THAT AT SOME

20   POINT IN THE PAST, HE HAD BEEN ON PROBATION FOR SOME CHARGE

21   RELATED TO COCAINE OR SOMETHING TO THAT EFFECT, RIGHT?

22       **A**    COCAINE DISTRIBUTION.

23       **Q**    OKAY.  AND THE FACT THAT SOMEONE HAS A PRIOR

24   CONVICTION FOR DISTRIBUTING COCAINE, OR ANY DRUG, THAT DOESN'T

25   MEAN THAT THAT PERSON IS NOT IN LEGITIMATE PAIN, CORRECT?

1        **A**     NO, SIR.  NONE OF THOSE THINGS MEAN THAT A PERSON IS

2    NOT IN LEGITIMATE PAIN.

3        **Q**     AND WHETHER IT'S SOMEONE WHO'S HAD A PRIOR

4    CONVICTION FOR SELLING A DRUG OR SOMEONE THAT'S BEEN TO A

5    METHADONE CLINIC IN THE PAST, THAT PERSON MIGHT STILL NEED

6    PAIN TREATMENT, RIGHT?

7        **A**     SIR, IF SOMEBODY IS A HEROIN ADDICT THAT HAS JUST

8    STOLEN SOMEBODY'S CAR STEREO AND THEY GOT HIT BY A BUS, THEY

9    STILL GET TO HAVE PAIN TREATMENT.  THE QUESTION IS HOW ARE

10   THEY GETTING THE PAIN TREATMENT?  ARE THEY GETTING THE PAIN

11   TREATMENT APPROPRIATELY?  ARE THEY GETTING THE PAIN TREATMENT

12   FOR A LEGITIMATE MEDICAL PURPOSE?

13       **Q**     DR. KENNEDY, YOU WOULD AGREE WITH ME THAT THESE

14   KINDS OF PATIENTS CAN BE DIFFICULT TO DEAL WITH AND DIFFICULT

15   TO MANAGE BECAUSE OF THEIR MULTIFACETED ISSUES?

16       **A**     OH, YEAH.

17       **Q**     AND IT IS EASY -- IT WOULD BE EASY FOR MEDICAL

18   PRACTITIONERS TO MAKE MISTAKES IN DEALING WITH THOSE KIND OF

19   DIFFICULT PATIENTS, WOULDN'T IT?

20       **A**     IT'S POSSIBLE TO MAKE MISTAKES CERTAINLY, SIR.

21       **Q**     WITH RESPECT TO THE PATIENT CHARLES HENSON, THE

22   CHART AT ONE POINT INDICATED THAT HE HAD TAKEN ANOTHER

23   PERSON'S METHADONE.  IF YOU COULD TAKE A LOOK AND SEE IF

24   THAT'S -- IS THAT CORRECT?

25       **A**     YES, SIR.

1      **Q**    AND THE CHART FURTHER INDICATED -- SO FIRST OF ALL,

2    THAT FACT WAS WRITTEN DOWN, IT WAS INCLUDED.  IT WASN'T

3    HIDDEN.  IT WAS PUT IN THERE, RIGHT?

4      **A**    AS I RECALL, YES, SIR.

5      **Q**    THE CHART OR THE NOTE FROM THE DOCTOR INDICATES THAT

6    MR. HENSON REPORTED THAT THIS HAPPENED DUE TO AN AGGRAVATED

7    PROBLEM WITH HIS BACK, RIGHT?

8      **A**    I'M NOT LOOKING AT WHAT YOU'RE LOOKING AT, BUT THAT

9    SOUNDS OKAY.

10     **Q**    I'M TAKING -- THAT WAS FROM YOUR SUMMARY --

11     **A**    I'M NOT LOOKING AT IT RIGHT NOW, SO.

12     **Q**    FAIR ENOUGH.  BUT YOU'RE NOT DISAGREEING?  THAT

13   SOUNDS ABOUT RIGHT.

14     **A**    I'M NOT DISAGREEING.

15     **Q**    OKAY.  AND THE CHART REFLECTED THAT THE PATIENT IS

16   DOING MUCH BETTER NOW ON THE PRESENT DOSE, RIGHT?

17     **A**    CAN I LOOK AT MY REVIEW --

18     **Q**    TAKE A LOOK AT ANYTHING THAT YOU NEED TO REVIEW.

19     **A**    WHICH NUMBER IS THAT, SIR?  ON THE FRONT PAGE, IT'LL

20   SAY CASE NUMBER.

21     **Q**    LET ME JUST ASK MR. --

22     **A**    THAT WAS HENSON?

23     **Q**    YES.

24     **A**    I HAVE IT, SIR.

25     **Q**    THIS HAS NOT BEEN ADMITTED INTO EVIDENCE.  THIS IS

1   JUST YOUR WORKSHEET THAT I'M LOOKING AT --

2       **A**   YES, SIR.

3       **Q**   -- FOR PATIENT 10, MR. HENSON.  DO YOU HAVE YOUR

4   WORKSHEET THERE?  PERFECT.

5           SO WITH RESPECT TO MR. HENSON, HE INDICATED THAT --

6   THE CHART INDICATED THAT HE WAS DOING MUCH BETTER ON PRESENT

7   DOSE AFTER HAVING TAKEN SOMEBODY ELSE'S METHADONE PILL,

8   CORRECT?

9       **A**   YES, SIR.

10      **Q**   AND SO WHAT THAT -- WHILE THE CHART WAS NOT DETAILED

11  ENOUGH BY ANY STRETCH OF THE IMAGINATION, WHAT THIS ONE

12  EXAMPLE SHOWS IS DR. LAMARTINERE APPARENTLY ENGAGING IN A

13  DIALOGUE WITH HIS PATIENT ABOUT PROBLEMATIC CONDUCT, WOULD YOU

14  AGREE WITH THAT?

15      **A**   NO.

16      **Q**   WELL, IF DR. LAMARTINERE NOTES THAT THE PATIENT SAID

17  THAT HE TOOK ANOTHER PERSON'S METHADONE AND THAT HE REPORTED

18  THAT THERE WAS -- THIS WAS DUE TO AN AGGRAVATED BACK PROBLEM

19  AND THEN THEY DISCUSSED IT AND HE SAID HE WAS DOING BETTER,

20  THAT INDICATES THAT A DISCUSSION HAPPENED, DOES IT NOT?

21      **A**   NO, NOT TO ME.  IT'S NOT THE DISCUSSION THAT IS

22  PERTINENT.  THE PERTINENT DISCUSSION IN THIS INSTANCE IS THAT

23  THE PREVIOUS MONTH THAT PATIENT HAD A DRUG SCREEN AND WAS

24  POSITIVE FOR OXYCODONE, AMPHETAMINES, XANAX, OXYMORPHONE,

25  MORPHINE AND METHADONE.  THERE ISN'T A SIGNIFICANT DISCUSSION

1   ABOUT THAT --

2       **Q**   IN THE CHART.

3       **A**   AND THERE CERTAINLY ISN'T ANY DISCUSSION ABOUT THE

4   PATIENT COMING IN SAYING THAT HE TOOK A FRIEND'S METHADONE AND

5   NOW HE'S FEELING MUCH BETTER.  THESE ARE SERIOUS, SERIOUS

6   ISSUES WHICH GO BEYOND SIMPLE LACK OF DOCUMENTATION.

7       **Q**   MY POINT IS THIS, THOUGH, BECAUSE OF THE LACK OF

8   DOCUMENTATION, YOU DON'T KNOW HOW EXTENSIVE THE DIALOGUE WAS,

9   DO YOU?

10      **A**   SIR, I KNOW THAT EXTENSIVE DIALOGUE WAS NOT -- WAS

11  NOT DOCUMENTED.

12      **Q**   I KNOW THAT.  THAT'S THE POINT OF THE QUESTION I

13  JUST ASKED YOU.  BECAUSE THE DOCUMENTATION IS INSUFFICIENT,

14  AND WE'VE ALREADY DISCUSSED HOW INSUFFICIENT IT IS, THERE'S NO

15  WAY FOR YOU TO KNOW HOW EXTENSIVE HIS DISCUSSION WITH THE

16  PATIENT WAS, IS THERE?

17      **A**   SIR, I CAN'T PROVE WHAT DID OR DIDN'T EXIST BASED ON

18  NO DOCUMENTATION.

19      **Q**   BUT WHEN HE TESTIFIED HERE, MR. HENSON INDICATED

20  THAT HE WOULD AT EVERY VISIT HAVE DETAILED DISCUSSIONS WITH

21  DR. LAMARTINERE ABOUT THINGS THAT WERE GOING ON WITH HIS

22  MEDICINE, CORRECT?

23      **A**   THAT WAS SAID, YES.

24      **Q**   DR. LAMARTINERE PRESCRIBED SOME OF THESE PATIENTS,

25  INCLUDING MR. HENSON, DRUGS THAT WERE NOT SCHEDULE II,

1   CORRECT?

2       **A**    YES, SIR.  AND TO THE BEST OF MY ABILITY AND MY

3   REVIEWS, I SAID THAT THAT WAS A LAUDABLE THING.

4       **Q**    HE WOULD PRESCRIBE GABAPENTIN.  HE WOULD PRESCRIBE

5   LYRICA.  HE WOULD PRESCRIBE OTHER OPTIONS TO TRY TO AVOID THE

6   MORE SERIOUS NARCOTIC MEDICATIONS, CORRECT?

7       **A**    WELL, THEY WORK AS ADJUNCTIVE MEDICATIONS THAT HELP

8   WITH THE OPIOID CASE, BUT IT'S ALWAYS GOOD TO PURSUE

9   NONSCHEDULE MEDICATIONS IF YOU CAN.

10      **Q**    AND THERE IS EVIDENCE OF HIM DOING THAT, EVEN THOUGH

11   HIS CHARTS ARE LOUSY, CORRECT?

12      **A**    I WOULD AGREE WITH THAT.

13      **Q**    NOW, IN YOUR DISCUSSION OF THE PATIENT ZACHARY

14   JACKSON, THE ONE THAT DIDN'T TESTIFY HERE, THERE WAS AN

15   INDICATION ABOUT HER MEDICATIONS BEING STOLEN IN THERE,

16   CORRECT?

17      **A**    SIR, THAT SOUNDS FAMILIAR.

18      **Q**    AND YOU DON'T KNOW WHETHER OR NOT SHE PROVIDED A

19   POLICE REPORT TO DR. LAMARTINERE BECAUSE THE CHART IS NOT --

20   IS SILENT ON THAT SUBJECT, CORRECT?

21      **A**    I DO NOT KNOW.

22      **Q**    YOU KNOW THAT BRIAN BOUDREAUX TESTIFIED HERE ABOUT

23   WHAT HAPPENED WHEN HE SAID THAT HE HAD LOST MEDICATION DUE TO

24   A CAR ACCIDENT, RIGHT?

25      **A**    I HEARD THAT.

1    **Q**    AND BRIAN BOUDREAUX SAID THAT HE HAD TO, AND THAT HE

2    DID, PROVIDE A POLICE REPORT TO DR. LAMARTINERE, CORRECT?

3    **A**    THAT IS APPROPRIATE, YES, SIR.

4    **Q**    AND WHEN DR. LAMARTINERE TALKED TO THE UNDERCOVER

5    PATIENT, ONE OF THE TWO OF THEM, IF YOU RECALL, HE TOLD THE

6    UNDERCOVER PATIENT -- IT WAS NEILSON, THE ONE THAT TALKED

7    ABOUT THE SHIRT.  THE GUY -- YOU REMEMBER THAT?

8    **A**    YES.

9    **Q**    THE GUY WHO STOLE HIS MEDICINE WHILE BORROWING HIS

10   SHIRT.  WHEN HE TALKED ABOUT THAT, DR. LAMARTINERE TOLD HIM

11   THAT YOU HAVE TO HAVE A POLICE REPORT IF YOU WANT TO GET

12   REPLACEMENT MEDICATION, CORRECT?

13   **A**    I DON'T REMEMBER SPECIFICALLY IF THAT WAS THE CASE

14   OR IF THAT WAS THE DISCUSSION WHERE THE POLICE DID NOT LIKE

15   TAKING POLICE REPORTS ON STOLEN MEDICATION.

16   **Q**    I THINK -- HE MAY HAVE SAID BOTH.  YOU DON'T

17   DISAGREE, DO YOU?

18   **A**    NO.

19   **MR. PUGLIESE:**  YOUR HONOR, IF I COULD JUST INTERRUPT

20   QUICKLY.  MR. STEVENS IS TAKING NOTES.  I DON'T WANT TO SLOW

21   THE PROCEEDING DOWN.  I JUST NEED TO STEP OUT FOR ABOUT 90

22   SECONDS.

23   **THE COURT:**  OKAY.  DO YOU WANT TO GO FORWARD WHILE

24   WE --

25   **MR. PUGLIESE:**  I'D LIKE TO CONTINUE.  MR. STEVENS IS

1    ABLE --

2            **THE COURT:**  NINETY SECONDS.

3            **MR. PUGLIESE:**  THANK YOU, YOUR HONOR.

4            **THE COURT:**  I'VE GOT MY STOPWATCH STARTED.

5            AND APPROXIMATELY HOW MUCH LONGER DO YOU HAVE?  CAN

6    YOU ESTIMATE?

7            **MR. BRINDLEY:**  JUDGE, I'D SAY 15 MINUTES, MAYBE EVEN

8    LESS PERHAPS.  WE'RE GETTING TO THE END.

9    **BY MR. BRINDLEY:**

10       **Q**    SO --

11           **THE COURT:**  WAIT.  HANG ON.

12           **MR. BRINDLEY:**  OH, I'M SORRY, JUDGE.

13           **THE COURT:**  WE'VE GOT TO WAIT FOR MR. PUGLIESE. HE

14    DIDN'T SAY TO GO ON, RIGHT?

15           **MR. STEVENS:**  I THOUGHT HE MEANT TO GO ON AND I'M

16    JUST TAKING NOTES.

17           **THE COURT:**  OH, OKAY.  WELL, THEN I MISUNDERSTOOD.

18    GO FORWARD.

19    **BY MR. BRINDLEY:**

20       **Q**    SO, DR. KENNEDY, WHEN MR. BOUDREAUX GAVE HIS

21    TESTIMONY HE SAID THAT A POLICE REPORT WAS REQUIRED, RIGHT,

22    AND THAT HE PROVIDED ONE?

23       **A**    AS I RECALL, YES.

24       **Q**    AND THERE WAS DISCUSSION ABOUT A POLICE REPORT WHEN

25    THE UNDERCOVER SAID THAT THE MEDICATION WAS LOST, CORRECT?

1  **A**    CAN YOU REPEAT THAT LAST --

2  **Q**    YEAH.  THERE WAS A DISCUSSION ABOUT GETTING A POLICE

3  REPORT WHEN THE UNDERCOVER SAID THAT HE HAD LOST MEDICATION,

4  CORRECT?

5  **A**    AS I RECALL, YES.

6  **Q**    SO YOU DON'T HAVE ANY REASON TO BELIEVE THAT

7  MS. JACKSON WOULD HAVE BEEN TREATED DIFFERENTLY THAN THOSE

8  OTHER PATIENTS, DO YOU?

9  **A**    SIR, I HAVE NO REASON TO HAVE AN OPINION, BUT --

10  **Q**    I KNOW THAT IT'S NOT IN THE CHART --

11  **THE COURT:**  Y'ALL ARE TALKING OVER ONE ANOTHER.  DID

12  YOU FINISH YOUR ANSWER, DOCTOR?

13  **THE WITNESS:**  I WAS JUST GOING TO SAY BECAUSE THERE

14  IS NOTHING CHARTED, I HAVE NO WAY OF -- I HAVE NO WAY OF

15  SUPPORTING AN ANSWER THAT I WOULD GIVE YOU.

16  **MR. PUGLIESE:**  THANK YOU, YOUR HONOR.  THANK YOU,

17  COUNSEL.

18  **THE COURT:**  THAT WAS EIGHTY-NINE SECONDS,

19  MR. PUGLIESE.  EXCELLENT.

20  **MR. PUGLIESE:**  THANK YOU, SIR.

21  **BY MR. BRINDLEY:**

22  **Q**    AND, IN FACT, WITH RESPECT TO PATIENT JACKSON IN

23  MARCH OF 2015, DR. LAMARTINERE INDICATED IN THE LIMITED CHART

24  THAT THERE WAS THAT THE PATIENT WAS COUNSELED THAT I'LL NOT

25  PROVIDE CHRONIC PAIN MEDICATIONS AT THE LEVEL SHE HAS BEEN

1    RECEIVING.  I'LL PRESCRIBE ONE-MONTH'S SUPPLY FOR PATIENT'S

2    ENCOURAGEMENT TO SEEK FURTHER PAIN MANAGEMENT ELSEWHERE; DO

3    YOU RECALL THAT?

4        **A**    I DO NOT.

5        **Q**    ALL RIGHT.

6            **MR. BRINDLEY:**  YOUR HONOR, IF I CAN SHOW THE WITNESS

7    WHAT I'M GOING TO MARK, WHICH IS ACTUALLY DEFENSE EXHIBIT 1,

8    WHICH IS A PORTION OF THE ZACHARY JACKSON CHART.  IF I COULD

9    SHOW IT TO THE WITNESS ON THE SCREEN HERE.

10   **BY MR. BRINDLEY:**

11       **Q**    DO YOU SEE THIS DOCUMENT, DEFENSE EXHIBIT 1,

12   DR. KENNEDY?

13       **A**    I DO.

14       **Q**    DOES THIS LOOK FAMILIAR TO YOU?

15       **A**    THIS LOOKS LIKE ONE OF THE EMR NOTES.

16       **Q**    SO THIS IS ONE OF THE NOTES FROM DR. LAMARTINERE'S

17   CHART REGARDING ZACHARY JACKSON?

18       **A**    YES, SIR.

19           **MR. BRINDLEY:**  YOUR HONOR, I WOULD OFFER INTO

20   EVIDENCE DEFENSE EXHIBIT 1.

21           **THE COURT:**  ANY OBJECTION?

22           **MR. PUGLIESE:**  NO OBJECTION.

23           **THE COURT:**  D-1 WILL BE RECEIVED.

24   **BY MR. BRINDLEY:**

25       **Q**    AND IF I COULD JUST DRAW YOUR ATTENTION TO THE

1  SECOND PAGE OF DEFENSE EXHIBIT 1 HERE UNDER *DISPOSITION*, WHAT

2  DOES IT INDICATE?  I'LL JUST READ IT TO YOU.  YOU DON'T HAVE

3  TO READ IT OUT LOUD.

4       "PATIENT WAS COUNSELED THAT I'LL NOT PROVIDE CHRONIC

5  PAIN MEDICATIONS AT THE LEVEL SHE HAS BEEN RECEIVING.  I WILL

6  PRESCRIBE ONE-MONTH SUPPLY FOR PATIENT WITH ENCOURAGEMENT TO

7  SEEK FURTHER PAIN MANAGEMENT ELSEWHERE."

8       DR. LAMARTINERE WROTE THAT IN THE CHART FOR ZACHARY

9  JACKSON, CORRECT?

10      **A**   YES.

11      **Q**   NOW, MR. BOUDREAUX, HE HAD A POSITIVE HEROIN TEST

12  AND THAT'S A SERIOUS DANGER, ISN'T IT?

13      **A**   YES, SIR.

14      **Q**   AND YOU HEARD HIM TESTIFY ABOUT WHAT HAPPENED WHEN

15  HE HAD THE POSITIVE -- YOU HEARD HIM TESTIFY THAT

16  DR. LAMARTINERE HAD AN EXTENDED DISCUSSION WITH HIM ABOUT IT,

17  RIGHT?

18      **A**   THAT PARTICULAR PART OF THE TESTIMONY, I DO NOT

19  RECALL OFF THE TOP OF MY HEAD, SIR.

20      **Q**   OKAY.  FAIR ENOUGH.  DO YOU REMEMBER HIM SAYING THAT

21  DR. LAMARTINERE MADE HIM COME IN MORE OFTEN?

22      **A**   YES, SIR, I DO.

23      **Q**   AND THEN WHEN YOU WERE LOOKING AT THE CHART OF THE

24  PRESCRIPTIONS WITH MR. PUGLIESE, IT APPEARED THAT FOLLOWING IN

25  AUGUST, FOLLOWING THIS POSITIVE HEROIN, THAT DR. LAMARTINERE

1  HAD GIVEN THE SAME DOSAGE, BUT A SMALLER NUMBER OF PILLS; IS

2  THAT RIGHT?

3      **A**    THAT SOUNDS FAMILIAR.

4      **Q**    AND THAT WOULD BE CONSISTENT WITH REQUIRING

5  MR. BOUDREAUX TO COME IN MORE OFTEN TO GET MORE MEDICATION

6  BECAUSE HE ONLY HAD A SMALL NUMBER OF PILLS TO TAKE, CORRECT?

7      **A**    YES, SIR.

8      **Q**    AND THAT WOULD ALLOW FOR FURTHER MONITORING OF

9  MR. BOUDREAUX IN LIGHT OF HIS POSITIVE HEROIN TEST, CORRECT?

10     **A**    YES, SIR.

11     **Q**    NOW, ONCE AGAIN, UNFORTUNATELY, MR. BOUDREAUX'S

12 CHART DOES NOT ADEQUATELY DOCUMENT THE NATURE OF THE DIALOGUE

13 THAT MR. BOUDREAUX DESCRIBED HERE, CORRECT?

14     **A**    THAT'S TRUE.

15     **Q**    NOW THE -- THE CHART THAT YOU HAVE SHOWING THE

16 PRESCRIPTIONS DEMONSTRATES THAT INDEED THE NUMBER OF PILLS WAS

17 REDUCED, CORRECT?

18     **A**    IT WAS.

19     **Q**    AND THAT IS CONSISTENT WITH WHAT MR. BOUDREAUX SAID,

20 CORRECT?

21     **A**    YES.

22     **Q**    HOWEVER, THE CHART DIDN'T ADEQUATELY DOCUMENT ALL

23 THE DETAILS SURROUNDING HOW THAT TOOK PLACE, DID IT?

24     **A**    NO.

25     **Q**    IF MR. BOUDREAUX HAD NOT TESTIFIED HERE, YOU WOULD

1    NOT HAVE BEEN AWARE OF THAT, RIGHT?

2         **A**    IF MR. BOUDREAUX HAD NOT TESTIFIED, I STILL WOULD

3    HAVE BEEN AWARE OF THE FACT THAT A PATIENT IN LOUISIANA PER

4    STATE MEDICAL BOARD RULES WHO TESTS POSITIVE, WHO DEMONSTRATES

5    INDICATIONS OF DRUG ABUSE, THE REQUIREMENT IS THAT THEY BE

6    WEANED AND REMOVED FROM THESE MEDICATIONS AND THEY CANNOT

7    RESUME THEM UNTIL THEY HAVE A CONSULTATION BY AN

8    ADDICTION-OLOGIST.

9         **Q**    THAT WASN'T THE QUESTION.  THE QUESTION WAS IF

10   MR. BOUDREAUX HADN'T TESTIFIED ABOUT THE DIALOGUE WITH

11   DR. LAMARTINERE AND HIM REDUCING THE NUMBER OF PILLS AND

12   MAKING HIM COME BACK MORE OFTEN, YOU WOULDN'T HAVE KNOWN THAT,

13   CORRECT?  YOU WOULDN'T HAVE KNOWN THAT THAT HAPPENED OR WHY.

14        **A**    I'M UNSURE HOW TO ANSWER YOU, SIR.  I KNOW YOU'RE

15   LOOKING FOR A NO, BUT I'M TRYING TO MAKE IT CLEAR.

16        **Q**    LET ME -- LET ME -- LET ME PUT IT TO YOU A DIFFERENT

17   WAY.  WITHOUT MR. BOUDREAUX'S EXPLANATION OF WHAT HAPPENED

18   BETWEEN HIM AND DR. LAMARTINERE, THE DETAILS ABOUT WHY THAT

19   NUMBER OF PILLS GOT REDUCED, YOU WOULD NOT HAVE HAD THOSE?

20        **A**    WITHOUT HIS EXPLANATION THERE WOULDN'T BE ONE, YES,

21   SIR.

22        **Q**    NOW, WITH RESPECT TO THE PATIENT JEREMY DOIRON, THIS

23   IS THE ONE WHERE THE CHART INCLUDED A NOTE FROM THE EMERGENCY

24   DEPARTMENT REGARDING A MOTOR VEHICLE ACCIDENT; DO YOU REMEMBER

25   THAT?

1     **A**   I DO.

2     **Q**   AND IN THAT CHART DR. LAMARTINERE NOTED THE

3 DECREASED RANGE OF MOVEMENT WHEN -- EVIDENCE OF RECONSTRUCTIVE

4 SURGERY WITH RESPECT TO HIS RIGHT KNEE; DO YOU RECALL THAT?

5     **A**   THIS WAS ON THE INITIAL EXAM?

6     **Q**   YES.

7     **A**   YES, SIR.

8     **Q**   AND HE INDICATED THAT -- LATER ON WHEN THERE WAS

9 THIS INCIDENT WITH THE MOTOR VEHICLE ACCIDENT, THE CHART

10 ACTUALLY INCLUDED, IN THIS INSTANCE AT LEAST, THE --

11 SOMETHING -- SOMETHING FROM THE EMERGENCY DEPARTMENT ABOUT THE

12 EVENT TOOK PLACE, CORRECT?

13     **A**   YES, SIR.

14     **Q**   AND YOU HEARD MR. DOIRON TODAY TESTIFY THAT HE CAME

15 IN AND HE PROVIDED DR. LAMARTINERE WITH PROOF THAT HIS

16 MEDICATION HAD BEEN DESTROYED THROUGH THIS MOTOR VEHICLE

17 ACCIDENT, CORRECT?

18     **A**   AS I RECALL, IT WAS A SHERIFF'S OFFICE REPORT.

19     **Q**   WHATEVER THE NATURE OF THE REPORT, MR. DOIRON SAID

20 THAT HE BROUGHT THAT IN AND DEMONSTRATED TO DR. LAMARTINERE

21 THAT HE HAD LOST HIS MEDICATION, CORRECT?

22     **A**   AS I RECALL, YES.

23     **Q**   THE NOTE IN MR. DOIRON'S CHART TALKED ABOUT THE

24 CIRCUMSTANCES THAT LED TO THE AUTO ACCIDENT, RIGHT?

25     **A**   I'M NOT REMEMBERING OFF THE TOP OF MY HEAD, SIR.

1      **Q**    FAIR ENOUGH.

2      **A**    I HAVE MY REVIEWS IF THAT'S WHAT YOU'RE REFERENCING,

3   SIR.

4      **Q**    HOLD ON ONE SECOND.  LET ME SHOW YOU WHAT I'M GOING

5   TO MARK AS DEFENDANT'S EXHIBIT 2, DR. KENNEDY.  THIS IS A

6   PORTION OF JEREMY DOIRON'S CHART.  I'D LIKE TO SHOW THAT TO

7   YOU, SIR.

8           DO YOU RECOGNIZE DEFENDANT'S EXHIBIT 2?

9      **A**    I BELIEVE SO.

10      **Q**    AND DOES DEFENDANT'S EXHIBIT 2 APPEAR TO BE ONE OF

11   THESE HANDWRITTEN NOTES --

12      **A**    YES.

13      **Q**    -- FROM DR. LAMARTINERE REGARDING JEREMY DOIRON?

14      **A**    YES, SIR.

15           **MR. BRINDLEY:**  LET ME MOVE INTO EVIDENCE DEFENSE

16   EXHIBIT 2.

17           **THE COURT:**  ANY OBJECTION?

18           **MR. PUGLIESE:**  NO OBJECTION.  THANK YOU, YOUR HONOR.

19           **THE COURT:**  D-2 WILL BE ADMITTED.

20   BY MR. BRINDLEY:

21      **Q**    AS AN EXAMPLE, DR. KENNEDY, WHAT WE'RE LOOKING AT

22   HERE WITH THE CIRCLES AND THE LITTLE NOTES, THIS IS WHAT

23   DR. LAMARTINERE'S HANDWRITTEN NOTES LOOK LIKE FOR HIS MEETINGS

24   WITH PATIENTS, RIGHT?

25      **A**    THAT'S CERTAINLY HOW THIS ONE LOOKS.

1    **Q**    THEY ALL LOOK SIMILAR, ALL THE HANDWRITTEN ONES,

2  DON'T THEY?

3    **A**    I DON'T KNOW THAT I WOULD GENERALIZE THIS TO ALL OF

4  HIS OTHER NOTES EITHER WAY.

5    **Q**    THIS ONE DOESN'T STAND OUT TO YOU AS APPEARING

6  PARTICULARLY DIFFERENT THAN THE OTHERS, DOES IT?

7    **A**    IN SOME RESPECTS, THAT'S TRUE.

8    **Q**    AND REGARDLESS, IN THIS REPORT FROM AUGUST THE 17TH

9  OF 2015 REGARDING JEREMY DOIRON, DR. LAMARTINERE NOTES THE

10  MOTOR VEHICLE ACCIDENT HERE WITH THE LETTERS MVA, CORRECT?

11    **A**    YES.

12    **Q**    AND HE NOTES SKIN GRAPHS AND KNEE FUSED AND WHAT

13  LOOKS LIKE RIGHT KNEE UP HERE, CORRECT?

14    **A**    YES.

15    **Q**    AND THEN HE NOTES GABAPENTIN NOT EFFECTIVE, CORRECT?

16    **A**    YES.

17    **Q**    SO WHAT WE CAN TELL FROM LOOKING AT THIS IS THAT

18  THERE WAS SOME DISCUSSION WITH MR. DOIRON ABOUT WHAT HAPPENED

19  WITH THIS MOTOR VEHICLE ACCIDENT, CORRECT?

20    **A**    MORE OR LESS, YES.

21    **Q**    AND WE CAN TELL THAT THERE WAS SOME DISCUSSION OF

22  WHETHER GABAPENTIN COULD HELP?

23    **A**    YES.

24    **Q**    UNFORTUNATELY, WE CAN'T TELL THE DETAILS OF WHAT WAS

25  REALLY DISCUSSED BECAUSE OF HOW THIS IS NOTED, RIGHT?

1      **A**    WELL, AND WHAT IS NOT NOTED, YES.

2      **Q**    IT INDICATES GOOD RESULTS FOR METHADONE, THAT'S

3   SOMETHING THAT HE HAD NOTED, CORRECT?

4      **A**    YES.  AND THAT'S PROBLEMATIC IN THAT ON THIS VERY

5   SAME DOCUMENT, THERE ARE NO VITAL SIGNS AND THIS IS SOMEBODY

6   WHO'S COMING IN AFTER HAVING SUSTAINED AN ACCIDENT.

7      **Q**    FAIR ENOUGH.  BUT WITH RESPECT TO VITAL SIGNS, IF WE

8   GO BACK TO THE UNDERCOVER RECORDINGS, WE SAW IN THE UNDERCOVER

9   RECORDINGS HIM DOING BASIC VITAL SIGNS; BLOOD PRESSURE,

10  LISTENING TO THEIR HEART.  WE SAW THAT HAPPEN, RIGHT?

11     **A**    THERE WAS A RECORDED INSTANCE.

12     **Q**    YES.  BUT THE CHARTS DIDN'T RECORD THOSE VITAL

13  SIGNS, DID IT?

14     **A**    ON THAT PARTICULAR VISIT, SIR, I CAN'T REMEMBER IF

15  THE VITAL SIGNS WERE RECORDED OR NOT.

16     **Q**    IF WE GO ON TO THE SECOND PAGE, OR THE NEXT PAGE,

17  ANYWAY, OF THIS JEREMY DOIRON CHART, THE ONE FROM 08/31, 2015,

18  THIS ONE ALSO TALKS ABOUT THE MOTOR VEHICLE ACCIDENT HAVING --

19  HAPPENING SIX DAYS AGO, CORRECT?

20     **A**    THAT'S WHAT IT SAYS, YES.

21     **Q**    IT INDICATES THAT HE WAS AVOIDING AN ANIMAL IN THE

22  ROAD; DO YOU SEE THAT?

23     **A**    YES.

24     **Q**    SO WHAT IT DOES IS IT TALKS ABOUT THE WAY THAT THE

25  MOTOR VEHICLE ACCIDENT HAPPENED, RIGHT; OR WHAT'S BEING

1    DESCRIBED?

2         **A**    IF THIS IS THE ENCOUNTER WHERE THERE WAS THE

3    EMERGENCY ROOM NOTE, THIS IS -- IS THAT WHAT YOU'RE TALKING

4    ABOUT?

5         **Q**    YEAH.  SURE.

6         **A**    THEN MY ANSWER TO YOU WOULD BE NO.  BECAUSE IF THIS

7    WAS ACCOMPANIED BY THE NOTE FROM THE EMERGENCY ROOM, THERE'S

8    NOTHING ON THE PHYSICIAN DOCUMENTATION INDICATING THAT IN THE

9    EMERGENCY ROOM THEY TOLD HIM HIS PROBLEM WAS DRUG ABUSE AND

10    THAT WHEN HE LEFT, HE WAS IN THE CUSTODY OF POLICE.

11         **Q**    WE'RE TALKING ABOUT TWO TOTALLY DIFFERENT THINGS

12    RIGHT NOW.  I'M JUST TALKING ABOUT WHAT'S PRESENT HERE.  AND

13    HERE YOU JUST AGREED WITH ME THAT THIS DOCUMENT TALKS ABOUT:

14    "MOTOR VEHICLE ACCIDENT, SIX DAYS AGO, AVOIDING ANIMAL IN THE

15    ROAD."  RIGHT?  YOU SAW THAT?

16         **A**    YES, SIR.  SO I WOULD SAY THAT'S AN INCOMPLETE NOTE.

17         **Q**    IT MAY BE INCOMPLETE, BUT WHAT IT DEFINITELY

18    INDICATES IS THAT THERE WAS A DIALOGUE BETWEEN DR. LAMARTINERE

19    AND JEREMY DOIRON ABOUT THIS MOTOR VEHICLE ACCIDENT, CORRECT?

20         **A**    I WOULD AGREE.

21         **Q**    HOWEVER, THE DIALOGUE HERE IS FAR MORE LIMITED THAN

22    WHAT JEREMY DOIRON DESCRIBED THE DIALOGUE BEING IN TOTALITY

23    AND WHAT ACTUALLY TOOK PLACE, CORRECT?

24         **A**    AT THE EMERGENCY ROOM YOU'RE REFERRING TO?

25         **Q**    NO, WHEN HE WENT TO SEE DR. LAMARTINERE AFTERWARDS.

1    **A**    THERE'S NO WAY TO KNOW BECAUSE THERE'S NOTHING

2    DOCUMENTED.

3    **Q**    BUT WHEN HE TESTIFIED, HE MADE CLEAR THAT IT WAS AN

4    EXTENSIVE DISCUSSION, DIDN'T HE?

5    **A**    I DON'T RECALL THAT SPECIFICALLY, BUT I WOULD

6    CONCEDE THAT THAT WOULDN'T SURPRISE ME.

7    **Q**    NOW, DR. KENNEDY, ALL OF THE NON-UNDERCOVER PATIENTS

8    THAT TESTIFIED IN HERE, YOU'D AGREE WITH ME THAT THEY ALL GAVE

9    DESCRIPTIONS OF SERIOUS STRUGGLES WITH WHAT THEY'VE DESCRIBED

10   AS VERY REAL PAIN THROUGHOUT LENGTHY PERIODS OF YEARS,

11   CORRECT?

12   **A**    I DON'T THINK I'D DISAGREE WITH THAT.

13   **Q**    AND I THINK YOU AGREED WITH ME BEFORE THAT ALL OF

14   THEM SAID THAT DR. LAMARTINERE'S TREATMENT HELPED THEM WITH

15   THAT PAIN, RIGHT?

16   **A**    I AGREE.

17   **Q**    AND SO YOU CERTAINLY CAN'T DISAGREE -- OR YOU WOULD

18   NOT -- LET ME PUT IT TO YOU THIS WAY, YOU CANNOT SAY THAT WHEN

19   HE MET WITH THOSE PATIENTS, DR. LAMARTINERE WASN'T IN ALL

20   INSTANCES ATTEMPTING TO HELP THEM WITH THEIR PAIN?

21   **A**    SIR, AS WE'VE AGREED BEFORE, BECAUSE OF THE NATURE

22   OF THE DOCUMENTATION IN THIS CASE, IT IS IMPOSSIBLE FOR ME TO

23   SAY.

24   **Q**    YOU CAN'T SAY BECAUSE YOU DON'T -- WITH SPECIFICITY.

25   SO YOU CANNOT SAY THAT DR. LAMARTINERE WAS NOT -- WHENEVER HE

1 | WAS WRITING THESE PRESCRIPTIONS, YOU CAN'T TELL ME THAT HE WAS

2 | INTENDING TO GIVE THEM TO SOMEBODY FOR SOMETHING OTHER THAN

3 | PAIN, CAN YOU?

4 | **A**   CAN YOU ASK THAT AGAIN BECAUSE I'M AFRAID IT'S JUST

5 | BOUNCING OFF.

6 | **Q**   YES.  YOU CAN'T -- I UNDERSTAND THE PROBLEM WITH THE

7 | RECORDS AND THAT YOU DON'T KNOW EXACTLY WHAT HAPPENED AND THAT

8 | YOU NEED TO KNOW AND THAT'S NOT ACCEPTABLE.  I GET IT.  BUT

9 | WHAT YOU CAN AGREE WITH ME ON, I HOPE, IS THAT YOU CANNOT SAY

10 | THAT WHEN HE WAS WRITING THESE PRESCRIPTIONS TO THESE PATIENTS

11 | WHO DESCRIBED FOR US SIGNIFICANT PAIN PROBLEMS, YOU CANNOT SAY

12 | THAT DR. LAMARTINERE WAS NOT -- WAS INTENDING TO GIVE THEM

13 | THAT MEDICATION FOR SOMETHING OTHER THAN PAIN TREATMENT?

14 | **A**   ARE YOU TALKING ABOUT IN ALL INSTANCES?

15 | **Q**   WITH EACH OF THE NON-UNDERCOVER PATIENTS WHO

16 | TESTIFIED.

17 | **A**   I DON'T REMEMBER ANYTHING SPECIFIC WITH THE

18 | NON-UNDERCOVER ONES THAT WOULD MAKE ME DISAGREE WITH THAT.

19 | **Q**   FAIR ENOUGH.

20 | **MR. BRINDLEY:**  WITH THAT, YOUR HONOR, I HAVE NO

21 | FURTHER QUESTIONS FOR DR. KENNEDY.

22 | **THE COURT:**  ALL RIGHT.  REDIRECT.

23 | **MR. PUGLIESE:**  YES.  THANK YOU, YOUR HONOR.

24 | REDIRECT EXAMINATION

25 | BY MR. PUGLIESE:

1      **Q**    I'M GOING TO START WITH DEFENSE EXHIBIT 2 ABOUT

2   ZACHARY JACKSON THAT WAS SHOWN TO YOU.  IT'S BEEN ADMITTED

3   INTO EVIDENCE.  THIS IS -- DO YOU SEE THIS REFERRING TO

4   PATIENT ZACHARY JACKSON?

5      **A**    YES.

6      **Q**    THE DATE OF SERVICE WAS MARCH 2ND, 2015?

7      **A**    YES, SIR.

8      **Q**    AND THE DEFENDANT COUNSEL NOTED THE DISPOSITION, IT

9   WAS SIGNED ON MARCH 9TH.  "PATIENT COUNSELED THAT I WILL NOT

10   PROVIDE CHRONIC PAIN MEDICATIONS TO THE LEVEL SHE HAS BEEN

11   RECEIVING."

12      **A**    I DO.

13      **Q**    "I WILL PRESCRIBE ONE-MONTH SUPPLY FOR PATIENT WITH

14   ENCOURAGEMENT TO SEEK FURTHER PAIN MANAGEMENT ELSEWHERE."

15   CORRECT?

16      **A**    YES, SIR.

17      **Q**    NOW I AM GOING TO ASK YOU TO LOOK AT THE SCREEN.

18   THIS IS THE SUMMARY SPREADSHEET AND IT'S FILTERED BY THE LAST

19   NAME JACKSON.  SO WE KNOW FROM THAT DEFENSE EXHIBIT 2 IS A

20   MARCH 2ND VISIT AND WE SEE ON MARCH 2ND AN OXYCODONE

21   PRESCRIPTION TO ZACHARY JACKSON FOR 30-MILLIGRAMS, 270.

22      **A**    YES, SIR.

23      **Q**    WHAT KIND OF HIGHER-LEVEL PRESCRIPTION IN TERMS OF

24   270 WOULD -- TWO EVERY FOUR HOURS.  I THINK THAT COMES TO

25   12 -- 12 A DAY?  I MEAN, THAT'S A PRESCRIPTION THAT SHOULD

1  LAST A HECK OF A LONG TIME, CORRECT?

2  **A**   TIMES TWO, NINE PILLS PER DAY, 30-MILLIGRAM

3  OXYCODONE.

4  **THE COURT:**  YOU'RE SPEAKING VERY SOFTLY, DOCTOR.

5  **THE WITNESS:**  I'M SORRY, YOUR HONOR.  THAT COMES TO

6  NINE PILLS PER DAY OF 30-MILLIGRAM OXYCODONE.

7  **BY MR. PUGLIESE:**

8  **Q**   LET'S JUST GO DOWN AFTER THAT MARCH 2ND.  THERE'S A

9  PRESCRIPTION FOR OXYCODONE 30 MILLIGRAMS.  LET ME JUST SHOW

10  YOU -- I'M GOING TO USE A FILTER FOR STRENGTH.  WE HAVE 30 AND

11  16-MILLIGRAMS.  WE'LL SEE WHAT THE 16 MILLIGRAMS ARE IN A BIT.

12  BUT ON MARCH 30TH, IT'S EXHIBIT 37, OXYCODONE AGAIN

13  30-MILLIGRAMS, 270, CORRECT?

14  **A**   YES, SIR.

15  **Q**   AND THEN ANOTHER PRESCRIPTION, APRIL 6TH,

16  30-MILLIGRAM, OXYCODONE, 270, CORRECT?

17  **A**   YES, SIR.

18  **Q**   APRIL 27, 2015, OXYCODONE, SAME, 30-MILLIGRAM, 270?

19  **A**   YES, SIR.

20  **Q**   MAY 1ST, 2015, MAY 11TH -- MAY 1ST, 2015, I'M SORRY,

21  OXY, 30-MILLIGRAMS 270?

22  **A**   YES, SIR.

23  **Q**   MAY 11TH, OXY, 30-MILLIGRAMS, 90, CORRECT?

24  **A**   YES, SIR.

25  **Q**   MAY 29TH, OXY, 30-MILLIGRAMS, 270 --

1        A     YES.

2        Q     -- CORRECT?

3        A     YES.

4        Q     JUNE 1ST, OXY, 30-MILLIGRAMS, 140.  PLEASE STOP ME

5    IF YOU DON'T AGREE.  LET ME JUST GO THROUGH IT THAT WAY.

6    JUNE 3RD, MS CONTIN, 30-MILLIGRAMS, 90 DAYS.  WHAT IS MS

7    CONTIN?

8        A     THAT IS AN EXTENDED RELEASE OF MORPHINE PROGRESSION.

9        Q     THAT'S ON JUNE 3RD.  ON JUNE 12TH, WE HAVE

10   16-MILLIGRAMS OF MORPHINE, EXTENDED RELEASE, 30; DO YOU SEE

11   THAT?

12       A     I DO.

13       Q     JUNE 22ND, OXYCODONE, 30-MILLIGRAMS, 270?

14       A     YES, SIR.

15       Q     I'M SORRY.  I SAID I WAS GOING TO KEEP GOING.

16   JULY 14TH, MORPHINE XR, 60-MILLIGRAMS, 30; JULY 14TH,

17   OXYCODONE, 30-MILLIGRAMS, 240; AUGUST 6, OXYCODONE,

18   30-MILLIGRAMS, 240; AUGUST 21ST, OXYCODONE, 30-MILLIGRAMS,

19   270; AUGUST 21ST, OXYCODONE, 30-MILLIGRAMS, 270; NOVEMBER 9TH,

20   OXY, 30-MILLIGRAM, 270; SAME PRESCRIPTION GIVEN ON

21   NOVEMBER 30TH AND DECEMBER 28TH, 2015.

22       A     YES, SIR.

23       Q     IS THAT CONSISTENT WITH THE NOTE SIGNED BY

24   DR. LAMARTINERE ON MARCH 9TH FOR A MARCH 2ND VISIT, "I WILL

25   NOT PROVIDE CHRONIC PAIN MEDICATIONS AT THE LEVEL SHE'S BEEN

| | |
|---|---|
| 1 | RECEIVING.  I WILL PRESCRIBE A ONE-MONTH SUPPLY WITH |
| 2 | ENCOURAGEMENT TO SEEK FURTHER PAIN MANAGEMENT ELSEWHERE." |
| 3 |     **A**    I WOULD SAY IT'S ENTIRELY INCONSISTENT WITH THAT. |
| 4 |     **Q**    THAT SCHEDULE, THAT COURSE OF PRESCRIBING FOR |
| 5 | ZACHARY JACKSON -- |
| 6 |          **MR. PUGLIESE:**  IF I COULD HAVE ONE MOMENT, YOUR |
| 7 | HONOR? |
| 8 |          **THE COURT:**  YES. |
| 9 | **BY MR. PUGLIESE:** |
| 10 |     **Q**    IN YOUR REPORT PATIENT -- THE CHART REVIEW FOR |
| 11 | ZACHARY JACKSON INDICATING THAT THE COURSE OF PRESCRIPTIONS |
| 12 | WERE A SIGNIFICANT DANGER TO HER PATIENT SAFETY. |
| 13 |     **A**    YES, SIR. |
| 14 |     **Q**    LET ME GO TO DEFENSE EXHIBIT 1 NOW FOR CHARLES |
| 15 | HENSON -- NO, I'M SORRY.  IT'S DEFENSE EXHIBIT 1, I THINK WAS |
| 16 | FOR -- |
| 17 |          **MR. BRINDLEY:**  2 IS DOIRON. |
| 18 |          **MR. PUGLIESE:**  2.  THANK YOU.  JEREMY DOIRON. |
| 19 | **BY MR. PUGLIESE:** |
| 20 |     **Q**    CAN YOU SEE THAT NOTE ON THE SCREEN, SIR? |
| 21 |     **A**    I CAN. |
| 22 |     **Q**    AND THE DATE OF THAT IS AUGUST 17TH, 2015? |
| 23 |     **A**    YES, SIR. |
| 24 |     **Q**    AND THAT'S THE EXHIBIT YOU WENT OVER WITH -- IT |
| 25 | SEEMS IT COVERS TWO ACTUAL VISITS? |

1    **A**    YES, IT DOES.

2    **Q**    PAGE 1 IS AUGUST 17TH, PAGE 2 IS AUGUST 31ST,

3    CORRECT?

4    **A**    YES, SIR.

5    **Q**    YOU REFERENCED A NOTE IN JEREMY DOIRON'S CHART.

6    HE'S COVERED JUST BY COUNTS 28, 29 AND 30; AUGUST 17TH SCRIPT,

7    25TH SCRIPT AND AUGUST 31ST SCRIPT.  YOU MENTIONED AN

8    IBERVILLE EMERGENCY ROOM NOTE.  DO YOU RECALL DOCUMENTING THAT

9    IN YOUR WORKSHEET FOR JEREMY DOIRON?

10   **A**    VAGUELY, I DO RECALL DOCUMENTING IT, YES.

11   **Q**    DO YOU HAVE THE DOCUMENT THERE?

12   **A**    WHICH NUMBER WAS THAT, SIR?

13   **Q**    IT'S CASE NUMBER 4.

14   **A**    CASE NUMBER 4.  STAND BY.

15   **Q**    AND I'D ASK YOU TO JUST --

16   **A**    I HAVE IT.

17   **Q**    THE TOP OF PAGE -- LOOK AT PAGE 1, OF COURSE.

18   THAT'S JEREMY DOIRON?

19   **A**    YES, SIR.

20   **Q**    GO TO THE TOP OF PAGE 3 AND JUST READ THAT TO

21   YOURSELF AND LET ME KNOW IF THAT REFRESHES YOUR RECOLLECTION

22   ABOUT DATES OF NOTES.

23   **A**    YES, SIR.

24   **Q**    NOW, IN THE PATIENT SUMMARY, 100-Y, IT SAID,

25   "PATIENT SEEN IN ER AFTER MVA WITH DIAGNOSIS OF DRUG ABUSE AND

1  DISCHARGED IN POLICE CUSTODY."

2          AFTER REVIEWING YOUR NOTES, WAS THAT AN -- IBERVILLE

3  EMERGENCY DEPARTMENT NOTE FROM AUGUST 24TH, 2015 ABOUT A MOTOR

4  VEHICLE ACCIDENT WITH DRUG ABUSE PRIMARY IN THIS PATIENT'S

5  CHART REVIEW?

6      **A**    YOUR QUESTION, SIR?

7      **Q**    WAS THAT A NOTE FROM AUGUST 24TH, FROM IBERVILLE

8  EMERGENCY DEPARTMENT RELATING TO A MOTOR VEHICLE ACCIDENT; IS

9  THAT CORRECT?

10      **A**    YES, SIR.

11      **Q**    AND DID IT INDICATE A DIAGNOSIS OF DRUG ABUSE

12  PRIMARY?

13      **A**    THE NOTE -- THE EMERGENCY ROOM NOTE DID, YES, SIR.

14      **Q**    AND THAT'S IN THE PATIENT CHART --

15      **A**    IT IS IN THE CHART.

16      **Q**    AND IS IT SAFE TO SAY ON AUGUST 25TH, 2015, THE

17  DEFENDANT GAVE THIS DEFENDANT OXYCODONE AND METHADONE?

18      **A**    YES, SIR.

19      **Q**    AND ON AUGUST 31ST, MORE METHADONE?

20      **A**    YES, SIR.

21      **Q**    AND DO YOU RECALL THIS PATIENT INDICATING THAT THE

22  DRUGS HELPED HIM?

23      **A**    I DO.

24      **Q**    THAT WAS THIS MORNING; HE WAS THE PATIENT THAT CAME

25  HERE --

1    A    YEAH.

2    Q    AND HE ALSO INDICATED HE HAD ENOUGH MEDS THAT HE WAS

3  ABLE TO DISTRIBUTE THEM?

4    A    THAT I ALSO REMEMBER HEARING.

5    Q    THANK YOU.  AND FOR JEREMY DOIRON, DID YOUR SUMMARY

6  END WITH, "A FATAL OUTCOME WOULD NOT HAVE BEEN SURPRISING"?

7    A    "I WOULD ALSO ASSERT THAT A FATAL OUTCOME WOULD NOT

8  HAVE BEEN SURPRISING," YES, SIR.

9        **THE COURT:**  WHICH EXHIBIT IS THAT?

10 **BY MR. PUGLIESE:**

11   Q    IF YOU WOULD, SIR, THOSE HAVE NOT BEEN ADMITTED.

12   A    I'M SORRY.  I DID CONCLUDE THAT IN MY OPINION A

13 FATAL OUTCOME WOULD NOT HAVE BEEN SURPRISING IN THIS CASE.

14   Q    THANK YOU.  LET'S GO TO -- LET'S JUST HIT THIS

15 QUICKLY.  IT'S SAFE TO SAY THAT BASED ON THE EVIDENCE

16 PRESENTED, YOU KNOW THAT PATIENTS "M" AND "W," THAT'S MAT

17 DIXON AND CRAIG CRAWFORD, THE UNDERCOVERS, ON THE FIRST VISIT

18 ADMITTED THERE WAS DIVERSION; THEY WERE GETTING DRUGS,

19 SCHEDULE II OPIOIDS -- I'M SORRY.  ONE WAS A SCHEDULE II

20 OPIOID, I THINK ROXY'S, CRAWFORD, AND DIXON, PATIENT "M" SAID

21 HE WAS GETTING ADDIES FROM A FRIEND -- FROM FRIENDS?

22   A    I WOULD AGREE WITH THAT.

23   Q    AND DESPITE THAT, THEY STILL GOT A SERIES OF

24 MEDICATIONS --

25   A    THEY DID.

1       Q    -- CONTROLLED SUBSTANCES, SCHEDULE II'S FROM

2  DR. LAMARTINERE.

3       A    YES, SIR, THEY DID.

4       Q    LET'S GO TO CHARLES HENDRICKS, PATIENT "K."  SIR,

5  I'M GOING TO FILTER THIS SPREADSHEET NOW ON HENSON AND MAKE

6  SURE WE'RE JUST TALKING ABOUT CHARLES.  AND IN YOUR PATIENT

7  SUMMARY, YOU INDICATED THERE WAS TOXICOLOGY POSITIVE FOR

8  MORPHINE, HYDROMORPHONE, METHADONE AND THC AS BEING IGNORED.

9            WOULD YOU JUST LOOK IN YOUR CHART, CASE 10, AND JUST

10  FIRST, TOP OF PAGE 1, IS THAT CHARLES HENSON?

11      A    IT IS.

12      Q    AND ON PAGE 2 IN THE MIDDLE, JUST LOOK AT THE URINE

13  TOXICOLOGY SCREEN?

14      A    FROM 07/07 --

15      Q    DON'T READ FROM THAT.

16      A    I'M SORRY.  YES, SIR.

17      Q    JUST LOOK AT THAT AND LOOK AT THE CONTROLLED

18  SUBSTANCES.

19      A    IN THE DRUG SCREEN?

20      Q    IN THAT TOXICOLOGY SCREEN.

21      A    YES, SIR.

22      Q    YOU SEE THAT?

23      A    I DO.

24      Q    AND IN 100-K YOU DOCUMENTED IT SAYS, "TOXICOLOGY

25  POSITIVE FOR MORPHINE, HYDROMORPHONE."  IS THAT ALSO

1    OXYMORPHONE?

2        **A**    NO.  HYDROMORPHONE IS A METABOLITE OF MORPHINE.

3        **Q**    METHADONE?

4        **A**    YES, SIR.

5        **Q**    DO YOU RECALL THAT?

6        **A**    YES, SIR.

7        **Q**    THANK YOU.  LET'S JUST FOCUS ON THOSE, THE HYDRO --

8    I MEAN OXYMORPHONE, MORPHINE AND METHADONE.  JUST TO MAKE

9    SURE, WOULD YOU JUST LOOK AT PAGE 2 AGAIN TO MAKE SURE I'M

10   CORRECT ON THE NAMES OF THOSE DRUGS.  SO AFTER YOU REVIEW IT,

11   PLEASE LOOK UP AT ME SO I KNOW YOU'VE SEEN THE MEDICATIONS.

12   THANK YOU.

13           AND SO AFTER REVIEWING YOUR CHART RECORD, IS IT SAFE

14   TO SAY ON JULY 7TH, 2015 THERE WERE POSITIVE TEST RESULTS FOR

15   OXYMORPHONE, MORPHINE AND METHADONE; IS THAT CORRECT?

16       **A**    YES, SIR.

17       **Q**    WHAT I'D LIKE TO DO IS JUST LOOK AT THE

18   PRESCRIPTIONS WRITTEN BY DR. LAMARTINERE PRIOR TO AND

19   INCLUDING JULY 7TH.  I'LL JUST GO TO THE FILTER INSTEAD OF

20   SCROLLING DOWN.  TO GET A POSITIVE RESULT FOR OXYMORPHONE,

21   METHADONE OR MORPHINE, DO ANY OF THE DRUGS -- WOULD ADDERALL

22   CAUSE THAT; ANY OF THOSE POSITIVE SCREENS?

23       **A**    NO.  ADDERALL WOULD BE A POSITIVE AMPHETAMINE.

24       **Q**    OPANA, WHICH IS A TYPE OF --

25       **A**    -- OXYMORPHONE.

1      **Q**    WOULD THAT BE -- WOULD THAT CAUSE A POSITIVE SCREEN

2    FOR ANY OF THESE?

3      **A**    FOR OXYMORPHONE.

4      **Q**    IT WOULD, OKAY.  WOULD ANY OF THOSE, ADDERALL,

5    OPANA, OXYCODONE CAUSE A POSITIVE SCREEN FOR MORPHINE?

6      **A**    NO, SIR.

7      **Q**    LET'S JUST FILTER THAT A DIFFERENT WAY.  SO WE HAVE

8    SUBSEQUENT VISITS IF YOU LOOK AT THIS COLUMN RIGHT HERE,

9    COLUMN F FOR CHARLES HENSON; JULY 7TH, JULY 24TH, AUGUST 24TH

10   AND I BELIEVE IT'S NOVEMBER 16TH.  IS IT SAFE TO SAY THAT A

11   NUMBER OF PRESCRIPTIONS AFTER THAT WERE WRITTEN FOR ADDERALL,

12   OPANA, WHICH IS ALSO OXYMORPHONE, AND OXYCODONE?

13     **A**    YES, SIR.

14     **Q**    SO DESPITE WHAT -- LET ME ASK IT THIS WAY.  YOU

15   REVIEWED THE CHARTS AND YOU IDENTIFIED THERE WAS VERY POOR

16   RECORD-KEEPING, WOULD YOU AGREE WITH THAT?

17     **A**    VERY POOR RECORDS?

18     **Q**    YES.

19     **A**    YES, SIR.

20     **Q**    AND WE DON'T KNOW WHY THAT IS, WHETHER IT WAS A

21   FAILURE TO DOCUMENT WHAT WAS STATED OR THE FACT NOTHING

22   HAPPENED?

23     **A**    ALL I CAN COMMENT ON IS THE QUALITY OF THE RECORDS,

24   SIR.

25     **Q**    BUT IT'S SAFE TO SAY THERE WERE OTHER THINGS THAT GO

1    INTO YOUR DETERMINATION ABOUT USUAL COURSE OF PRACTICE?

2        **A**    YES, SIR.

3        **Q**    AND LEGITIMATE MEDICAL PURPOSE?

4        **A**    THE MEDICAL RECORDS -- THE MEDICAL RECORDS WHILE

5    THEY STAND ALONE IN MAKING A DETERMINATION ABOUT MEDICAL

6    LEGITIMACY AND WITHIN THE COURSE OF USUAL PRACTICE, THE

7    MEDICAL RECORDS THEMSELVES, THE DOCUMENTATION IS NOT THE ONLY

8    THING THAT WE LOOK AT -- THAT I LOOK AT, CERTAINLY.

9        **Q**    SO FOR PATIENT "K" --

10       **MR. PUGLIESE:**  ARE YOU ABLE TO PULL UP 100-K FOR ME,

11   MS. BATEMAN?

12   **BY MR. PUGLIESE:**

13       **Q**    FOR PATIENT "K," YOU ACTUALLY RECOGNIZE IN

14   EXHIBIT 100-K, PATIENT "K" CHARLES HENSON TOXICOLOGY REPORT

15   BEING POSITIVE.  NOW YOU KNOW THAT'S ON JULY 7TH --

16       **A**    YES, SIR.

17       **Q**    -- BASED UPON YOUR REVIEW OF THE REPORTS, WHAT THE

18   PATIENT WAS ULTIMATELY PRESCRIBED.  SO IS THERE ANYTHING NOW

19   AFTER THE EXAMINATION BY MR. BRINDLEY, EVERYTHING YOU'VE SEEN,

20   EVERYTHING YOU'VE HEARD, MR. HENSON'S TESTIMONY, THAT WOULD

21   SAY THE PRESCRIPTIONS THAT WERE PRESCRIBED ON MARCH 31ST FOR

22   ADDERALL AND OXYCODONE OR ON NOVEMBER 16TH, BOTH IN 2015, FOR

23   ADDERALL, OXYCODONE AND OXYMORPHONE, WERE IN THE USUAL COURSE

24   OF PRACTICE AND FOR A LEGITIMATE MEDICAL PURPOSE?

25       **A**    NO, SIR.

1    Q    WERE THEY OUTSIDE THE USUAL COURSE OF PRACTICE?

2    A    YES, SIR.

3    Q    THAT'S ALL WE NEED TO HEAR FOR NOW.  THANK YOU.

4         AND LAST, BRIAN BOUDREAUX.  SO IS IT SAFE TO SAY THE

5    PATIENT SUMMARY SPREADSHEET THAT'S ON THE SCREEN IN FRONT OF

6    YOU IS FILTERED TO SHOW IN COLUMN D JUST BRIAN BOUDREAUX?

7    A    COLUMN D IS BRIAN BOUDREAUX.

8    Q    AND IS IT SAFE TO SAY THAT ALSO THE FIRST NAME IS

9    BRIAN; IS THAT CORRECT?

10   A    YES, SIR.

11   Q    NOW, ON -- IF YOU WOULD JUST TO REFRESH YOUR

12   RECOLLECTION, LOOK AT YOUR WORKSHEET CASE NUMBER 9.

13   A    YES, SIR.

14   Q    LOOK AT PAGE 2 CLOSE TO THE BOTTOM WHERE IT TALKS

15   JUST ABOVE COMPUTER-GENERATED ENCOUNTER.

16   A    YES, SIR.

17   Q    HANDWRITTEN IN COMPUTER-GENERATED ENCOUNTER, DO YOU

18   SEE THE BULLET ABOUT "LABORATORY REPORT FOR UDS"?

19   A    I DO.

20   Q    WHAT ARE UDS?

21   A    URINE DRUG SCREEN.

22   Q    THOSE WERE POSITIVE FOR AMPHETAMINE?

23   A    YES.

24   Q    HEROIN, MARIJUANA AND FENTANYL?

25   A    YES.  AND BU --

1    Q    I'M SORRY.  LET'S JUST FOCUS ON THE HEROIN,

2   MARIJUANA AND FENTANYL.  AFTER REVIEWING THAT, YOU WOULD SAY

3   THAT THAT WAS IN THE CHART FOR THE DATE OF JULY 31ST, 2015; IS

4   THAT CORRECT?

5    A    YES.

6    Q    I'M JUST FILTERING OUT ANYTHING AFTER -- ON OR AFTER

7   JULY 31ST IN TERMS OF PRESCRIPTIONS AND WE HAVE 13 RESULTS.

8   SO LET ME ASK YOU -- WE'LL JUST START WITH HEROIN.  IF I

9   FILTER ON THE PRESCRIPTIONS IT'LL SHOW ALL OF THE

10  PRESCRIPTIONS; ADDERALL, OXYCODONE, OXYMORPHONE.  WOULD ANY OF

11  THOSE RESULT IN A POSITIVE DRUG SCREEN FOR HEROIN?

12   A    NO.

13   Q    MARIJUANA?

14   A    NO.

15   Q    FENTANYL?

16   A    NO.

17   Q    SO ON JULY 31ST, 2015 WITH BRIAN BOUDREAUX, IS IT

18  SAFE TO SAY DR. LAMARTINERE KNOWS, BASED ON A URINE DRUG

19  SCREEN, THAT HE'S ABUSING A SCHEDULE I, HEROIN, MARIJUANA,

20  WHICH I BELIEVE IS A SCHEDULE I AND FENTANYL, WHICH I BELIEVE

21  IS A SCHEDULE II; IS THAT CORRECT?

22   A    AS WELL AS BUPRENORPHINE, WHICH IS A SCHEDULE III

23  FOR TREATING HEROIN ADDICTION.

24   Q    AND DESPITE THAT -- JUST TO GO TO WHERE I'M KIND OF

25  POINTING TO AT THE BOTTOM, 18 OF 123 PRESCRIPTIONS WERE

1    WRITTEN AFTER THAT?

2        **A**    I SEE.

3        **Q**    YOU SEE WHERE MY CURSER IS?

4        **A**    I SEE THE CURSER, YES.

5        **Q**    THOSE SCRIPTS INCLUDED SCRIPTS FOR ADDERALL,

6    OXYCODONE AND OXYMORPHONE; IS THAT CORRECT?

7        **A**    YES, SIR, IT IS.

8        **Q**    LET'S GO BACK TO THE TOP.  THESE ARE IN

9    CHRONOLOGICAL ORDER.  SO YOU SEE JULY 31ST, AND BASED ON THE

10   NOTE, THAT WAS THE DATE OF THE POSITIVE DRUG SCREEN, CORRECT?

11       **A**    THAT'S CORRECT.

12       **Q**    AND THEN ON AUGUST 21ST WE HAVE A PRESCRIPTION FOR

13   ADDERALL THAT DOESN'T LOOK TO HAVE BEEN EFFECTIVE BASED ON THE

14   PRIOR PRESCRIPTION.  SO IF YOU LOOK AT 58-A AT THE TOP OF THE

15   SCREEN, ADDERALL, 30-MILLIGRAMS, 60.  AND THEN ON AUGUST 21ST,

16   ADDERALL REMAINS THE SAME.  BUT IT DOES GO DOWN FOR OXYCODONE,

17   EXHIBIT 59-B, FOR SEVEN DAYS, CORRECT, WHEN YOU LOOK AT THE

18   DIRECTIONS?  NUMBER 40 FOR SEVEN DAYS IN THE NOTES?

19       **A**    YES.

20       **Q**    AND FOR 59-C, NUMBER 14 FOR OXYMORPHONE FOR SEVEN

21   DAYS, CORRECT?

22       **A**    YES.

23       **Q**    AND THEN THIS PERIOD OF OBSERVATION TO MAKE SURE THE

24   DEFENDANT WAS COMPLYING WITH THE DOCTOR'S DIRECTIONS AND

25   TAKING HIS SCHEDULE II OPIOIDS CORRECTLY, WE LOOK SEVEN DAYS

1  LATER AT PRESCRIPTIONS WRITTEN ON AUGUST 28TH.  LOOK AT 60-A.

2  DOES THE OXYCODONE PRESCRIPTION GO BACK UP TO 30-MILLIGRAMS OF

3  120?

4       **A**    IT DOES.

5       **Q**    AND THAT'S FOR 30 DAYS --

6       **A**    CORRECT.

7       **Q**    -- NOTES.

8       **A**    YES, SIR.

9       **Q**    60-B, OXYMORPHONE GOES 30-MILLIGRAMS, 60, FOR 30

10  DAYS.  SO IS IT SAFE TO SAY -- IS THERE ANYTHING AFTER THAT

11  THAT YOU CAN SEE THAT THAT WOULD TELL YOU THAT THE DEFENDANT

12  WAS GIVEN SMALLER DOSES OVER AN EXTENDED PERIOD OF TIME?

13       **A**    I WOULD SAY, NO.

14       **Q**    AND IF YOU NEED TO REFRESH YOUR RECOLLECTION, PLEASE

15  JUST SAY SO AND I'LL GIVE YOU THE NUMBERS.  I THINK I HAVE

16  THEM.  SO FOR PATIENT "K," HENSON, PATIENT "W," BOUDREAUX,

17  PATIENT "V," AUGHEY AND PATIENT -- PATIENT "N," BOUDREAUX,

18  PATIENT "V," AUGHEY AND PATIENT "Y," DOIRON, DOES YOUR CHART

19  REVIEW FINISH WITH, "A FATAL OUTCOME WOULD NOT HAVE BEEN

20  SURPRISING"?

21       **A**    YES, SIR.

22       **Q**    AND FOR PATIENT "L," JACKSON, PATIENT "M," HENDRICKS

23  AND PATIENT "N," NEILSON, "SIGNIFICANT DANGER TO PATIENT'S

24  SAFETY;" IS THAT CORRECT?

25       **A**    YES, SIR.

1    **MR. PUGLIESE:** NO FURTHER QUESTIONS. THANK YOU,
2    YOUR HONOR.
3    **THE COURT:** ALL RIGHT. THANK YOU, SIR. YOU MAY
4    STAND DOWN.
5    ALL RIGHT. WHO'S YOUR NEXT WITNESS?
6    **MR. PUGLIESE:** MAY I HAVE ONE MOMENT, YOUR HONOR?
7    **THE COURT:** YES, YOU MAY.
8    **MR. PUGLIESE:** THANK YOU. YOUR HONOR, THE UNITED
9    STATES RESTS. THANK YOU, SIR.
10   **THE COURT:** ALL RIGHT. MR. BRINDLEY?
11   **MR. BRINDLEY:** YOUR HONOR, BASED ON -- BASED ON THE
12   PRIOR PRETRIAL FILING REGARDING THE TESTIMONY OF THE
13   DEFENDANT, IT IS OUR POSITION AT THIS TIME THAT WE WILL NOT
14   PRESENT A DEFENSE CASE.
15   **THE COURT:** OKAY. SO THE DEFENSE RESTS?
16   **MR. BRINDLEY:** YES, YOUR HONOR.
17   **THE COURT:** OKAY. SO LET'S THEN TALK ABOUT
18   BRIEFING. I WANT TO -- FIRST OF ALL, I DIDN'T GIVE YOU A
19   CHANCE, MR. BRINDLEY, TO WEIGH IN. WHAT WOULD BE YOUR
20   PREFERENCE? HOW WOULD YOU LIKE TO HANDLE IT? THE COURT'S
21   GOING TO DO WHAT THE COURT'S GOING TO DO, BUT I DO WANT INPUT,
22   OKAY. SO WHAT IS IT THAT YOU WOULD PREFER?
23   **MR. BRINDLEY:** JUDGE, WHAT MAKES SENSE TO ME IS
24   BASICALLY A WRITTEN BRIEFING IN THE FORM OF WRITTEN ARGUMENT,
25   ONE BRIEF -- WE COULD DO SIMULTANEOUS BRIEFS AT THE SAME TIME

1  FROM EACH SIDE OR WE CAN DO THE GOVERNMENT'S BRIEF, THE

2  DEFENDANT'S BRIEF AND THEN THE GOVERNMENT'S REBUTTAL BRIEF,

3  EITHER WAY.

4         **THE COURT:**  ALL RIGHT.  AND WOULD YOU -- DO YOU HAVE

5  ANY PREFERENCE WITH RESPECT TO TIME TO SUBMIT BRIEFING?

6         **MR. BRINDLEY:**  JUDGE, IF WE COULD GET TO THE END OF

7  NEXT WEEK, JUDGE, THAT WOULD BE BETTER.

8         **THE COURT:**  MR. STEVENS, WHAT'S YOUR PREFERENCE?

9         **MR. STEVENS:**  I HESITATE TO SAY THIS, JUDGE, BECAUSE

10  I'M THE ONE THAT WOULD BE DOING THE TALKING --

11         **THE COURT:**  AND THE WRITING.

12         **MR. STEVENS:**  WELL, NO.  YOU'D BE STUCK LISTENING TO

13  ME, BUT OUR PREFERENCE WOULD BE FOR A SHORT CLOSING ARGUMENT

14  TONIGHT.

15         **THE COURT:**  OH, I DON'T HAVE A PROBLEM WITH THAT.  I

16  WOULD WELCOME CLOSING ARGUMENTS AS LONG AS IT'S SHORT.  BUT IN

17  TERMS OF BRIEFING.

18         **MR. STEVENS:**  OH, BRIEFING.  I THINK IT'S A GREAT

19  IDEA AND WE CAN HAVE OURS READY AS SOON AS THE COURT DESIRES.

20  DOES THAT ANSWER YOUR QUESTION?

21         **THE COURT:**  YES.

22         **MR. PUGLIESE:**  YOUR HONOR, WE WOULD JUST REQUEST A

23  SIMULTANEOUS BRIEFING.

24         **THE COURT:**  YES.  WHAT THE COURT IS GOING TO DO IS

25  WITHIN, LET'S SAY, TWO WEEKS OF TODAY WE WOULD LIKE

1  SIMULTANEOUS BRIEFS.  YOU WILL THEN BE GIVEN SEVEN DAYS

2  THEREAFTER TO FILE A REPLY TO YOUR OPPONENT'S BRIEF, AND LET'S

3  KEEP IT WITHIN THE STANDARD LIMITS THAT THE COURT RULES

4  IMPOSE.  I KNOW THERE'S A LOT OF INFORMATION AND YOU WOULD BE

5  TEMPTED AND THE COURT WOULD BE TEMPTED TO GRANT IT.  BUT ON

6  THE OTHER HAND, I THINK WE'VE TAKEN GOOD NOTES.  I'VE TRIED TO

7  LISTEN VERY CAREFULLY.  I KNOW DAVID HAS AS WELL.  SO I THINK

8  IF WE JUST KEEP IT WITHIN THE LIMITS IMPOSED BY THE COURT

9  RULES, WE'LL BE FINE.

10          **MR. PUGLIESE:**  IF I MAY, YOUR HONOR, AND THE UNITED

11  STATES WOULD REQUEST, JUST AS IF CLOSINGS WERE TO BE GIVEN

12  NOW, THERE'S NO TRANSCRIPT REQUEST ALLOWED.

13          **THE COURT:**  YOU'RE NOT ASKING FOR A TRANSCRIPT IS

14  WHAT YOU'RE SAYING?

15          **MR. PUGLIESE:**  I'D ASK THAT NO TRANSCRIPT REQUEST BE

16  PERMITTED.

17          **THE COURT:**  OH, OKAY.  THE COURT IS NOT GOING TO

18  GRANT IT WHETHER YOU ASK THAT IT NOT BE PERMITTED OR WHETHER

19  YOU ASK THAT IT BE PERMITTED, SO THAT PROBABLY SATISFIES YOU.

20          **MR. PUGLIESE:**  WHAT WOULD THE PAGE LIMIT BE FOR THE

21  BRIEF ALLOWANCE?

22          **MR. BORGHART:**  25 AND 10.

23          **THE COURT:**  25 AND 10.  25 WOULD BE FOR THE ORIGINAL

24  BRIEF AND THEN 10 FOR THE REPLY.

25          **MR. PUGLIESE:**  THANK YOU, YOUR HONOR.

| | |
|---|---|
| 1 | **THE COURT:**  OKAY.  SO LET'S DO BRIEF CLOSING |
| 2 | ARGUMENTS. |
| 3 | **MR. STEVENS:**  CAN I HAVE JUST FIVE MINUTES TO GO GET |
| 4 | MY LAPTOP AND GET THE POWERPOINT -- |
| 5 | **THE COURT:**  OH, SURE.  LET'S GO AHEAD AND TAKE TEN |
| 6 | MINUTES AND THEN WE'LL COME BACK AND DO CLOSING ARGUMENTS.  I |
| 7 | KNOW MR.  BRINDLEY'S DEFENSE VERY WELL.  HE'S EXPLORED IT. |
| 8 | HE'S POUNDED IT, EVERY WITNESS, AS HE POUNDED IT IN HIS |
| 9 | PRETRIAL BRIEFS, HE'LL POUND IT IN HIS POST-TRIAL BRIEF.  SO I |
| 10 | WANT THE GOVERNMENT TO ADDRESS HIS ARGUMENTS ABOUT THE |
| 11 | INTENTIONS, EITHER UNDER THE FIFTH CIRCUIT RULE OR UNDER THE |
| 12 | NON-FIFTH CIRCUIT RULES, ADDRESS THE POINT THAT HE'S TRYING TO |
| 13 | MAKE THAT HE'S NOT GUILTY OF A CRIME BECAUSE BASICALLY HE |
| 14 | INTENDED TO DO THE RIGHT THING BY THESE PATIENTS.  HE WAS |
| 15 | TRYING TO CONTROL THEIR PAIN AND SO ON.  SO I WANT Y'ALL TO |
| 16 | FOCUS ON -- I DON'T WANT IT EXCLUSIVELY TO BE THAT, BUT PLEASE |
| 17 | TOUCH ON THAT. |
| 18 | **MR. STEVENS:**  YES, JUDGE. |
| 19 | **THE COURT:**  ALL RIGHT.  TEN MINUTES. |
| 20 | **(RECESS)** |
| 21 | **THE COURT:**  YOU MAY BE SEATED. |
| 22 | **MR. STEVENS:**  MAY IT PLEASE THE COURT.  JUDGE, LET |
| 23 | ME TELL YOU AT THE BEGINNING I'VE NEVER DONE A CLOSING |
| 24 | ARGUMENT IN A BENCH TRIAL AND I'VE CUT THIS WAY BACK, BUT I |
| 25 | WILL NOT BE OFFENDED IF YOU TELL ME TO MOVE ALONG AND SKIP |

1  OVER SOME OF THIS.

2        **THE COURT:**  DON'T WORRY ABOUT THAT.  I WILL SAY --

3  IF I'VE HAD ENOUGH I WILL SAY NO MÁS.

4        **MR. STEVENS:**  IT WON'T OFFEND ME.

5  **UNITED STATES' CLOSING ARGUMENT**

6        **MR. STEVENS:**  JUDGE, 2015/2016, WE KNOW THE

7  DEFENDANT PRESCRIBED HIGHLY ADDICTIVE OPIOID PILLS.  HE WAS

8  GIVING THESE PILLS TO PEOPLE WHO WERE CLEARLY SUFFERING FROM

9  ADDICTION.  HE WAS GIVING THE PILLS TO FOLKS WHO WERE ABUSING

10  DRUGS AND WHO WEREN'T EVEN TAKING THE DRUGS.  SOME OF THEM

11  WERE SUFFERING FROM REAL PAIN, WE KNOW THAT.  WHAT THE

12  DEFENDANT SHOULD HAVE DONE WAS HE SHOULD HAVE FOLLOWED THE

13  RULES.  HE SHOULD HAVE TREATED THEM.  HE SHOULD HAVE WORKED

14  WITH THEM TO COME UP WITH TREATMENT PLANS THAT WOULD HELP AND

15  HE SHOULD HAVE TRIED TO GET THEM OFF OF THESE DANGEROUS PILLS.

16        WHAT WE THINK THE EVIDENCE HAS SHOWN THROUGH THE

17  WITNESSES AND ALSO THROUGH DR. KENNEDY IS THAT HE REALLY

18  DIDN'T DO ANY OF THOSE THINGS, NOT VERY OFTEN.

19        **THE COURT:**  HE SEEMS TO HAVE THOUGHT ABOUT IT.  HE

20  SEEMS TO HAVE TALKED ABOUT IT.  BUT WHEN YOU GET DOWN TO THE

21  BOTTOM LINE AT THE END OF THE DAY AFTER HAVING SAID, WELL, YOU

22  KNOW, YOU OUGHT TO TRY THAT TRAMADOL, YOU KNOW, AND YOU OUGHT

23  TO TRY THIS, AND YOU OUGHT TO TRY THAT, HE GIVES THEM THE

24  OPIOIDS.

25        **MR. STEVENS:**  AND I'M ALSO WONDERING IF YOU'RE

1    TELLING ME I SHOULD SKIP AHEAD ABOUT SIX OR SEVEN SLIDES

2    BECAUSE I THINK THAT'S EXACTLY RIGHT, JUDGE.  THERE'S A LOT OF

3    TALK AND THERE'S EVEN SOME PAPERWORK BUT IN SOME CASES, THE

4    PAPERWORK IS SHAM.  IT'S KIND OF A CYA-TYPE SITUATION.  AND,

5    YOU KNOW, LEAVING UP TO THE PATIENTS WHAT SUBSTANCES THEY

6    SHOULD LEAVE HIS OFFICE WITH PRESCRIPTIONS FOR IS NOT IN THE

7    BALLPARK OF ACCEPTABLE MEDICAL PRACTICE IN THIS COUNTRY.  AND

8    THAT'S THE PATIENTS WHO HAD REAL PAIN; WHO HAD REAL INJURIES.

9         THE COURT HAS ALSO SEEN SOME OF THESE PEOPLE DIDN'T

10   HAVE ANY PAIN AT ALL.  THEY WERE MAKING IT UP ENTIRELY.  AND

11   THE DEFENDANT WOULD GIVE THEM PILLS TOO AS LONG AS THEY WERE

12   GOING TO PAY CASH FOR THEM AND HE WASN'T DOING ANY OF THE

13   THINGS THAT DOCTORS SHOULD DO TO FERRET OUT WHETHER THESE

14   FOLKS WERE LYING TO HIM AND USING HIM TO GET PILLS THAT THEY

15   COULD SELL OR ABUSE OR DO OTHER ILLEGAL THINGS WITH.

16        JUDGE, THERE'S A LOT OF FACTS NOT IN DISPUTE.  I CAN

17   SKIP A FEW SLIDES.

18        **THE COURT:**  LET ME ASK YOU THIS, WOULD IT BE A CRIME

19   IF YOU HAVE A REAL PAIN PATIENT WHO COMES IN WITH A REAL ISSUE

20   AND ALL THE DOCUMENTATION IS IN THE CHART, BUT HE GIVES THE

21   MEDICINE TO SOMEBODY WHO IT'S NOT PROPER AND APPROPRIATE FOR,

22   WOULD THAT BE A CRIME?

23        **MR. STEVENS:**  I BELIEVE SO, JUDGE.  I'M SURE I'M --

24   AND MAYBE WE'RE BOTH OVER-GENERALIZING, WITH ALL DUE RESPECT,

25   BUT I THINK IN GENERAL, YES, THAT WOULD BE A CRIME.

1    **THE COURT:**  OKAY.

2    **MR. STEVENS:**  HAVING THE PAPERWORK IN ORDER OR

3    HAVING MORE PAPERWORK ISN'T THE ANSWER.  THAT'S PART OF THE

4    EQUATION BUT NOT THE FULL EQUATION.

5    SO I'M GOING TO CUT TO THE ELEMENT THAT REALLY IS

6    THE BIG ONE HERE AND THAT'S WHAT HE WAS DOING, OTHER THAN FOR

7    A LEGITIMATE MEDICAL PURPOSE WAS WHAT HE WAS DOING OUTSIDE THE

8    COURSE OF PROFESSIONAL PRACTICE.  I WOULD SUGGEST THAT

9    DR. KENNEDY WALKED US THROUGH THAT IN DETAIL AND HE EXPLAINED

10   THAT ALL OF THESE PRESCRIPTIONS IN THE SUPERSEDING INDICTMENT

11   MEET THAT STANDARD BUT, YOU KNOW, MORE GENERALLY, JUDGE, WHAT

12   YOU'VE SEEN, WARNING AFTER WARNING, RED FLAG AFTER RED FLAG,

13   AFTER BEING FIRED BY OCHSNER AS THE STATE MEDICAL BOARD IS

14   INVESTIGATING HIM, HE KEEPS TRADING THESE PRESCRIPTIONS FOR

15   CASH.

16   THE FIRST SEVEN COUNTS, JUDGE -- AND I PROMISE I'M

17   GOING TO TAKE A LOT LESS TIME THAN I WOULD IF I WAS DOING THIS

18   IN FRONT OF A JURY.  I'M GOING TO START WITH THE FIRST SEVEN,

19   BECAUSE ALTHOUGH WE BELIEVE THAT WE'VE MET OUR BURDEN OF PROOF

20   FOR ALL 30, I THINK THAT THE EVIDENCE ON THESE FIRST SEVEN IS

21   THE CLEAREST AND THE MOST STRAIGHTFORWARD.

22   THE CHRONOLOGY, JUDGE, YOU KNOW THIS SO WE CAN GO

23   OVER IT PRETTY QUICKLY.  SEPTEMBER, HE'S FIRED BY OCHSNER.

24   THE STATE BOARD BEGINS INVESTIGATING.  NOVEMBER, THEY ISSUE

25   THEIR FIRST EMERGENCY ORDER; DECEMBER, THEY ISSUE A SECOND

1    EMERGENCY ORDER WHICH CUTS HIM OFF ON DECEMBER 3OTH, AND HE

2    GETS THE ORDER ON JANUARY 4TH.

3         NOW, REMEMBER WHAT DR. MOUTON SAID, THAT THE BOARD

4    HAD TO TAKE EMERGENCY ACTION, NOT BECAUSE HIS PAPERWORK WASN'T

5    IN ORDER, BECAUSE THE BOARD WAS CONCERNED ABOUT PATIENT SAFETY

6    AND THE BOARD CONCLUDED THAT HIS PRESCRIBING PRACTICES WERE SO

7    FAR OUTSIDE THE ACCEPTABLE STANDARDS THAT --

8         **THE COURT:**  TWO TO THREE TIMES IN 20 YEARS.

9         **MR. STEVENS:**  EXACTLY.  THAT'S NOT EVEN IN THE NOTES

10   HERE, BUT IT PROBABLY SHOULD BE, JUDGE.  AND THAT'S NOT THE

11   DEA AND THAT'S NOT THE DOJ.  THAT'S THE STATE BOARD THAT'S

12   RESPONSIBLE FOR ENFORCING THE MEDICAL STANDARDS IN OUR STATE

13   SAYING:  THIS IS A DANGER AND HE CANNOT BE PERMITTED TO WRITE

14   ANY MORE OF THESE PRESCRIPTIONS.

15        THE EFFECTIVE DATE AFTER A GRACE PERIOD,

16   DECEMBER 3OTH, THE FED-EX RECORDS CONFIRMED THAT HE RECEIVED

17   IT AND SIGNED FOR IT ON JANUARY 4TH.  SO WE KNOW THAT HE KNEW

18   THAT HE COULD NOT CONTINUE WORKING WRITING PRESCRIPTIONS FOR

19   SCHEDULE II'S, REALLY, AFTER DECEMBER 3OTH, BUT GIVING HIM THE

20   BENEFIT OF THE DOUBT AND SAY AFTER JANUARY 4TH.

21        I'M NOT GOING TO READ THIS TO YOU.  IT'S PART OF THE

22   LAW THAT I KNOW YOU'RE GOING TO APPLY, BUT IT'S INCREDIBLY

23   IMPORTANT BECAUSE OF WHAT HAPPENED NEXT.  THERE'S NO QUESTION,

24   JUDGE, COUNT 1 IN OUR VIEW, THERE'S NO QUESTION THAT THIS

25   PRESCRIPTION WAS UNLAWFUL.  AT THE TIME HE ISSUED IT, HE WAS

1   PROHIBITED FROM WRITING PRESCRIPTIONS FOR CONTROLLED

2   SUBSTANCES BY THE LOUISIANA STATE BOARD.  HE HAD NO AUTHORITY

3   TO ISSUE THIS PRESCRIPTION.  THERE'S NO WAY HE COULD HAVE

4   THOUGHT THAT HE DID AND WE ASK YOU TO FIND HIM GUILTY ON

5   COUNT 1.

6         I'M NOT GOING TO TAKE UP THE COURT'S TIME GOING

7   THROUGH COUNTS 2 THROUGH 7 ONE AT A TIME, BUT I'LL JUST REMIND

8   THE COURT HE HAD NO LEGAL AUTHORITY TO ISSUE THESE

9   PRESCRIPTIONS.  IT WAS ILLEGAL FOR HIM TO DO SO.  HE DID IT

10  ANYWAY.  AND DR. KENNEDY CONFIRMED, WHAT I THINK WAS PROBABLY

11  ALREADY CLEAR, WHAT I HOPE WAS ALREADY CLEAR, HE WAS KNOWINGLY

12  DISTRIBUTING CONTROLLED SUBSTANCES OUTSIDE THE USUAL COURSE OF

13  A PROFESSIONAL PRACTICE.  THAT'S, I THINK, OVER 1200 OR 1200

14  OPIOID PILLS THAT HIT THE STREETS IN JANUARY AFTER THE BOARD

15  HAD TOLD HIM FOR THE SECOND TIME TO STOP, DON'T DO THIS AND HE

16  JUST KEPT DOING IT.

17        NOW, YOU KNOW, I DON'T -- I DON'T KNOW EXACTLY

18  HOW TO -- THERE'S NO EVIDENCE REALLY OF THE DEFENDANT'S

19  EXPLANATION FOR THESE POST-SUSPENSION PRESCRIPTIONS OTHER THAN

20  SOME QUESTIONING, PARTICULARLY WHEN MR.  BRINDLEY WAS

21  CROSS-EXAMINING DR. MOUTON, BUT TO THE EXTENT THAT THE

22  EXPLANATION IS OR THE SUGGESTION WAS THAT THERE WAS A

23  MISCOMMUNICATION, I WOULD ARGUE THAT THAT'S JUST NOT CREDIBLE.

24        THE BOARD'S EMERGENCY ORDERS, THEY'RE CRYSTAL CLEAR.

25  THEY'RE NOT SUBJECT TO ANY CONFUSION, ESPECIALLY NOT BY AN

1   EDUCATED PHYSICIAN.  THE EFFECTIVE DATE OF THAT SECOND ORDER

2   IS TYPED VERY CLEARLY AT THE BOTTOM.  DR. MOUTON TESTIFIED

3   THAT SHE WAS VERY CLEAR WITH THE DEFENDANT.  AND I THINK SOME

4   OF WHAT THE DEFENSE TRIED TO DO WITH HER, WHICH HAPPENS IN A

5   LOT OF CASES, IS JUST KIND OF GET HER CONFUSED ON THE TIMING,

6   ABOUT THE GRACE PERIOD, AND MAYBE THE GRACE PERIOD EXTENDED

7   INTO JANUARY.  THAT'S NOT WHAT THE RECORDS SAY, THAT'S NOT

8   WHAT DR. MOUTON SAID, AND I WOULD RESPECTFULLY SUGGEST THAT

9   THAT WAS REALLY JUST AN ATTEMPT TO CREATE SOME CONFUSION WHERE

10  NONE EXISTED.

11          WE THINK THE EVIDENCE SHOWS THAT HE JUST DIDN'T WANT

12  TO COMPLY WITH THE BOARD'S ORDER OR THE LAW AND HE WAS GOING

13  TO DO WHAT HE WAS GOING TO DO, REGARDLESS.

14          SO THAT COVERS COUNTS 1 THROUGH 7.  SO I WANT TO

15  SHIFT BACK TO THE REMAINING COUNTS AND I WANT TO JUST VERY

16  QUICKLY HIGHLIGHT SOME OF THE EVIDENCE.  YOU'LL PROBABLY SEE

17  ME HIGHLIGHT IT AGAIN IN OUR BRIEFS, BUT I WON'T TAKE LONG,

18  JUDGE, AND I'M PROBABLY ALREADY TALKING TOO FAST FOR YOUR

19  COURT REPORTER.

20          LET ME SAY THIS, WE HEARD A LOT OF EXPERT TESTIMONY

21  FROM DR. KENNEDY AND THAT WAS CERTAINLY IMPORTANT, BUT I THINK

22  WE CAN TAKE A STEP BACK FROM IT.  BECAUSE IN A TYPICAL CASE

23  THERE'S THAT JURY INSTRUCTION THAT TELLS THE JURORS THAT

24  THEY'RE SUPPOSED TO DRAW ON THEIR OWN LIFE EXPERIENCES AND USE

25  THEIR OWN COMMON SENSE.  AND WITH YOUR HONOR IN THAT ROLE IN

1  THIS CASE, I BELIEVE YOU CAN DO THE SAME.  SO THE QUESTION IS,

2  WHEN A PATIENT COMES IN AND ASKS FOR SOMETHING AS DANGEROUS AS

3  OPIOID PILLS, WHAT'S THE DOCTOR SUPPOSED TO DO?

4         SO WHAT IS APPROPRIATE TREATMENT?  DR. MOUTON WALKED

5  US THROUGH SOME OF THE KEY PAIN RULES THAT PROVIDE THE

6  STANDARD OF CARE.  DIVISION INVESTIGATOR MOSER TALKED ABOUT

7  SOME OF THE RED FLAGS IN THESE CASES AND DR. KENNEDY TALKED

8  ABOUT WHAT DOCTORS CAN DO TO ENSURE THAT THEY'RE ONLY ISSUING

9  OPIOID PRESCRIPTIONS FOR LEGITIMATE MEDICAL PURPOSES AND

10  DR. KENNEDY EXPLAINED WHAT THE USUAL COURSE OF A PROFESSIONAL

11  PRACTICE LOOKS LIKE.  BUT A LOT OF THIS IS COMMONSENSE STUFF.

12  YOU DON'T GIVE A SCHEDULE II PRESCRIPTION TO SOMEONE

13  ESSENTIALLY JUST BECAUSE HE ASKS FOR IT.  YOU EVALUATE THE

14  PATIENT, YOU DO A MEDICAL DIAGNOSIS, YOU COME UP WITH A

15  TREATMENT PLAN, AND YOU HAVE TO WATCH OUT FOR SIGNS OF ABUSE

16  AND MISUSE AND DIVERSION.

17         SO WHEN WE COMPARE WHAT APPROPRIATE TREATMENT IS

18  VERSUS THE DEFENDANT'S TREATMENT, AND I'M GOING TO GO THROUGH

19  THIS QUICKLY BECAUSE I WANT TO GET TO YOUR HONOR'S QUESTION

20  ABOUT HIS INTENT, HIS STATE OF MIND, BUT, YOU KNOW, THIS IS

21  IMPORTANT TOO.  WAS THE DEFENDANT EVALUATING THESE PATIENTS,

22  TALKING WITH THEM ABOUT THEIR PATIENT HISTORIES?  YOU KNOW, I

23  SAY ON THE SLIDE, NOT REALLY.  SURE.

24         SOME OF THESE PATIENTS SAID THAT HE TALKED TO THEM

25  AND HE SPENT SOME TIME CHATTING WITH THEM AND EVEN THE

1    UNDERCOVER SAID THERE WAS A LOT OF TALK.  IS THAT REALLY THE

2    KIND OF EVALUATION AND REVIEW OF PRIOR TESTS AND TREATMENTS

3    AND DIAGNOSES THAT DR. KENNEDY TALKED ABOUT?  NO.  BUT, YOU

4    KNOW, IT GETS WORSE WHEN YOU LOOK AT IS HE DOING A MEDICAL

5    DIAGNOSIS?  IS HE ORDERING TESTS?  IS HE ORDERING X-RAYS?  IS

6    HE ORDERING MRI'S?  HE'S NOT DOING ANY OF THAT.  IS HE COMING

7    UP WITH A TREATMENT PLAN TO TRY TO GET THESE PEOPLE IN A

8    BETTER SITUATION.  YOU DIDN'T REALLY HEAR ANY EVIDENCE THAT

9    HE'S DOING MUCH OF THAT.  AND IS HE WATCHING OUT FOR SIGNS OF

10   ABUSE AND DIVERSION AND MISUSE?  HE WASN'T REALLY DOING THAT

11   MUCH.

12        THE PAIN RULES, DR. KENNEDY TALKED ABOUT THIS JUST

13   RECENTLY.  WHEN YOU SUSPECT DIVERSION, YOU SHALL OBTAIN A DRUG

14   TEST AND WHEN YOU HAVE EVIDENCE OF DIVERSION FROM A DRUG TEST

15   OR OTHER EVIDENCE, YOU SHALL START TAPERING THAT PATIENT'S

16   MEDICATIONS OR STEERING HIM TOWARDS SOMETHING THAT'S NOT --

17   YOU KNOW --

18        **THE COURT:**  AND IN GENERAL TERMS, THE EVIDENCE OF

19   DIVERSION IS THE PATIENT TAKES A BLOOD TEST AND WHAT'S NOT

20   SEEN IN THE BLOOD TEST IS THE MEDICINES THAT WERE PRESCRIBED

21   EARLIER, WHICH MEANS THE PATIENT IS NOT TAKING THEM,

22   THEREFORE, THE PATIENT IS DOING SOMETHING ELSE WITH THEM; IS

23   THAT BASICALLY THE IDEA OR AM I MISSING THAT?

24        **MR. STEVENS:**  I HATE TO ASK YOU TO DO THIS BUT WOULD

25   YOU REPEAT THE QUESTION, JUDGE?

1    **THE COURT:**  YES.  SO IN TERMS OF EVIDENCE OF

2    DIVERSION FROM THE BLOOD TEST, THE PATIENT COMES IN ON A GIVEN

3    DAY AND TAKES A BLOOD TEST.  THAT BLOOD TEST DOES NOT SHOW

4    EVIDENCE OF THE MEDICINES PRESCRIBED BY THE DOCTOR, WHICH

5    MEANS HE'S NOT TAKING THE MEDICINES, WHICH MEANS HE'S DOING

6    SOMETHING ELSE WITH THE MEDICINES, DO I HAVE AT LEAST THE

7    CONCEPT RIGHT?

8    **MR. STEVENS:**  THAT'S MY UNDERSTANDING, JUDGE, YES.

9    THAT'S ONE OF THE THINGS THAT A DOCTOR COULD LOOK AT TO

10   IDENTIFY DIVERSION.  AND THERE ARE OTHER RED FLAGS IN OUR VIEW

11   THAT WE PUT ON EVIDENCE OF THAT I'LL GET TO IN JUST A MINUTE.

12   YOU KNOW, I'LL TALK ABOUT MR. HENSON AGAIN BRIEFLY

13   IN A MINUTE OR TWO, BUT MY RECOLLECTION OF HIS TESTIMONY IS HE

14   WAS ADDICTED TO DRUGS BEFORE HE CAME TO SEE --

15   **THE COURT:**  WHICH ONE?

16   **MR. STEVENS:**  MR. HENSON, CHARLES HENSON.

17   **THE COURT:**  YEAH.  I REMEMBER MR. HENSON VERY WELL.

18   **MR. STEVENS:**  AND MY RECOLLECTION IS THAT HE

19   ADMITTED HE HAD BEEN ADDICTED BEFORE SEEING THE DEFENDANT AND

20   THAT'S NOT THE DEFENDANT'S FAULT.  THE DEFENDANT KEPT GIVING

21   HIM PILLS FOR OPIOIDS.  AND THEN WHAT STRUCK ME ABOUT

22   MR. HENSON'S TESTIMONY, ONE OF THE THINGS THAT STRUCK ME ABOUT

23   IT, I RECALL HIM SAYING THAT LATER ON HE STOPPED SEEING

24   DEFENDANT.  HE GOT BETTER.  HE GOT SOME OTHER FORM OF

25   TREATMENT THAT -- I THINK HE SAID *GOT THE DEVIL OFF HIS BACK*.

1  WHY DID THAT TAKE THREE OR FOUR YEARS?  WHY COULDN'T THIS

2  DEFENDANT HAVE DONE SOME OF THE BASIC STEPS THAT DR. KENNEDY

3  TALKED ABOUT TO GET THE DEVIL OFF HIS BACK EARLIER? AND DRUG

4  TESTS ARE ONE OF THE THINGS THAT COULD HAVE BEEN DONE THAT

5  WEREN'T BEING DONE ACCORDING TO DR. KENNEDY'S TESTIMONY.

6       DID HE KNOW BETTER?  OF COURSE HE DID.  HE MOVED

7  HERE TO BATON ROUGE TO TAKE A JOB AT AN OCHSNER CLINIC HERE

8  AND THEY FIRED HIM.  NOT JUST BECAUSE HIS PAPERWORK WAS A MESS

9  OR HIS NOTES WERE CHICKEN SCRATCH, BECAUSE THEY WERE CONCERNED

10  THAT HE WASN'T FOLLOWING THEIR PROTOCOLS ON THIS TYPE OF

11  MEDICAL ISSUE.  AND ABOUT THE PAPERWORK, JUDGE, THIS COMES UP

12  A FEW TIMES, BUT THE FIRST THING I'D SAY IS, AND I THINK

13  DR. MOUTON MADE THIS PRETTY CLEAR AND I KNOW DR. KENNEDY

14  TALKED ABOUT IT, BUT POOR PAPERWORK AND POOR DOCUMENTATION, I

15  MEAN, IT ISN'T -- IT'S NOT AS INNOCENT AS IT CAN MAYBE SOUND

16  SOMETIMES.

17       **THE COURT:**  BOTH OF THEM SAID IT WAS A PATIENT

18  SAFETY ISSUE.

19       **MR. STEVENS:**  IT'S INEXTRICABLY LINKED TO PATIENT

20  SAFETY.  AND BESIDES, JUDGE, SOME OF THE PAPERWORK WAS A TOTAL

21  SHAM.  AND WHAT I MEAN BY THAT IS THE ZACHARY JACKSON

22  PAPERWORK, WHICH FRANKLY I DIDN'T EVEN NOTICE HOW SIGNIFICANT

23  IT WAS UNTIL 45 MINUTES AGO, BUT WE SEE THIS PAPER, MARCH 3RD,

24  2015, WHERE THE DEFENDANT DOCUMENTS, *HEY, LOOK, I NEED TO GET*

25  *YOU OFF THESE MEDS AND I'M GOING TO REFER YOU TO SOMEBODY*

1  | *ELSE.  THESE DOSES ARE TOO HIGH.*  AND THEN FOR NINE MONTHS,

2  | JUDGE, 1,000 MORE PILLS TO THAT SAME WOMAN.  SO, YOU KNOW,

3  | SURE THERE'S PAPERWORK FOR MS. JACKSON, BUT THAT PAPERWORK

4  | DIDN'T DO ANY GOOD.  OTHER THAN MAYBE THEM SERVING AS AN

5  | ATTEMPT FOR THE DEFENDANT TO COVER HIMSELF FROM PROBLEMS LIKE

6  | THESE.  BUT HE CERTAINLY WASN'T DOING WHAT HE SAID HE WAS

7  | GOING TO DO IN THAT PAPERWORK.

8  | ONE QUESTION YOU MAY HAVE AND ONE QUESTION WE HAVE

9  | HAD, WHY WOULD HE DO THIS?  WHY ISSUE PRESCRIPTION AFTER

10 | PRESCRIPTION FOR THESE DRUGS AFTER SUCH A LONG CAREER IN

11 | MEDICINE BEFORE WE GOT TO WHERE THIS STORY STARTS?  THERE'S NO

12 | WAY TO KNOW FOR SURE.  BUT, YOU KNOW, SOME OF THE EVIDENCE

13 | SUGGESTS THAT HE NEEDED THE MONEY, THAT IT WAS GREED AND HE

14 | NEEDED THE MONEY.  AND I SAY THAT BECAUSE WE KNOW IN 2014 HE

15 | WAS MAKING $195,000 A YEAR AND WE KNOW HE WAS TERMINATED.

16 | MEANWHILE, I THINK BOTH OF THE UNDERCOVERS

17 | MENTIONED, AND IF THEY DIDN'T MENTION IT IT'S IN THE

18 | RECORDINGS IN THE TRANSCRIPTS, THE DEFENDANT LIKED CARS.  HE

19 | LIKE GOING TO AUTO RACES.  HE HAD JUST BOUGHT A PRETTY

20 | EXPENSIVE CAR.

21 | **THE COURT:**  I THINK HE HAD ALMOST AN HOUR

22 | CONVERSATION WITH MR. AUGHEY ABOUT CARS AND RACING.

23 | **MR. STEVENS:**  AND I DON'T HAVE THE EXHIBIT NUMBERS

24 | OF SOME OF THE UNDERCOVER RECORDINGS OFF THE TOP OF MY HEAD,

25 | BUT IF YOU WANT TO HEAR MORE ABOUT FANCY CARS AND RACES IN NEW

1  ORLEANS, JUST WATCH THEM IN THEIR ENTIRETY BECAUSE THERE'S A

2  LOT OF THAT.  SO HE'S GOT THAT INTEREST IN CARS AND RACING.

3  WE HEARD ABOUT THE LENGTHY DISCUSSION IN ONE OF THESE PATIENT

4  VISITS ABOUT HIS VACATION TO HOT SPRINGS AND HE DOESN'T HAVE A

5  JOB, SO THAT'S MOTIVE.

6       **THE COURT:**  WASN'T THERE SOME TESTIMONY WITH RESPECT

7  TO THE FACT THAT HE HADN'T PAID HIS TAXES FOR TWO YEARS?

8       **MR. STEVENS:**  I ALMOST FEEL LIKE YOU COULD DO MY --

9  I DO FEEL LIKE YOU COULD DO MY JOB BETTER THAN I'M DOING IT,

10  JUDGE.

11       **THE COURT:**  OKAY, I'M SORRY.

12       **MR. STEVENS:**  NO, NO.  YOU'RE EXACTLY RIGHT.

13       HERE'S THE POINT, THESE MEMBERSHIPS ARE LUCRATIVE.

14  $100 A VISIT.  YOU SAW SOME VIDEO OF THE DEFENDANT'S OFFICE.

15  THERE'S VERY LITTLE OVERHEAD.  OF COURSE, HE'S NOT PAYING FOR

16  MRI'S AND HE'S NOT PAYING FOR X-RAYS.  MATT DIXON TESTIFIED

17  THAT THE OFFICE GOT MUCH BUSIER I THINK BY JULY COMPARED TO

18  WHEN HE FIRST STARTED GOING IN APRIL.

19       YOU KNOW, $100 A MONTH AT 250 PATIENTS IF THEY'RE

20  ALL PAYING, THAT'S A LOT MORE THAN HE WAS MAKING AT OCHSNER.

21  NOW, ONLY IF HALF OF THOSE PATIENTS ARE PAYING EVERY MONTH

22  THAT STILL ALMOST REPLACES HIS SALARY.  AND REMEMBER, JUDGE,

23  IT'S EXHIBIT 88, I BELIEVE, HE DIDN'T FILE ANY TAXES IN 2015

24  OR 2016.  WHY NOT?  WHAT'S HE TRYING TO HIDE?  WHY NOT REPORT

25  THIS LAWFUL INCOME IF HE HAD NOTHING TO HIDE?  IF HE BELIEVED

1    HIS PRACTICE WAS, YOU KNOW, IN ACCORDANCE WITH THE WAY

2    BUSINESS AND MEDICINE OUGHT TO BE DONE.

3           SO YOU ASKED BEFORE THE BREAK, JUDGE, TO FOCUS ON,

4    YOU KNOW, HIS INTENT, AND THIS ARGUMENT THAT HE WAS DOING --

5    THOUGHT HE WAS DOING WHAT WAS BEST FOR HIS PATIENTS, SO I WANT

6    TO HIGHLIGHT BRIEFLY SOME OF THE EVIDENCE AND THE REASONS IN

7    ADDITION TO WHAT I'VE ALREADY KIND OF WENT THROUGH QUICKLY

8    THAT SHOULD CONVINCE YOU TO REJECT HIS ARGUMENT.

9           NOW, THE STANDARD THAT THE COURT HAS ADOPTED, I

10   WON'T READ IT TO YOU, BUT I WOULD URGE THAT WE PUT ON PLENTY

11   OF EVIDENCE THAT THESE PRESCRIPTIONS WERE ISSUED WITHOUT

12   APPROPRIATE MEDICAL JUSTIFICATION, THEY WERE FAR OUTSIDE THE

13   USUAL COURSE OF PROFESSIONAL PRACTICE, AND FROM THAT, FROM

14   DR. MOUTON AND ESPECIALLY DR. KENNEDY, THE COURT CAN CONCLUDE

15   THAT THE DEFENDANT WAS NOT ACTING IN AN HONEST EFFORT TO

16   PRESCRIBE FOR HIS PATIENTS' CONDITIONS IN ACCORDANCE WITH THE

17   STANDARDS, YOU KNOW, IN EFFECT.

18          BUT HERE'S ANOTHER REASON -- THE SECOND REASON WHY

19   YOU SHOULDN'T BUY THIS ARGUMENT, JUDGE.  I WOULD ARGUE YOU'VE

20   SEEN ENOUGH EVIDENCE AT THIS POINT TO KNOW THAT IT'S JUST NOT

21   TRUE.  THE STORY ABOUT ALWAYS WANTING TO DO WHAT'S BEST FOR

22   HIS PATIENTS, IT'S NOT TRUE.  HE COULD NOT POSSIBLY HAVE

23   THOUGHT THAT THESE PRESCRIPTIONS WERE BEING ISSUED FOR

24   LEGITIMATE MEDICAL PURPOSES OR THAT HE WAS ASKING WITHIN THE

25   USUAL COURSE OF A MEDICAL PRACTICE.

1            HE KNEW THESE PRESCRIPTIONS WERE ILLEGITIMATE.

2    ALMOST NO MEDICAL RECORDS.  NO X-RAYS OR MRI'S.  ONE OF THE

3    PATIENTS TALKED ABOUT BRINGING SOME THAT I THINK MIGHT HAVE

4    BEEN A FEW YEARS OLD.  I DON'T MEAN TO OVERSTATE THE EVIDENCE.

5    BUT VIRTUALLY NO X-RAYS OR MRI'S, CERTAINLY NONE THAT THIS

6    DEFENDANT ORDERED.  THERE MIGHT HAVE BEEN SOME OLDER DOCUMENTS

7    THAT CERTAIN PATIENTS BROUGHT TO HIM.  VERY FEW DRUG TESTS.

8    SHAM EXAMS.  TAKING REQUESTS FROM THE PATIENTS ABOUT WHAT

9    DRUGS THEY WANTED, WHICH I THINK IS ONE OF THE QUESTIONS YOU

10   TOUCHED ON EARLIER.  ADMITTING IN SOME OF THE RECORDINGS THAT

11   HE WASN'T TAKING BASIC PRECAUTIONS AND LYING TO THE DEA.  YOU

12   KNOW THERE WAS A BRIEF WITNESS, MS. FITZGERALD, BUT IT WAS

13   IMPORTANT, BECAUSE WHAT SHE REPORTED AT THE TIME WAS HE TOLD

14   THE DEA, "I DRUG TEST 100 PERCENT OF MY PATIENTS.  WELL, NO, I

15   DRUG TEST 95 PERCENT OF THEM.  AND I CHECK THEIR PMP'S AND I

16   CHECK THEIR CRIMINAL HISTORIES AND I CHECK THEIR ARREST

17   REPORTS."  MOST OF THAT WE'VE SEEN HE WASN'T DOING FROM DR.

18   KENNEDY AND FROM THE OTHER WITNESSES.  SO WHY LIE TO THE DEA?

19   WHY NOT JUST DESCRIBE HIS PRACTICE IN AN HONEST WAY AND TELL

20   THEM SOMETHING CLOSER TO THE STORY THAT WE'VE KIND OF SEEN

21   GLIMPSES OF IN THE CROSS-EXAMINATION OF THIS TRIAL.

22           WE ALSO KNOW THAT HE KNEW THAT THESE PRESCRIPTIONS

23   WERE BAD FROM HIS OWN WORDS.  APRIL 7TH, "A LITTLE BIT MORE

24   LEGAL."  APRIL 17, "THAT'S ACTUALLY ILLEGAL FOR THAT.  IT'S

25   UNETHICAL.  A DOCTOR COULD GET IN TROUBLE."  JULY 6, "YOUR

1   SYMPTOMS ARE NOT REALLY" -- I'M JUST TAKING CLAUSES HERE.

2   JULY 13TH, "I'M DOING NEITHER OF THOSE IN YOUR CASE."

3   AUGUST 4TH, "WE HAVE TO BE CAREFUL.  IT DOESN'T LOOK RIGHT."

4   HE ALSO IGNORED OBVIOUS SIGNS OF ABUSE AND DIVERSION.

5          MS. HINES, THAT WAS YESTERDAY, SHE REPORTED HIM TO

6   LAW ENFORCEMENT AND I RECALL HER SAYING THAT IT WAS PRETTY

7   OBVIOUS TO HER THAT PEOPLE WERE GOING TO SEE THE DEFENDANT WHO

8   DIDN'T REALLY HAVE A NEED FOR THESE PILLS.

9          MR. DIXON GOES TO SEE HIM ON APRIL 7TH AND THE

10  DOCTOR TELLS HIM THIS SHOULD LAST YOU A COUPLE MONTHS.  GOES

11  BACK TEN DAYS LATER TO ASK FOR MORE, USES THE STREET TERM

12  *ADDIES* FOR ADDERALL AND ALL OF THE OTHER KIND OF RED FLAGS

13  THAT MR. DIXON WAS PUTTING UP OR RAISING.

14         MR. CRAWFORD, "I GET THESE FILLED IN TEXAS." ROXY'S,

15  AGAIN USING THE STREET TERM, AND MR. CRAWFORD'S OBSERVATIONS I

16  THINK OF THE SEPTEMBER 29TH, 2015 VISIT WHERE HE SAID IN HIS

17  EXPERIENCE AS A LAW ENFORCEMENT AGENT, HE KNEW THERE WERE

18  PEOPLE IN THE LOBBY WHO WERE UNDER THE INFLUENCE OF DRUGS AT

19  THE TIME.

20         AND MR. BOUDREAUX, YOU KNOW, HE ADMITTED HE WAS

21  ADDICTED TO THESE DRUGS AND I THINK HE EVENTUALLY GOT AROUND

22  TO ADMITTING WHAT IS CONSISTENT WITH THE EVIDENCE, WHICH IS

23  THAT IN JANUARY OF '16, HE WAS CHARGED WITH DISTRIBUTING SOME

24  OF THE SAME DRUGS HE HAD GOTTEN FROM THIS DEFENDANT.

25         JUDGE, THESE WON'T TAKE VERY LONG, BUT JUST TO

1   HIGHLIGHT SOME OF THE EXHIBITS HERE.  THIS IS DIXON ASKING FOR

2   LORTABS, "TYLENOL WOULD BE A LITTLE BIT MORE LEGAL."  WELL,

3   DIXON GETS AN OPIOID AFTER THAT.  APRIL 17TH DIXON ASKS FOR

4   ADDERALL.  WE'VE HEARD A LOT ABOUT THIS TODAY SO I WON'T SPEND

5   MUCH TIME ON IT, BUT WE KNOW DIXON GETS THE ADDERALL.

6   JULY 6TH, CRAWFORD ASKS FOR ROXY'S AND NORCO.  THE DOCTOR

7   TELLS HIM, "YOUR SYMPTOMS ARE NOT THE KIND THAT ANY DOCTOR

8   WOULD PRESCRIBE A MAJOR NARCOTIC FOR."  CRAWFORD ENDS UP

9   GETTING AN OPIOID.  JULY 6, "DON'T SAY I DIDN'T SUGGEST A

10  BETTER IDEA."  JULY 31ST, THE DEFENDANT IS TELLING DIXON,

11  "LOOK, I SHOULD BE DOING DRUG SCREENS AND I SHOULD BE

12  MONITORING THE PRESCRIPTIONS.  I'M DOING NEITHER OF THOSE IN

13  YOUR CASE."  DIXON STILL, AFTER THIS, GETS ANOTHER

14  PRESCRIPTION FOR OPIOID.

15           SEPTEMBER 1ST, 2015, THERE'S THIS DISCUSSION WITH

16  CRAWFORD, "WELL, YOU KNOW, YOU SHOULD PROBABLY GET AN X-RAY.

17  WELL, LET'S JUST TRY A HIGHER DOSE FIRST."  THEN CRAWFORD GETS

18  ANOTHER PRESCRIPTION FOR ANOTHER OPIOID.

19           I ONLY HAVE TWO SLIDES LIKE THIS, JUDGE, AND I DON'T

20  MEAN TO DWELL ON THIS, THE POINT IS JUST HOW EASY IT WAS FOR

21  MR. DIXON TO OBTAIN OXYCODONE FROM THIS DEFENDANT.  "MY KNEE

22  HURTS ALL OVER FROM AN OLD SPORTS INJURY."  NO TESTS OR REALLY

23  ANY EXAM AND THEN IN 166-B4 WE HEAR THE DEFENDANT SAY, "IF YOU

24  HAVE $300, YOU CAN GET SOME TODAY."  DIXON PAYS $300 AND HE

25  GETS THE PILLS AND THAT'S EXHIBIT 12.

1    WHEN MR. BRINDLEY SAID AT THE START THAT THIS IS NOT

2  A CASE INVOLVING A FIVE-MINUTE VISIT WHERE A PATIENT WALKS OUT

3  WITH A PRESCRIPTION, I WAS SURPRISED.  AND I WAS SURPRISED

4  BECAUSE THAT'S EXACTLY WHAT HAPPENED ON APRIL 24TH, 2015, WITH

5  MR. DIXON.  SO AS CONTEXT, MR. DIXON TELLS THE DEFENDANT HE'S

6  TAKING ADDIES TO STAY AWAKE, HE GETS THEM FROM A FRIEND AND

7  ALARM BELLS SHOULD BE GOING OFF, AND THE DEFENDANT COULD HAVE

8  SAID, *YOU CAN'T DO THAT.  THAT'S DANGEROUS.  LOOK, I CAN'T*

9  *TREAT YOU.  THERE'S NO WAY I CAN GIVE YOU ADDERALL.*

10    BUT WHAT HE DOES INSTEAD, FIRST, HE LAUGHS AND HE

11  TELLS DIXON THAT THAT'S ILLEGAL, AND THAT'S 167B-1.  AND THEN

12  HE SAYS, "I'LL HAVE TO TRY TO FIGURE OUT A WAY TO COME UP WITH

13  A DIAGNOSIS."  THEN THE EXAM WAS A SHAM, JUDGE.  I MEAN, HE

14  ASKED HIM IF HE COULD SIT THROUGH A MOVIE AND IF HE -- AND

15  DIXON SAYS HE STARTS CUTTING THE LAWN AND THEN STOPS.  AND IF

16  HE'S EVER JUST SQUEAKED BY IN SCHOOL.  IF THOSE WERE THE

17  CRITERIA FOR GETTING AN -- THERE WOULD -- THEN I WOULD

18  PROBABLY BE ON THESE MEDICINES.

19    **THE COURT:**  ESPECIALLY THE LAWN PART, RIGHT?

20    **MR. STEVENS:**  WHAT'S THAT?

21    **THE COURT:**  ESPECIALLY THE LAWN PART.

22    **MR. STEVENS:**  I'VE GOT TO DO THAT LATER THIS WEEK,

23  JUDGE, AND I'M SURE I'M NOT GOING TO WANT TO FINISH THE JOB,

24  BUT I WOULD HOPE THAT IF I WOULD GO TELL A DOCTOR, I DON'T

25  FEEL LIKE FINISHING THE YARD WHEN I START, HE WON'T GIVE ME

1  ADDERALL.  BUT, JUDGE, THE STORY GETS WORSE.  DIXON WAITS A

2  FEW DAYS.  AND, AGAIN, THIS WAS AN EXAMPLE OF, I THINK, MR.

3  BRINDLEY TRYING TO CREATE SOME CONFUSION WHERE THERE REALLY

4  SHOULDN'T BE ANY.  THE VISIT IS APRIL 17TH.  I THINK YOU CAN

5  SEE IT CLEARLY ON THE TEXT THAT WAS SENT ON APRIL 21ST.  SO

6  THE DELAY IS FROM FRIDAY TO TUESDAY.

7        DIXON WAITS A FEW DAYS, TEXTS HIM, "HEY, CAN I COME

8  BY AND PICK UP THE DRUGS?"  AND WHAT DOES THE DEFENDANT SAY

9  ESSENTIALLY?  SURE.  COME ON IN.  THEY MEET IN THE LOBBY.  THE

10 DEFENDANT SELLS HIM A PRESCRIPTION.  THAT'S NOT MEDICINE.

11 THAT'S A DRUG DEAL.  AND I THINK THAT VISIT TOOK LESS THAN

12 FIVE MINUTES.  I'D HAVE TO GO BACK AND WATCH THE VIDEO BUT I

13 THINK IT TOOK ABOUT THREE-AND-A-HALF MINUTES.  AND YOU HEARD

14 FROM DR. KENNEDY THAT'S NOT IN THE BALLPARK, THAT'S NOT EVEN

15 IN THE UNIVERSE OF WHAT'S ACCEPTABLE.  AND YOU DON'T NEED TO

16 RELY ON THE EXPERT TESTIMONY TO KNOW THAT THAT'S JUST NOT THE

17 WAY MEDICINE IS SUPPOSED TO BE PRACTICED, AND SURELY THE

18 DEFENDANT KNEW THAT.

19        COUNTS 12 THROUGH 16, IN OUR NUMBERING, YOU KNOW, IT

20 TOOK ME A WHILE TO UNDERSTAND THE WAY IT'S ALL LAID OUT, BUT

21 I'LL BE VERY BRIEF, JUDGE.  THE DIXON OR HENDRICKS COUNTS ARE

22 COUNTS 12 THROUGH 16.  SO WE'VE TALKED ABOUT 1 THROUGH 7,

23 THOSE ARE THE POST-SUSPENSION.  DIXON 12 THROUGH 16, THE

24 EVIDENCE IS CLEAR ON THOSE, IN OUR VIEW.  HE WAS JUST MAKING

25 UP HIS SYMPTOMS TRYING TO BUY DRUGS.  IT WORKED EVERY TIME.

1  YOU CAN TELL THAT FROM DIXON'S TESTIMONY THAT WHAT THE

2  DEFENDANT WAS DOING WAS OUTSIDE THE SCOPE.  THE DEFENDANT KNEW

3  HE SHOULDN'T HAVE BEEN DOING IT -- DOING WHAT HE DID AND HE

4  DID IT ANYWAY AND DR. KENNEDY CONFIRMED THAT.  I MEAN, YOU

5  HAVE A SENSE THAT YOU HEAR DIXON DESCRIBE HOW EASY IT WAS FOR

6  HIM TO GET THESE PILLS, THAT THAT'S WRONG AND THEN DR. KENNEDY

7  EXPLAINS THAT IN HIS EXPERT OPINION AS WELL.  THAT COVERS

8  COUNTS 12 THROUGH 16.

9         CRAIG CRAWFORD OR CRAIG NEILSON, COUNTS 24 THROUGH

10  27, WE WOULD ARGUE THE EVIDENCE IS JUST AS CLEAR ON THOSE.

11  AND HERE TOO, I MEAN THE DEFENSE SPENT AN HOUR I THINK WITH

12  MR. CRAWFORD READING ALL THOSE WARNINGS THAT THE DEFENDANT

13  GAVE, ALL THE -- READING ALL WHAT I WOULD CALL THE LIP SERVICE

14  THE DEFENDANT WAS PAYING TO DOING THINGS THE RIGHT WAY AND

15  NONE OF THAT MADE ANY DIFFERENCE.  EVERY TIME CRAWFORD ASKED

16  FOR AN OPIOID, THE DEFENDANT GAVE HIM AN OPIOID AND

17  DR. KENNEDY CONFIRMED THAT THAT'S FAR OUTSIDE THE BOUNDS OF

18  USUAL PRACTICE.  THAT'S COUNTS 24 THROUGH 27.

19         THE REMAINING COUNTS, I'LL SUMMARIZE VERY, VERY

20  BRIEFLY.  MR. HENSON IS 8 AND 9.  WE TOUCHED -- I TOUCHED ON

21  HIM BRIEFLY.  I ALSO THINK HE SAID, AND I COULD BE WRONG --

22  YOU KNOW, WE HEARD THAT THIS IS A CASE WHERE THERE WAS A DRUG

23  TEST AND HE TESTED POSITIVE FOR A BUNCH OF DRUGS AND

24  MR. HENSON SAID, I THINK HE DIDN'T EVEN KNOW THAT HE WAS

25  TESTING POSITIVE FOR DRUGS BECAUSE I THINK HE SAID HE THINKS

1   THE DOCTOR WOULD HAVE KICKED HIM OUT.  SO WHY ARE YOU

2   ADMINISTERING THESE DRUG TESTS IF YOU'RE NOT GOING TO TALK

3   ABOUT THEM WITH THE PATIENTS AND WORK THEM INTO THE TREATMENT

4   PLAN.

5         DR. KENNEDY SAID THAT THE DEFENDANT DIDN'T DO ANY OF

6   THE THINGS HE SHOULD HAVE DONE TO ENSURE THAT HE WAS SAFELY

7   TREATING MR. HENSON, AND THAT'S TRUE EVEN THOUGH MR. HENSON

8   HAD REAL PAIN.  WE THINK WE'VE ESTABLISHED COUNTS 8 AND 9.

9   WE'RE FAR OUTSIDE THE USUAL COURSE.

10        MS. JACKSON, COUNTS 10 AND 11.  YOU DIDN'T HEAR FROM

11  HER, BUT YOU HEARD FROM DR. KENNEDY.  THIS PATIENT HAD A LIST

12  OF PROBLEMS.  MEDICALLY SHE HAD 10 OR 11 DIFFERENT DIAGNOSES

13  OR PROBLEMS.  NO INITIAL EXAM, NO TESTS EVER ORDERED AND I

14  BELIEVE DR. KENNEDY TESTIFIED THAT THE DEFENDANT'S TREATMENT

15  OF MS. JACKSON JUST WASN'T CREDIBLE.  AND WE SAW ALL THOSE

16  PILLS EARLIER THAT HE ISSUED TO MS. JACKSON AFTER TELLING HER

17  THAT HE WASN'T GOING TO ISSUE -- GIVE HER THAT MANY PILLS.  SO

18  WE THINK THAT COVERS COUNTS 10 AND 11.

19        MR. BOUDREAUX, HE'S CLEARLY -- HE WAS CLEARLY

20  SYMPATHETIC TO THE DEFENDANT AND PROBABLY DIDN'T WANT TO BE

21  HERE TESTIFYING IN THE DEFENDANT'S TRIAL, AND THE DEFENDANT

22  REACHED OUT TO HIM RECENTLY.  AND THE NOTION THAT -- THE

23  NOTION THAT WHEN THE DEFENDANT REACHED OUT TO HIM RECENTLY THE

24  DEFENDANT DIDN'T KNOW THAT MR. BOUDREAUX WAS GOING TO BE A

25  WITNESS IN THIS TRIAL, THAT'S JUST NOT CREDIBLE.  BUT, YOU

1    KNOW, WE COULDN'T GET A STRAIGHT ANSWER FROM MR. BOUDREAUX AT

2    FIRST.  EVENTUALLY HE DID ADMIT THAT HE WAS A DRUG ADDICT.

3            I RECALL SOME DISCUSSION OF MAYBE THE DEFENDANT

4    SUGGESTED SUBOXONE AND MR. BOUDREAUX SAID, I DIDN'T WANT TO

5    GET ON THAT, SO HE KEPT GETTING PRESCRIPTIONS FOR OPIOIDS,

6    WHICH, AGAIN, THAT'S A RED FLAG WE SEE AGAIN AND AGAIN,

7    PATIENTS DICTATING THE PILL THEY LEAVE WITH.

8            MR. BOUDREAUX IS ARRESTED IN JANUARY OF 2016, SPENDS

9    SEVEN MONTHS IN JAIL, AND I THINK HE SAID TODAY OR YESTERDAY

10   THAT HE'S SOBER, THAT OBVIOUSLY EFFORTS TO GET HIM OFF THESE

11   DANGEROUS DRUGS WERE EFFECTIVE.  IT'S TOO BAD THEY WEREN'T

12   STARTED EARLIER AND DR. KENNEDY SAID THAT THE TREATMENT OF

13   DR. BOUDREAUX WAS OUTSIDE THE USUAL COURSE.

14           MR. AUGHEY WAS ANOTHER TRICKY WITNESS.  I'M NOT SURE

15   THAT HE WAS HONEST OR MAYBE HE HAD SOME MEMORY ISSUES.  AT

16   FIRST HE SAID HE NEVER SAW THE DEFENDANT MORE THAN ONCE A

17   MONTH, AND THEN MR. PUGLIESE SHOWED HIM TWO PRESCRIPTIONS THAT

18   WERE THREE DAYS APART.  IT SEEMED LIKE HE DIDN'T WANT TO BE

19   HERE EITHER.  WE DIDN'T ASK HIM WHETHER THE DEFENDANT REACHED

20   OUT TO HIM RECENTLY, PROBABLY IN HINDSIGHT, WE SHOULD HAVE.

21   IT WAS A BIT OF A SAD STORY.  I MEAN HE, TOO, USED DRUGS AND

22   WAS ADDICTED TO DRUGS FOR A LONG TIME.  THE DEFENDANT'S OFFICE

23   IS THE PLACE HE WOULD GO TO TO GET THOSE DRUGS AND DR. KENNEDY

24   TESTIFIED THAT THE TREATMENT WAS FAR OUTSIDE THE USUAL COURSE.

25           AND THAT BRINGS US TO THE LAST WITNESS -- THE LAST

| | |
|---|---|
| 1 | OF THE COUNTS, MR. DOIRON, COUNTS 28 THROUGH 30.  HE WANTED TO |
| 2 | HELP THE DEFENDANT AND THAT'S ANOTHER WITNESS, JUDGE, THAT AS |
| 3 | I UNDERSTAND IT, AFTER -- AFTER A SEVERAL-YEAR BREAK IN THEIR |
| 4 | RELATIONSHIP, AFTER NOT HAVING ANY RELATIONSHIP FOR YEARS, THE |
| 5 | DEFENDANT REACHED OUT TO HIM POST-INDICTMENT.  WE DIDN'T |
| 6 | REALLY GO INTO THAT, BUT IT MAY HAVE EXPLAINED WHY HE SEEMED |
| 7 | RELUCTANT TO BE HERE.  HE'S A DRUG ADDICT.  AND THE THING I |
| 8 | WANT TO FLAG WITH MR. DOIRON IS, AND IT MIGHT HAVE GOTTEN LOST |
| 9 | IN SOME OF THE EXHIBITS, BUT HE WAS IN A CRASH, NO QUESTION |
| 10 | ABOUT THAT, PROBABLY HURT BADLY, BUT I MEAN AT THE ER THE |
| 11 | MEDICAL PROFESSIONALS DOCUMENT THAT HE IS -- I THINK THE QUOTE |
| 12 | WAS "DRUG ABUSE," BUT HE'S A DRUG ABUSER AND THAT'S IN LATE |
| 13 | AUGUST.  THE MEDICAL PROFESSIONAL SAYS THAT.  WHAT HAPPENS? |
| 14 | BETWEEN AUGUST 25TH AND AUGUST 31ST WITHIN 6 DAYS, THAT'S |
| 15 | EXHIBITS 29-A AND B 30-A AND B, HE KEEPS GOING TO THE |
| 16 | DEFENDANT AND GETS 1350 MORE PILLS, AFTER BEING RELEASED FROM |
| 17 | THE HOSPITAL WITH A NOTATION IN THE FILE THAT HE'S ABUSING |
| 18 | THESE DRUGS. |
| 19 | **THE COURT:**  DID I UNDERSTAND THAT HE DID BRING THE |
| 20 | POLICE REPORT TO DR. LAMARTINERE? |
| 21 | **MR. STEVENS:**  I DON'T REMEMBER IF HE DID OR DIDN'T, |
| 22 | BUT I THINK THERE WAS A POLICE REPORT.  I DON'T THINK THERE'S |
| 23 | ANY DOUBT ABOUT THAT. |
| 24 | **THE COURT:**  OKAY. |
| 25 | **MR. STEVENS:**  YOUR QUESTION IS WHETHER HE BROUGHT |

1  THE REPORT AND I DON'T REMEMBER, JUDGE.  I'M SORRY.

2  **THE COURT:**  ALL RIGHT.

3  **MR. STEVENS:**  AND HE WAS GETTING METHADONE FROM THE

4  DEFENDANT.  IN 2015 HE WAS CONVICTED OF SELLING THOSE SAME

5  DRUGS AND, AS DR. KENNEDY EXPLAINED, THAT'S JUST -- NOT ONLY

6  IS IT WAY OUTSIDE THE USUAL COURSE OF PRACTICE, BUT IT'S NOT

7  SAFE FOR PATIENTS LIKE MR. DOIRON.

8        SO I'M SURE WE'LL HIT ON SOME OF THESE KEY PIECES OF

9  EVIDENCE AGAIN IN THE BRIEFS, BUT WE DO THINK, JUDGE, EVIDENCE

10  SUFFICIENT TO MEET OUR BURDEN ON ALL OF THE COUNTS IN THE

11  SUPERSEDING INDICTMENT.

12  **THE COURT:**  THANK YOU, MR. STEVENS.  MR. BRINDLEY?

13  **DEFENSE'S CLOSING ARGUMENTS**

14  **MR. BRINDLEY:**  THANK YOU, YOUR HONOR.  THEY'LL BE

15  PLENTY OF SPACE IN MY 25 PAGES TO GO THROUGH SOME OF THE

16  DETAILS ABOUT EACH ONE OF THESE PATIENTS SO THAT'S --

17  **THE COURT:**  YOU KNOW I HEARD -- LOOK, I'VE HEARD THE

18  THINGS THAT YOU'VE SAID FOR EACH ONE OF THESE THINGS,

19  INCLUDING DR. KENNEDY, AND YOU RECAPPED ALL OF IT.  IN EVERY

20  CASE, YOU POINT TO EITHER THE NON-UNDERCOVER WITNESS'

21  STATEMENTS TO THE EFFECT THAT HE CARED ABOUT ME, HE ASKED

22  ABOUT ME, HE WANTED TO KNOW WHETHER I WAS IN PAIN, HE WANTED

23  TO HELP MY PAIN, ALL OF THOSE THINGS, AND THEN IN THE

24  UNDERCOVER TESTIMONY YOU POINTED TO THOSE PORTIONS OF THE

25  RECORD WHERE HE SAYS THINGS THAT BASICALLY SUPPORT THAT I DID.

1   AND, IN FACT, DR. KENNEDY SAID HE WAS STRUGGLING.

2            **MR. BRINDLEY:** YES.

3            **THE COURT:** MY CONCERN IS THAT HE LOST THE STRUGGLE.

4 BECAUSE AFTER EVERY ONE OF THESE INSTANCES IN WHICH HE SEEMS

5 TO BE SINCERE IN ASKING THESE QUESTIONS AND RAISING THESE

6 ISSUES, WELL, YOU KNOW, YOU PROBABLY SHOULDN'T DO THIS, YOU

7 KNOW, ADDERALL IS NOT APPROPRIATE FOR THIS PATIENT AND ANOTHER

8 PATIENT IT WAS, YOU KNOW, YOU OUGHT TO TRY THE TRAMADOL.  BUT

9 AFTER ALL OF THAT STUFF, HE ENDS UP GIVING HIM THE OPIOIDS AND

10 THAT'S -- I MEAN, TELL ME --

11            **MR. BRINDLEY:** HERE'S WHERE I THINK THAT THAT ALL

12 CRYSTALIZES TOGETHER.  ULTIMATELY THE CRIME CHARGED UNDER

13 SECTION 841 AS IT APPLIES TO MEDICAL PRACTITIONERS IS MEANT TO

14 CRIMINALIZE THE PRACTITIONERS THAT CROSS THE LINE; THAT GO ON

15 FROM BECOMING DOCTORS AND TREATING PATIENTS TO BECOMING DRUG

16 TRAFFICKERS AND WHO DO SO WITH PURPOSE AND WHO PROVIDE

17 MEDICATIONS FOR REASONS THAT ARE UNRELATED TO TRYING TO TREAT

18 SOMEBODY.

19      AND MY ANSWER TO WHAT YOUR HONOR'S SAYING IS, FIRST

20 OF ALL, I APPRECIATED DR. KENNEDY'S STATEMENT AND HIS SINCERE

21 RESPONSE THAT DR. LAMARTINERE WAS STRUGGLING WITH THE PATIENT

22 TRYING TO FIND THE RIGHT TREATMENT, TRYING TO HELP HIM.  AND,

23 YOUR HONOR, WHAT I WOULD SAY IS THE DOCTOR THAT CROSSED THE

24 LINE DOESN'T STRUGGLE.  THE FACT OF THE STRUGGLE AND HOW IT

25 HAPPENS -- IT'S NOT -- IT'S NOT AS IF -- THE GOVERNMENT TALKS

1    ABOUT PAYING.  OH, IT'S JUST LIP SERVICE.  THAT'S NOT HOW THIS

2    IS.  YOU HEAR THEM TALKING, WHAT ABOUT THE TRAMADOL AND THE

3    OLD TRAM -- IT MIGHT BE BETTER IN THIS WAY AND IT MIGHT BE

4    BETTER IN THAT WAY OR MAYBE YOU CAN JUST TRY THE SLEEP

5    MEDICINE, IT HELPS FOR PAIN TOO.  YOU MIGHT NEED TO TAKE THE

6    OPIOID ALL THE TIME.  THAT'S NOT THE DOCTOR WHO'S CROSSED THE

7    LINE.

8            THAT MAY BE THE DOCTOR WHO'S NEGLIGENT AND,

9    HONESTLY, WE HEARD FROM THE STIPULATION FROM DR. HART ABOUT

10   HIS TESTIMONY WHERE HE INDICATED THAT DR. LAMARTINERE HAD

11   ACKNOWLEDGED THAT HE HAD DIFFICULTY SAYING NO TO PATIENTS.  I

12   THINK THAT'S TRUE AND I THINK THAT MEANS THAT HE MAY BE

13   NEGLIGENT.  HE VIOLATED THE MEDICAL BOARD REGULATIONS BY HIS

14   OWN ADMISSION AND THE MEDICAL BOARD DOCUMENTS ESTABLISH THAT

15   IN TERMS OF THE SUSPENSION.  BUT HE IS NOT THE DOCTOR WHO

16   CROSSED THE LINE ON PURPOSE AND WANTED TO PROVIDE MEDICATIONS

17   TO PEOPLE FOR SOME REASON OTHER THAN TREATING WHAT WAS WRONG

18   WITH THEM.  HE DIDN'T.  AND IF HE DID, THE FACT THAT HE

19   STRUGGLED ON TAPE WITH THE UNDERCOVER I THINK IS THE BEST

20   EVIDENCE THAT HE'S NOT THE GUY WE'RE AFTER WITH THE STATUTE.

21           WHICH, OF COURSE, BRINGS ME TO THE PROBLEM THAT WAS

22   RAISED IN THE PRETRIAL BRIEF AND OF COURSE IN THE MOTION TO

23   STAY AND ALL OF THIS, THE PROBLEM IS WHEN THIS WHOLE THING

24   ABOUT DOCTORS AND SECTION 841 WAS ORIGINALLY BREACHED,

25   BROACHED I GUESS IS THE RIGHT WORD, BY THE SUPREME COURT OF

1  THE UNITED STATES, THAT COMMENT I JUST MADE ABOUT THE PLACE

2  WHERE THE DOCTOR CROSSES THE LINE, THAT WAS WHAT THEY SAID IN

3  THE FIRST CASE ON THIS SUBJECT AND MORE.  THAT WAS WHAT THEY

4  SAID.  I'VE NEVER REALLY GONE BACK ON THAT, BUT THE WAY THE

5  STANDARDS HAD EVOLVED HAS BECOME VERY, VERY DIFFICULT TO

6  MANAGE.  AND WHAT WE HAVE --

7        **THE COURT:**  IF YOU CAN SORT OF IDENTIFY THE LANGUAGE

8  IN THE NON-FIFTH CIRCUIT CASES THAT YOU THINK IS THE RIGHT --

9  THE LANGUAGE THAT IS -- FORMS PART OF THE REQUIREMENT FOR

10 CONVICTION THAT DR. LAMARTINERE DOES NOT MEET.

11       **MR. BRINDLEY:**  HERE -- IN THE NINTH CIRCUIT FOR

12 EXAMPLE, WHICH IS THE CLEANEST ONE, FIRST OF ALL, THE NINTH

13 CIRCUIT REQUIRES THAT THE GOVERNMENT, TO PREVAIL, THEY MUST

14 PROVE BEYOND A REASONABLE DOUBT THAT THE DEFENDANT

15 PRACTITIONER ACTED BOTH WITH INTENTIONALLY PRESCRIBED DRUGS

16 FOR NO MEDICAL PURPOSES, SO HE KNEW AND HE DID IT ON PURPOSE

17 THAT THERE WAS NO MEDICAL NEED, AND HE ACTED OUTSIDE THE SCOPE

18 OF PROFESSIONAL PRACTICE.  THEY REQUIRED BOTH.  AND ONE OF THE

19 ISSUES THAT WE WILL BE ARGUING WITH THE SUPREME COURT IS

20 WHETHER THAT'S RIGHT, WHETHER BOTH SHOULD BE REQUIRED.

21 SECONDLY, IN THE NINTH CIRCUIT --

22       **THE COURT:**  BUT WHAT YOU'RE ARGUING FOR

23 DR. LAMARTINERE HERE IS THAT THE FIRST PRONG --

24       **MR. BRINDLEY:**  HE INTENDED --

25       **THE COURT:**  -- HE WAS NOT INTENDING -- HE WAS

1    INTENDING TO TRY TO HELP PATIENTS AND, THEREFORE, HE DOESN'T
2    MEET THE FIRST PRONG.

3            **MR. BRINDLEY:**  ABSOLUTELY.  THAT'S WHY WE SEE HIM
4    STRUGGLING, BECAUSE HE WAS TRYING TO HELP.  AND IF YOU'RE
5    TRYING TO ADDRESS THE MEDICAL PROBLEM, YOU ARE NOT GUILTY.

6            HOWEVER, THE PROBLEM HERE IS THAT WHEN WE GET TO THE
7    USUAL COURSE OF PROFESSIONAL PRACTICE, HERE IN THE STATE OF
8    LOUISIANA, IT'S DEFINED BY THESE PAIN RULES WHICH SHE SAID
9    THEY'RE NOT RECOMMENDATIONS, THEY'RE WHAT YOU MUST DO IN THE
10   STATE AND THEY REQUIRE THIS DOCUMENTATION.  AND
11   DR. LAMARTINERE IN HIS DISCUSSIONS WITH THE BOARD ACKNOWLEDGED
12   THAT HIS -- THAT WHICH DR. KENNEDY AND I AGREED ON -- HIS
13   DOCUMENTATION ISN'T GOOD.  HIS DOCUMENTATION WASN'T DETAILED
14   ENOUGH.  HE WAS BAD AT RECORD-KEEPING.  AND THERE WAS ALL
15   SORTS OF EVIDENCE, FROM THE PATIENTS THEMSELVES WHO TESTIFIED
16   ABOUT THE DIALOGUE, WHICH DOESN'T ACTUALLY APPEAR, AND THEN
17   FROM THE RECORDINGS WHICH DEMONSTRATE THE EXACT SAME THING.

18           BUT THE PROBLEM IS, OF COURSE, ACCORDING TO THE CASE
19   THAT I'VE CITED HERE IN THE FIFTH CIRCUIT, WHEN ONE AS A
20   MATTER OF OBJECTIVE FACT ACTS OUTSIDE THE USUAL COURSE, HIS
21   INTENTION NO LONGER MATTERS.  BECAUSE THERE'S TWO PRONGS.
22   IT'S AN "OR" HERE.  IT'S CONJUNCTIVE OR DISJUNCTIVE.  I'M
23   SORRY I USED CONJUNCTIVE.  I MEANT DISJUNCTIVE.  IT'S AN "OR."
24   SO ON THE PURPOSE SIDE OF THE "OR," YOU HAVE TO PROVE THAT HE
25   KNOWINGLY AND INTENTIONALLY GAVE THE PRESCRIPTION FOR NO

1  MEDICAL REASON.  AND I DON'T THINK THEY CAN PROVE THAT ABOUT

2  ANY OF THIS.  HE'S ALWAYS TRIED.  ON THE VIDEO RECORDINGS HE'S

3  TRYING AND SOMETIMES HE'S UNSUCCESSFUL --

4          **THE COURT:**  HE'S SAYING HE'S TRYING.  BUT, YOU KNOW,

5  THERE'S SAYING AND THERE'S DOING, YOU KNOW.  AND THERE'S AN

6  OLD ADAGE, ACTIONS SPEAK LOUDER THAN WORDS.

7          **MR. BRINDLEY:**  THAT MAY BE.  THERE IS THAT, THAT'S

8  TRUE, BUT TRYING AND FALLING SHORT, THE DIFFICULTY AND THE

9  STRUGGLE BACK AND FORTH WITH THE PATIENT, IS EVIDENCE THAT

10  HE'S NOT INTENDING TO DO THE WRONG THING.

11          AND THE SAD THING ABOUT DR. LAMARTINERE, JUDGE, IS

12  WE WATCH HIM ON THE VIDEO.  WE SEE HIM.  HE DOES HAVE A HARD

13  TIME AND STRUGGLES WITH DIFFICULT PATIENTS, AND BY THE

14  ADMISSION OF ALL OF THE PATIENTS WHO TESTIFIED HE WAS A GUY

15  WHO WAS TRYING TO HELP.  HE REALLY WANTED TO.  AND JUST PAIN

16  MANAGEMENT IS HARD.  PATIENTS ARE HARD.  THEY MAY TAKE

17  ADVANTAGE.  THEY MAY NOT TELL YOU EVERYTHING THAT'S GOING ON.

18          **THE COURT:**  LET ME ASK YOU THIS, BECAUSE MR. STEVENS

19  DIDN'T KNOW THE ANSWER AND I WAS A LITTLE UNCLEAR, MR. DOIRON

20  WAS IN AN AUTOMOBILE ACCIDENT WHERE THE CAR BURNED UP AND THEN

21  I THOUGHT THE TESTIMONY WAS IN ORDER TO -- THAT

22  DR. LAMARTINERE HAD REQUIRED HIM TO BRING THE POLICE REPORT IN

23  TO EXPLAIN WHAT HAD HAPPENED AND HE DID THAT.

24          **MR. BRINDLEY:**  THAT'S WHAT DOIRON SAID.

25          **THE COURT:**  THAT'S WHAT DOIRON SAID, OKAY.  BUT THE

1    POLICE REPORT ALSO SAID THAT HE GOT ARRESTED FOR --

2            **MR. BRINDLEY:**  THERE'S A REPORT THAT'S IN THE CHART

3    THAT'S LIKE FROM EMERGENCY SERVICES AND IT SAYS SOMETHING

4    ABOUT DIAGNOSIS DRUG ABUSE OR SOMETHING.  NOW, DOIRON SAID

5    THAT WHAT HE BROUGHT WAS A POLICE REPORT ABOUT THE INCIDENT.

6    SO IT'S NOT CLEAR THAT WHAT DOIRON BROUGHT IS THE ACTUAL THING

7    THAT'S IN THE CHART, FOR ONE.  BUT WHAT DOIRON SAID WAS THAT

8    HE HAD A DIALOGUE WITH DR. LAMARTINERE ABOUT WHAT HAPPENED AND

9    HE TOLD HIM THAT THE PILLS WERE LOST AND DR. LAMARTINERE

10   DIDN'T HAVE ANY REASON TO DOUBT THAT BASED ON THE TOTALITY OF

11   THEIR DISCUSSION.  THAT'S WHAT DOIRON SAID.  THE DIFFICULTY

12   HERE IS, OF COURSE, THAT WHEN IT COMES TO PURPOSE IT SEEMS

13   FROM THE WITNESS' OWN TESTIMONY, ALL OF THEM, WHICH IS -- I

14   TRIED A BUNCH OF THESE CASES.  IT'S UNIQUE, JUDGE, TO HAVE

15   WITNESSES LIKE THIS WHO ARE SO UNIFORMLY SAYING, "HE REALLY

16   WAS TRYING TO HELP ME."  OFTENTIMES YOU GET A LOT OF WELL, HE

17   DIDN'T CARE.  HE WAS JUST HUSTLING ME IN AND OUT.  HE JUST

18   WANTED TO GET HIS MONEY.  THIS GUY DIDN'T DO THAT.

19           WHEN I ASKED THE QUESTIONS ABOUT THE GUY COMES IN

20   AND HE WANTS ROXICODONE AND HE STRUGGLES WITH HIM ABOUT ULTRAM

21   AND TRAMADOL, BUT HE ENDS UP WITH HYDROCODONE, MUCH LESS

22   POTENT.  HE DOESN'T GIVE HIM WHAT HE ASKED FOR.  THAT DOESN'T

23   HAPPEN WITH THE GUY THAT'S CROSSED THE LINE.  AND THAT'S -- ON

24   PURPOSE, DR. LAMARTINERE, HE'S CLEARLY NOT GUILTY.  BUT ON THE

25   OTHER SIDE OF THE "OR" HIS RECORDS AREN'T UP TO PAR, NO DOUBT

1   ABOUT IT.  HIS OWN ADMISSION.  AND IF DR. LAMARTINERE IN THE

2   SEVENTH OR THE NINTH CIRCUIT WOULD HAVE PRESENTED HIS DEFENSE

3   AND HIS TESTIMONY OF WHY HE BELIEVED HE WAS DOING THE RIGHT

4   THING IN ALL OF THESE INSTANCES, BUT WOULD HAVE ALSO ADMITTED,

5   WHICH IS WHAT WE COULDN'T DO HERE, HE WOULD HAVE ADMITTED THAT

6   THE RECORDS WERE INSUFFICIENT, THAT HE WAS NOT INTENDING TO

7   ACT OUTSIDE THE USUAL COURSE, BUT HE WAS JUST BAD AT

8   RECORD-KEEPING.  HE SPENT MORE TIME LISTENING AND NOT ENOUGH

9   TIME WRITING, AND I THINK HE WOULD EXPRESS REGRET AT THAT.

10        WITH RESPECT TO THE HENSON INCIDENT WITH THE DRUG

11   TEST, SO HE DIDN'T -- I DON'T EVEN THINK I FAILED A DRUG TEST.

12   I THINK THE DOCTOR WOULD HAVE GIVEN THE EXPLANATION OF COURSE

13   THAT HE JUST MISSED IT.  HE DIDN'T WRITE IT.  HE JUST DIDN'T

14   SEE IT.  HE DIDN'T CATCH IT AND IT WAS A MISTAKE.  BUT THOSE

15   ADMISSIONS, PARTICULARLY WITH RESPECT TO THE MEDICAL BOARD AND

16   THE RECORDS, AND ADMISSIONS ABOUT JUST NOT DOING WHAT HE

17   SHOULD WITH THE -- OR WHAT HE SHOULD HAVE DONE OR WHAT THE

18   BEST PRACTICE WOULD HAVE BEEN IN SEEING THE DRUG RESULT AND

19   NOT MISSING IT, THOSE ADMISSIONS, I THINK, THE OBJECTIVE --

20   THE QUESTION IS ARE YOU OBJECTIVELY OUTSIDE OF WHAT MOST

21   PRACTITIONERS DO WHEN YOU KEEP POOR RECORDS?  YES.

22        SO THAT ADMISSION IS ULTIMATELY IN THE FIFTH CIRCUIT

23   AND THE ELEVENTH.  IT IS AN ADMISSION AND ENDS UP BEING AN

24   ADMISSION OF GUILT, WHEREAS IT WOULD NOT BE IN THE OTHER

25   CIRCUITS WHERE WHAT MATTERS IS, WAS IT YOUR INTENTION TO GO

1  OUTSIDE THE USUAL COURSE?

2  YOU CAN TAKE BAD RECORDS BECAUSE YOU'RE NOT GOOD AT

3  KEEPING RECORDS AND YOU'RE LISTENING TO THE PATIENTS AND YOU

4  BELIEVE THAT WHAT'S MOST IMPORTANT IS THAT INTERACTION, AND

5  THAT'S WHAT HE WOULD SAY.  BUT -- AND IN THE NINTH AND THE

6  SEVENTH CIRCUIT AND VARIOUS HYBRIDS IN OTHER PLACES, THAT

7  QUESTION IS WHAT'S DECISIVE, DID YOU INTEND TO DO SOMETHING

8  THAT WAS OUTSIDE THE COURSE?  AND HE WOULD SAY HE DID NOT.

9  BUT IT DOESN'T MATTER WHEN, AS A MATTER OF OBJECTIVE FACT,

10  PURSUANT TO THE LAWS OF THE FIFTH CIRCUIT, IF YOU'RE OUTSIDE

11  THE USUAL COURSE, YOU'VE COMMITTED A CRIME.  AND THAT'S THE

12  DIFFICULTY OF THIS CASE.

13  I THINK THIS CASE PRESENTS A UNIQUE SORT OF LIKE A

14  POSTER CHILD FOR WHAT THE PROBLEM IS HERE.  IT'S REALLY HARD

15  FOR US BECAUSE WE DO HAVE A SITUATION WHERE PATIENTS

16  RESOUNDINGLY THOUGHT THIS GUY WAS TRYING TO HELP THEM AND SAID

17  THAT HE DID HELP THEM, YOU KNOW.  IT'S NOT AS IF DR. KENNEDY

18  OR ANYONE SAID THAT THESE FOLKS WEREN'T IN REAL PAIN.  THERE

19  IS SOME DISCUSSION WITH THEM ABOUT WHETHER THEY WERE ADDICTED

20  BEFORE THEY GOT THERE OR WHETHER THEY WERE ADDICTED --

21  **THE COURT:**  NO, THERE WERE TWO THAT SAID CLEARLY

22  THAT THEY WERE ADDICTED AT THE TIME THEY CAME TO SEE HIM.

23  **MR. BRINDLEY:**  AT THE BEGINNING, YEAH.  AND

24  DR. KENNEDY AND I HAVE THIS DISCUSSION ABOUT DEPENDENCE VERSUS

25  ADDICTION.  THOSE LAY WITNESSES, I DON'T KNOW IF THEY CAN TELL

```
 1  THE DIFFERENCE.  THEY KNOW THEY NEED THE MEDICINE.  SO DR.
 2  KENNEDY SAID THE DIFFERENCE IS WELL, IF YOU NEED THE MEDICINE
 3  BECAUSE YOU HAVE A REAL PROBLEM THAT'S LEGITIMATE AND YOU'RE
 4  DEPENDENT AND YOU GET WITHDRAWALS, THAT'S DEPENDENCE, BUT IT'S
 5  SOMETHING ELSE IF YOU DON'T NEED IT.  BUT ALL OF THESE PEOPLE,
 6  WELL, THEY SAID THEY WERE ADDICTED BEFORE THEY GOT THERE.
 7  THEY ALSO SAID THAT THEY REALLY HAD PAIN AND NEEDED TREATMENT.
 8  SO THAT LINE BETWEEN DEPENDENCE AND ADDICTION FOR THOSE LAY
 9  WITNESSES I THINK IS PRETTY NEBULOUS.
10          BUT THE BOTTOM LINE IS, THEY CAME IN HERE, AND
11  WITHOUT ANY DISTINCTION BETWEEN THEM, ALL WERE SAYING HE WAS
12  ALWAYS ASKING ABOUT TRYING TO HELP THE PAIN AND HOW WAS I
13  DOING AND HE CARED ABOUT THEM.  SOME OF THEM WENT OUT OF THEIR
14  WAY TO SAY, YOU KNOW, HE WASN'T -- YOU KNOW, HE SPENT TIME
15  WITH ME.  HE SEEMED TO CARE ABOUT MY LIFE.  AND YOU CAN SORT
16  OF SEE THAT IN THE WAY THAT HE INTERACTS WITH PEOPLE AND THE
17  UNDERCOVER, HE'S TALKING -- YEAH, HE DOES TALK ABOUT CARS.  HE
18  TALKS ABOUT THINGS THAT ARE OF INTEREST.  HE ALSO TALKS WITH
19  THEM ABOUT RISKS ASSOCIATED WITH THE DRUGS AND WHAT DIFFERENT
20  DRUGS YOU MIGHT TAKE AND HE SPENDS A LONG TIME TRYING TO GET,
21  WHICHEVER ONE IT WAS, NEILSON, I CAN'T REMEMBER WHAT HIS REAL
22  NAME IS, BUT THE GUY THAT HAD THE FUNNY FEELING THAT WASN'T
23  EXACTLY PAIN.  WHAT WAS THAT FEELING?  WHAT --
24          THE COURT:  BUT HE ALSO -- I'M NOT GOING TO
25  INTERPRET IT, BUT ONE INTERPRETATION GIVEN BY DR. KENNEDY, I
```

1    BELIEVE, WAS THAT HE WAS BASICALLY MAKING UP THE DIAGNOSIS AS

2    HE WENT ALONG.  HE WAS SUGGESTING TO HIM THAT THIS WAS A

3    RUPTURED DISK BUT, IN FACT, THAT'S NOT WHAT THE GUY WAS

4    SAYING.  NOW, THAT'S ONLY ONE INTERPRETATION.  I GET IT.

5         **MR. BRINDLEY:**  THAT IS AN -- THE PROBLEM HERE, OF

6    COURSE, IS EVEN IF YOU HAVE THAT AS ONE POSSIBLE

7    INTERPRETATION, THE OTHER SIDE OF THE COIN IS HE'S LIKE:  WHAT

8    DO YOU MEAN WHEN YOU SAY "FUNNY FEELING" AND HE'S TRYING TO

9    GET SOME SORT OF PARAMETERS ON WHAT IT COULD BE, AND THEN HE

10   SAYS I THINK IT MIGHT BE CAUSED BY A NERVE, IT MIGHT BE CAUSED

11   BY A DISK, BECAUSE THE GUY IS SAYING HE HAS THIS STRANGE

12   SENSATION THAT'S NOT EXACTLY PAIN.

13        **THE COURT:**  LOOK, IN MY OTHER LIFE I MUST HAVE

14   DEPOSED 5,000 ORTHOPAEDIC SURGEONS AND NEUROSURGEONS, OKAY, IN

15   BACK CASES.  I KNOW WHAT THE STANDARD WORKUP FOR A BACK CASE

16   IS.  AND DR. LAMARTINERE DIDN'T COME CLOSE.  THAT'S NOT TO SAY

17   THAT THAT'S A DISPOSITIVE, YOU KNOW, THAT'S DISPOSITIVE OF

18   ANYTHING, BUT I'M TELLING YOU THAT WHAT HE -- THAT

19   CONVERSATION WAS NOT A NORMAL WORKUP FOR A BACK ISSUE.  SO --

20        **MR. BRINDLEY:**  AND THE THING IS, JUDGE, THAT RIGHT

21   THERE, I THINK, GOES TO THAT DISTINCTION WE'RE DRAWING BETWEEN

22   USUAL COURSE AND PURPOSE.  BECAUSE, YEAH, IT MAY NOT BE NORMAL

23   AND HE MAY NOT HAVE BEEN DOING IT THE WAY THAT MOST PEOPLE

24   WOULD HAVE OR SHOULD HAVE DONE, BUT THE QUESTION FROM OUR

25   PERSPECTIVE AND WHAT WE BELIEVE SHOULD BE DISPOSITIVE AND IF

1  IT WASN'T FOR THE LAW IN THE FIFTH CIRCUIT WE WOULD HAVE HIM

2  TESTIFY ABOUT, IS THAT HE WAS TRYING WITH ALL OF THESE PEOPLE

3  AND THAT PAIN MANAGEMENT PATIENTS ARE HARD.  HE DIDN'T HAVE A

4  LENGTHY --

5      **THE COURT:**  LET ME SAY THAT WE -- I THINK EVERYBODY

6  IS BEGINNING TO SWEAT AND THE REASON FOR THAT IS BECAUSE THEY

7  TURN OFF THE AIR-CONDITIONING IN THIS BUILDING, SO I'M GOING

8  TO CALL THE NO MÁS --

9      **MR. BRINDLEY:**  ALL RIGHT, JUDGE.

10      **THE COURT:**  I UNDERSTAND THE ISSUES.  AND, MR.

11  STEVENS, I'M NOT GOING TO ALLOW REBUTTAL BECAUSE I THINK I

12  UNDERSTAND THE ISSUES AND I'M GOING TO GET BRIEFING IN

13  ADDITION TO THAT.  SO THANK BOTH SIDES FOR AN EXTREMELY

14  WELL-TRIED CASE.  THANK YOU VERY MUCH.  IT'S ALWAYS A PLEASURE

15  FOR ME AS AN EX-TRIAL LAWYER TO SEE VERY GOOD LAWYERS AT THEIR

16  CRAFT.  SO I APPRECIATE THAT.  WE'LL GET THE BRIEFING AND WE

17  WILL DECIDE THE CASE.

18      **MR. BRINDLEY:**  THANK YOU, YOUR HONOR.

19      **MR. PUGLIESE:**  THANK YOU, YOUR HONOR.

20      **THE COURT:**  THANK YOU, FOLKS.

21      **REPORTER'S NOTE:**  *(WHEREUPON COURT WAS ADJOURNED.)*

22          C E R T I F I C A T E

23      I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

24  FROM THE RECORD OF THE PROCEEDINGS IN THE ABOVE-ENTITLED

25  NUMBERED MATTER.

1    **S:/GINA DELATTE-RICHARD**

2    GINA DELATTE-RICHARD, CCR

3    OFFICIAL COURT REPORTER

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25